## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| THE CITY OF FERGUSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

### INTRODUCTION

Plaintiff, the United States of America ("United States"), brings this civil action against Defendant, the City of Ferguson ("City"), under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

The City of Ferguson, through the Ferguson Police Department ("FPD"), the Ferguson Municipal Court, and the office of the City Prosecuting Attorney, engages in an ongoing pattern or practice of conduct, including discrimination, that deprives persons of rights, privileges and immunities secured and protected by the United States Constitution and federal law. Ferguson law enforcement officials conduct stops, searches, and arrests without legal justification, in violation of the Fourth Amendment; use excessive force, in violation of the Fourth Amendment; interfere with the right to free expression, in violation of the First Amendment; prosecute and resolve municipal charges in a manner that violates due process and equal protection guarantees

of the Fourteenth Amendment; and discriminate against African Americans in violation of the Fourteenth Amendment and federal statutory law.

Defendant's routine violation of constitutional and statutory rights, based in part on prioritizing the misuse of law enforcement authority as a means to generate municipal revenue over legitimate law enforcement purposes, is ongoing and pervasive.  Further, it is unlikely that the City will remedy these patterns and practices of unlawful conduct absent judicial mandate and oversight.  The United States brings this action to remedy Defendant's unlawful conduct and secure the declaratory and injunctive relief needed to ensure compliance with the Constitution and federal law.

The United States alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

2.      The United States is authorized to initiate this action against the City under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI").

3.      Under Section 14141, the United States is authorized to bring suit against a state or local government for equitable and declaratory relief in order to remedy a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or federal law.  The United States is authorized to enforce Title VI, which, together with relevant implementing regulations, prohibits discrimination on the basis of race, color, or national origin by agencies receiving federal funds or federal financial assistance.

2

4.      The declaratory and injunctive relief sought by the United States is authorized by Section 14141, Title VI, 28 U.S.C. §§ 2201 and 2202.

5.      Venue is proper under 28 U.S.C. § 1391(b) because the City is located in the Eastern District of Missouri and all of the events, actions, or omissions giving rise to these claims occurred in the Eastern District of Missouri.

## PARTIES

6.      Plaintiff is the United States of America.

7.      Defendant City of Ferguson is a municipal corporation located in the Eastern District of Missouri.  The City funds and operates the Ferguson Police Department, the Ferguson Municipal Court, and the office of the City Prosecuting Attorney, as well as other City agencies.

## FACTUAL ALLEGATIONS

8.      The United States, pursuant to an extensive investigation of the Ferguson Police Department ("FPD"), including the Ferguson Municipal Court, alleges that, through its acts and omissions, Defendant and its agents engage in a pattern or practice of conduct that violates the First, Fourth, and Fourteenth amendments to the United States Constitution.

9.      These patterns and practices include:  conducting stops and searches, issuing citations and "stop orders," making arrests, and using excessive force without legal justification in violation of the Fourth Amendment; engaging in retaliation for protected expression and impeding individuals' right to record official activities conducted in public in violation of the First Amendment; prosecuting and resolving municipal charges in a manner that violates the due process and equal protection clauses of the Fourteenth Amendment; and engaging in racially discriminatory law enforcement conduct that violates the Fourteenth Amendment and Title VI.

10.     These patterns and practice are further reflected in, and caused by, the City's: failure to establish consistent policies and procedures, effective training, and meaningful supervision to appropriately guide and monitor the actions of law enforcement officers and other agents of Defendant engaged in law enforcement activities; failure to establish reliable systems to detect and appropriately discipline and hold accountable officers for misconduct; and prioritizing revenue generation at the expense of the rights of individuals in Ferguson and public safety needs.

11.     Since the commencement of the United States' investigation, the City of Ferguson has made some changes to its police and municipal court practices.  These changes are insufficient to eliminate the pattern or practice of unconstitutional conduct and ensure it will not recur.  Given the nature, breadth, and long-standing commission of the City's unconstitutional conduct, necessary remedial changes to Ferguson's police and municipal court practices are unlikely to be implemented or maintained absent a court enforceable decree.

## A.     FACTUAL BACKGROUND

12.     The City of Ferguson is a municipal corporation in northern St. Louis County, Missouri.  It is one of eighty-nine municipalities in the County.

13.     According to the 2010 United States Census, Ferguson has approximately 21,000 residents.  The overall population of Ferguson has remained relatively constant in recent decades, but a significant increase in African-American residents has considerably shifted demographics.  In 1990, the City was predominantly white with 74% of the population identifying as white, and 25% as black.  By 2000, African Americans made up 52% of the City's population.  Ten years later, in 2010, 67% of Ferguson's population was black, and 29% white.  Approximately 25% of the City's population lives below the federal poverty level.

4

14.     Residents of Ferguson elect a Mayor and six individuals to the City Council.  The
City Council appoints a City Manager to an indefinite term, subject to removal by Council vote.
The City Manager serves as chief executive and administrative officer of the City, and directs
and supervises all City departments, including the Ferguson Police Department.

15.     The City Manager appoints the Chief of Police.  Thomas Jackson was the Chief
from 2010 until he resigned effective March 19, 2015.  In July 2015, the City appointed Andre
Anderson as interim Chief of Police for a six-month period.  Chief Anderson resigned effective
December 2, 2015.

16.     John Shaw was the City Manager of Ferguson from March 2007 until March
2015.  Upon Mr. Shaw's departure, then-Assistant City Manager Pamela Hylton became Acting
City Manager, but she too resigned in April 2015.  Acting City Manager Edward Beasley served
from June 2015 to November 2015.  Ferguson's current City Manager is De'Carlon Seewood.

17.     Jeffrey Blume has been the City's Finance Director from March 2008 until the
present.

18.     As of March 2014, FPD had approximately 54 sworn officers, four of whom were
African American.  FPD had four patrol squads, each with its own canine officer.

19.     All FPD officers can make stops, issue "stop orders," issue summonses, issue
citations, and make arrests for violations of Ferguson's municipal code or state law.  Ferguson's
municipal code establishes hundreds of municipal violations, some of which mirror non-felony
state law violations.  FPD files most charges as municipal code violations even if an analogous
state offense exists.

20.     Between July 1, 2010, and June 30, 2014, the City of Ferguson issued
approximately 90,000 citations and summonses for municipal violations.  During that period, the

rate of citations steadily increased, and FPD issued nearly 50% more citations in the last year of that time period than it did in the first.

21.     The Ferguson Municipal Court ("the court") has primary jurisdiction over all charged violations of the municipal code.  The court processes and resolves the majority of charges brought by FPD, including some charges brought against juveniles.

22.     The court operates in the same building as the police department, located at 222 South Florissant Road, Ferguson, Missouri.  The building underwent a roughly $3.5 million renovation that was completed in 2015.  Long referred to as a "police court," the court was under the direct supervision of the Chief of Police until 2015.  Under the current supervisory structure, municipal court employees officially report to the City Finance Director.  The Chief of Police, in practice, continues to supervise court employees in many respects.

23.     The City Manager and City Council hire the employees of the court, including the City's Prosecuting Attorney and assistant prosecutors, the Municipal Judge, and Court Clerk and assistant clerks.  In practice, these employees work in coordination to resolve municipal charges pending before the court.

24.     The City's Prosecuting Attorney and her assistants officially prosecute all actions before the court.  The current Prosecuting Attorney, Stephanie Karr, was appointed in April 2011.  At the time of her appointment, the Prosecuting Attorney was already serving as City Attorney, and she continues to serve in that separate capacity, which entails providing general counsel and representation to the City.

25.     The Municipal Judge presides over court sessions, which occur between three to six times per month.  The Municipal Judge serves a two-year term, subject to reappointment. Judge Ronald Brockmeyer was the Municipal Judge in Ferguson for ten years until his

resignation in March 2015, which came shortly before the Missouri Supreme Court reassigned all cases pending before the court to the Missouri Circuit Court.  During his tenure as Ferguson Municipal Judge, Judge Brockmeyer also served as Municipal Judge for Breckenridge Hills and Municipal Prosecutor for Florissant, Vinita Park, and Dellwood.  The current Municipal Judge, Donald McCullin, was appointed in June 2015.  Because Missouri law prohibits municipal judges from serving after they reach the age of 75, Judge McCullin's tenure is scheduled to end in April 2016.

26.     The Court Clerk and assistant court clerks, all of whom are City employees and all of whom have operated under the supervision of the Chief of Police, exercise broad discretion in conducting the court's daily operations.  Ferguson's municipal code confers broad authority on the Court Clerk, including authority to collect all fines and fees, accept guilty pleas, sign and issue subpoenas, and approve bond determinations.  The Court Clerk and assistant clerks routinely issue arrest warrants and perform other judicial functions without judicial supervision.

27.     As the number of charges initiated by FPD has increased in recent years, the size of the court's docket has also increased.  According to data the City reported to the Missouri State Courts Administrator, at the end of fiscal year 2009, the court had roughly 24,000 traffic cases and 28,000 non-traffic cases pending.  As of October 31, 2014, both of those figures had roughly doubled to 53,000 and 50,000 cases, respectively.  In fiscal year 2009, 16,178 new cases were filed, and 8,727 were resolved.  In fiscal year 2014, by contrast, 24,256 new offenses were filed, and 10,975 offenses were resolved.

28.     It is not uncommon for as many as 500 people to be scheduled to appear before the court in a single session, exceeding the court's physical capacity and leading individuals to line up outside of court waiting to be heard.  Many people have multiple offenses pending,

resulting in the court frequently considering 1,200-1,500 offenses in a single session, and sometimes over 2,000 offenses in a single session.

29.     Court staff has also increased in recent years.  In January 2013 the City Manager requested and secured City Council approval to fund additional assistant court clerk positions because "each month we are setting new all-time records in fines and forfeitures," and the funding for the additional positions "will be more than covered by the increase in revenues."

30.     The municipal code authorizes the court to impose imprisonment in the City jail for up to three months, a fine of up to $1,000 plus costs, or a combination thereof, for all violations.  It is rare for a violation to result in a sentence of imprisonment, but the court routinely issues municipal arrest warrants for failure to pay fines or appear for court appearances, which commonly result in arrest and incarceration.

31.     During the course of conduct described in this Complaint, Defendant has been and continues to be a recipient of federal financial assistance from the United States Department of Justice ("DOJ"), either directly or through another recipient of federal financial assistance.

32.     FPD participates in the DOJ Equitable Sharing Program, which is administered by the DOJ Criminal Division, Asset Forfeiture and Money Laundering Section ("AFMLS").

33.     As a condition of receiving federal financial assistance, the City, through its authorized representatives, certified that it agreed to comply with all requirements imposed by Title VI and the federal regulations implementing Title VI.  The assurances signed by the City bind subsequent recipients, including FPD, to which the City disburses the funds.  The City is responsible for ensuring that subsequent recipients comply with the requirements of Title VI and its implementing regulations.

34.     Title VI and its implementing regulations prohibit intentional discrimination on the grounds of race, color, or national origin in any of a grant recipient's or subrecipient's operations, and they prohibit methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the grant recipient's or subrecipient's operations with respect to individuals of a particular race, color, or national origin.

B.      **THE UNITED STATES' INVESTIGATION AND FINDINGS REPORT**

35.     On September 4, 2014, the Civil Rights Division of the United States Department of Justice opened an investigation of the Ferguson Police Department.  This investigation was initiated under the pattern-or-practice provisions of Section 14141, and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act"), and Title VI.

36.     The investigation revealed an ongoing pattern or practice of unlawful conduct. On March 4, 2015, the United States notified Defendant of ongoing violations of the Constitution and federal law, including failures to comply with Title VI.

37.     Between March 4, 2015, and February 9, 2016, the United States sought to engage with Defendant in an effort to secure voluntary compliance with Title VI and other laws. The United States' efforts have been unsuccessful.

38.     Pursuant to its authority under Section 14141 and Title VI, the United States has thus initiated this civil action in order to secure declaratory and injunctive relief that will bring an end to the longstanding pattern or practice of law enforcement misconduct within the City of Ferguson.

## C.    DEFENDANT ENGAGES IN A PATTERN OR PRACTICE OF STOPPING, SEARCHING, CITING, AND ARRESTING INDIVIDUALS WITHOUT LEGAL JUSTIFICATION

39.    The Ferguson Police Department conducts stops and searches, issues citations, and makes arrests without legal justification.  Ferguson officers routinely detain community members without reasonable suspicion and make arrests and issue stop orders and summonses without probable cause.  As set out further below, Ferguson Police Department engages in at least two practices, the issuance and enforcement of what it calls "wanteds" or "stop orders," and conducting what it calls "ped checks," that routinely violate the Fourth Amendment.

40.    Defendant engages in a pattern of unlawfully stopping and detaining individuals. For example, in October 2012, police officers pulled over an African-American man who had lived in Ferguson for 16 years, claiming that his passenger-side brake light was broken.  The driver had replaced the light recently and knew it to be functioning properly.  As one officer stated, "Let's see how many tickets you're going to get," a second officer tapped his Electronic Control Weapon ("ECW") on the roof of the man's car.  The officers wrote the man a citation for "tail light/reflector/license plate light out."  They refused to let the man show them that his car's equipment was in order, warning him, "Don't you get out of that car until you get to your house."  The man, who believed he had been racially profiled, went to the police station that night to show a sergeant that his brake- and license-plate-light worked.  The sergeant responded that he would speak to the involved officers and "help [the man] out" regarding the citation.

41.    In another example from July 2013, Ferguson police officers encountered an African-American man in a parking lot while on their way to arrest someone else at an apartment building.  Although officers knew that the encountered man was not the person they had come to arrest, they handcuffed the man without reasonable suspicion and placed him in the back of a patrol car.  The man turned out to be the intended arrestee's landlord.  The landlord went on to

help the police conduct the intended arrest but later filed a complaint alleging racial discrimination and unlawful detention.  Despite having handcuffed the landlord and placed him in a police car without any reason to believe he had done anything wrong, a police sergeant vigorously defended the officers' actions, noting the detention as "minimal" and that the car was air conditioned.  The sergeant's response displays a disregard for the impact of being needlessly handcuffed and detained in the back of a vehicle, as well as a lack of understanding of the law: even temporary detention constitutes a deprivation of liberty and must be justified under the Fourth Amendment.  The fact that a police supervisor defended this unlawful detention provides evidence that such stops were not isolated or aberrational, but rather were tolerated and even condoned.

42.     Defendant conducts suspicionless, legally unsupported stops that they call "pedestrian checks" or "ped checks."  For example, in December 2013, officers went out and "ped checked those wandering around" in Ferguson's apartment complexes.  In another case, officers detained and "ped checked" a group of six African-American youths, ostensibly to investigate a call about drugs, even though that call described only a single subject.  FPD's "ped checks" routinely are investigatory detentions that do not meet the legal threshold required by the Fourth Amendment.

43.     Defendant engages in a pattern of searching individuals without legal justification.  As set forth below, this pattern disproportionately impacts African Americans, who are searched at higher rates than others, but who have contraband found on them significantly less often than others.

44.     Ferguson police officers take retaliatory action, including issuing citations and making arrests, when a subject refuses an officer's request for consent to conduct a search.  FPD

officers also conduct searches even where consent is refused and even where there is no other legal justification for conducting the search. In one example from 2012, an officer asked to search a man's car. When the man objected, citing his constitutional rights, the officer arrested the man, reportedly at gunpoint, and charged him with multiple code violations.

45.     Ferguson police officers arrest individuals even though they lack probable cause of a crime. This practice is particularly pronounced, though not limited to, arrests under Section 29-16, the City's Failure to Comply ordinance. Officers routinely arrest individuals on this charge when individuals do not do what the officers demand, even when refusal is not a crime. For example, officers order individuals to stop despite lacking objective indicia that they are engaged in wrongdoing, and then arrest them for Failure to Comply with the order to stop, or similar violation.

46.     FPD's charging practices under Section 29-16(2) of Ferguson's Failure to Comply ordinance also violates the Constitution. Section 29-16(2) makes it unlawful to "[f]ail to give information requested by a police officer in the discharge of his/her official duties relating to the identity of such person." Officers routinely arrest individuals under Section 29-16(2) for failure to identify themselves despite lacking reasonable suspicion to stop them in the first place.

47.     For example, in an October 2011 incident, a Ferguson police officer arrested two sisters who were backing their car into their driveway from the street. The officer claimed that the car had been idling in the middle of the street, warranting investigation, while the women claim they had pulled up outside their home to drop someone off when the officer arrived. The officer arrested one sister for failing to provide her identification when requested. He arrested the other sister for getting out of the car after being ordered to stay inside. The two sisters spent the next three hours in jail.

12

48.     FPD also circumvents the Fourth Amendment's warrant requirement by using an officer-run system of "wanteds" or "stop orders" as a substitute for seeking judicial approval for arrest warrants, and arresting people on the basis of those wanted, often without probable cause. When officers believe a person has committed a crime but are not able to immediately locate that person, they enter a "wanted" into the statewide law enforcement database, indicating to all other law enforcement agencies that the person should be arrested if located.  Officers are authorized to issue wanteds for serious state-level crimes and minor municipal code violations, including traffic offenses.

49.     FPD officers repeatedly have issued wanteds based on less than probable cause for the purpose of effectuating an arrest and then developing probable cause.  According to one detective, officers will issue a wanted if they "do not have enough probable cause to arrest."  For example, in December 2014, a Ferguson detective investigating a shooting emailed a county prosecutor to see if a warrant for a suspect could be obtained, since "a lot of state agencies won't act on a wanted."  The prosecutor responded stating that although "[c]hances are" the crime was committed by the suspect, "we just don't have enough for a warrant right now" because of weaknesses in the witness statement being relied upon.  The detective subsequently entered a wanted for the subject into the system.

50.     FPD also routinely enforces wanteds that are no longer valid because the information upon which they are based is no longer accurate or reliable, or the wanted has been rescinded by the issuing agency.  In 2010, for example, an FPD supervisor wrote that "[a]s of late we have had subjects arrested that were wanted for other agencies brought in without being verified first.  You guessed it, come to find out they were no longer wanted by the agencies and had to be released."  In 2014, the same supervisor cleared hundreds of invalid wanteds from the

system, some of them over ten years old.  Nonetheless, significant numbers of legally unsupported FPD wanteds remain in effect, and FPD and the City continue this practice.

51.     Many unlawful stops, searches, citations, and arrests conducted or issued by Ferguson officers originate not from reasonable suspicion, but rather from an officer's desire to check whether the subject has a municipal arrest warrant or wanted pending.  Officers frequently approach individuals without any reasonable suspicion and demand identification.  Where an individual refuses to provide identification, officers commonly issue charges under the Failure to Comply municipal ordinance, even though the officer had no legal justification to demand identification during the encounter.  Where an individual provides identification, officers will determine whether the individual has outstanding municipal arrest warrants, even though the officer had no basis to suspect a warrant was outstanding.  These stops violate the Fourth Amendment and reflect Ferguson's focus on revenue generation rather than respect for individual rights and public safety.

**D.     DEFENDANT ENGAGES IN A PATTERN OR PRACTICE OF UNREASONABLE USE OF FORCE**

52.     Ferguson Police Department engages in a pattern or practice of using unreasonable force in violation of the Fourth Amendment.  Ferguson police officers routinely escalate encounters with individuals they perceive to be disobedient, and unreasonably use canines on unarmed subjects, including young juveniles.  Some incidents of excessive force result from stops or arrests that have no basis in law, while others are punitive and retaliatory.  In addition, officers use unnecessary force against vulnerable groups such as people with mental health conditions or cognitive disabilities, in part because FPD and the City have failed to provide officers sufficient training on interactions with these vulnerable populations, despite their awareness of the need for an availability of such training.  In almost all cases, FPD fails to

14

adequately supervise officers' use of force; fails to meaningfully investigate use-of-force; and fails to hold officers accountable for use of force that is unlawful and/or in violation of FPD policy.

53.     Further, in the 151 use-of-force incidents that FPD actually documented from 2010 to 2014, supervisors and command staff deemed only one in violation of FPD policy.  The Chief of Police never once reversed a commander's decision of whether to classify a use of force as reasonable or within policy.

54.     FPD's pattern or practice of excessive force includes using less-lethal ECWs in a manner that is unconstitutional, abusive, and unsafe.  For example, in August 2010, a lieutenant used an ECW in "drive-stun" mode against an African-American woman in the Ferguson City Jail because she had refused to remove her bracelets.  The lieutenant resorted to his ECW even though there were five officers present and the woman posed no physical threat.  Similarly, in November 2013, a correctional officer fired an ECW at an African-American woman's chest because she would not follow his verbal commands to walk towards a cell.

55.     FPD officers routinely deploy ECWs against individuals who have committed low-level offenses and who pose no immediate physical threat.  In September 2012, an officer "drive-stunned" an African-American woman who he had placed in the back of his patrol car but who had stretched out her leg to block him from closing the door.  The woman was in handcuffs. In May 2013, officers "drive-stunned" a handcuffed African-American man who verbally refused to get out of the back seat of a police car once it had arrived at the jail.  The man did not physically resist arrest or attempt to assault the officers.  Use of ECWs in "drive-stun" mode is widely recognized to be particularly prone to abuse.

56.     In January 2013, a patrol sergeant stopped an African-American man after he saw the man talk to an individual in a truck and then walk away.  The sergeant detained the man, although he did not articulate in his incident report any reasonable suspicion that criminal activity was afoot.  When the man declined to answer questions or submit to a frisk—which the sergeant sought to execute despite articulating no reason to believe the man was armed—the sergeant grabbed the man by the belt, drew his ECW, and ordered the man to comply.  The man crossed his arms and objected that he had not done anything wrong.  Video captured by the ECW's built-in camera shows that the man made no aggressive movement toward the officer.  The sergeant fired the ECW, applying a five-second cycle of electricity and causing the man to fall to the ground.  The sergeant almost immediately applied the ECW again, which he later tried to justify in an official report by claiming, falsely, that the man tried to stand up.  The video makes clear, however, that the man never tried to stand—he only writhed on the ground.  The sergeant applied the ECW nearly continuously for 20 seconds, longer than represented in his report.  The man was charged with Failure to Comply and Resisting Arrest, but no criminal violation for conduct from before the encounter with officers began.  There is no evidence that the FPD found any fault in this sergeant's use of force.  This use of unreasonable force by a Ferguson police supervisor evidences that this practice is not aberrational, but rather tolerated and condoned.

57.     Ferguson police officers deploy canines to bite individuals when the articulated facts do not justify their use.  Officers use canines out of proportion to the threat posed by the people they encounter, leaving serious puncture wounds to nonviolent offenders, including children.

16

58.     In November 2013, for example, an officer deployed a canine to bite and detain a fleeing subject even though the officer knew the suspect was unarmed.  The officer deemed the subject, an African-American male who was walking down the street, suspicious because he appeared to walk away when he saw the officer.  The officer stopped him and frisked him, finding no weapons.  The officer then checked the man's name for warrants.  The man fled when the officer learned that he had outstanding warrants.  The officer followed him and released his dog, which bit the man on both arms. The officer's supervisor found the force justified because the officer released the dog "fearing that the subject was armed," even though the officer's own report reflects that he had already checked and found no weapons on the man.

59.     In December 2011, officers deployed a canine to bite an unarmed 14-year-old African-American boy who was apparently truant from school and waiting in an abandoned house for his friends.  Officers claim they found the boy, who was 5'5" and 140 pounds, curled up in a ball inside a closet.  According to the canine officer, even though four officers had control of the scene and there was no indication the boy might be armed, the officer deployed the dog, which bit the boy's arm and caused puncture wounds, because the boy would not come out.

60.     In December 2012, an officer deployed a canine to bite an unarmed 16-year-old boy who was suspected of stealing a car and who had run from police.  The officer deployed the dog to extract the boy from a closet, without providing any warning at the closet door.  Officers also applied three ECW stuns in quick succession, apparently in retaliation for the suspect's flight.

61.     FPD uses excessive force when interacting with persons with mental illness or intellectual disabilities.  For example, in August 2010, an officer responded to a call about an African-American man walking onto the highway and lying down on the pavement.  Seeing that

the man was sweating, acting jittery, and had dilated pupils, the officer believed he was on drugs. The man was cooperative at first but then pushed away when the officer tried to handcuff him for safety reasons. The officer struck the man several times with his baton—including once in the head, a form of deadly force—causing significant bleeding.  Two other officers then deployed their ECWs against the man a total of five times.

62.     In 2013, FPD stopped a man running with a shopping cart because he seemed "suspicious."  According to FPD's own file, the man had an obvious mental disability.  Officers took the man to the ground and attempted to arrest him for Failure to Comply after he refused to submit to a pat-down.  The officers claimed that the man resisted arrest by pulling his arms away.  The officers drive-stunned him in the side of the neck.  They charged him with Failure to Comply and Resisting Arrest.

63.     Similarly, in April 2014, an intoxicated jail detainee climbed up on the bars in his cell and refused to get down when ordered to by the arresting officer and the correctional officer on duty.  The correctional officer then fired an ECW at him, from outside the closed cell door, striking the detainee in the chest and causing him to fall to the ground.  This use of force was excessive and violated FPD policy that "[p]roper consideration and care should be taken when deploying the X26 TASER on subjects who are in an elevated position or in other circumstance where a fall may cause substantial injury or death."  FPD General Order 499.04.  Nonetheless, the reviewing supervisor deemed the use of force within policy.

64.     In September 2011, a man with mental illness died after an FPD officer deployed an ECW against him four times in rapid succession after the man allegedly ran toward the officer while swinging his fist. *See Estate of Moore v. Ferguson Police Dep't*, No. 4:14-cv-01443 (E.D. Mo. filed Aug. 19, 2014).  Despite objective signs the man may be in mental health crisis, the

officer applied the ECW nearly continuously, deploying four charges for 21 seconds over a 23-second period and leaving zero to one second between ECW applications.  The officer's use of the ECW, at least after the initial application, was unreasonable and excessive because the man did not pose a threat to the officer, the officer did not give the man the opportunity to comply, and the officer did not reassess the threat posed by the man between ECW applications.

65.     FPD School Resource Officers ("SRO") routinely treat routine discipline issues as criminal matters and use force when communication and de-escalation techniques would likely resolve the conflict.

66.     At least one FPD officer has been the subject of a criminal investigation for use of force, specifically, sexual assault.  In November 2013, correctional officer Jarvis Hayden was charged with one count of Public Servant Acceding to Corruption, two counts of Sexual Contact with an Inmate, and one count of Permitting Escape.  The case is pending.

67.     Officers frequently fail to report the force they use at all despite policy requiring that they do so.  FPD has multiple offense and arrest reports that describe officers using force, but there is no corresponding use-of-force report.  Of the nine cases between 2010 and 2014 in which officers claimed injury sustained from using force on the job, three have no corresponding use-of-force paperwork.

68.     Even when force is reported, the force review process is perfunctory, at best, and fails to ensure that force is used properly and in a manner that improves officer safety. Supervisors almost never actually investigate force incidents, with most supervisor reports merely summarizing the involved officers' version of events and sometimes relying on the officers' offense reports alone.  The supervisory review typically starts and ends with the presumption that the officer's version of events is truthful and that the force was reasonable.

19

69.     As a consequence, though contrary to policy, supervisors almost never interview non-police witnesses, such as the arrestee or any independent witnesses.  They do not review critical evidence even when it is readily available.  For example, a significant portion of the documented uses of force occurs at the Ferguson jail, which employs surveillance cameras to monitor the area.  However, FPD records provide no indication that a supervisor has ever sought to review the footage for a jail incident.  Nor do supervisors examine ECW camera video, even though it is available for certain units.  Sometimes, supervisors provide no remarks on the use-of-force report, indicating simply, "see offense report."

70.     FPD does not perform any comprehensive review of force incidents sufficient to detect patterns of misconduct by a particular officer or unit, or patterns regarding a particular type of force.  FPD does not keep records in a manner that would readily allow for such a review.

71.     Ferguson officers have not been trained or incentivized to use de-escalation techniques to avoid or minimize force. Instead, they respond with impatience, frustration, and disproportionate force, and sometimes directly escalate force themselves.  FPD's weak oversight of officer use of force facilitates this abuse.

**E.     DEFENDANT ENGAGES IN A PATTERN OR PRACTICE OF VIOLATING FIRST AMENDMENT RIGHTS, INCLUDING THE RIGHT TO FREE EXPRESSION AND THE RIGHT TO RECORD PUBLIC POLICE ACTIVITIES**

72.     Defendant engages in a pattern or practice of violating First Amendment rights, including the right to record public police activities and the right to free expression.

73.     Ferguson officers routinely prohibit people from recording police activity, and retaliate against those who do record.  For example, in June 2014, an African-American couple took their children to play at a local park.  The couple allowed their small children to urinate in

20

shrubs next to their parked car.  An officer stopped them, threatened to cite them for allowing the children to "expose themselves," and checked the father for warrants.  When the mother asked if the officer had to detain the father in front of the children, the officer turned to the father and told him, "you're going to jail because your wife keeps running her mouth."  The mother then began recording the officer on her cell phone.  The officer became angry and yelled, "you don't videotape me!" As the officer drove away with the father in custody for "Parental Neglect," the mother drove after them, continuing to record.  The officer then pulled over and arrested the mother, ostensibly for traffic violations.  When the father pleaded with the officer, the officer responded, "No more mercy, since she wanted to videotape," and declared, "nobody videotapes me."  The officer then took the phone, which the couple's daughter was holding.  After posting bond, the couple found that the video had been deleted.

74.     In an effort to circumvent First Amendment protection of the right to record public police activity, FPD officers routinely claim without any factual support that the use of camera phones endangers officer safety.  Sometimes, moreover, officers offer no rationale at all for interfering with individuals' right to record.  In one such incident from October 2013, a cell phone video shows an officer telling a civilian, "If you want to take a picture of me one more time, I'm going to lock your ass up."  When the civilian asked, "Do I not have the right to record?" the officer responded, inaccurately, "No, you don't."  The officer arrested him for Failure to Comply.

75.     In November 2014, a federal judge entered a consent order prohibiting Ferguson officers from interfering with individuals' rights to lawfully and peacefully record public police activities.  *See Hussein v. County of St. Louis, Missouri et al.*, 4:14-cv-1410 (E.D. Mo. Nov. 21, 2014) (Doc. 39).  To date, three separate parties have filed motions to show cause why the City

of Ferguson should not be held in contempt of the consent order, based on interference with individuals' First Amendment activities. *See Hussein*, 4:14-cv-1410 (show cause motions filed on March 6, 2015; October 20, 2015; and January 22, 2016). In August 2014, the City settled another suit alleging that it had abused its loitering ordinance, Mun. Code § 29-89, to arrest people who were protesting peacefully on public sidewalks. *See Abdullah v. County of St. Louis, Missouri, et al.*, 4:14-cv-1436 (E.D. Mo. Nov. 5, 2014) (Doc. 57).

76.     These orders and agreements address discrete problems that remain ongoing, but they do not adequately ensure the remedy of Defendant's First Amendment violations. Indeed, despite the lawsuits, FPD has continued to interfere with individuals' rights to protest and record police activities.

77.     Defendant makes retaliatory enforcement decisions based on the content of individuals' expression. For example, in July 2012, a police officer arrested a business owner on charges of Interfering in Police Business and Misuse of 911 because she objected to the officer's detention of her employee, which she regarded as unlawful. The officer had stopped the employee for "walking unsafely in the street" as he returned to work from the bank. The owner criticized the officer's conduct, came out of her shop after being asked to stay inside, and called 911 to complain to the Chief of Police. The officer characterized her protestations as interference and arrested her inside her shop. The officer decided to arrest her only after the woman tried to contact the Chief of Police, and indicated that his intent was to retaliate against her for reporting his conduct.

78.     Officers in Ferguson use their arrest power to retaliate against individuals for using offensive, but lawful, language to criticize police conduct. For example, one afternoon in September 2012, an officer stopped a 20-year-old African-American man for dancing in the

22

middle of a residential street. The officer determined that the man did not have any outstanding warrants and told him that he was free to go. The man responded with offensive language. The officer warned the man to against using offensive language. When the man continued using the language, he was arrested for Manner of Walking in Roadway.

**F.     DEFENDANT ENGAGES IN A PATTERN OR PRACTICE OF PROSECUTING AND RESOLVING MUNICIPAL CHARGES IN A MANNER THAT VIOLATES THE DUE PROCESS AND EQUAL PROTECTION RIGHTS OF DEFENDANTS**

79.     Defendant prosecutes and resolves municipal violations charged by FPD in a manner that violates due process and equal protection requirements. As a result of Defendant's conduct, individuals are denied adequate notice and opportunities to resolve the charges brought against them, and may face repeated, prolonged, and unnecessary incarceration, lose their jobs, and become trapped in cycles of poverty that can be nearly impossible to escape solely because they cannot afford to pay the fines and fees imposed against them.

80.     Many of these practices are the result of Defendant's consistent emphasis on generating revenue. As a result of that emphasis, the court prioritizes the collection of fines and fees over the administration of justice or protecting the rights of individuals appearing before it. The priority the court has placed on maximizing revenue directly contributes to the unlawful police practices described herein. Further, the significant extent to which revenue considerations have shaped court operations, set forth in detail in paragraphs 141-50 of this Complaint, undermines the fundamental fairness and impartiality of the court in violation of due process.

81.     Defendant, through its agents, has established and continues to implement practices and procedures that result in deprivations of due process and equal protection. These practices and procedures impede an individual's ability to challenge or resolve a municipal charge, and result in additional penalties, including incarceration, that are imposed to compel the

23

payment of court debts—even though the court does not deem any municipal violation to itself justify a penalty of incarceration.

82.     As set forth in detail below, these deficient practices and procedures exist at nearly every stage of a case, and include:  failing to provide individuals with adequate notice; failing to provide fair and impartial trials to those who seek to challenge their charges; imposing unduly high fines and fees without assessing an individual's ability to pay or providing alternative penalties to fines for those who cannot afford them; issuing arrest warrants—and, until recently, additional "Failure to Appear" charges—when an individual misses a payment or other deadline solely to coerce payment and without determining if the defendant's failure was willful or was instead due to an inability to pay; denying individuals against whom a warrant has issued access to a judicial hearing unless they are able to pay the set bond amount; and using a bond system that does not consider an incarcerated individual's financial capacity, resulting in prolonged detention of indigent defendants who do not pose a threat to public safety solely because they cannot afford to pay the bond amount.  Further, Defendant applies different procedures to individuals who are represented by counsel than individuals who are not, denying individuals who cannot afford an attorney equal treatment.

83.     In violation of their constitutional due process rights, individuals who receive a Ferguson municipal citation or summons routinely do not receive adequate notice of the allegations made against them and a meaningful opportunity to be heard.  They are often unable to determine how much is owed, where and how to pay the ticket, what the options for payment are, what rights the individual has, and what the consequences are for various actions or oversights.

84.     People cited by police for violating Ferguson's Municipal Code are often provided with incomplete information regarding the charges brought against them. In June 2014, for instance, a court clerk wrote to an FPD officer: "The above ticket . . . does not have a speed in it. The guy came in and we had to send him away. Can you email me the speed when you get time." People are also provided with incorrect information about the date and time of their assigned court session. In November 2012, for instance, court staff emailed the two patrol lieutenants asking: "Would you please be so kind to tell your squads to check their ct. dates and times. We are getting quite a few wrong dates and times [on tickets]." In some cases, citations fail to indicate the offense charged altogether. In November 2013, court staff asked FPD patrol to "see what [a] ticket was for" because it "does not have a charge on it." As set forth below, individuals routinely face severe penalties for failing to resolve charges despite this pattern of inadequate notice.

85.     These defects are also prevalent in cases in which FPD makes an arrest rather than issues a citation. Arrested individuals are sometimes not provided clear information regarding the charges against them. Further, while they can secure release from the Ferguson City Jail upon payment of a bond, the bond procedures used by the court depart from those articulated in official policy, and are arbitrary and confusing. Correctional officers have at times tried to find a arrested individual's case file in order to determine the bond amount owed, but have been unable to do so, resulting in the person being unable to secure release. In some cases, people have attempted to pay a bond to secure the release of a family member arrested by FPD, but were unable to make the payment, despite appearing in person at FPD headquarters.

25

86.     The trial procedures provided to individuals who challenge the charges brought against them also violate due process guaranteed by the Constitution.  Attempts to raise legal claims in the court are often met with retaliatory conduct.

87.     The Prosecuting Attorney also fails to disclose information that is favorable to defendants challenging their charges, despite the constitutional duty to disclose such evidence. *Brady v. Maryland*, 373 U.S. 83 (1963); *see also Giglio v. United States*, 405 U.S. 150 (1972). This duty applies to impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and it applies even if the defendant does not request the evidence, *United States v. Agurs*, 427 U.S. 97, 107 (1976).  The duty encompasses, furthermore, information that should be known to the prosecutor, including information known solely by the police department.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Individual defendants have, for instance, been deprived of information that an FPD officer testifying as a witness was previously found to be untruthful during an official FPD investigation.

88.     Even where defendants are provided with adequate notice of their charges and opt not to challenge them, other court practices make resolving a case exceedingly difficult, particularly for indigent defendants.  It is common for a single traffic stop or other encounter with FPD to give rise to fines in amounts that a person living in poverty is unable to immediately pay.  This fact is attributable in part to FPD's practice of issuing multiple citations—frequently three or more—on a single stop.  This fact is also attributable to the significant fine amounts imposed.  For example, the court has charged $302 for a single Manner of Walking violation; $427 for a single Peace Disturbance violation; $531 for High Grass and Weeds; $777 for Resisting Arrest; and $792 for Failure to Obey, and $527 for Failure to Comply, which officers appear to use interchangeably.

26

89.     The City's desire to generate revenue influences fine amounts.  City officials have extolled that Ferguson's preset fines are "at or near the top of the list" compared with other municipalities across a large number of offenses, and have cited these fine amounts—which were lowered during the pendency of the United States' investigation—as one of several measures taken to increase court revenues.  For violations that do not have preset fines, Defendant has also taken measures to ensure fines are set sufficiently high for revenue purposes.

90.     The court imposes significant fines without evaluating an individual's ability to pay.  Notably, this stands in direct tension with Missouri law, which instructs that in determining the amount and the method of payment of a fine, a court "shall, insofar as practicable, proportion the fine to the burden that payment will impose in view of the financial resources of an individual."  Mo. Rev. Stat. § 560.026.

91.     Nor has Defendant typically offered community service as an alternative to payment of a fine.  City officials have recognized the need to provide a meaningful community service option for indigent defendants.  In August 2013, one City Councilmember wrote to the City Manager and the Mayor, noting that the City had long discussed creating such a program but had not done so, and discussing the benefits of such a program, including that it would "keep those people that simply don't have the money to pay their fines from constantly being arrested and going to jail, only to be released and do it all over again."  The City increased available community service options following the commencement of the United States' investigation, but the City's practice in this area remains insufficient.

92.     In lieu of proportioning a fine to a particular individual's ability to pay, the court offers payment plans to those who cannot afford to immediately pay in full.  But Defendant's payment plans themselves facilitate constitutional violations.  It is routine practice, for example,

27

to immediately issue an arrest warrant when an individual on a payment plan misses a single payment, or makes a partial or untimely payment—without any notice or opportunity to explain why a required payment was missed.

93.     Despite the pervasive procedural defects described herein, Defendant imposes significant penalties when individuals fail to meet payment requirements, appearances, or other court obligations.  The court routinely issues municipal arrest warrants in response to missed payments or other missed requirements, and does so at a rate that City officials have called "staggering."

94.     As of December 2014, over 16,000 people had such warrants, almost all of which were issued for a missed payment or appearance.  In fiscal year 2013 alone, the court issued warrants to approximately 9,000 persons.  Many of those individuals had warrants issued on multiple charges, as the 9,000 warrants applied to roughly 32,000 different offenses.  For example, a 90-year-old man had a warrant issued for his arrest after he failed to timely pay the five citations FPD issued to him during a single traffic stop in 2013.

95.     The large number of warrants issued—and executed—is due to the fact that Defendant uses arrest warrants and the threat of arrest as its primary tool for collecting outstanding fines and fees.  The warrants the court issues are not put in place for public safety purposes; Judge Brockmeyer and other City officials have stated so unequivocally.  These warrants in fact run counter to public safety interests:  they divert FPD resources that could be focused on promoting public safety to instead focus on the collection of court debts, and they erode trust in FPD and the court.

96.     Prior to issuing these warrants, the City does not proactively inquire whether a missed payment or other obligation was willful or instead the result of an inability to pay.

28

Moreover, even where individuals inform the court that they lack the financial capacity to make a required payment, the court rarely provides any relief.

97.     An individual who owed $1,002 in fines and fees stemming from a Driving with a Revoked License charge wrote to a City official that he would be unable to make his required monthly payment but hoped to avoid having a warrant issued.  He explained that he was unemployed, that the court had put him on a payment plan only a week before his first payment was due, and that he did not have enough time to gather enough money.  He implored the City to provide "some kind of community service to work off the fines/fees," stating that "I want to pay you guys what I owe" and "I have been trying to scrape up what I can," but that "with warrants it's hard to get a job."  The Court Clerk, noting that the underlying charge dated back to 2007, that five Failure to Appear charges had been levied, and that no payments had yet been made, responded:  "In this certain case [the defendant] will go to warrant."

98.     In another example, in July 2014, an assistant court clerk wrote in an email that she rejected a defendant's request to make a reduced monthly payment to the court on account of defendant's inability to pay.  Instead of granting the defendant's request or providing the defendant with options to have the request heard by the Judge, the clerk told the defendant, "everyone says [they] can't pay."

99.     Individuals are arrested for outstanding warrants by FPD officers without having known that a warrant was issued against them.  Defendant fails to provide adequate notice when a warrant is issued.  In the past, when the court issued a warrant it would also send notice to the individual that a warrant was issued against them and telling them to appear at the police department to resolve the matter.  This notice did not provide the basis of the arrest warrant or describe how it might be resolved.  In any case, Ferguson stopped providing even this

29

incomplete notice in 2012.  In explaining the decision to stop sending this warrant notice, the
Court Clerk wrote in a June 2011 email to the Chief of Police that "this will save the cost of
warrant cards and postage," and "it is not necessary to send out these cards."

100.    Once an arrest warrant is issued, the individual against whom it has been issued
cannot access any judicial hearing until the bond amount designated on the warrant is paid in
full, even if the individual has not yet been arrested.  Those individuals are thus denied the
opportunity to establish good cause for the failure that led to the warrant being issued.  This
practice also impermissibly fails to provide indigent defendants with the same access to a judicial
hearing that is available to those who have the ability to pay the bond amount.

101.    FPD routinely executes the municipal arrest warrants issued by the court.

102.    During the roughly six-month period from April to September 2014, 256 people
were booked into the Ferguson City Jail after being arrested at least in part for an outstanding
warrant—96% of whom were African American.  Of these individuals, 28 were held for longer
than two days, and 27 of these 28 people were black.  During a larger period of time between
October 2012 and October 2014, FPD arrested roughly 460 individuals following a vehicle stop
*solely* because they had outstanding warrants.  In some cases, individuals are incarcerated
pursuant to municipal warrants solely because they could not afford to pay a fine or fee owed to
the court.

103.    Defendant's bond practices deprive incarcerated indigent defendants of equal
protection.  Defendant sets bond amounts without regard to the incarcerated individual's
financial capacity.  As a result, incarcerated individuals who cannot afford to pay their bond
remain in jail, while those who can afford to pay are released.  This practice has caused indigent

defendants to remain in the Ferguson City Jail for days not because of any public safety need, but instead because of their lack of financial resources.

104.    Additional deficiencies in Defendant's bond practices further facilitate the pattern of unlawful law enforcement conduct.  Bond amounts are mostly set by court staff and are rarely ever reviewed by a judicial officer.  Officers sometimes collect cash bonds without recording which jail detainee paid them.  And individuals are sometimes arrested after their bonds have been paid because the corresponding warrants were never cancelled.

105.    In response to concerns raised during the United States' investigation, Defendant implemented several changes to its bond practices.  These changes, however, mainly apply to those who are detained following a warrantless arrest, and do not apply to those arrested on the basis of an outstanding municipal warrant.  Even the minimal changes that have been made are inadequate, as the revised bond procedures regarding warrantless arrests continue to lack any provision for considering a defendant's ability to pay in setting bond amounts.

106.    In resolving charges, Defendant also uses different procedures for cases in which an individual is represented by counsel than the procedures used in cases in which an individual is not.  Represented individuals, for example, are able to have pending municipal arrest warrants cleared without payment of a bond; unrepresented individuals are not.

107.    There are instances in which Defendant intentionally gave expedited and preferential treatment to represented defendants.  This same treatment is denied for pro se defendants.  Similarly, by practice, the court grants continuances for represented defendants, but not for those defendants who do not have counsel.

108.    The court also does not maintain appropriate independence from the Prosecuting Attorney.  For example, the Prosecuting Attorney does not maintain case files separate from

31

those maintained by the court.  Instead, the Prosecuting Attorney's files are comingled with the court's file, and that file is treated as a shared file between the two entities, with the court sometimes using the file to respond to discovery requests.  In one instance, for example, a City clerk and the Chief of Police forwarded an affidavit from an individual complaining about police conduct to Prosecuting Attorney Stephanie Karr.  Ms. Karr responded:  "I am assuming this person has a municipal court case.  Just send the document over to [the Court Clerk] to put with the court file—if the document is in the court file, we will have a heads up that this person is a kook when we have to deal with him/her."  Comingling of case files in this manner undermines the fairness and impartiality of the court.

## G.    DEFENDANT'S LAW ENFORCEMENT CONDUCT DISPROPORTIONATELY HARMS FERGUSON'S AFRICAN-AMERICAN RESIDENTS AND IS DRIVEN BY RACIAL BIAS

109.    The police and municipal court practices described herein disproportionately harm African Americans.  These disparities are not the necessary or unavoidable results of legitimate public safety efforts.  Rather, the disproportionate harm to African Americans stems, at least in part, from racial bias, including racial stereotyping.

### 1.    Defendant's Law Enforcement Conduct Disparately Impacts African Americans

110.    African Americans are disproportionately represented at nearly every stage of Ferguson law enforcement, including:  traffic stops; searches; citations; arrests; fine assessments; municipal arrest warrants; and case dispositions.  Data collected directly by police and court officials reveal racial disparities that are substantial and consistent across this wide range of police and court enforcement action.

111.    The disparities are longstanding.  FPD has collected data related to vehicle stops pursuant to State requirements since 2000.  The data show disparate impact on African

32

Americans in Ferguson for as long as that data has been reported.  For example, in each of the last 14 years, the State-tracked "Disparity Index" calculation shows that African Americans are "over represented" in FPD's vehicular stops.

112.    Upon being stopped, African Americans are significantly more likely to be searched, cited, and arrested than other stopped individuals, even when controlling for non-race factors such as the stated reason the stop was initiated.  For example, from October 2012 to October 2014, African Americans were more than twice as likely to be searched, to receive a citation, or to be arrested than other stopped individuals.  These results are statistically significant and would occur by chance less than one time in 1000.

113.    During that same time period, even though FPD searched African Americans at higher rates, African Americans were less likely to have contraband found on them than others to a statistically significant degree.  Of the 31 searches reported by FPD that were purportedly conducted because the officer had reasonable suspicion that a crime was being committed and that the suspect was armed with a weapon,  30 were of black individuals; of the 103 times FPD asked both the driver and passenger to exit a vehicle during a search, the searched individuals were black in 95 cases; and, while only one search of a white person lasted more than half an hour (1% of all searches of white drivers), 59 searches of African Americans lasted that long (5% of all searches of black drivers).

114.    African Americans disproportionately receive multiple citations during a single stop.  In 2013, for instance, approximately half of all African Americans cited received multiple citations during a single encounter with FPD, whereas only approximately a quarter of non-African Americans did.  Between October 2012 to July 2014, 38 black individuals received four

citations during a single incident, compared with only two white individuals; and while 35 black individuals received five or more citations at once, not a single white person did.

115.     Data on charges issued by FPD from 2011-2013 shows that, for numerous municipal offenses for which FPD officers have a high degree of discretion in charging, African Americans are disproportionately represented relative to their representation in Ferguson's population.  For example, while African Americans make up 67% of Ferguson's population, they make up 95% of Manner of Walking in Roadway charges; 94% of Failure to Comply charges; 92% of Resisting Arrest charges; 92% of Peace Disturbance charges; and 89% of Failure to Obey charges.

116.     African Americans account for a smaller percentage of speeding citations based on radar or laser than they do of speeding citations based on other or unspecified methods. Controlling for other factors, the disparity in speeding tickets between African Americans and non-African Americans is significantly larger when citations are issued not on the basis of radar or laser, but by some other method, such as the officer's own visual assessment.

117.     African Americans account for 88% of all incidents from 2010 to August 2014 in which an FPD officer reported using force, including all canine bites for which information is available about the race of the person bitten.  FPD uses force, including unreasonable force, against African Americans at a rate that is disproportionate to African Americans' proportion of the Ferguson population and not lawfully explained by the nature or frequency of interactions between African-American individuals and FPD officers.

118.     In their interactions with African-American individuals, FPD officers use more force against similarly situated African Americans, including more force that is unreasonable.

34

119.    African Americans are also disproportionately impacted by the practices of the City's court and Prosecuting Attorney.  African-American defendants are more likely to have their cases persist for longer durations, and are more likely to face a higher number of mandatory court appearances and other requirements.

120.    African Americans are also more likely to have a warrant issued against them.  Of all warrants issued in 2013, 92% were issued in cases involving an African-American defendant. This figure is disproportionate to the representation of African Americans in the court's docket. African Americans are also disproportionately more likely to have warrants executed against them.

121.    Analysis of the municipal court's fines and fees data suggests racial disparities in the court's fine assessment practices that consistently disfavor African Americans.  And the court is significantly less likely to dismiss cases with African-American defendants.

> **2.   The Disparate Impact of Defendant's Law Enforcement Conduct is Motivated by Racial Bias**

122.    These disparities occur, at least in part, because Ferguson law enforcement practices are directly shaped and perpetuated by racial bias.  Evidence of racial bias includes: the consistency and magnitude of the racial disparities found throughout police and court enforcement actions; direct communications by police supervisors and court officials that exhibit racial bias, particularly against African Americans; a number of other communications by police and court officials that reflect harmful racial stereotypes; the background and historic context surrounding FPD's racially disparate enforcement practices; and the fact that City, police, and court officials failed to take any meaningful steps to evaluate or address the race-based impact of its law enforcement practices despite longstanding and widely reported racial disparities, and

instead consistently reapplied police and court practices known to disparately impact African Americans.

123.    The race-based disparities are not isolated or aberrational; rather, they exist in nearly every aspect of Ferguson police and court operations

124.    Communications of Ferguson officials reveal direct evidence of racial bias among influential Ferguson decision makers.

125.    Several written communications sent by FPD and court employees are unequivocally derogatory, dehumanizing, and demonstrative of impermissible bias.  For example, a March 2010 email mocked African Americans through speech and familial stereotypes, using a story involving child support.  One line from the email read:  "I be so glad that dis be my last child support payment!  Month after month, year after year, all dose payments!"

126.    In another example, a May 2011 email stated:  "An African-American woman in New Orleans was admitted into the hospital for a pregnancy termination.  Two weeks later she received a check for $5,000.  She phoned the hospital to ask who it was from.  The hospital said, 'Crimestoppers.'"

127.    These and other email exchanges involved supervisors of FPD's patrol and court operations.  FPD patrol supervisors are responsible for holding officers accountable to governing laws, including the Constitution, and helping to ensure that officers treat all people equally under the law, regardless of race or any other protected characteristic.  Similarly, court supervisors have significant influence and discretion in managing the court's operations and in processing individual cases, and court rules and procedures are interpreted largely at the discretion of the court clerks.

128.    Until the United States' investigation revealed the content of these and other communications demonstrating racial bias, no officer or court employee was ever admonished or disciplined for such communications.  In March 2015, the City terminated the employment of several FPD and court employees, including the Court Clerk.  The Court Clerk subsequently has stated in a televised interview, "it went on all the time," and that "they would have to shut the doors because they [the emails in question] went through the whole station.  Trust me . . . I'm saying it went on all the time."

129.    This documentary evidence of explicit racial bias is consistent with reports from community members indicating that some FPD officers use racial epithets in dealing with members of the public.

130.    Ferguson officials have explained the significant disparate impact of its law enforcement efforts as stemming from a lack of "personal responsibility" among African-American members of the Ferguson community.  Application of this racial stereotype does not explain the disparities, and in fact furthers the disproportionate impact of Ferguson's police and court practices:  it causes court and police decision makers to discredit African Americans' explanations for not being able to pay tickets, and allows officials to disown the harms of Ferguson's law enforcement practices.

131.    The common practice among Ferguson officials of writing off tickets further evidences a double standard grounded in racial stereotyping.  Even as Ferguson City officials maintain the harmful stereotype that black individuals lack personal responsibility—and continue to cite this lack of personal responsibility as the cause of the disparate impact of Ferguson's practices—white City officials condone a striking lack of personal responsibility among themselves and their friends.

37

132.    In August 2013, for instance, a white FPD patrol supervisor wrote an email entitled "Oops" to Prosecuting Attorney Stephanie Karr regarding a ticket his relative received in another municipality for traveling 59 miles per hour in a 40 miles-per-hour zone, noting "[h]aving it dismissed would be a blessing."  The Prosecuting Attorney responded that the prosecutor of that other municipality promised to nolle pros the ticket.  The supervisor responded with appreciation, noting that the dismissal "[c]ouldn't have come at a better time."

133.    In November 2011, the Court Clerk received a request from a friend to "fix a parking ticket" received by the friend's coworker's wife.  After the ticket was faxed to the clerk, she replied:  "It's gone baby!"  Later, in March 2014, another friend of the Court Clerk's relative emailed the Court Clerk with a scanned copy of a ticket asking if there was anything she could do to help.  She responded:  "Your ticket of $200 has magically disappeared!"  Later, in June 2014, the same person emailed the Court Clerk regarding two tickets and asked:  "Can you work your magic again?  It would be deeply appreciated."  The Clerk later informed him one ticket had been dismissed and she was waiting to hear back about the second ticket.

134.    City officials secure or receive ticket write-offs from staff in a number of neighboring municipalities.

135.    City officials' application of the stereotype that African Americans lack "personal responsibility" to explain why Ferguson's practices harm African Americans, even as these same City officials exhibit a lack of personal—and professional—responsibility in handling their own and their friends' code violations, reveals discriminatory bias on the part of decision makers central to the direction of law enforcement in Ferguson.

136.    Further, the disparities in Defendant's conduct exist within a historical context replete with racial tension.  Until the 1960s, Ferguson was a "sundown town" where African

Americans were banned from the City after dark.  The City is very different today, but has nonetheless struggled with changing demographics and incorporating African Americans into civic life as equals.  Some individuals, including individuals charged with discretionary enforcement decisions in either the police department or the court, have expressed concerns about the increasing number of African Americans that have moved to Ferguson in recent years. Similarly, some City officials explicitly distinguish Ferguson's African-American residents from Ferguson's "normal" residents or "regular" people.

137.    Defendant has also consistently maintained the unlawful practices described herein, knowing that they impose a persistent disparate impact on African Americans.  Until the United States' investigation, Defendant continued to encourage FPD to stop and cite aggressively as part of its revenue generation efforts, even though that encouragement and increased officer discretion has yielded disproportionate African-American representation in FPD stops and citations.  FPD officials had not restricted officer discretion to issue multiple citations at once, even though the application of that discretion has led officers to issue far more citations to African Americans at once than others, on average, and even though only black individuals (35 in total) ever received five or more citations at once over a three-year period. FPD has not provided further guidance to constrain officer discretion in conducting searches, even though FPD officers have, for years, searched African Americans at higher rates than others but found contraband during those searches less often than in searches of individuals of other races.  FPD also has not significantly altered its use-of-force tactics, even though FPD records make clear that current force decisions disparately impact black suspects, and that officers appear to assess threat differently depending upon the race of the suspect.  FPD, for example, has not reviewed or revised its canine program, even though available records show that canine officers

have exclusively set their dogs against black individuals, often in cases where doing so was not justified by the danger presented.

138.    Similarly, Defendant has not taken any meaningful steps to train or adequately supervise court staff with regard to racial bias.  Indeed, until September 2014—after the United States' investigation began—the City had not taken any meaningful steps to evaluate or reform any of the court or prosecutorial practices described herein, even though the implementation of those practices has plainly exerted a disparate impact on African Americans.

139.    Defendant has actively endorsed and encouraged the perpetuation of the practices that have led to harmful racial disparities.  This encouragement has been motivated at least in part by racial bias.

## H.    **DEFENDANT'S PATTERN OR PRACTICE OF CONSTITUTIONAL VIOLATIONS IS A DIRECT RESULT OF BROAD AND LONGSTANDING SYSTEMIC DEFICIENCIES IN FERGUSON LAW ENFORCEMENT**

140.    Defendant's pattern or practice of unconstitutional conduct is caused in part by: (1) the focus of its law enforcement efforts on generating municipal revenue rather than on public safety needs; and (2) deficiencies in its systems for recruiting, training, providing policy direction to, supervising, and holding accountable law enforcement officers.

1.    Defendant Has Focused Law Enforcement Efforts on Generating Municipal Revenue Rather than on Public Safety Needs and the Protection of Individual Rights

141.    Defendant has long focused FPD and court activities on generating revenue.  The City has budgeted for, and achieved, significant increases in revenue from municipal code enforcement for many years.  In fiscal year 2010, 12 percent of the City's general fund revenues came from fines and fees collected by the court.  By fiscal year 2015, the City's anticipated fine and fee collections accounted for over 23 percent of general fund revenues.

40

142.    Defendant has worked to meet these targets by directing FPD to aggressively enforce the municipal code to generate revenue.  City and police leadership have pressured officers to write citations, independent of any public safety need.  In an email from March 2010, for instance, Finance Director Jeffrey Blume—who continues to serve as the City's Finance Director—wrote to then-Chief Jackson that "unless ticket writing ramps up significantly before the end of the year, it will be hard to significantly raise collections next year.  What are your thoughts?  Given that we are looking at a substantial sales tax shortfall, it's not an insignificant issue."  Chief Jackson responded that the City would see an increase in fines once more officers were hired and that he could target the $1.5 million forecast.  In another instance from March 2013, Mr. Blume wrote in an email:  "Court fees are anticipated to rise about 7.5%.  I did ask the Chief if he thought the PD could deliver 10% increase.  He indicated they could try."

143.    Defendant goes so far as to direct FPD to develop enforcement strategies and initiatives, not to better protect the public, but to raise more revenue.  In an April 2014 communication from Mr. Blume to then-Chief Jackson and then-City Manager Shaw, Mr. Blume recommended immediate implementation of an "I-270 traffic enforcement initiative" in order to "begin to fill the revenue pipeline."  Mr. Blume's email attached a computation of the net revenues that would be generated by the initiative, which required paying five officers overtime for highway traffic enforcement for a four-hour shift.  Mr. Blume stated that "there is nothing to keep us from running this initiative 1,2,3,4,5,6, or even 7 days a week.  Admittedly at 7 days per week[] we would see diminishing returns."  Indeed, in a separate email to FPD supervisors, FPD's Patrol Captain explained that "[t]he plan behind this [initiative] is to PRODUCE traffic tickets, not provide easy OT."  There is no indication that anyone considered whether community policing and public safety would be better served by devoting five overtime officers to

neighborhood policing instead of a "revenue pipeline" of highway traffic enforcement.  Rather, the only downsides to the program that City officials appear to have considered are that "this initiative requires 60 to 90 [days] of lead time to turn citations into cash," and that Missouri law then capped the proportion of revenue that can come from municipal fines at 30%, which limited the extent to which the program could be used.  *See* Mo. Rev. Stat. § 302.341.2.  With regard to the statewide-cap issue, the Mr. Blume advised:  "As the RLCs [Red Light Cameras] net revenues ramp up to whatever we believe its annualized rate will be, then we can figure out how to balance the two programs to get their total revenues as close as possible to the statutory limit of 30%."

144.    As directed, FPD supervisors have implemented steps to ensure that officers aggressively enforce the municipal code against community residents to meet the City's revenue generation expectations.  Citation writing has been the primary goal and measure of policing performance, and policing resources have been diverted to aggressive code enforcement at the expense of important public safety needs.  FPD has also modified deployment schedules to place more officers on the street specifically to generate more revenue.  Supervisors have instructed individual officers to increase production when their citation totals are deemed insufficient.  Supervisors have also communicated that ticket-writing productivity is a consideration for promotions, and have threatened to alter officer assignments or impose discipline when officers fail to meet productivity goals.  And court staff have provided FPD supervisors with a monthly list of the number of tickets issued by each officer and each squad.  Supervisors have posted the list inside the police station, a tactic officers say is meant to push them to write more citations.

145.    Defendant has also established revenue generation as a priority for the Ferguson Municipal Court.  The influence of revenue on court operations is significant, and documented in

part in a February 2011 Report coordinated by City Finance Director Jeffrey Blume for the City
Council on "efforts to increase efficiencies and maximize collection."  In that Report, then-Judge
Brockmeyer describes "what he has done to help in the areas of court efficiency and revenue,"
including establishing fines "at or near the top of the list" compared with other municipalities,
and creating new fines and fees—one of which, the "Failure to Appear" fine, has yielded
$442,901 in revenue in 2013 alone.  Those fines and fees, several of which were repealed during
the pendency of our investigation, were lauded by Judge Brockmeyer, who noted that "none of
these changes could have taken place without the cooperation of the Court Clerk, the Chief of
Police, and the Prosecutor's Office."

146.    Defendant has been aware for years of concerns that the City's focus on revenue
has undermined the fair administration of justice within the Municipal Court.  It has disregarded
those concerns to avoid disturbing the court's ability to optimize revenue generation.  In 2012,
for instance, the City Manager urged the reappointment of Judge Brockmeyer over objections
from a City Councilmember that Judge Brockmeyer failed to follow appropriate procedures,
noting in part that "[i]t goes without saying the City cannot afford to lose any efficiency in our
Courts, nor experience any decrease in our Fines and Forfeitures."

147.    Further, court clerks have been involved in setting targets for fine and fee
revenues during development of the City's budget—even as those same clerks make a number of
critical case decisions, including deciding whether to require a court appearance for certain
offenses; whether to grant continuances or other procedural requests; whether to accept partial
payment of an owed fine; and whether to cancel a warrant without a bond payment.

148.    Court clerks have also taken specific actions to ensure that the revenue targets
they help develop are met.  For example, in April 2011, the Court Clerk wrote to Judge

43

Brockmeyer, copying her supervisor, the Chief of Police, that the fines the new Prosecuting Attorney recommended were not high enough. The Clerk concluded: "We need to keep up our revenue."

149. Defendant has closely monitored whether City law enforcement efforts are successful at bringing in revenue. Consistently over the last several years, the Chief of Police has directly reported to City officials FPD's successful efforts at raising revenue through policing, and City officials have continued to encourage those efforts and request regular updates. For example, in a June 2011 email from the then-Chief of Police to Finance Director Blume and the then-City Manager, the Chief reported that "May is the 6th straight month in which court revenue (gross) has exceeded the previous year." The City Manager applauded the Chief's efforts, and the Finance Director added praise, noting that the Chief is "substantially in control of the outcome." The Finance Director further recommended in this email greater police and judicial enforcement to "have a profound effect on collections." In one March 2012 email, the Captain of the Patrol Division reported directly to the City Manager regarding record court collections, noting "[t]he [court clerk] girls have been swamped all day with a line of people paying off fines today." The City Manager reported the Captain's email to the City Council and congratulated both police department and court staff on their "great work."

150. In December 2014, Finance Director Jeffrey Blume stated publicly that Ferguson intends to make up a 2014 revenue shortfall in 2015 through municipal code enforcement, explaining that "[t]here's about a million-dollar increase in public-safety fines to make up the difference." Defendant continues to project that the court will generate significant revenues in the form of fines and fees, and rely on those projections in developing its budget. At least as of

the Fall of 2015—months after the public release of United States' findings report exposing these emails—Mr. Blume continued to push for implementation of the "revenue pipeline" initiative.

>    2.   Defendant Has Failed to Implement Basic Policies and Practices that Would Decrease or Eliminate Unconstitutional Police and Court Conduct

151.    In part because of its focus on generating revenue, Defendant has failed to implement policies and practices that would decrease or eliminate police misconduct, including discriminatory policing, unconstitutional stops, searches and arrests, and the use of unreasonable force.

152.    Defendant has failed to implement a community engagement model that would increase public trust and reduce bias.  Defendant further has failed to provide adequate policy guidance or train officers on appropriate law enforcement practices; failed to adequately supervise officers or review their actions to ensure adherence to constitutional law; failed to implement systems to reliably prevent, detect, investigate, and hold officers accountable for, misconduct.  These and other systemic deficiencies have caused and perpetuated the unlawful conduct described above.

153.    Defendant's focus on revenue generation has required an approach to law enforcement that is incompatible with true community policing, in which communities and law enforcement work together to decide community priorities and discuss appropriate policing strategies to address those priorities.  Ferguson's support of community policing has historically been modest but in recent years dwindled to nearly nothing, as revenue-generation police activities increased.  During this time period, Ferguson's relationships with youth, apartment residents, and residents living in poverty have become particularly more strained.

154.    One officer stated during the United States' investigation that officers could spend more time engaging with community members and undertaking problem-solving projects if FPD

45

officers were not so focused on activities that generate revenue.  This officer stated, "everything's about the courts . . . the court's enforcement priorities are money."  Another officer stated that officers cannot "get out of the car and play basketball with the kids," because "we've removed all the basketball hoops—there's an ordinance against it."  One officer reported that there was a police substation in Canfield Green when FPD was more committed to community policing, while another stated that now there is "nobody in there that anybody knows."

155.    As a result of a lack of true community engagement and community policing, police and municipal conduct in Ferguson has undermined public trust rather than enhanced it, and has violated individuals' legal rights, instead of protected them.

156.    In one instance, for example, a woman called FPD to report a domestic disturbance.  By the time the police arrived, the woman's boyfriend had left.  The police looked through the house and saw indications that the boyfriend lived there.  When the woman told police that only she and her brother were listed on the home's occupancy permit, the officer placed the woman under arrest for the permit violation and she was jailed.  In another instance, after a woman called police to report a domestic disturbance and was given a summons for an occupancy permit violation, she said, according to the officer's report, that she "hated the Ferguson Police Department and will never call again, even if she is being killed."  These examples underscore that Ferguson's overly aggressive enforcement of low-level municipal violations significantly undermines public safety, rather than promoting it.

157.    Defendant also has failed to provide the policy guidance necessary to ensure that officers and court staff have a clear set of directives for lawful conduct to which they can be held

accountable.  Defendants routinely ask officers to perform functions for which it has provided no written guidance or directive.

158.    Defendant has failed to provide the training to FPD officers and other staff, and to municipal court employees, that is necessary to ensure that they know how to carry out their duties consistent with law.  Defendant has failed to ensure that newly hired officers have sufficient training when they arrive; has failed to provide sufficient field- or in-service training to officers, and fails to provide additional or remedial training to respond to known or readily identifiable problems with officer misconduct or other training needs.  Defendant has not developed a training plan or implemented training pursuant to that plan.  Defendant provides insufficient, or no training at all, in the following areas:  community engagement/community policing; bias-free policing; stop, search, and arrest; First Amendment; use of force; mental health crisis intervention; and use of body-worn and in-car cameras.  Defendant provides generally insufficient training for non-patrol positions such as School Resource Officers and detectives.

159.    Defendant fails to ensure that FPD supervisors have the skills, temperament, and training necessary to be effective; fails to deploy supervisors in a manner conducive to close and effective supervision; and fails to hold supervisors accountable for supervising officers, or for their own conduct.

160.    Partly as a result of these deficiencies, FPD fails to provide the supervision to FPD officers that is necessary to ensure that they routinely respect the constitutional rights of the individuals with whom they interact, and are held accountable when they do not.  FPD supervisors routinely fail to offer effective guidance to FPD officers, fail to adequately detect or

investigate officer misconduct, and fail to counsel or hold officers accountable where they violate the law or FPD policy.

161.     FPD supervisors have routinely failed to ensure that officers complete required reports.  In 2010, a senior police official complained to supervisors that every week reports go unwritten, and hundreds of reports remain unapproved.  "It is time for you to hold your officers accountable," he urged them.  In 2014, the official had the same complaint, remarking on 600 reports that had not been approved over a six-month period.

162.     FPD failed to take sufficient measures to require or assist supervisors in holding officers accountable.  In fact, one supervisor noted to the Captain of Patrol that coding errors in the then-new records management system is set up "to hide, do away with, or just forget reports," creating a heavy administrative burden for supervisors who discover incomplete reports months after they are created.

163.     Defendant fails also to institute the systems necessary to permit adequate supervision of officer conduct, including appropriate systems for documenting FPD stops, searches, arrests, and uses of force.

164.     While FPD collects vehicle-stop data because it is required to do so by state law, its data collection methods are inadequate to allow for close and effective supervision of officers, particularly as needed to prevent bias-based policing.  For example, FPD collects no reliable or consistent data regarding pedestrian stops, even though it has the technology to do so and its own policy recommends doing so.

165.     Officers' uses of force frequently go unreported, and are reviewed superficially if at all.  There is evidence that this underreporting is widespread.  For example, information in FPD's internal affairs files indicates instances of force that are not included in FPD's force files.

48

Second, several offense reports describe officers using force with no corresponding use-of-force report.  Third, of the nine cases between 2010 and 2014 in which officers claimed injury sustained from using force on the job for purposes of workers compensation, three had no corresponding use-of-force paperwork.

166.     FPD has not adopted or effectively used an early warning system to address officers with repeated complaints or other histories indicating a need for intervention or oversight to prevent future violations of constitutional rights.

167.     As a result of these deficient practices, FPD stops, searches, arrests, and uses of force that violate the law or FPD policy are rarely detected and often go ignored when they are discovered.  Additionally, changes to equipment, policy, or training that may be necessary to ensure lawful conduct and officer safety are not discovered or implemented.

168.     The patterns of misconduct described above are facilitated further by Defendant's failure to adequately accept, investigate, and respond to allegations of officer misconduct. Because of Defendant's failed accountability system, it fails to detect, prevent, or respond to officer misconduct, including serious misconduct such as excessive force, violations of due process rights, and race discrimination.

169.     Defendant makes it unduly difficult for an individual to make a misconduct complaint against an officer in Ferguson.  Ferguson both discourages individuals from making complaints and discourages City and police staff from accepting them.  For example, in a March 2014 email, a lieutenant criticized a sergeant for taking a complaint from a man on behalf of his mother, who stayed in her vehicle outside the police station.  Despite the fact that Ferguson policy requires that complaints be taken "from any source, identified or anonymous," the lieutenant stated "I would have had him bring her in, or leave."  While official FPD policy states

49

clearly that officers must "never attempt to dissuade any citizen from lodging a complaint," FPD General Order 301.3, FPD leadership has indicated that officers need to justify their actions when they do accept a civilian complaint.  For example, in one case a sergeant explained:  "I spoke to [two people seeking to make a complaint] . . . but after the conversation, neither had changed their mind and desired still to write out a complaint."

170.    The United States' investigation documented several instances in which people complained to FPD that they were prevented from making a complaint, but FPD did not investigate those allegations.  For example, a man alleging significant excessive force reported the incident to a commander after being released from jail, stating that he was unable to make his complaint earlier because several different officers refused to let him speak to a sergeant to make a complaint about the incident and threatened to keep him in jail longer if he did not stop asking to make a complaint.  There is no indication that FPD investigated this allegation.

171.    When individuals do report misconduct, there is a significant likelihood it will not be treated as a complaint and investigated.  For example, FPD failed to open an investigation of an allegation made by a caller who said an officer had kicked him in the side of the head and stepped on his head and back while he was face down with his hands cuffed behind his back, all the while talking about having blood on him from somebody else and "being tired of the B.S." According to the man, the officer did not stop until the other officer on the scene said words to the effect of, "[h]ey, he's not fighting he's cuffed."  The man alleged that the officer then ordered him to "get the f*** up" and lifted him by the handcuffs, yanking his arms backward.  The commander taking the call reported that the man stated that he supported the police and knew they had a tough job but was reporting the incident because it appeared the officer was under a lot of stress and needed counseling, and because he was hoping to prevent others from having the

50

experience he did.  The commander's email regarding the incident expressed no skepticism about the veracity of the caller's report and was able to identify the incident (and thus the involved officers).  Still, FPD failed to conduct an internal affairs investigation of this incident or complete a use-of-force report.

172.    In another case, an FPD commander wrote to a sergeant that despite a complainant being "pretty adamant that she was profiled and that the officer was rude," the commander "didn't even bother to send it to the chief for a control number" before hearing the sergeant's account of the officer's side of the story.  Upon getting the officer's account second hand from the sergeant, the commander forwarded the information to the Chief of Police so that it could be "filed in the non-complaint file."

173.    FPD officers and commanders also often seek to frame complaints as being entirely related to complainants' guilt or innocence, and therefore not subject to a misconduct investigation, even though the complaint clearly alleges officer misconduct.

174.    FPD does not treat allegations of misconduct as complaints even where it believes that the officer did in fact commit the misconduct.  For example, a supervisor wrote an email directly to an officer about a complaint the Chief of Police had received about an officer speeding through the park in a neighboring town.  The supervisor informed the officer that the Chief tracked the car number given by the complainant back to the officer, but assured the officer that the supervisor's email was "[j]ust for your information.  No need to reply and there is no record of this other than this email."

175.    On the rare occasion when an allegation of officer misconduct is investigated as such, the investigation is inadequate.  Officer misconduct investigations do not fairly weigh

available evidence.   FPD frequently credits the officer with telling the truth and finds that the complainant is not truthful, even where objective evidence indicates that the reverse is the case.

176.    On the rare occasion that FPD does sustain an external complaint of officer misconduct, the discipline it imposes is generally too low to be an effective deterrent.

177.    FPD does not respond meaningfully even to allegations of untruthfulness by officers.  For example, in one case FPD sustained a charge of untruthfulness against an officer after he was found to have lied to the investigator about whether he had engaged in an argument with a civilian over the loudspeaker of his police vehicle.  FPD imposed only a 12-hour suspension on the officer.  FPD appears not to have taken the officer's untruthfulness into sufficient account in subsequent complaints, including in at least one case in which the complainant alleged conduct very similar to the conduct alleged in the case in which the officer was found to have lied.  Nor does Defendant appropriately share information of officer untruthfulness with defendants against whom the officer is testifying in court.

178.    By failing to hold officers accountable, FPD leadership sends a message that FPD officers can behave as they like, regardless of law or policy, and even if caught, that punishment will be light.  FPD's tolerance for officer violations of FPD policy and the Constitution contrasts with the City's intolerance for civilian infractions of the Ferguson Municipal Code.

179.    FPD's systems for recruiting, performance evaluation and promotion also contribute to the patterns and practices of constitutional violations described above.  Because of deficiencies in FPD's recruiting, performance evaluation and promotional systems, FPD too often hires individuals with histories of officer misconduct or who are otherwise ill-suited for constitutional policing; fails to hire qualified individuals who would promote constitutional

policing; fails to reward lawful and ethical conduct; and instead rewards officers who commit or tolerate misconduct.

180.    FPD fails to collect the data that is necessary for ensuring compliance with law, or to analyze such data to detect, prevent, or correct patterns of constitutional violations.  Together, these systemic deficiencies allow for, and in fact perpetuate, the pattern or practice of unlawful conduct described herein.

### FIRST CLAIM FOR RELIEF:

### DEFENDANT'S LAW ENFORCEMENT ACTIVITIES VIOLATE
### SECTION 14141

181.    The United States realleges and incorporates by reference the allegations set forth above.

182.    The United States is authorized under 42 U.S.C. § 14141(b) to seek declaratory and equitable relief to eliminate a pattern or practice of law enforcement officer conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

183.    Defendant, its agents, and persons acting on its behalf have unreasonably stopped, searched, detained, cited, and arrested numerous persons in the City of Ferguson.  These unreasonable actions include searches and seizures made without probable cause or reasonable suspicion.

184.    Defendant, its agents, and persons acting on its behalf use force that is objectively unreasonable against individuals.

185.    Defendant, its agents, and persons acting on its behalf have infringed upon the free expression of numerous persons in the City of Ferguson and retaliated against persons for

53

the exercise of free expression.  Defendant has infringed on, and chilled, protected conduct in a manner that is not constitutionally justifiable.

186.    Defendant, its agents, and persons acting on its behalf have intentionally prosecuted and resolved municipal violations in the City of Ferguson in a manner that violates due process and equal protection requirements.

187.    Defendant, its agents, and persons acting on its behalf have intentionally engaged in law enforcement conduct against African-American persons in the City of Ferguson that is discriminatory on the basis of their race.

188.    By the actions set forth above, Defendant has engaged and continues to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 14141(a).

## SECOND CLAIM FOR RELIEF:

## DEFENDANT'S LAW ENFORCEMENT ACTIVITIES VIOLATE

## TITLE VI

189.    The United States re-alleges and incorporates by reference the allegations set forth above.

190.    Defendant received and continues to receive federal financial assistance for its programs and activities.

191.    Defendant has engaged in law enforcement practices that have an adverse disparate impact on African Americans and that are unnecessary to non-discriminatory objectives.

192.    Defendant has engaged in law enforcement practices with the intent to discriminate against African Americans on the basis of their race, color, or national origin.

193.    The United States has determined that all administrative requirements have been exhausted and that securing compliance from the Defendants cannot be achieved by voluntary means.

194.    Defendant's discriminatory law enforcement practices, and intentional discrimination, violate Title VI.

## PRAYER FOR RELIEF

195.    WHEREFORE, the United States prays that the Court:

196.    Declare that the Defendant has engaged in a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, in violation of Section 14141 and Title VI;

197.    Order the Defendant, its officers, agents, and employees to refrain from engaging in any of the predicate acts forming the basis of the pattern or practice of conduct described herein;

198.    Order the Defendant, its officers, agents, and employees to adopt and implement policies, procedures, and mechanisms that identify, correct, and prevent the unlawful conduct described herein that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States; and

199.    Order such other appropriate relief as the interests of justice may require.

Respectfully submitted this 10th day of February, 2016.

_/s/ Vanita Gupta_

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC  20530
(202) 514-4609
NY Bar Reg. Number 4058418


_/s/ Steven H. Rosenbaum_

STEVEN H. ROSENBAUM
Chief, Special Litigation Section
601 D Street NW
Washington, DC  20004
NY Bar Reg. Number 1901958
(202) 616-3244


_/s/ Christy E. Lopez_

CHRISTY E. LOPEZ
Deputy Chief, Special Litigation Section
601 D Street NW
Washington, DC  20004
DC Bar Number 473612
(202) 514-2000


_/s/ Jude J. Volek_

JUDE J. VOLEK
Special Counsel, Special Litigation Section
601 D Street NW
Washington, DC  20004
(202) 353-1077
Permanent Bar Number 10041483N
NY Bar Reg. Number 10041483


CHARLES HART
Trial Attorney, Special Litigation Section


CHIRAAG BAINS
Senior Counsel, Civil Rights Division