UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:16 CV 180 CDP |
| ) | |
| THE CITY OF FERGUSON, ) | |
| ) | |
| Defendant. ) | |

## **Written Testimony of the NAACP Legal Defense and Educational Fund, Inc. Regarding the Proposed Consent Decree between the City of Ferguson and the U.S. Department of Justice**

On behalf of the NAACP Legal Defense and Educational Fund, Inc. (LDF), we would like to thank the court for inviting the public to provide written testimony concerning the proposed consent decree. As the nation's oldest and foremost civil rights legal organization, LDF has utilized the Constitution and federal and state civil rights laws to pursue equality and justice for African Americans and other persons of color in the areas of education, voting, employment and housing for 76 years. In fact, in the late 1940s, LDF's founder, Thurgood Marshall, successfully represented African-American residents of St. Louis, Missouri in a lawsuit claiming that racially-restrictive covenants unconstitutionally prevented them from purchasing property because of their race.[1] LDF has also advocated for unbiased and responsible policing through litigation and policy advocacy.[2]

---

[1] *See generally*, *Shelly v. Kramer* 334 U.S. 1 (1948).
[2] *See, e.g., Shepherd v. Florida*, 341 U.S. 50 (1951). *See also*, Gilbert King, *Devil in the Grove: Thurgood Marshall, the Groveland Boys, and the Dawn of a New America* (Harper Collins 2012); Complaint, *Davis, et al. v. City of New York, et al.*, Case No. 1:10-cv-00699-SAS-HBP (S.D.N.Y Jan. 28, 2010) (challenging the unlawful stopping, questioning and arresting of African-American and Latino public housing residents and their guests by New York City Police Department officers), http://www.naacpldf.org/update/court-approves-final-settlement-federal-class-action-lawsuitchallenging-police-practices-nyc; *Tolan v. Cotton*, Case No. 13-5551, Motion for Leave to File U.S. Supreme Court Amicus Brief, http://www.naacpldf.org/case-issue/tolan-v-cotton (alleging excessive use of force by the Bellaire, Texas Police Department); Sherrilyn Ifill, *Statement by the NAACP Legal Defense and Educational Fund, Inc. Before the President's Task Force on 21st Century Policing* (Jan. 13, 2015), http://www.naacpldf.org/files/case_issue/Sherrilyn%20Ifill%20TestimonyTask%20Force%20on%2021st%20Century%20Policing.pdf.

1

In 2014, following the fatal shooting death of Michael Brown by a Ferguson police officer, LDF assisted local lawyers and activists with developing strategies for improving policing practices. Within days of Mr. Brown's death, LDF's community organizers traveled to Ferguson, Missouri to assist local activists with planning and carrying out peaceful protests. We also sent a letter to then U.S. Attorney General Eric Holder asking the U.S. Department of Justice (DOJ) to employ its authority to end police violence against communities of color in Ferguson and across the country.[3] LDF also published and distributed a briefing paper, *Ferguson in Focus*, which highlighted the history of racial discrimination in the St. Louis area that has resulted in inequities in housing, education, voting and policing.[4]

Additionally, last year, believing that unbiased and responsible policing could occur when all residents have the ability to elect leaders of their choice, LDF partnered with organizations, including the Missouri State Conference of the NAACP, to send letters to elected officials in four cities in the St. Louis area challenging the configuration of their city council and alderman districts. We argued that these districts have the potential to both deny African-American voters the ability to elect candidates of their choice and preclude their fair representation on city councils.[5] LDF urged city leaders to take immediate corrective measures to resolve these issues in order to avoid costly and lengthy litigation.

Most recently, LDF staff attended the City of Ferguson's public comment hearings concerning the City's negotiated consent decree with the DOJ. Overall, the proposed agreement contains many promising provisions that, if followed, could eradicate the use of excessive or lethal force by Ferguson Police Department (FPD), such as the August 2014 police shooting death of Michael Brown, an unarmed 18-year-old African American. Additionally, if properly implemented, there are a number of provisions that could eliminate the unlawful, racially-biased, and predatory policing and court practices that Ferguson police and employees used to generate revenue for the city, as detailed in DOJ's March 2015

---

[3] *See*, Letter from Sherrilyn Ifill, President and Director Counsel, NAACP LDF, to Eric Holder, U.S. Attorney General (Aug. 14, 2014), http://www.naacpldf.org/document/letter-attorney-general-holder-regarding-use-excessive-force-police.
[4] *See*, NAACP Legal Defense and Educational Fund, Inc., *Ferguson in Focus*, http://www.naacpldf.org/files/publications/Ferguson%20in%20Focus_4.pdf.
[5] *See*, LDF Submits Letters to St. Louis Municipalities Addressing Lack of African-American Representation on City Councils, Apr. 15, 2015. http://www.naacpldf.org/press-release/ldf-submits-letter-st-louis-municipalities-addressing-lack-african-american-representa.

stereotypes investigative report.[6] There are, however, provisions in the proposed consent decree that must be improved to ensure that Ferguson's criminal justice system is administered fairly and without regard to race. To this end, LDF offers suggested changes to specific provisions below.

## Voluntary Contacts, Stops, Searches, Citations and Arrests

Paragraph 76b provides that FPD officers will not use race, color, ethnicity, national origin or other protected characteristics as a reason to investigate, search or restrain a person "except as part of an actual and credible description of a specific suspect in an ongoing criminal investigation."[7] This exception is problematic because a description of an African-American man in his twenties may result in stopping all African-American males in their twenties. The exception should be revised to state "race may be considered as a reason to investigate, search or restrain a person only when race, age and gender is included among other identifying characteristics and information. When FPD police carry out stops based on reasonable suspicion that a person fits such a description, the officer may consider other aspects of an individual's physical description such as height or hair color."

Likewise, in a policy guidance issued in 2014, the DOJ condemned the use of race in routine domestic law enforcement stops as a profile. The DOJ guidance stated that the use of race in a suspect description is acceptable only if it is for a specific individual previously identified as involved in crime and not based on stereotypes about a population.[8] In order to prevent racial profiling, it is important that FPD officers do not identify persons mostly or solely on race, but rather in conjunction with as many other identifying characteristics as possible.

## Municipal Court Reform

Paragraph 326 requires the city to create and carry out a comprehensive amnesty program that will require the prosecutor to decline to prosecute all open, unresolved cases initiated prior to January 1, 2014, and to eliminate all warrants associated with those cases,

---

[6] *See*, U.S. Department of Justice, Civil Rights Division, *Investigation of the Ferguson Police Department*, March 4, 2015, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf.
[7] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶ 76b.
[8] *See*, U.S. Department of Justice, *Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity*, Dec. 2014 at 3. https://www.justice.gov/sites/default/files/ag/pages/attachments/2014/12/08/use-of-race-policy.pdf.

"except where the prosecutor finds good cause to continue prosecution..."[9] "Good cause" should be defined in the consent decree.

DOJ's investigation of the Ferguson Police Department and municipal court system has revealed that the issuance of warrants to compel fine payments disproportionately impacted African American defendants in violation of federal law.[10] The attorney responsible for the disproportionate prosecution and incarceration of indigent African-American residents remains in her position. Without a clear definition of the "good cause" clause, the prosecuting attorney maintains excessive discretion, which may continue to result in a disparate impact on African-American residents.

Additionally, because criminal records can serve as a barrier to obtaining employment, housing, public assistance, and other aspects of stability and self-sufficiency,[11] the comprehensive amnesty program should include the expungement of any arrest records associated with the cases that are not prosecuted.[12]

## Public Protests and Demonstrations

Paragraph 119f states that any policy or protocols for policing public protests should include a plan for "clearly communicating to all law enforcement agencies participating in any response to a public demonstration in Ferguson the limitations and requirements for such participation..."[13] This limitations should include the prohibition of the use of military and military-style vehicles, weapons and acoustics to disperse or otherwise police crowds.

Communities of color are disproportionately targeted by law enforcement's use of paramilitary tactics, heavy weaponry, and zero-tolerance policing.[14] The federal government's recent approach to the use of military and military-styled equipment by local police departments should be mirrored by the implementation of the consent decree. Following widespread criticism of the military-style response to protests in Ferguson, the

---

[9] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶¶ 326.
[10] *See*, United States Department of Justice Civil Rights Division, *Investigation of the Ferguson Police Department*, March 4, 2015 at 68-69.
[11] Rebecca Vallas and Roopal Patel, "Sentenced to A life of Criminal Debt: A Barrier to Reentry and Climbing out of Poverty," Clearinghouse Review Journal of Poverty Law and Policy, July–August 2012 at 135.
[12] *See U.S. v. The City of Ferguson*, Consent Decree at ¶ 326
[13] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶ 119f.
[14] *See, War Comes Home*, ACLU, June 2014 at 5. https://www.aclu.org/sites/default/files/field_document/jus14-warcomeshome-text-rel1.pdf (stating that the use of paramilitary weapons and tactics primarily impacted people of color; when paramilitary tactics were used in drug searches, the primary targets were people of color, whereas when paramilitary tactics were used in hostage or barricade scenarios, the primary targets were white).

Obama Administration banned the transfer of certain military equipment to local law enforcement agencies and required more police training, supervision and oversight of use of the other military equipment.[15]

Additionally, DOJ's Community Oriented Policing Services Office conducted an assessment of the police response to the August 2014 demonstrations in Ferguson, MO and found that the use of military equipment and sniper deployment was inappropriate and escalated tensions.[16] Therefore, the proposed consent decree should include specific language limiting the use of military-style equipment during demonstrations.

## School Resource Officer (SRO) Program

Paragraph 210 states that FPD must develop a SRO Program in consultation with the Ferguson-Florissant School District. Prior to the development of this Program, the FPD should consider and the school district must conduct, an assessment to determine whether such a Program is needed.[17]

Research shows that police presence in schools negatively impacts school climate fueling distrust and anxiety among students, despite doing little to improve safety.[18] The use of SRO's also tends to contribute to the disproportionate number of youth of color in the juvenile justice system.[19]

---

[15] *See*, Gregory Korte, "Obama bans some military equipment sales to police" USA Today, May 18, 2015. http://www.usatoday.com/story/news/politics/2015/05/18/obama-police-military-equipment-sales-new-jersey/27521793/.

[16] *See*, Institute for Intergovernmental Research, 2015, *After Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson*, Missouri, COPS Office of Criitical Response Initiative, Washington, DC , at xvii, https://assets.documentcloud.org/documents/2328941/after-action-assessment-of-the-police-response.pdf.

[17] *See*, U.S. v. *The City of Ferguson*, Consent Decree at ¶ 210.

[18] *See*, Justice Policy Institute, *Education Under Arrest: the Case Against Police in Schools* (November 2011) at 3-5. http://www.justicepolicy.org/uploads/justicepolicy/documents/educationunderarrest_fullreport.pdf. (stating that officers in schools often send young people straight to the criminal justice system instead of allowing school officials handle the situation. These referrals have long-term consequences, and the disruption in the arrested child's education further strains the child's relationship with the positive school environment). *Also see*, Russell Skiba et al, *Are Zero Tolerance Policies Effective in the Schools? A Report by the American Psychological Association Task Force* (2006), available at http://www.apa.org/pubs/info/reports/zero-tolerance-report.pdf (Research has found that zero tolerance and other harsh disciplinary approaches do not improve school safety).

[19] *See*, Justice Policy Institute, *Education Under Arrest: the Case Against Police in Schools* (November 2011) at 5. http://www.justicepolicy.org/uploads/justicepolicy/documents/educationunderarrest_fullreport.pdf.; LDF-Appleseed Letter re: school police in McKinney, http://www.naacpldf.org/press-release/school-police-mckinney-texas-arrest-and-ticket-african-american-students-excessive-and (Data shows that from January 2012 to June 2015, African-American students in the McKinney Independent School District, who make up less than 13 percent of the student population, accounted for 39 percent of arrests made by school police, also known as SROs, and 36 percent of misdemeanor tickets).

Instead of funding security personnel in schools, resources should be used to improve school climate and increase the capabilities of teachers and school staff to respond to conflict and problematic behavior. The strategies vary, but specific programs may include Restorative Justice, Social and Emotional Learning, student conflict resolution programs, mentoring, and crisis prevention and intervention.[20]

Also, paragraph 208 should include a subsection (i) requiring that the SROs have no history of being disciplined or complaints filed against them.[21] Also, parents should be included in decisions about which SROs will be assigned to schools. SROs are often not trained to handle minor disciplinary matters, and the combination of possible implicit bias and unchecked discretion results in discipline disparities among youth of color, even though they do not misbehave more frequently than their white peers.[22]

Paragraph 222 limits FPD officers' use of force on school grounds.[23] This provision should include language stating that if an officer uses force, he or she will be placed on desk duty until the incident is investigated.

### Body-Worn and In-Car Camera Program

Paragraph 231a of the consent decree states that body-worn cameras must be activated for "all investigatory stops; all arrests; all searches, except where specifically articulated and approved privacy considerations require a search not to be recorded; all encounters with subjects believed to be in a mental health crisis; and other scenarios as appropriate."[24] The "other scenarios" language is overbroad and could allow cameras to be used for unconstitutional purposes. Requiring officers to record every encounter with the public could at times undermine community members' privacy rights and damage important police-community relationships. Using more specific language than "other scenarios" would strengthen this area of the consent decree.

Paragraph 234 provides that police officers' intentional failure to activate or continue recording on devices contrary to FPD policy could result in discipline.[25] Additional language

---

[20] *See*, Center for Social and Emotional Education, School Climate Brief Vol. 1 No. 1 (January 2010), https://www.schoolclimate.org/climate/documents/policy/sc-brief-v1.pdf.
[21] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶ 208.
[22] *See*, Advancement Project, et al., *Police in Schools Are Not the Answer to Newtown Shooting*, Jan. 2013, http://www.naacpldf.org/files/publications/Police%20in%20Schools%20are%20Not%20the%20Answer%20to%20the%20Newtown%20Shooting%20-%20Jan.%202013.pdf.
[23] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶ 222.
[24] *See Id.* ¶ 231a.
[25] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶ 234.

should be added to ensure that repeated unintentional failures by FPD police to activate or continue recording with devices will be cause for discipline and mandatory training.

All officers involved in a critical incident, such as the use of deadly force, should be required to write a statement on the incident **before** viewing video footage from the body-worn or in-car camera. Viewing the video footage prior to writing the report can cause an officer to conform the report to what the video appears to show, rather than what the officer actually saw and better preserve the independent evidentiary value of officer reports.[26] A provision should be added to section XII. A. of the consent decree stating that all officers involved in a critical incident must write a statement on the incident before viewing the video footage from the body-worn or in-car camera.

Paragraph 238 of the consent decree should include language stating that body-worn and in-car camera footage will not be used to create a directory of photos, such as mug shots, or for facial recognition purposes.[27] The use of facial recognition and other biometric technologies with body cameras could increase racial disparities in policing, particularly in heavily policed communities, such as communities of color. FPD needs to commit to a set of narrow and well-defined purposes for which cameras and their footage may be used.[28]

A provision should be added to the consent decree prohibiting body-worn cameras in school settings due to confidentiality and privacy rights of minors. The presence of police body-worn camera in schools may result in the surveillance of minor student infractions that should not be characterized as criminal conduct.[29]

### Monitoring, Compliance Assessment, and Enforcement

Paragraphs 419-423 of the proposed consent decree calls for the selection of a monitor to oversee the implementation of the agreement. Language should be added to these paragraphs permitting Ferguson residents and other stakeholders to participate in the selection of the monitor and his/her team.[30]

---

[26] *See id. at principle 5.*
[27] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶ 238.
[28] *See,* The Leadership Conference on Civil and Human Rights, *Civil Rights Principles on Body-Worn Cameras*, Principle 2, May 2015 http://www.civilrights.org/press/2015/body-camera-principles.html?referrer=https://www.google.com/.
[29] *See,* Jay Stanley, *Body Cameras on Police in Schools*, March 27, 2015 https://www.aclu.org/blog/free-future/body-cameras-police-schools.
[30] *See, U.S. v. The City of Ferguson*, Consent Decree at ¶¶ 419-423.

The City of Ferguson has a documented history of violating federal, state and local laws as it relates to its justice system.[31] Therefore, central to the implementation of any consent decree will be the selection of a monitor who will supervise the completion of each and every provision. This monitor must have the trust of the community, and the community should be involved in his or her selection. Ferguson residents should have a seat at the table during this process to ensure that the experiences of residents match the data being reviewed by the court and the DOJ. The participation of Ferguson residents in the selection of the monitor will allow residents to be meaningfully involved in the implementation of the consent decree.

Finally, paragraph 462 states that the consent decree "will terminate when the City has been in full and effective compliance for two consecutive years."[32] This provision should be changed to state that the Agreement "will terminate in no less than five consecutive years after the City has been in full and effective compliance." This is especially true in this case where Ferguson officials showed signs of their unwillingness to eradicate the long list of legal violations DOJ uncovered in its investigative report by making unilateral changes to the proposed consent decree, which they negotiated over several months with the DOJ.[33] Termination of the consent decree in no less than five consecutive years after the City has fully and effectively complied with the Agreement assures a sufficient amount of time to determine if the City of Ferguson is in full compliance.

## Conclusion

The proposed consent decree is a very promising and welcome first step towards restoring the civil rights of Ferguson's African-American community and the integrity of Ferguson's criminal justice and municipal court systems. There are important and achievable means of strengthening the decree to achieve this laudable goal. Therefore, LDF respectfully requests that the court consider the comments set forth in this testimony and make modifications to the proposed consent decree accordingly.

---

[31] *See generally,* United States Department of Justice Civil Rights Division, *Investigation of the Ferguson Police Department,* March 4, 2015.

[32] *See, U.S. v. The City of Ferguson,* Consent Decree at ¶ 462.

[33] *See,* Tribune News Services, Ferguson's Proposed Amendments to the DOJ Consent Decree, Chicago Tribune, Feb. 10, 2016, http://www.chicagotribune.com/ct-ferguson-justice-department-plan-20160210-story.html.

Respectfully submitted,

Janai Nelson, Associate Director
Monique Dixon, Deputy Director of Policy
Carlton Mayers, Policy Counsel
**NAACP Legal Defense and Educational Fund, Inc.**