# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **NO. 4:16-cv-000180-CDP** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CATHERINE D. PERRY** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE CITY OF FERGUSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

## <u>CONSENT DECREE</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................... 1

II.      BACKGROUND AND GENERAL PROVISIONS ........................................ 1

III.     COMMUNITY POLICING AND ENGAGEMENT ..................................... 4

     A.   Community Engagement ................................................................ 4
     B.   Neighborhood Policing Steering Committee ................................ 6
     C.   Ferguson Youth Advisory Board and Apartment Neighborhood Group ...... 7
     D.   Community-Oriented and Problem-Solving Policing .................... 7
     E.   Community Mediation Program ..................................................... 8
     F.   Ongoing Assessment and Improvement ......................................... 9

IV.     REFORM OF THE FERGUSON MUNICIPAL CODE ............................... 9

V.      POLICIES AND TRAINING ................................................................... 11

     A.   Policies Generally .......................................................................... 11
     B.   Training Generally ......................................................................... 12

VI.     BIAS-FREE POLICE AND COURT PRACTICES ................................... 16

     A.   Requirements of Bias-Free Policing ............................................. 17
     B.   Ongoing Assessment and Improvement ....................................... 18

VII.    VOLUNTARY CONTACTS, STOPS, SEARCHES, CITATIONS, AND ARRESTS................................................................................................. 19

     A.   Voluntary Contacts:  Social Contacts & Non-Custodial Interviews .......... 20
     B.   Investigatory Stops and Detentions ............................................... 20
     C.   Searches ......................................................................................... 21
     D.   Citations and Arrests ..................................................................... 22
     E.   Stop Orders, or "Wanteds".......................................................... 23
     F.   Supervision .................................................................................... 24
     G.   Ongoing Assessment and Improvement ....................................... 26

VIII.   FIRST AMENDMENT PROTECTED ACTIVITY ................................... 26

     A.   Right to Observe and Record ........................................................ 27
     B.   Public Protests and Demonstrations .............................................. 28
     C.   Retaliation for First Amendment Activity Prohibited ................... 29
     D.   Supervision of First Amendment Related Arrests and Seizures ................. 29
     E.   Ongoing Assessment and Improvement ....................................... 30

IX.     FORCE .................................................................................................. 30

     A.   General Use-of-Force Requirements.............................................. 31
     B.   Weapon-Specific Requirements .................................................... 34
     C.   Use of Force in Ferguson Jail........................................................ 40
     D.   Use-of-Force Reporting and Investigation .................................... 40
     E.   Ongoing Assessment and Improvement ....................................... 45

X.      CRISIS INTERVENTION ...................................................................... 46

    A.  Crisis Intervention Coordinator ................................................. 46
    B.  Specialized Crisis Intervention Officers ................................... 47
    C.  Crisis Intervention Requirements ............................................. 47
    D.  Ongoing Assessment and Improvement ................................... 48

**XI.**    **SCHOOL RESOURCE OFFICER PROGRAM ............................... 48**

    A.  Revision of SRO Program and Training and Qualifications of SROs ........ 49
    B.  SRO Non-Involvement in School Discipline ............................. 50
    C.  Minimizing School Arrests and Force ...................................... 50
    D.  SRO Supervision and Evaluation ............................................. 51
    E.  Ongoing Assessment and Improvement ................................... 52

**XII.**    **BODY-WORN AND IN-CAR CAMERAS ..................................... 52**

    A.  Body-Worn and In-Car Camera Requirements ......................... 53
    B.  Supervisory Responsibilities Related to Body-Worn and In-Car
        Cameras ................................................................................... 55
    C.  Storage and Public Availability of Recordings ......................... 56
    D.  Ongoing Assessment and Improvement ................................... 57

**XIII.**    **SUPERVISION .......................................................................... 57**

    A.  Supervisory Character and Duties ............................................ 57
    B.  Supervisor Staffing and Officer Assignment to Supervisors ... 58
    C.  Early Intervention System ........................................................ 59
    D.  Ongoing Assessment and Improvement ................................... 62

**XIV.**    **OFFICER ASSISTANCE AND SUPPORT .................................. 62**

    A.  Support Services for Officers and Their Families ...................... 62
    B.  Officer Support During Public Demonstrations and Periods of Civil
        Unrest ...................................................................................... 63
    C.  Ongoing Assessment and Improvement ................................... 64

**XV.**    **RECRUITMENT ........................................................................ 64**

    A.  Recruitment Plan ..................................................................... 64
    B.  Ferguson Police Department Academy Assistance Program ..... 66
    C.  Background Investigation and Screening System ...................... 66
    D.  Ongoing Assessment and Improvement ................................... 67

**XVI.**    **PERFORMANCE EVALUATIONS AND PROMOTIONS ....................... 68**

    A.  Performance Evaluations .......................................................... 68
    B.  Promotions .............................................................................. 69
    C.  Ongoing Assessment and Improvement ................................... 70

**XVII.**    **SUPPLEMENTAL RECRUIT AND IN-SERVICE TRAINING ................ 71**

    A.  Information Regarding this Agreement ..................................... 71
    B.  Community Policing, Critical Thinking, and Problem-Solving Policing
        Training .................................................................................... 71
    C.  Training to Promote Bias-Free Policing ................................... 72

|  | D. | Stop, Search, and Arrest Training ................................................ 72 |
|--|----|----|
|  | E. | First Amendment Training ........................................................ 73 |
|  | F. | Use-of-Force Training ............................................................. 73 |
|  | G. | Crisis Intervention Training ..................................................... 75 |
|  | H. | School Resource Officer Training............................................. 75 |
|  | I. | Body-Worn and In-Car Camera Training ................................... 76 |
|  | J. | Supervisor Training ................................................................. 76 |
|  | K. | Officer Wellness Training ........................................................ 77 |
|  | L. | Accountability Training ........................................................... 78 |

| XVIII. | MUNICIPAL COURT REFORM ................................................... 78 |
|--------|----|
|  | A. | Ensuring that Municipal Code Enforcement is Driven by Public Safety.... 78 |
|  | B. | Comprehensive Amnesty Program............................................. 79 |
|  | C. | Revision of Ferguson Municipal Court Practices ....................... 80 |
|  | D. | Ongoing Assessment and Improvement..................................... 88 |

| XIX. | ACCOUNTABILITY ................................................................. 89 |
|------|----|
|  | A. | Principles of Accountability..................................................... 89 |
|  | B. | Misconduct Complaint Intake, Investigation and Adjudication.................. 90 |
|  | C. | Internally Discovered Violations of Policy that Do Not Involve Members of the Public .......................................................... 97 |
|  | D. | Community-Centered Mediation of Misconduct Complaints.................... 97 |
|  | E. | Ongoing Assessment and Improvement..................................... 98 |

| XX. | CIVILIAN OVERSIGHT ............................................................ 99 |
|-----|----|

| XXI. | DATA COLLECTION, REPORTING, AND TRANSPARENCY............ 102 |
|------|----|
|  | A. | Data Collection...................................................................... 102 |
|  | B. | Public Availability of Policies and Reports .............................. 102 |
|  | C. | Annual Report ...................................................................... 102 |

| XXII. | MONITORING, COMPLIANCE ASSESSMENT, AND ENFORCEMENT................................................................... 103 |
|-------|----|
|  | A. | Independent Monitor .............................................................. 103 |
|  | B. | Selection and Compensation of the Monitor............................. 104 |
|  | C. | Duties of the Monitor ............................................................ 105 |
|  | D. | Monitor and DOJ Access and Confidentiality ........................... 116 |
|  | E. | City of Ferguson Consent Decree Coordinator ......................... 118 |
|  | F. | City of Ferguson Data Collection, Self-Assessment, and Report ............. 119 |
|  | G. | Court Jurisdiction, Modification of this Agreement, and Enforcement .... 119 |
|  | H. | Termination of this Agreement ................................................ 120 |

| XXIII. | DEFINITIONS..................................................................... 121 |
|--------|----|

## I.     INTRODUCTION

The United States of America and the City of Ferguson (collectively, "the Parties") enter into this Consent Decree ("Agreement") with the shared recognition that the ability of a police department to protect the community it serves is only as strong as the relationship it has with that community.  The provisions of this Agreement are meant to ensure protection of the constitutional and other legal rights of all members of the community, improve Ferguson's ability to effectively prevent crime, enhance both officer and public safety, and increase public confidence in the Ferguson Police Department (FPD).

To achieve these goals, the City of Ferguson ("City") agrees to continue to change how FPD polices, and how it enforces the Ferguson Municipal Code and resolves municipal charges. This Agreement sets forth terms and requirements for the City and FPD to continue to reorient their approach to law enforcement to focus on community engagement and collaborative partnerships with groups and individuals throughout Ferguson, including those segments of the community that have not previously had strong or positive relationships with FPD or the City. The Agreement is designed also to increase transparency, strengthen accountability measures, and increase community and officer confidence that these systems are fair and consistent.  The Agreement further includes requirements regarding the training, supervision, and direction necessary to police effectively and in a manner that builds community trust and improves officer safety and morale.  The Parties also recognize that FPD officers often work under difficult circumstances, risking their physical safety and well-being for the public good.

For these reasons, and noting the general principle that settlements are to be encouraged, particularly settlements between government entities, the Parties agree to implement this Agreement under the following terms and conditions.

## II.     BACKGROUND AND GENERAL PROVISIONS

1.     On September 4, 2014, the United States Department of Justice (DOJ) notified the City that it was initiating an investigation of FPD for an alleged pattern or practice of unlawful misconduct, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"); the anti-discrimination provisions of the Omnibus Crime Control

and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act"); and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d ("Title VI").

2.     DOJ issued a 102-page written report of its findings ("Report") on March 4, 2015. The Report documents DOJ's finding of a number of patterns or practices of unconstitutional conduct and details DOJ's concerns about a number of Ferguson's police and court policies and practices.

3.     While the City does not agree with every finding or opinion referenced in the Report, the City desires to focus its attention and resources on implementing a better community-oriented policing model and to become an exemplar of modern community-oriented policing for the entire region and for other cities of similar size.

4.     The City's desire and commitment to this goal is demonstrated by the actions that the City has already undertaken, especially since August 2014.  The City has been willing, and remains willing, to continue such actions and to cooperate with DOJ to fulfill its aspiration to become an exemplar of modern community-oriented policing.  DOJ acknowledges the good faith of Ferguson in trying to address actions that are needed to promote integrity in its police department and municipal court to ensure constitutional policing and court practices.

5.     This Agreement is effectuated pursuant to the authority granted to DOJ under Section 14141 to seek declaratory and equitable relief where DOJ has reasonable cause to believe that there is a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law.

6.     Nothing in this Agreement is intended to limit the lawful authority of the Ferguson City Council or the lawful authority of the Chief of Police to oversee the operations of FPD.

7.     Nothing in this Agreement, the United States' Complaint, or the negotiation process shall be construed as an admission or evidence of liability under any federal, state, or municipal law including, but not limited to, 42 U.S.C. § 1983.  Nor is the City's entry into this Agreement an admission by the City, FPD, or any officer or employee of either entity that it has engaged in any unconstitutional, illegal, or otherwise improper activities or conduct.  The City's entry into this Agreement is not an admission of any of the findings or conclusions contained in DOJ's March 4, 2015 Report.

8.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345. The United States is authorized to initiate this action pursuant to 42 U.S.C. § 14141 and 42 U.S.C. § 3789d.  Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391, because the Defendant is located in, and the claims arose in, the Eastern District of Missouri.

9.      The Parties have determined that this Agreement, rather than costly and protracted litigation, is the most effective means to resolve all issues between DOJ and the City.

10.      This Agreement resolves all claims in the United States' Complaint filed in this case.  This Agreement also constitutes a full and complete settlement of any and all civil claims the United States may have as of the Effective Date against the City and its officers, employees, or agents, regarding any alleged pattern or practice of conduct by FPD officers and other City employees in carrying out the responsibilities referenced in the Report or the United States' Complaint.

11.      This Agreement shall constitute the entire integrated agreement of the Parties.  No prior drafts or prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

12.      This Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, assigns, and successors.  If the City establishes, reorganizes, or contracts with a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing or assuming the operations of FPD or any aspect thereof, including the Municipal Court, the City agrees to ensure these functions are consistent with the terms of this Agreement and shall incorporate the terms of this Agreement into the functions of the government agency or contracting entity as necessary to ensure consistency.

13.      This Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action.  Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

14.      In the event of any public-records request for drafts of this Agreement or communications among the Parties leading to this Agreement, the Court will maintain continuing jurisdiction over any such request.  Further, the Parties may assert in any action, motion,

3

subpoena, or request for disclosure of information the ongoing applicability of a settlement privilege to all such drafts or communications among the Parties leading to this Agreement.  The assertion of such privilege would be decided by the court with jurisdiction over the action, motion, subpoena, or request for disclosure.

15.      This Agreement is not intended to limit or expand the right of any person or organization to seek relief against the City, FPD, or any officer or employee thereof, for their conduct or the conduct of FPD officers; accordingly, it does not alter legal standards governing any such claims by third parties, including those arising from city, state, or federal law.  This Agreement does not expand, nor will it be construed to expand, access to any City, FPD, or DOJ documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the City, FPD, and the Monitor.

16.      The City is responsible for providing necessary support and resources to FPD to enable FPD to fulfill its obligations under this Agreement, and as otherwise necessary to ensure that the requirements of this Agreement are fully implemented and sustained.

17.      In the interest of avoiding costly and protracted litigation, the City, and its officials, agents, employees, and successors, by and through the City Council, agrees to entry of this injunction from engaging in conduct that deprives persons of rights, privileges, or immunities secured or protected by the laws of the United States.

### III.      COMMUNITY POLICING AND ENGAGEMENT

18.      Strong community partnerships and frequent positive interactions between police and members of the public make policing more effective, increase public confidence in law enforcement, and can reduce bias.  To promote and strengthen community partnerships and positive interactions between officers and Ferguson residents, the City and FPD will increase opportunities for community engagement and will continue to adopt a policing approach that is community-oriented and based on problem solving principles as described below.

### A.      Community Engagement

19.      Within 180 days of the Effective Date, the City will begin to host and participate in a series of small-group structured dialogues, arranged and led by a qualified neutral facilitator, between police officers and community members and groups, with an emphasis on community members and groups who previously have not had strong or positive relationships with FPD or

the City.  Each FPD police officer will participate in at least one series of meetings, with each series consisting of at least three structured, facilitated dialogues between the same set of officers and community members.  FPD officers will make up at least one-third and up to one-half of each dialogue group.

20.     Within 180 days of the Effective Date, the City and FPD will develop and begin implementing an FPD community-engagement plan for creating opportunities for routine and frequent positive interactions between officers and community members.  The plan will be developed in consultation with the Neighborhood Policing Steering Committee to be established pursuant to paragraph 21 of this Agreement; Ferguson's Civilian Review Board; representative individuals and groups within Ferguson; and community stakeholders who can provide unique perspectives and assistance, such as local colleges and universities.  The community engagement plan will:

a.  Provide for all sworn representatives of FPD to actively participate in neighborhood and community meetings and other events designed to bring a diverse group of community members and police personnel together.   The plan will address the number of meetings and events to be attended by sworn personnel and shall ensure that all sworn officers are scheduled for certain meetings and events throughout the year.  In no event shall this provision be construed to require that all sworn officers must attend any particular meeting or event.  The plan will indicate the number and types of meetings and events to be attended on a regular basis;

b.  Establish or provide for participation in a variety of long-term programs that promote and foster positive police-youth interactions.  Potential programs include activities with the Ferguson Youth Initiative and Ferguson Youth Advisory Board and local athletic, art, or music programs;

c.  Provide for the continuation of an FPD Explorer Program for youth in Ferguson, ages 12 to 21 years, to learn police-related skills and assist with community events and outreach; and

d.  Place emphasis on creating opportunities for positive interactions with communities of color and residents of Ferguson's apartment complexes.

### B.   Neighborhood Policing Steering Committee

21.   Within 90 days of the Effective Date, the City will begin community meetings to solicit volunteers and community members to serve on the Neighborhood Policing Steering Committee (NPSC), which shall perform a separate function than the Civilian Review Board (CRB) already established by the City and addressed in Section XX.  Within 180 days of the Effective Date, the City will establish the NPSC.  The NPSC will serve as a meaningful, but not exclusive, mechanism through which a diverse and broadly representative set of members of the Ferguson community can provide input to FPD and the City on law enforcement issues.  The NPSC will provide input and be instrumental in developing the City's Neighborhood Policing Plan.  The NPSC will specifically perform the following advisory responsibilities:

    a.  Assist in the development of the community-engagement plan described in paragraph 20 above;

    b.  Advise FPD on strategies, training, and policies to improve community relations, implementation of the Neighborhood Policing Plan described in paragraph 26, and promotion and improvement of bias-free policing;

    c.  Coordinate with neighborhood groups and work with FPD to establish and carry out public safety priorities;

    d.  Provide recommendations to the City Council with regard to reform of, and amendments to, the Ferguson Municipal Code;

    e.  Provide input in the hiring and recruitment process for new officers, including lateral hires, as set forth in Section XV; and

    f.  Provide the City with input regarding the implementation of this Agreement, and provide the community with information about the status of implementation.

The agreement to give the NPSC these advisory responsibilities in no way changes or limits the advisory responsibilities of the CRB.  Both the NPSC and the CRB are expected to participate in many of the advisory duties described above.

22.   Within 180 days of the Effective Date, the City agrees to enact any City ordinances necessary to establish the NPSC and agrees to either:  (a) select, pursuant to selection protocols developed in consultation with DOJ and with input of the broader Ferguson community, members of the NPSC who are representative of the diverse communities served by FPD; or (b) not limit the number of participants on the NPSC and allow attendees and volunteers

6

to participate and choose the specific category to which such attendees and volunteers would like to devote time.

23.     The City will, in consultation with FPD and the NPSC, develop and implement policies to receive, consider, respond to, and act upon NPSC recommendations in a fully transparent and timely manner.  The City will designate a City employee to provide administrative support necessary for the NPSC to effectively perform its advisory function.

### C.     Ferguson Youth Advisory Board and Apartment Neighborhood Group

24.     The City will continue the Ferguson Youth Advisory Board that was established in 2011.  The City will revise as necessary the enabling ordinances to ensure that the Ferguson Youth Advisory Board provides input to FPD and the City on law enforcement issues, especially issues that have a particular impact on young people, such as FPD's School Resource Officer Program, FPD's pedestrian stop practices, and the selection and implementation of youth-focused FPD community engagement programs set out in paragraph 20 above.

25.     Within 180 days of the Effective Date, the City agrees to assist with the establishment of a Neighborhood Association in each of Ferguson's apartment complexes, including, for example, Canfield Green, Parkridge, and Northwinds.  The City will work with these apartment complex Neighborhood Associations in the same manner that the City consults and works with other Neighborhood Associations, such as Old Ferguson East, Jeske Park, and Old Ferguson West.

### D.     Community-Oriented and Problem-Solving Policing

26.     Building on its ongoing development of a Neighborhood Policing Plan and the community engagement efforts outlined above, within one year of the Effective Date, the City will develop an FPD crime-prevention plan and a community-policing plan to ensure that policing is oriented around community priorities and partnerships, and based on problem-solving principles.

27.     FPD's Community-Policing Plan will include a commitment to, and timelines for, implementing within two years, Ferguson's "Neighborhood Policing Plan:  A Police Community Partnership," along with the additional elements set out in this section.

28.     FPD will conduct monthly command staff meetings to discuss and analyze significant crimes, crime trends, policing complaints, neighborhood quality of life issues, as well as community priorities for policing, and to develop strategies for working with community

7

members to address these issues.  FPD commanders also will discuss and assess progress and identify needed and available resources to reduce crime and improve police-community relationships.

29.     FPD will structure individual officer patrol areas around specific neighborhood boundaries, and, through supervision and evaluation, will encourage direct officer-resident communication.   FPD will assign officers to specific areas to allow for neighborhood problem-solving projects, and will assign officers to patrol such areas for a minimum of one year.  FPD also will require officers to:

a.  Periodically patrol via walking and/or bicycle patrols in their assigned patrol area;

b.  Provide residents in their assigned area with their business email and business telephone number, and respond to calls and emails directed to such officers from residents in their assigned area within a reasonable time period; and

c.  Attend community meetings, as scheduled, within the officers' assigned patrol area.

30.     FPD will revise its current shift schedules and deployment to better support a community-oriented approach to policing, and will post officer patrol area assignments on the FPD website.

31.     FPD will timely collect, analyze and disseminate public crime data for each patrol area or other geographic area, as feasible and appropriate.

**E.      Community Mediation Program**

32.     Within two years of the Effective Date, the City will affiliate with the Community Mediation Services of St. Louis to conduct neighborhood mediations that promote lasting resolutions of appropriately selected disputes among community members, while reducing the need for involvement in the criminal justice system.   DOJ will approve that affiliation to ensure it comports with best practices in community meditation and the requirements below.

33.     Within 180 days of the Effective Date, the City will, in consultation with members of the Ferguson community and the Monitor, develop a plan for providing neighborhood mediations in Ferguson.  The plan will include an implementation timeline for interim steps, as appropriate, such as the retention of an administrator and volunteers; training; and initiation of mediations.

34.     This neighborhood mediation program will:

a.  Support mediation at all stages of the dispute, from early-intervention to intervention after charges have been filed, as a diversion from the criminal justice system;

b.  Be administered by an individual with experience in neighborhood mediation or the administration of mediation programs, including the selection and training of mediators (this individual may also administer the misconduct mediation program required by Section XIX);

c.  Use mediators that reflect the diversity of, and come from the communities served by, the program;

d.  Ensure that mediators are trained consistently with best practices;

e.  Have a screening tool to ensure that mediation participants can speak for themselves in the mediation without fear of retaliation; and

f.  Have quality assurance mechanisms to ensure that all components of the program, including volunteer participants, are operating effectively and consistently with best practices.

**F.     Ongoing Assessment and Improvement**

35.     Within one year of the Effective Date, the City will develop protocols for regularly, and at least annually, conducting cost-feasible data-driven and qualitative assessments to measure the level and impact of its community engagement and community policing initiatives.  These assessments will be designed to ensure community-based initiatives are being implemented effectively and appropriately.  As part of the assessment process, the City and FPD will identify deficiencies and opportunities for improvement, implement appropriate corrective action and improvement measures, and document measures taken.

## IV.     REFORM OF THE FERGUSON MUNICIPAL CODE

36.     To ensure constitutional enforcement of the Ferguson Municipal Code ("Code") and further promote community-oriented policing, the City agrees to revise the Code and ensure that it comports with the United States Constitution and other laws; establishes clearly defined municipal offenses and appropriate penalties for violations; and adequately protects the public health, safety, and welfare.  To achieve these outcomes, the City will implement the requirements below.

37.     The City has repealed Code Section 13-58 ("Failure to Appear Upon Arrest or Summons"); Section 13-60 (authorizing a fee for "Withdrawal of Complaint"); Section 1-16 (providing that individuals who fail to pay a fine or costs imposed for a municipal violation shall be imprisoned one day for every ten dollars of any such unpaid fine); and Section 1-17 (which pertained to imprisonment for failure to pay fine or cost of prosecution to include work).  The City agrees that these provisions of the Ferguson Municipal Code will remain repealed and will not be replaced with any similar ordinance.

38.     The City has prepared amendments, attached to this Agreement (see Attachment A), to the following sections of the Municipal Code.  To the extent that the City has not yet adopted such amendments as of the Effective Date of the Agreement, the City agrees to do so within 30 days of the Effective Date.

    a.   Sections 13-26, 13-52, 13-61, 13-63, 13-68,  and 13-70(2) and (3), regarding the administration of the Ferguson Municipal Court;

    b.   Sections 29-16, the "Failure to Comply with Order of Police Officer" ordinance;

    c.   Sections 1-15 and 44-15 regarding available penalties;

    d.   Section 7-145.1, "Occupancy Permit;" and

    e.   Section 44-339, "Use of Right Half of Crosswalks," Section 44-341, "Crossing at Right Angles," and Section 44-344, "Manner of Walking Along Roadway," each of which will be repealed.

39.     The City agrees to make any additional revisions to the Code necessary to enable the City to comply with this Agreement and the law.  Where the Parties do not agree whether a revision is required, the Parties may seek resolution by the Court.

40.     Within 120 days of the Effective Date, the City agrees to develop and implement a plan for the comprehensive reassessment and revision of remaining Code provisions in order to ensure that they are consistent with the United States Constitution and other laws and provide clear and appropriate guidance to the public and law enforcement officers.  The reassessment and revision process will also be aimed at ensuring that the Code is designed and enforced in a manner that is focused on protecting public health, safety, and welfare.  To help ensure that the Code's design and enforcement are not unnecessarily burdensome on members of the Ferguson community and furthers public health, safety, and welfare, the City will conduct outreach meetings, including holding and attending meetings in locations throughout Ferguson, to hear the

views of persons within the community, and will consider and incorporate these views into its
code revisions where appropriate.

## V.     POLICIES AND TRAINING

41.     To ensure that officers have the knowledge, skills, and direction necessary to
police constitutionally, effectively, and in a manner that promotes both officer and public safety,
the City agrees to continue to enhance its policies and increase the quality and scope of training
provided to FPD officers and other FPD employees.  As set forth in this section, the City agrees
to develop systems for policy and training development and delivery that will generate policies
and training that are current, responsive to identified needs, and effective.  The City agrees to
implement policies that reflect its commitment to community policing, procedural justice, and
bias-free policing, and to support these directives through effective training for recruits, as well
as for new and experienced officers, that reflects these same principles.  Substantive training
requirements for in-service and supplemental basic training are set out in Section XVII below.

### A.     Policies Generally

42.     The City agrees to incorporate the requirements of this Agreement into FPD and
City policies and procedures as appropriate.  These policies and procedures will fully incorporate
the terms of this Agreement, be consistent with best practices, and comply with applicable law.
The City agrees that its policies and procedures will be plainly written, logically organized, and
use terms that are clearly defined.  Unless otherwise noted, the City will seek to develop and
implement all policies and procedures required by this Agreement within one year of the
Effective Date, and will ensure the development and implementation of all such policies and
procedures within two years of the Effective Date.

43.     The City agrees to ensure that officers from all varying ranks and units have a
meaningful opportunity to review and comment on new or revised policies and procedures.

44.     The City agrees to submit all policies, procedures, protocols, plans and other
administrative orders or directives related to this Agreement, as well as any proposed revision to
such materials, to the Monitor and DOJ for review and approval prior to publication and
implementation.  Approval by the Monitor and DOJ will be based upon consistency with this
Agreement, best practices in the relevant area, and applicable law.

45.     The City agrees to review each policy or procedure within one year of its implementation, and annually thereafter, to ensure that the policy or procedure provides effective direction to FPD personnel and remains consistent with this Agreement, best practices in the relevant area, and current law.  The City agrees to review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews.

46.     The City agrees to maintain a complete, up-to-date manual of all FPD policies and procedures that is organized and maintained in a manner that makes it easily accessible and clear to officers, employees, and others.  Officers and employees will have access to the manual in hard copy form, and in a readily usable electronic format (e.g., through an FPD intranet system accessible within the mobile data computers of FPD officers).  Revisions and updates to FPD policies and procedures will be incorporated into the manual.

47.     The City agrees to ensure that changes in relevant case law and statutes are disseminated to relevant FPD personnel in a timely manner and incorporated, as appropriate, into FPD policies, procedures, and training.

**B.     Training Generally**

48.     Unless otherwise noted, the training required under this Agreement, as set out in this section and in Section XVII, and training on all policies revised or developed pursuant to this Agreement, will begin within 90 days of the Effective Date and be fully delivered within two years of the Effective Date.  The parties acknowledge that FPD has already undertaken training on certain topics described in this Section and in Section XVII.

*1.  Training Committee and Plan*

49.     Within 180 days of the Effective Date, FPD agrees to establish a Training Committee that will include representatives from FPD and the Neighborhood Policing Steering Committee.  The Training Committee may consult with additional training and subject matter experts as the Training Committee deems necessary.

50.     Within 180 days of the Effective Date, FPD, in coordination with the Training Committee, will develop a schedule, to be approved by the Monitor and DOJ, for delivering all training specifically required by the provisions of this Agreement.

51.     Within one year of the Effective Date, the Training Committee will develop a written Training Plan for supplementing FPD recruits' academy training; enhancing FPD's field

12

training with a revised Police Training Officer program; and implementing comprehensive in-service training for officers and other City and FPD employees.  The Training Plan will be developed in consultation with the Monitor and the City's retained expert and must be approved by DOJ.  The Training Plan will:

    a.  Identify training priorities, principles, and broad goals consistent with this Agreement and the substantive training requirements set out in Section XVII below;

    b.  Include a plan for delivering supplemental basic training and in-service training, as necessary to provide the relevant training required by this Agreement;

    c.  Coordinate the topics of supplemental basic training and in-service training with Police Training Officer training;

    d.  Establish the frequency and subject areas for supplemental basic and in-service training;

    e.  Develop a plan for at least 50 hours of annual in-service training each year, with approximately 65 hours of annual in-service training for each of the first two years of the Agreement;

    f.  Identify available training delivery and related resources, as well as unmet needs, such as instructors, curricula, and equipment;

    g.  Coordinate with City and others to assist in obtaining necessary training resources; and

    h.  Establish a rubric for assessing the content and delivery of training, including training provided by outside instructors or non-FPD entities.  This rubric will allow for the measurement and documentation of student reaction to, and satisfaction with, the training they received, and student learning as a result of training, including the extent to which students are applying the knowledge and skills acquired in training to their jobs.

### 2.  Training Instructors and Curricula

52.    The Training Committee, pursuant to the Training Plan and in consultation with FPD's training coordinator, the Monitor, and DOJ, will review all training curricula and lesson plans for consistency, quality, and compliance with applicable law, FPD policy, and this Agreement.  The Training Committee will ensure that a variety of adult learning techniques,

13

scenario-based training, and problem-solving practices, in addition to traditional lecture formats, are incorporated into training delivery.  The Training Committee will advise the Parties regarding training that can be delivered in roll-call or online, as opposed to training that will require more intensive delivery.  The Training Committee will also assess instructor qualifications and testing materials.

53.     Within 18 months of the Effective Date, in consultation with the Training Committee, FPD will develop or adopt supplemental basic training and in-service training curricula and lesson plans for the training required pursuant to this Agreement.  All curricula and lesson plans will be reviewed and approved by the Monitor and DOJ prior to delivery.  All training required by this Agreement that is conducted by an outside instructor or non-FPD entity will be reviewed and approved by the Monitor and DOJ prior to delivery.

54.     With the assistance of the Training Committee, FPD will ensure that instructors are qualified, and that all instructors, curricula, and lesson plans have been approved by the Training Committee, the Monitor, and DOJ.  With the assistance of the Training Committee, FPD will actively seek out and retain qualified instructors from outside FPD to supplement the skills of its in-house training staff and adjunct instructors.  As appropriate, FPD will incorporate experts and guest speakers, including judges, prosecutors, crime victims, criminal justice professors, community resource providers, and community members, including youth, to participate in relevant courses.

### 3. *Training Review and Update*

55.     The Training Committee will review and update FPD's Training Plan every 18 months.  To inform these updates, the Training Committee will conduct a needs assessment, taking into consideration:  effectiveness of past training, as measured by the rubric described above; trends in misconduct complaints; any problematic uses of force; analysis of officer safety issues; input from members at all levels of FPD; input from members of the community, including community concerns; court decisions; research reflecting the latest in law enforcement trends; and any changes to Missouri or federal law, or FPD policy.  The Training Committee will also assess FPD's Police Training Officer program on an annual basis, as set out in Section V.B.5 below.

#### *4.   Training Coordination, Instructors, and Tracking*

56.     FPD agrees to designate a Training Coordinator to oversee implementation of all training; provide administrative assistance to the Training Committee; track training delivery; and ensure that training is delivered consistently with FPD's Training Plan and the terms of this Agreement.  The Training Coordinator will also be responsible for ensuring the measurement and documentation of training effectiveness, using the rubric designed by the Training Committee, described above.

57.     The Training Coordinator shall ensure that all officers complete training as required and that documentation of training is maintained.  FPD will accurately document all training provided to, or received by, FPD officers (whether required or otherwise) in a manner that allows analysis by training type, training date, training source, and by individual officer name.  FPD will facilitate and encourage officer training by allowing for sufficient overtime and time off, as necessary.  FPD will develop and implement measures, including disciplinary and non-disciplinary corrective action, to ensure that all officers successfully complete all required training programs as scheduled by FPD.

#### *5.   Police Training Officer Program*

58.     Within two years of the Effective Date, FPD will redevelop its field training program for new recruits into a Police Training Officer (PTO) program that is consistent with FPD's Training Plan and this Agreement.  The PTO program will incorporate established standards for police training officer programs, such as employing contemporary methods of adult education and problem-based learning methods.

59.     Within one year of the Effective Date, FPD will develop and implement a participation policy that ensures only highly qualified officers serve as Police Training Officers. FPD agrees to develop eligibility criteria and methodology to select PTOs based on their written applications, performance evaluations, previous performance as police officers, and complaint and disciplinary histories.

60.     FPD agrees to ensure that all PTOs receive a minimum of 40 hours of initial training, as well as necessary refresher training, consistent with the training plan, after one year of participation in the program.  This training will be adequate in quality, quantity, scope, and type, and will address management and supervision; community-oriented policing; effective

problem-solving techniques; and field communication.  PTOs will be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing and teaching community-oriented policing, and solving problems effectively.  FPD will maintain current documentation of PTOs' evaluations and training and remove PTOs or add as appropriate and necessary.

61.     Within one year of the Effective Date, FPD will create a mechanism for recruits and lateral hires to provide confidential feedback regarding the quality of their PTO training, including the extent to which that training was consistent with what they learned in the academy or prior experience, and suggestions for changes to FPD's training programs.  FPD will document its response, including the rationale behind any responsive action taken or decision to take no action.

62.     FPD's Training Committee will, on an annual basis, assess FPD's PTO program and consider emerging national policing practices in this area, and make recommendations for modifications to the City as appropriate.  The City will institute appropriate changes to policies, procedures, and training related to FPD's PTO program.

### 6.  *Supplemental Basic Training*

63.     FPD agrees to ensure that:  (a) new police recruit hires will have graduated from a police academy requiring at least 900 hours of basic training for graduation; or (b) for recruits who did not graduate from such an academy, FPD will develop a plan for providing supplemental individualized training to such FPD recruits, to ensure that such recruits have at least 900 hours of basic training which include the supplemental basic training content described in Section XVII.  FPD further agrees to develop individualized training plans for lateral police hires for providing supplemental training as necessary to ensure that the lateral police hire, through a combination of academy training, subsequent in-service training, and the supplemental training provided by FPD, has training that is substantively equivalent to a 900-hour training academy and the training requirements of this Agreement.

### VI.     BIAS-FREE POLICE AND COURT PRACTICES

64.     This Agreement, in its entirety, will be implemented in a manner that ensures equal protection of the law for all individuals, regardless of race, color, ethnicity, national origin, religion, gender, sexual orientation, disability, or other protected characteristics.  The provisions

16

below, alongside the related training requirements in Section XVII.C of this Agreement, most directly address the obligations of the City, through FPD officers and employees, to provide police and court services free from unlawful bias or discrimination, and to fully recognize and value the legal rights and inherent dignity of all individuals, regardless of their protected characteristics.

       A.     **Requirements of Bias-Free Policing**

     65.    The City has prohibited unlawful discrimination as provided in Chapter 21 of the Ferguson Municipal Code.  The City will administer all programs, initiatives, activities and police services without unlawful discrimination on the basis of race, color, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, immigrant status, disability, housing status, occupation, or limited English proficiency.

     66.    The City agrees to provide clear policy, training, and supervisory direction on prohibited conduct, including selective enforcement activities or decisions, or non-enforcement of the law, and the selection or rejection of particular tactics and strategies based upon stereotypes or bias.  If necessary, the City will retain consultants in developing this policy, training, and supervisory direction, and such consultants shall possess the requisite expertise and be approved by DOJ.  The City's policies, training and supervisory direction shall take into account the influences of implicit bias, stereotype threat, and gender bias on officer enforcement decisions, use of force, and other police and court activity.

     67.    The City agrees that all FPD police and court employees will provide timely and meaningful access to police and court services to all, including individuals who have a limited ability to speak, read, write, or understand English (LEP individuals).  The City will develop and implement, in consultation with the Monitor and with approval by DOJ, the policies and training necessary to ensure timely and meaningful police services to LEP individuals.

     68.    The City agrees to revise policy, training and supervisory direction related to officer response to allegations of domestic violence and sexual assault, which are largely crimes against women, to ensure that the law enforcement response is both effective and not undermined by gender bias.

     69.    The City agrees to consider any indicia of unlawfully discriminatory policing or other bias by officers or officer candidates in evaluating officer performance and making hiring and promotion decisions.  This includes giving significant weight to an individual's history of

sustained bias-related violations, including sexual harassment or discrimination against City employees or members of the public.

70.     The City agrees to assess, and if necessary, improve upon the accuracy and reliability of, FPD's current processes for collecting and analyzing state-mandated "racial profiling" data.  The City will develop protocols for collecting and analyzing such data, which will set forth additional data to be collected and analyzed and improve the accuracy and reliability of data collection methods.  Such protocols will be consistent with the data collection requirements of Section XXI of this Agreement.

71.     The City agrees that, if at any point it identifies indicia of unlawfully discriminatory conduct, it will take immediate corrective action as necessary to ensure that the program, initiative, activity, or service in question is not further applied or administered in a manner that unlawfully discriminates against individuals on the basis of protected characteristics.

**B.      Ongoing Assessment and Improvement**

72.     The City and FPD will develop cost-feasible protocols for regularly, and at least annually, conducting data-based assessments of the impact of all police and court programs, initiatives, activities, and services to determine whether they impose a disparate impact on the basis of protected characteristics.  These ongoing disparate impact assessments will be consistent with the data collection requirements of Section XXI of this Agreement, and subject to the approval of DOJ.  Such assessments will include regression analyses that will control for factors other than protected characteristics.  Examples of regression analyses that will be conducted are set forth in Section XXII.C of the Agreement as outcome measures.

73.     For the duration of this Agreement, the Monitor will be responsible for conducting the ongoing disparate impact assessments required by this section.  The City agrees to work with the Monitor, or work with third parties with expertise in relevant data collection and analysis, during the duration of this Agreement to develop the capacity to conduct these assessments so that it can continue the performance of such assessments following termination of this Agreement.

74.     Within one year of the Effective Date, the City will develop protocols for correcting any identified disparate impact in any FPD program, initiative, activity, or police or court service.  Such protocols will require that, if any disparate impact on the basis of a protected characteristic is identified, the City will determine whether there are appropriate modifications or

alternatives to the program, initiative, activity, or service that would have less of a disparate impact.  If appropriate modifications or alternatives are available, the City will implement them within a reasonable time.

## VII.    VOLUNTARY CONTACTS, STOPS, SEARCHES, CITATIONS, AND ARRESTS

75.    The City agrees to ensure that all FPD voluntary encounters, investigatory stops and detentions, searches, citations, and arrests are conducted in accordance with the rights, privileges, and immunities secured or protected by the Constitution and the laws of the United States.  FPD will ensure that these police activities are part of an effective overall crime prevention strategy; are consistent with community priorities for enforcement; build trust between FPD and the community; and are adequately documented for tracking and supervision purposes.

76.    With respect to the subsections below, the City agrees to ensure that FPD officers adhere to the following principles:

a.    No City or FPD employee will recommend, develop, or implement any law enforcement program, strategy, tactic, or action in order to generate revenue.  Any revenue generated by law enforcement actions will be incidental to the public safety purpose;

b.    FPD officers will not use race, color, ethnicity, national origin, religion, gender, sexual orientation, disability, or other protected characteristics as a factor, to any extent or degree, in investigating, searching, or restraining the liberty of any person, except as part of an actual and credible description of a specific suspect in an ongoing criminal investigation;

c.    FPD officers will not initiate an encounter with any person or stop any person, or attempt to do so, for the purpose of checking for warrants even where there is an alternative pretext for the stop, unless the officer knows the person's identity and that the person has outstanding warrants for his/her arrest, prior to the encounter;

d.    FPD officers will not use "canned," boilerplate, or conclusory language in any reports documenting investigatory stops or detentions.  Articulation of reasonable suspicion, probable cause, or any other applicable legal standard will be specific, clear, and based on objective facts particular to the stopped, detained, or arrested

19

person; and

e. FPD officers will not use or rely on information known to be materially false or incorrect in conducting or justifying any police activity.

**A. Voluntary Contacts:  Social Contacts & Non-Custodial Interviews**

77. FPD will recognize two distinct classes of voluntary contacts:  social contacts, which are non-investigative conversations, and non-custodial interviews, in which the officer seeks to investigate the person he or she questions.  Officers will be encouraged to engage in social contacts to develop relationships and implement FPD's commitment to community-oriented policing.  Officers conducting or attempting to conduct non-custodial interviews will:

a. Introduce themselves by name and rank as soon as reasonable and practicable;

b. Notify the person(s) encountered that they are free to leave and do not have to answer any questions;

c. Inform the subject that the encounter is being recorded; and

d. Refrain from using words or actions that would tend to communicate that the person(s) are not free to leave or must answer questions.

78. FPD will ensure that officers engaged in, or attempting to engage in, a social contact or non-custodial interview do not use a person's failure to stop, failure to answer questions, decision to end the encounter, or departure to justify an investigatory stop or detention, search, citation, or arrest of the person.

**B. Investigatory Stops and Detentions**

79. FPD will ensure that officers conduct investigatory stops or detentions only when they have reasonable suspicion that a person has been, is, or is about to be engaged in the commission of an offense.

80. FPD officers will not conduct pretextual stops except where the actual reason for the stop is to investigate a felony.

81. FPD will ensure that, upon initiating an investigatory stop or detention, officers:

a. Introduce themselves by name and rank as soon as reasonable and practicable.  It will be FPD practice to also provide the stopped individual an FPD business card at the end of a stop;

b. Immediately notify the person(s) encountered that they are not free to leave, and, if the officer intends to ask questions, that they do not have to answer any

20

questions;

   c. State the reason for the investigatory stop or detention as soon as reasonable and practicable;

   d. Inform the subject that the encounter is being recorded;

   e. Ensure that the stop or detention is no longer than necessary to take appropriate action; and

   f. Act with professionalism and courtesy throughout the interaction.

82. FPD will ensure that officers do not further limit a person's freedom during an investigatory stop or detention in any of the following ways unless the officer has an articulable basis (including but not limited to officer safety) to justify the action:

   a. Taking a subject's identification or driver's license away from the immediate vicinity;

   b. Ordering a motorist to exit a vehicle;

   c. Placing a pedestrian against a wall;

   d. Directing a person to stand or remain standing, or to sit on a patrol car bumper or any other place not of his or her choosing;

   e. Directing a person to lie on the ground;

   f. Applying handcuffs;

   g. Transporting a person any distance away from the scene of the initial stop, including for the purpose of witness identification;

   h. Placing a person into a police vehicle;

   i. Frisking (see paragraph 83 below); or

   j. Unholstering or pointing a weapon.

**C.   Searches**

83. In order to frisk, or pat down, any person, that person must first be lawfully stopped or detained pursuant to reasonable suspicion.  In addition, the officer must have reasonable grounds to suspect the person is armed and dangerous, and the frisk must be reasonably designed to discover weapons or instruments that could be used to assault the officer.

84. FPD will ensure that officers do not conduct any other search, of person or property, without:  (a) probable cause, meaning that the objective facts available to the officer would warrant a person of reasonable caution in believing there is a fair probability that

21

contraband or evidence of an offense is present in the place to be searched; and (b) a warrant or an exception to the warrant requirement, including but not limited to a search incident to arrest or exigent circumstances.

85.     FPD will prohibit officers from seeking consent to search unless the officer has a reasonable and articulable suspicion that the search will reveal evidence of an offense, or the officer has legal authority for the search that is independent of consent.  Officers will document in writing the basis for this suspicion or other legal authority.

86.     FPD officers seeking consent for a search will affirmatively inform the subject of the right to refuse and to revoke consent at any time.  The officer will record this notification and the subject's affirmative statement of consent or denial of consent on his or her body-worn camera, except where exigent circumstances preclude such recording, in which case the officer will be required to obtain written consent on a form that notifies the individual of those rights.

87.     Any affidavit or sworn declaration supporting an application for a search warrant will provide an accurate, complete, and clear description of the offense, the place or thing to be searched, the scope of the search, and the time and method of the search.

88.     Administrative searches for building and housing code purposes by non-FPD officers, e.g., by building code inspectors or code enforcement officers, will be handled differently than the FPD searches covered by this section.  The City agrees to develop and implement protocols for interaction between FPD officers and those performing administrative searches, including criteria for, and documentation of, FPD accompaniment of these officials during housing searches.

89.     FPD will maintain centrally a log listing each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the search warrant, and each supervisor who reviewed the application for the search warrant.

### D.     Citations and Arrests

90.     FPD will ensure that officers issue a citation or make a custodial arrest only when they have probable cause to believe a person has committed or is committing an offense.

91.     The City will not use citation or arrest quotas, whether formal or informal, of any kind.

92.     FPD will ensure that FPD officers obtain verbal supervisory approval, which shall be documented as soon as practicable:

a. Before issuing three or more citations to any person in any single encounter, or more than one citation for the same act;

b. Before issuing citations for any of the following offenses:  any housing or zoning code violation, including any occupancy or maintenance violation; failure to comply/obey; disorderly conduct; peace disturbance; manner of walking in roadway; resisting arrest; and obstruction of government operations/interfering with an officer;

c. Before transport of any arrested person on a charge of failure to comply/obey or resisting arrest; and

d. Of every other arrest as soon as reasonably practicable after the person is presented at FPD headquarters.

93.     FPD will ensure that officers do not arrest any person for any code offense except: traffic offenses involving alcohol or drugs; offenses involving property damage or injury to others; animal neglect or cruelty; where the objective evidence indicates that, absent arrest, the person's unlawful conduct will continue; where a valid citation cannot be issued because the person refused to identify himself or herself to the officer; or if the person is considered a danger to any person or property.

94.     Within 180 days of the Effective Date, FPD will develop and implement a plan for correctable violations for FPD to address vehicular equipment violations, traffic violations involving the failure to provide proof of driver's license, any housing, zoning, or animal licensing violations (including occupancy and maintenance violations) enforced by FPD, and additional violations as the City deems appropriate.  This plan will provide for individuals to provide proof of the correction of a violation within a reasonable period of time in lieu of a citation.

95.     FPD will ensure that officers complete accurate reports for all activities that warrant a report, including all arrests, before the end of their shift absent extenuating circumstances approved by a supervisor.

**E.     Stop Orders, or "Wanteds"**

96.     The City has already eliminated some "stop orders" or "wanteds" issued by FPD and agrees to eliminate all "stop orders" or "wanteds" issued by FPD within 180 days of the Effective Date.

23

97.    The City agrees to implement a one-year moratorium on issuing new "stop orders" or "wanteds," and on stopping, detaining, searching, citing, or arresting any person or vehicle on the basis of a "stop order" or "wanted."  The sole exception to this moratorium will be where:  a) there is, both when the "stop order" or "wanted" is issued and enforced, verified and current probable cause of a state violation; b) the St. Louis County Prosecutor's Office has refused the City's request to seek a warrant related to the violation on a basis other than a lack of probable cause; and c) the "stop order" or "wanted," both when issued and enforced, comports with FPD policy and is approved by the FPD Chief of Police.

98.    During this moratorium, the City will continue to use "be on the lookout" or "all-points" bulletins, and warrants, consistent with generally accepted police practice nationwide, and evaluate alternatives to the use of "stop orders" or "wanteds."  DOJ and the Monitor shall assist the City in identifying and evaluating alternative systems that improve officer and public safety and fully comport with constitutional and other legal requirements.  Upon completion of the evaluation, the City shall implement the selected alternative, as approved by the Monitor and DOJ.  Should the City determine after evaluation that it wishes to reinstate the "stop order" or "wanted" system and DOJ objects, the court shall resolve the matter.  Under no circumstances shall the wanted/stop order system be reinstated without significant modifications to policies, use, and training to ensure that the system better protects officer and public safety, and comports with the Constitution and other legal requirements.

**F.    Supervision**

99.    Supervisors evaluating a request for approval to issue a citation, as set out in paragraph 92, will consider the legality of the citation, whether issuing the citation is required by public safety and would be consistent with community-oriented policing and the policing goals established by the City and the community, and whether the citation is unfairly duplicative, excessive, or retaliatory.

100.    FPD will develop a protocol for checking all arrestees for signs of injury, including any complaint by the arrestee, when the arrestee arrives at FPD headquarters, and ensuring appropriate medical treatment.

101.    FPD field supervisors will review each arrest report of officers under their command and will memorialize their review in writing by the end of the shift within which the arrest occurs, absent exceptional circumstances.

102.    Supervisors will review each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with FPD policy and this Agreement.

103.    Supervisors will review the operational plan for the execution of a search warrant, and, absent exceptional circumstances, supervisors will be present for the execution of the search warrant.  A supervisor will document in the case file the exceptional circumstances preventing his or her presence.  Once executed, a supervisor will review the execution of the search warrant. Supervisors will memorialize their reviews in writing within 24 hours of the execution of a search warrant.

104.    Supervisors will assess warrant applications, citation and arrest reports, and all supporting documents for:  accuracy and authenticity; "canned," boilerplate, or conclusory language; inconsistent information; and inadequate articulation of a legal basis for the police action taken.

105.    Supervisors will regularly audit their assigned officers' stop, search, citation, and arrest documentation for completeness, accuracy, legal sufficiency, and compliance with FPD policy and this Agreement.  Supervisors will audit at least one CAD log for each officer under their supervision each week.  Sergeants will conduct further review as shown to be necessary by weekly audits, data in FPD's records management system, and other indicia.

106.    Each supervisor will document those stops or detentions, searches, warrant applications, citations, and arrests that are legally unsupported, are in violation of FPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The supervisor will take appropriate action to address violations or deficiencies, including recommending non-disciplinary corrective action for the involved officer(s), and/or referring the incident for administrative or criminal investigation.

107.    For each subordinate, the supervisor will track each violation or deficiency and the corrective action taken, to identify officers needing repeated corrective action.

108.    A command-level official will review, in writing, all supervisory reviews related to stops or detentions, searches, warrant applications, citations, and arrests that the supervisor has determined to be unsupported by proper legal justification, in violation of FPD policy or this Agreement, or indicative of a need for corrective action or review of agency policy, strategy, tactics, or training.  The commander's review will be completed within seven days of receiving

25

the document reporting the event in question.  The commander will evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for an internal or criminal investigation, if warranted.

### G.    Ongoing Assessment and Improvement

109.    Within 180 days of the Effective Date, the City and FPD will develop protocols for regularly, and at least annually, conducting cost-feasible data-driven and qualitative assessments of its voluntary encounter; stop, including pedestrian stop; search; citation; and arrest practices, including breakdowns by the protected characteristics of the subject.  These assessments will be designed to ensure these law enforcement actions are being conducted appropriately in accordance with FPD policy and state and federal law.  As part of this assessment process, the City and FPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## VIII.   FIRST AMENDMENT PROTECTED ACTIVITY

110.    The parties acknowledge that First Amendment protected activities serve important societal functions, including promoting transparency in government affairs, ensuring accountability of public officials, and encouraging community feedback—whether critical or laudatory—that ultimately reduce tension and foster a sense of openness and trust between law enforcement and the public.

111.    FPD will ensure that all FPD personnel respect the First Amendment rights of all persons, including:

   a. The right to observe and record officers in the public discharge of their duties in all traditionally public spaces, including sidewalks, parks, and locations of lawful public protests, as well as any other areas where individuals otherwise have a legal right to be present, including an individual's home or business and common areas of public and private facilities and buildings;

   b. The right to criticize or complain about police conduct without being subject to retaliation; and

   c. The right to engage in lawful public protest.

26

### A. Right to Observe and Record

112.    Consistent with the Order by Consent issued in *Mustafa Hussein v. County of Saint Louis, Missouri, et al.*, 4:14-cv-1410-JAR (E.D. Mo., November 21, 2014), FPD will ensure that "its officers, employees, or agents, and those acting on its behalf, shall not enforce or threaten to enforce any rule, policy, or practice that grants law enforcement officers the authority or discretion to arrest, threaten to arrest, or interfere with any individual, including any member of the media or member of the public photographing or recording in public places unless that person is threatening the safety of others or physically interfering with the ability of law enforcement to perform their duties."

113.    FPD will ensure that FPD policy and training makes clear what conduct is considered "obstruction" or "interference," with specific examples, to ensure that FPD officers do not unreasonably claim that an individual's presence amounts to the offense of obstructing or interfering with a law enforcement officer, or otherwise violates the law. FPD will ensure that where the person's location is causing the obstruction or interference, the officers recommend a less-intrusive location from which the bystander may continue to observe, record, and/or protest and give the individual a reasonable opportunity to comply prior to taking further enforcement action.

114.    Individuals shall be permitted to record officer activity by camera, video recorder, cell phone recorder, or any other means.  The use of a recording device during a police encounter shall not in itself be considered a threat to officer safety and thus shall not be a basis to require a person to refrain from recording or to put away his or her recording device, as long as the person recording is in a lawful location, is not threatening the safety of others or the police officers, and is not obstructing or interfering with the officer's lawful duties, and is not otherwise violating the law.  Officers may instruct an individual to cease recording and put away the recording device when that individual is being placed under arrest.

115.    FPD will ensure that officers do not search, seize, or otherwise coerce production of recorded sounds, images, or videos without obtaining a warrant.  Where an officer has a reasonable belief that a bystander or witness has captured a recording of critical evidence related to a felony and the exigencies of the circumstances demand it, the officer may secure such evidence for no more than 12 hours while a legal subpoena, search warrant, or other valid order

is obtained.  Upon seizing such property, officers may not search or review its contents without first obtaining a search warrant.

116.    FPD will ensure that officers do not coerce individuals to consent to the search or seizure of their recording devices or recordings.

117.    FPD will ensure that officers do not intentionally destroy cameras, other recording devices, sounds, images, or videos, and that they do not order an individual to intentionally destroy the same or otherwise cause such destruction, provided, however, that the City may dispose of material in accord with the record retention and destruction requirements established by state law.

### B.    Public Protests and Demonstrations

118.    FPD will ensure that officers do not unlawfully interfere with individuals gathering in groups for public protests and demonstrations in a lawful manner and location.

119.    FPD will revise current policies and protocols for policing public protests and demonstrations as necessary, in consultation with the Monitor and to be approved by DOJ. These policies and protocols will include:

a.   Factors officers should consider when exercising their lawful discretion to arrest;

b.   Clear guidelines that minimize individually applied discretionary enforcement decisions by officers during public protests;

c.   An effective traffic control plan for streets and sidewalks;

d.   Plan for public information sharing before, during, and after public demonstrations;

e.   Guidelines and limitations on the use of less-lethal force during public demonstrations, including the criteria and circumstances for the use of different types of force, required warnings, and documentation;

f.   Plan for clearly communicating to all law enforcement agencies participating in any response to a public demonstration in Ferguson the limitations and requirements for such participation, including limitations and requirements related to force, arrests, and officer uniforms, including officer identification;

g.   Centralized complaint intake process for use by individuals to make a complaint regarding an officer of any agency during a multijurisdictional response and referral process to an appropriate agency for adjudication of such complaint; and

28

      h.   Officer safety and well-being (see Section XIV of this Agreement).

120.    FPD will ensure that officers do not treat protestors differently based on the content of their speech or expression.

121.    FPD will not use canines for crowd control and will not use law enforcement officers using rifle sights to monitor crowds during protests, and shall request other law enforcement agencies responding within Ferguson to refrain from doing the same.

122.    FPD will ensure that all law enforcement officers employed by the City of Ferguson during public demonstrations have received appropriate training, including de-escalation techniques, key concepts of the National Incident Management System command and management, including Incident Command Systems, multiagency coordination systems, and policing consistent with the First Amendment.  FPD shall request other law enforcement agencies responding within Ferguson to ensure the same.

### C.    Retaliation for First Amendment Activity Prohibited

123.    FPD will ensure that officers do not take any police action in retaliation for individuals lawfully exercising their right to witness, observe, record, comment on, or protest police activity.  This includes detaining, searching, arresting, issuing a citation, or using force in response to non-criminal statements or other expressive conduct, when the officer would not have taken such action in the absence of the statements or expressive conduct.

### D.    Supervision of First Amendment Related Arrests and Seizures

124.    Only the Chief or the Assistant Chief may declare an assembly to be unlawful. Orders to disperse may be issued, if at all, only following such a declaration, and only by a supervisor.  FPD will ensure that officers obtain supervisory approval, to be documented as soon as practicable, before issuing any citations or making arrests related to public protest activity, including violation of any state or local law, such as Mo. Rev. Stat. § 574.060 (refusal to disperse); § 574.040 (unlawful assembly); or ad hoc police rule limiting the time, place, and manner of lawful public assembly, *see Mustafa v. Cnty of St. Louis,* No. 4:14-cv- 1436 (E.D. Mo.) (Oct. 6, 2014) (issuing a preliminary injunction against the Missouri Highway Patrol and Saint Louis County with regard to the "keep-moving" policy).

125.    FPD will ensure that officers obtain supervisory approval, to be documented as soon as practicable, before taking any action set forth below.  In each of these circumstances, if reasonably practical, a supervisor shall respond to the scene and assess the situation in person.

At a minimum, supervisors must be present to approve arrests and other actions prior to arrestees being transported to a holding facility, absent exigent circumstances to be documented as soon as practicable.

      a.  Issuing any citation or making any arrest related to the use of a recording device;

      b.  Issuing any citation or making any arrest of any member of the media, whether formally credentialed or not, including citizen-journalists and live-streamers;

      c.  Performing any warrantless seizure of a recording device or recording; and

      d.  Taking any other significant action involving recording devices or recordings.

### E.    Ongoing Assessment and Improvement

126.    Within 180 days of the Effective Date, the City and FPD will develop protocols for conducting, at least annually, cost-feasible data-driven and qualitative assessments of FPD's practices related to First Amendment protected activity.  These assessments will be designed to ensure that FPD officers are policing within the parameters of the First Amendment.

127.    Assessments will include the review and analysis of complaints alleging misconduct related to First Amendment protected activity; an analysis of the number and nature of recording device seizures, arrests, or other interference with members of the press; and analysis of law enforcement response to public protest or demonstration.  Any officer identified as having committed such misconduct shall be afforded an opportunity to respond to such complaints.  As part of this assessment process, the City and FPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action or improvement measures; and document measures taken.

### IX.    FORCE

128.    The Parties agree that all FPD officers and employees must have an unwavering commitment to protecting human life, and to upholding the value and dignity of every person. To foster this commitment, and to ensure adherence to the Constitution and all other laws, FPD will ensure that its use-of-force policies, training, supervision, and accountability systems are designed to ensure that FPD officers, including civilian correctional officers:

      a.  Use force only when necessary to accomplish a legitimate public safety objective;

      b.  Use de-escalation techniques and tactics to minimize the need to use force and increase the likelihood of voluntary compliance with legitimate police orders;

     c.   Use force in a manner that avoids unnecessary injury or risk of injury to officers and civilians, is proportional to the level of resistance or threat encountered, and is de-escalated at the earliest possible moment;

     d.   Recognize and act upon the duty to intervene to stop any officer or civilian correctional officer from using force that is unreasonable or unnecessary;

     e.   Immediately provide any necessary emergency medical assistance after using force and immediately summon additional medical assistance as necessary;

     f.   Accurately and completely report all reportable force used or observed by officers;

     g.   Are recognized and supported when they achieve public safety goals while avoiding use of force; and

     h.   Are disciplined when they use force that is unnecessary or objectively unreasonable or otherwise violates law or policy.

### A.     General Use-of-Force Requirements

129.     The City will ensure that officers use force in accordance with the Constitution and other laws, FPD policy, and this Agreement.

130.     FPD agrees to commit to a use-of-force model that, through policy, training, and supervision, provides officers with the skills and training necessary to make optimal force decisions and resolve situations without the use of force whenever possible.  Under this approach, FPD will train and encourage officers to, where appropriate, slow down or stabilize a given incident, through tactical retreat or other de-escalation techniques, to create more time, space, resources, and options to resolve incidents, and to enhance officer safety.

131.     Pursuant to this model, FPD will ensure that, whenever possible, officers gather information before using force to determine:  whether the situation truly presents a threat to public safety; whether it may involve a medical/mental health crisis rather than a criminal matter; if a threat is present, what tactical options are available, including communication and negotiation; what other law enforcement personnel or resources should be involved; and whether the officer's actions would be consistent with the agency's code of ethics, including respect for the sanctity of life and the dignity of all persons.

132.     FPD will specify all weapons and force techniques officers are authorized to use, and which weapons/use-of-force equipment officers must carry while on duty, for every officer

31

assignment.  FPD policies will clearly define and describe each force option and the circumstances under which use of such force is appropriate.  If FPD makes any additional weapons/use-of-force equipment available to its officers in the future, it will likewise create a policy for the weapon/equipment.  These policies, while recognizing that many incidents requiring a use of force are unique, will require that all FPD uses of force adhere to the core principles articulated in paragraph 128 above.  FPD will ensure that officers carry only the weapons/equipment that have been approved by the department and that the officer has been properly trained and certified to use.

133.    FPD will ensure officers do not use lethal force unless:  (a) a person is displaying aggravated aggressive resistance, thereby leading the officer to an objectively reasonable belief that the person poses an imminent threat of death or serious physical injury to the officer or others, or to prevent escape of a violent felon where the officer has probable cause to believe that the suspect poses a threat of immediate, serious physical injury either to the officer or others; and (b) less intrusive methods to control the subject or avoid harm have been tried and were ineffective or would be ineffective.  FPD will train and encourage officers to recognize the opportunity for and to employ tactical retreat, withdrawal, and other de-escalation techniques to increase incident resolution options and enhance officer safety.

134.    FPD will ensure that officers do not use less-lethal force unless:  (a) a person is displaying aggressive resistance by attacking or attempting to attack the officer or another person, and (b) less intrusive methods to control the person or avoid harm have been tried and proven to be ineffective or would be ineffective.

135.    FPD will ensure that officers use the minimum amount of force necessary, objectively reasonable, and proportional to a person's behavior when interacting with persons who are displaying passive resistance or active resistance.  Force used in these situations should be low-level.

136.    FPD agrees to train and require all officers to do the following:

a.    Identify themselves as officers before using force whenever safely possible.  Whenever possible, officers will allow individuals the opportunity to submit to arrest before force is used.  Prior to the use of any approved weapon/equipment, when possible and appropriate, officers will communicate to the subject and other officers that the use of the weapon is imminent to allow the subject an opportunity

32

to comply;

b. In determining whether the use of force is necessary and reasonable, consider whether a subject may be noncompliant due to a medical or mental health condition, mental health crisis, physical or hearing impairment, language barrier, or drug interaction.  When noncompliance appears to be due to such a condition, officers will be trained and required to employ de-escalation tactics and techniques where possible;

c. Fulfill their duty to safely intercede to prevent the use of objectively unreasonable force; and

d. Whether or not an eyewitness to an improper use of force or other constitutional violation, bring relevant information regarding known or suspected improper uses of force to the attention of a supervisor.

137. FPD will prohibit officers from doing the following:

a. Using force on restrained individuals (e.g., subjects handcuffed or contained in a police vehicle) except:  (a) when the individual's actions must be immediately stopped to prevent imminent or ongoing injury to any person; (b) to prevent the individual's escape or significant destruction of property; or (c) when the individual is refusing to get out of a police vehicle and reasonable attempts to gain voluntary compliance have failed, and a supervisor has approved the use of force to remove the individual.  FPD will closely review force used against restrained individuals to ensure that it was necessary and proportional given the offense committed by the subject and the danger the subject posed to others;

b. Using neck holds, a form of lethal force;

c. Using force only because another officer is using force, or against persons who only verbally confront them;

d. Using retaliatory force, including force used after a threat has diminished and that is thus not reasonably necessary; force intended to punish an individual for fleeing or otherwise resisting arrest; and force used in response to the expression of criticism or disrespect for an officer or any other person;

e. Using force against individuals who may be observing or recording officer behavior, absent a basis for the use of force consistent with law, FPD policy, and

this Agreement; and

    f.   Using force to effect compliance with a command that is unlawful.

138.    FPD will ensure that immediately following a use of force, officers adhere to the following requirements:

    a.   Officers—and, upon arrival, a supervisor—will inspect and observe subjects for injury or complaints of pain resulting from the use of force.  Officers will render or obtain medical assistance, including emergency life-saving care where appropriate, for any person who exhibits signs of physical distress, has sustained a visible injury, expresses a complaint of injury or continuing pain, or was rendered unconscious.  As necessary, officers will provide emergency first aid until professional medical care providers arrive on the scene.  Any individual exhibiting signs of physical distress will be continuously monitored by the officer involved or another on-scene officer until medical care providers can assess the individual;

    b.   Officers will handcuff individuals against whom lethal force has been used only when there are objective articulable facts indicating the individual remains a threat;

    c.   Officers will not restrain individuals in a manner that compromises the individual's ability to breath; and

    d.   Following a use of force in which a person is killed or seriously injured, the agency controlling the scene/investigation will assign a trained officer or employee to provide the individual's family members with information about the incident, as appropriate, and provide them information about any available counseling services.  Family may be kept from the seriously injured or killed person as necessary to protect the integrity of the scene, and law enforcement personnel should explain this rationale.  Family members should not be restrained unless necessary to protect the integrity of the scene or when otherwise objectively reasonable.

**B.**    **Weapon-Specific Requirements**

139.    In addition to the generally applicable force requirements of this section of the Agreement, FPD will ensure that officers comply with the weapon-specific requirements below.

34

### 1. *Firearms*

140.    FPD will ensure that only officers who have successfully completed approved training and are currently certified may be issued, carry, and use firearms.  At least once a year, officers must qualify with each firearm they are authorized to carry while on duty.  Officers who fail to qualify will immediately relinquish FPD-issued firearms on which they failed to qualify.  Those officers who still fail to qualify after remedial training within a reasonable time will be subject to disciplinary action, which may include termination of employment.

141.    Each shot fired is a separate use of force that officers must separately justify as reasonable.

142.    If feasible, and if to do so would not increase the danger to the officer or others, officers will issue a verbal warning to the subject and fellow officers prior to shooting a firearm.

143.    FPD will ensure that officers:

    a.    Do not unholster and display a firearm unless the objective circumstances create a reasonable belief that lethal force may become necessary;

    b.    Do consider their surroundings before discharging their firearms and will avoid unnecessary risk to bystanders, victims, and other officers;

    c.    Do not fire warning shots;

    d.    Do not shoot through a door or window when the target is not clearly in view; and

    e.    Do not shoot from or at a moving vehicle except to prevent otherwise unavoidable serious injury or death to the officer or third parties.  Officers will attempt to move out of the path of a moving vehicle rather than discharging a firearm.  Officers will not place themselves in the path of or reach inside a moving vehicle.  A fleeing vehicle, in and of itself, will not be considered a threat of immediate serious injury or death.

### 2. *Electronic Control Weapons*

144.    FPD will ensure that only officers who have successfully completed approved training and are currently certified may be issued, carry, and use Electronic Control Weapons (ECW).  Officers will complete ECW certification annually, consisting of updated FPD policy, weapon retention, technology changes, scenario-based training, and report-writing.

145.    Each ECW application (in probe mode or drive-stun mode) is a separate use of force that officers must separately justify as reasonable.  FPD will ensure that, after the first ECW application, the officer will reevaluate the situation to determine if subsequent cycles are necessary, and will weigh the risks of subsequent cycles against other force options.  In determining whether any additional application is reasonable, officers will consider that a subject may not be able to respond to commands during or immediately following an ECW application, and the officer will allow sufficient time for the subject to comply prior to applying another cycle.  Officers will not employ more than three cycles or 15 total seconds of an ECW against a subject during a single incident.

146.    FPD will ensure that officers:

a.  Do not continue to apply ECWs when ECW application is not leading to compliance;

b.  Do not use ECWs in drive-stun mode as a pain compliance technique.  Officers may use ECWs in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between the officer and the subject so that the officer can consider another force option;

c.  Determine the reasonableness of ECW use based on all relevant circumstances, including the subject's apparent age, size, physical and mental condition, and the feasibility of lesser force options;

d.  Except where lethal force is the only other option, do not use ECWs when a deployment may cause serious physical injury or death from situational hazards, including falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances;

e.  Except where lethal force is the only other option, do not use ECWs when the subject is visibly pregnant, apparently elderly, a child, visibly frail, of abnormally slight build, or in apparent medical or mental health crisis;

f.  Do not use ECWs on fleeing persons who do not pose an imminent threat of physical harm to the officer, third persons, or themselves.  Flight will never be the sole reason for applying an ECW;

g.  Do not apply ECWs to a subject's head, neck, or genitalia;

36

    h.  Do not activate more than one ECW at a time against a subject; and

    i.  Do keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm;

147.    FPD will establish protocols and training on officers' responsibilities, in consultation with local emergency medical services personnel, to include:

    a.  Ensuring that subjects against whom ECWs were used receive a medical evaluation by emergency medical responders in the field or at a medical facility;

    b.  Ensuring that probes are removed from a subject's skin only by medical personnel or properly trained officers;

    c.  Minimizing the risk of positional asphyxia and the need to use restraint techniques that do not compromise a subject's breathing;

    d.  Monitoring all subjects who have received an ECW application while in police custody; and

    e.  Informing medical personnel of all subjects who have been subjected to multiple ECW applications, including prolonged applications (more than three cycles or 15 seconds), or who appear to be under the influence of drugs or exhibiting symptoms associated with "excited delirium," or who were kept in restraints after ECW use.

### 3.  Impact Weapons

148.    Officers must justify the use of each separate impact weapon, such as a baton or asp.

149.    Officers will not use improvised weapons, such as a flashlight or firearm, to strike a person, unless there is an immediate need to strike and the officer is unable to use a weapon that would be necessary and objectively reasonable under the circumstances.  The failure to carry a baton when required to do so will not justify the use of an improvised weapon.

### 4.  OC Spray

150.    FPD will ensure that only officers who have successfully completed approved training and are currently certified may be issued, carry, and use Oleoresin Capsicum spray (OC spray).  Certification will be completed at least once every two years, and will include information from the medical community on the effects of OC spray.

151.    Officers must justify each separate application of OC spray.

152.    Officers will issue a verbal warning to the subject, fellow officers, and other individuals present prior to using OC spray, whenever possible.  Officers will wait a reasonable amount of time after providing the warning to allow the subject to comply with the warning.

153.    Officers will not use OC spray against individuals or groups who merely fail to disperse.

154.    Officers will assist exposed subjects with decontamination and water-flushing of exposed areas as soon as feasible.  No spit hood or mask of any type may be placed on a person subjected to OC spray until that person has been fully decontaminated.

### 5.  Canines

155.    FPD will ensure that only officers who have successfully completed approved training and are current in their certification and ongoing training requirements can serve as canine handlers, and that only dogs that meet their certification requirements can be deployed as FPD canines.  FPD will work with canine trainers to ensure that detailed training records are maintained regarding whether each handler-canine team has met specific control criteria for each control exercise; to ensure the documentation of remedial training given in response to a canine team's deficiencies in any area; and to ensure that all observed deficiencies are reported to FPD's canine unit supervisor.

156.    Canines and handlers will be certified annually by a nationally recognized trainer or organization whose standards are consistent with the law, FPD policy, and best practices.  The certification process must involve the demonstration of control and proficiency in specific, widely-accepted obedience and criminal apprehension exercises.

157.    FPD agrees that a police canine is primarily a locating tool, and is only used as a force tool when reasonable and appropriate, which should be a rare occasion.

158.    FPD will ensure that no canine handler uses his or her canine solely to intimidate or frighten any person.

159.    FPD will ensure that canine handlers keep their canines within visual and auditory range at all times during deployments, except when a canine clears a threshold (e.g., rounding a corner, entering a room, ascending or descending a stairwell), in which case the handler will regain sight and hearing of the canine as quickly as possible.

160.     FPD will ensure that canine handlers obtain verbal supervisory approval before a canine is deployed, absent documented exigent circumstances that permit this use of force under law, FPD policy, and this Agreement.  The approving supervisor will not serve as a canine handler during the course of the deployment.

161.     FPD will ensure that, before deploying a canine, canine handlers issue verbal warnings that a canine will be deployed and that the suspect should surrender, unless providing such warnings would create an imminent threat of danger to the canine handler or any other person on the scene.  A canine handler will allow a reasonable period of time between each warning to provide a suspect an opportunity to surrender.

162.     FPD will ensure that canine searches of residences are conducted on short leash unless the canine handler can determine with certainty that there are no authorized individuals in the home.

163.     To limit the risk of unnecessary canine bites, FPD will ensure that canine handlers do not deploy canines off-leash to search for or apprehend a fleeing or concealed subject unless the following requirements are all satisfied:

    a. The handler is in auditory range of a suspect;

    b. The subject is wanted for a violent felony, or the objective and particularized circumstances make it reasonable to believe the subject is armed with a weapon capable of causing death or serious physical injury or otherwise poses an imminent threat of death or serious physical injury to another person, including the officer; and

    c. Lesser means (including waiting) have been tried and have been ineffective or cannot reasonably be expected to allow for the apprehension of the subject.

164.     Canines will not be used to apprehend anyone suspected of being under the influence of drugs or alcohol, if no other serious crime is involved.  Absent exigent circumstances, officers will also avoid deploying canines to apprehend persons believed to be in mental health crisis.

165.     FPD will ensure that, when a canine apprehends a subject by biting, the canine handler calls the canine off at the first moment the canine can safely release its bite.  If the suspect is determined to be unarmed, the handler will immediately order the canine to release the bite.  When deciding to call off the dog, the handler must keep in mind that the average person

39

will struggle if being seized or confronted by a canine.  This struggling will not be cause for not calling off the canine.

166.     FPD will ensure that officers do not deploy canines against persons believed to be juveniles unless objective circumstances lead to a reasonable belief that such deployment is necessary to prevent imminent serious physical injury or death to any person, including an officer.

167.     FPD will ensure that canines are not used for crowd control.

**C.     Use of Force in Ferguson Jail**

168.     To minimize the unnecessary use of force and enhance safety, FPD will ensure that officers and correctional officers do not possess or use firearms or ECWs within the FPD jail booking or lockup areas.

169.     FPD will ensure that at least two correctional officers are present in the FPD jail at all times.

170.     In addition to the use of body-worn cameras required by this Agreement, FPD will ensure that all parts of the jail where prisoners may be present are surveilled by stationary video cameras that are always recording.  Supervisors will review jail video footage when investigating uses of force, in addition to conducting random or targeted reviews of video footage.

**D.     Use-of-Force Reporting and Investigation**

171.     To ensure that FPD officers use force only as permitted by the law, FPD policy, and this Agreement, and are held accountable when they do not; that officers are positively recognized when they appropriately minimize or avoid use of force; that FPD identifies and corrects training, policy, equipment, tactical, and officer safety concerns raised by use-of-force incidents; and that FPD's response to officer use of force builds community trust and confidence, FPD agrees to the following requirements.

172.     Within 120 days of the Effective Date, FPD will develop and implement, in consultation with the Monitor and subject to approval by DOJ, a comprehensive process for reporting and investigating all FPD officer uses of force.  The policies and training developed pursuant to this system will ensure that all FPD personnel, including officers, correctional officers, dispatchers, supervisors, and commanders at all levels, are required and trained to carry out their force-related reporting, review, and accountability duties and responsibilities.

40

### 1. *Force Reporting*

173.    Consistent with paragraph 384 of this Agreement, all officers using force above unresisted handcuffing will be required to document the use of force in writing before the end of shift, and to immediately report the use of force to a supervisor.  An officer's use-of-force report will include a narrative that explains with specificity the type of force used; the legitimate police objective necessitating the use of force; details regarding the level of resistance encountered; and all efforts to de-escalate the situation to avoid the use of force, and to minimize the level of force used, or reason why such efforts were not attempted.  Officers will note in their use-of-force reports the existence of any body-worn camera or in-car camera audio or video footage.

174.    All officers observing a use of force by an FPD officer will be required to document their observations in writing before the end of shift.

175.    FPD officers will not use conclusory statements, boilerplate, or canned language (e.g., "furtive movement" or "fighting stance") without supporting incident-specific detail.

176.    Where use-of-force reports are found to include material omissions or inaccuracies, FPD will take corrective action, including discipline as appropriate.  Where the material omissions or inaccuracies are found to be deliberate, the employee will be disciplined, up to and including termination.

177.    Officers who use or observe a reportable use of force but do not report it will be disciplined, up to and including termination.

178.    Any FPD officer learning of a previous use of force by another FPD officer, whether from an FPD employee or a non-employee civilian, will immediately report the use of force to a supervisor unless the FPD officer is certain that the use of force was previously reported.

179.    FPD policies will include particularized reporting requirements for certain types of force, such as ECWs, canines, OC Spray, and lethal force, including the use of firearms.

### 2. *Force Response and Investigation*

180.    With the exception of the lowest level of reportable force (Type 3), an FPD supervisor will immediately respond to the scene of every reportable use of force by an FPD officer.  The duties of the responding supervisor will include, at a minimum:  interviewing all witnesses to the use of force; directing the gathering and preservation of evidence related to the

41

use of force, consistent with paragraph 384 of this Agreement; ensuring that both officers and subjects of the use of force are given appropriate medical care; providing information, as appropriate, to family or friends of subjects of use of force who are injured; and taking steps to maintain calm and preserve the integrity of the scene.  If notified, an FPD supervisor will respond to the scene of every use of force by another law enforcement agency within Ferguson's city limits.  FPD will make a good-faith attempt to revise its mutual aid agreements with other agencies to ensure that FPD is notified when other agencies use force in Ferguson.

181.    Scene management and investigation will be conducted by an uninvolved supervisor, i.e., a supervisor that neither ordered nor participated in the use of force.

182.    Supervisors who conduct high-quality force investigations will receive preference for assignments and promotions.  Supervisors who fail to adhere to FPD policy regarding use-of-force investigations, or conduct low-quality force investigations will be subject to corrective action or discipline as appropriate, including demotion.

183.    The type of supervisory response and investigation will depend upon the level of force used and the surrounding circumstances.  There will be three types of force for purposes of response and investigation within FPD:

a.  Type 3 force is force that is reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance, including pressure point compliance and joint manipulation techniques, but that is not reasonably expected to cause injury, does not result in an actual injury, and does not result in a complaint of injury.  Type 3 force also includes the unholstering or pointing of a firearm at a subject and the pointing of an ECW at a subject.  The use of Type 3 force requires that all officers using or observing force report and document the force as set out above, but does not require that a supervisor respond to the scene of the use of force or conduct a use-of-force investigation, absent extenuating circumstances to be set out in policy;

b.  Type 2 force is force that causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to a Type 1 force.  Type 2 force includes the use of an ECW; OC spray; weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks, leg sweeps, and takedowns); impact weapons (when the use is not to the head, neck, or face); use of force

against a restrained person; and canine apprehension (when no bite is involved). An uninvolved supervisor will investigate a Type 2 use of force and document the investigative findings in a written report; and

c. Type 1 force includes lethal force; force resulting in death or serious bodily injury; force resulting in hospital admission; canine bites; more than three applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the applications and regardless of whether the applications are by the same or different officers, or ECW application that lasts longer than 15 seconds, whether continuous or consecutive; and any vehicle pursuit.  Any officer-involved shooting and any death while in or as a result of being in police custody will be considered a "critical incident" and investigated consistent with the requirements in paragraph 185 below.  Depending upon the exact type of force and surrounding circumstances, all other Type 1 uses of force will be investigated by an uninvolved supervisor or an outside entity or agency, pursuant to protocols developed in consultation with the Monitor and approved by DOJ.

184.    Type 3 use-of-force investigations will be completed within 30 days; Type 2 investigations will be completed within 45 days; and Type 1 investigations will be completed within 60 days, absent reasonable cause, as approved by the Chief of Police, in which case the investigation will be completed in 90 days.  Use-of-force investigations will be fully documented in writing and include appropriate consideration of all relevant evidence.

185.    Within 180 days of the Effective Date, FPD will develop and implement policies and training on the immediate response to critical incidents that occur in Ferguson and the investigation of critical incidents that involve FPD officers in or outside of Ferguson.  Critical incident policies and training will be developed in consultation with the Monitor and be approved by DOJ and will address:

a. The immediate FPD response to a critical incident, including the steps that involved- and other FPD officers and dispatchers must take to protect the integrity of the investigation; minimize injury and loss of life (e.g. the provision of medical care); and de-escalate tensions until any outside investigative agency assumes control of the scene;

  b. Requirements for the investigation of critical incidents that must be adhered to by FPD or any agency whom FPD arranges to have conduct critical incident investigations on a regular or ad hoc basis; and

  c. Communications protocols that ensure that when critical incidents occur, authorized City representatives communicate with the public and the media swiftly, openly, and neutrally, respecting areas where the law requires confidentiality.  Policies will require that designated City representatives release all information lawfully permitted as soon as possible after a critical incident and on a continuing basis, unless there is a compelling investigatory, personnel or public safety reason not to release the information.

### *3. Force Review and Assessment*

186. The determination of whether a use of force violates FPD policy will be based on a preponderance of the evidence standard.

187. All Type 3 uses of force will be reviewed and approved by the supervisor, or an investigation initiated, as appropriate, within 24 hours.

188. Except as noted below, all Type 2 use-of-force investigations will be reviewed by the involved officer's chain of command within a specific, reasonable period of time to be stated in FPD policy.

189. Within 180 days of the Effective Date, FPD will develop and implement a Force Review Board (FRB) to determine whether certain use-of-force incidents were consistent with FPD policy and law, and to evaluate all use-of-force incidents from a tactics, training, policy, equipment, officer safety and agency improvement perspective. The FRB will:

  a. Except where the administrative investigation of the incident is conducted by an outside agency, review all Type 1 investigations, all Type 2 investigations where there was an allegation of force-related misconduct, and a sample of all other Type 2 investigations;

  b. Be comprised of three voting members:  an FPD commander with skills and experience different from those of the other FRB members, who will chair the Board ("Chair"); a training supervisor; and a third member with law enforcement experience, who will be subject to approval by DOJ.  The Chair may include any consultants, subject matter experts, or other civilians the Chair feels would be

helpful in reviewing particular incidents.  The FRB also may consult with other advisors as necessary.  Consultants and observers, however, will not be permitted to vote; and

c.   Conduct comprehensive and reliable reviews of investigations, and issue its findings, within 14 days of submission to the FRB.  The scope of the FRB's review will not be limited to assessing an officer's decision making at the moment the officer employed force.  Rather, the FRB's review will include issues such as: the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, any applicable medical response, and any commendable actions.  The review will include consideration of the actions and inactions of all officers, supervisors, commanders, and dispatchers involved in the incident, as appropriate.

190.   All use-of-force investigations reviewed by the FRB will be reviewed by the involved officer's chain of command within a specific, reasonable period of time to be stated in FPD policy.

191.   Where the FRB finds that a use of force violates FPD policy, it will document its findings in writing and refer the matter to the disciplinary process as set out in Section XIX.B. of this Agreement.

192.   Where the FRB determines that the force incident indicates a need for changes to policy, training, or equipment, it will document its findings in writing and advise the Chief of Police in writing, who will ensure that appropriate modifications occur and document their completion in writing.

193.   Where the FRB determines that the use of force indicates a need for corrective action, such as training, it will advise the Chief of Police in writing, who will ensure that appropriate corrective action occurs and document its completion in writing.

194.   The Chief of Police will approve all use-of-force investigation findings and all disciplinary adjudications.

**E.   Ongoing Assessment and Improvement**

195.   Within 180 days of the Effective Date, the City will develop protocols for regularly, and at least annually, conducting cost-feasible data-driven and qualitative assessments of FPD's use-of-force practices.  These assessments will be designed to ensure that FPD officers

only use force in accordance with state and federal law as well as FPD policies and values. Assessments will involve the analysis of use-of-force data to identify officer-specific, unit-specific, and department-wide trends, and will include reviews of FRB and other force investigations; force reporting; officer injury reports and incidents in which medical assistance was requested or provided following a use of force; and complaints alleging excessive use of force.  As part of this internal assessment process, the City and FPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action or improvement measures; and document measures taken.

## X.    CRISIS INTERVENTION

196.    FPD will implement a Crisis Intervention Team (CIT) first-responder model of police-based crisis intervention with community, health care, and advocacy partnerships to:  (a) assist individuals who are in mental health crisis or who are in crisis related to the influence of alcohol or drugs ("individuals in crisis"); (b) reduce the need to use significant force against individuals in crisis and improve the safety of patrol officers, individuals in crisis and their families, and others within the community; (c) provide the foundation necessary to promote community solutions to assist individuals with mental illness; and (d) reduce the need for individuals with mental illness to have further involvement with the criminal justice system.

### A.    Crisis Intervention Coordinator

197.    Within 180 days of the Effective Date, FPD will designate an officer, at the rank of Lieutenant or above, to act as a Crisis Intervention Coordinator ("Coordinator") to better facilitate communication between FPD and members of the area mental health community and to increase the effectiveness of FPD's crisis intervention program.  The Coordinator shall identify, develop, and maintain partnerships with program stakeholders and shall serve as a point of contact for advocates, individuals with mental illness, their families, caregivers, professionals, and others associated with the mental health community.

198.    The Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers consistently with the requirements set forth in this Agreement.  The Coordinator shall also ensure that, within one year of the Effective Date, there are enough specialized CIT officers to have at least one CIT officer on duty and available to respond to calls and incidents involving an individual in crisis at all times.  The Coordinator

will assess the number of CIT officers necessary to achieve this goal, identify gaps in coverage of particular shifts and on call schedules, and develop strategies to fill those gaps.  The Coordinator will also be required to ensure that officers and dispatchers are appropriately responding to CIT-related calls, and that their efforts and successes are appropriately publicly recognized.

**B.    Specialized Crisis Intervention Officers**

199.    Designation as a specialized CIT officer will be voluntary.  To the extent feasible, these officers will continue to be assigned to their regular patrol divisions and will maintain their standard patrol duties, except when called upon to respond to incidents or calls involving individuals in crisis.  Officers who serve as CIT officers will receive a salary increase during their service in the role, to reflect the importance and the additional demands of the position.

200.    To be eligible for consideration, officers must have at least three years of experience as a law enforcement officer.  FPD will assess each applicant's fitness to serve as a CIT officer by considering the applicant's written application, supervisor recommendations, disciplinary file, and an in-person interview.  Officers with a history of complaints regarding the use of excessive force that receive a disposition of "sustained" or "not sustained" will be presumptively ineligible to be CIT officers.

201.    CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene, unless a higher-ranking officer has assumed responsibility for the scene.  In that case, the higher ranking officer will seek the input of a CIT officer regarding strategies for resolving the crisis.

202.    In addition to the crisis intervention training provided to all FPD officers, CIT officers will receive specialized CIT-specific training consistent with FPD's Training Program and the terms of this Agreement, including the requirements set forth in Section XVII.

**C.    Crisis Intervention Requirements**

203.    FPD will, where practicable, dispatch at least one specialized CIT officer, as well as one additional officer, to all incidents involving an individual in crisis.  FPD will develop and implement appropriate policies to ensure that, in situations in which a CIT officer is not available to respond immediately to a call or incident involving an individual in crisis, FPD's response is consistent with the principles of the crisis intervention program.

47

204.    FPD will encourage specialized CIT officers to redirect individuals with mental health and substance abuse issues to the health care system, where appropriate.

205.    FPD policy will provide that a crisis intervention response may be necessary even in situations where there has been an apparent violation of law.  This policy shall not prevent responding FPD officers from conducting law enforcement action necessary to address an urgent public safety situation.

**D.    Ongoing Assessment and Improvement**

206.    Within 180 days of the Effective Date, the City and FPD will develop protocols for at least annually conducting cost-feasible data-driven and qualitative assessments of FPD's CIT first responder model of police-based crisis intervention.  These assessments will be designed to ensure FPD's crisis intervention practices allow FPD to provide an appropriate response to an incident involving an individual in crisis, including reducing injuries to officers, persons in mental health crisis, and the public.   Assessments will include review and analysis of whether CIT officers were properly dispatched to calls for service involving an individual in crisis, as well as targeted and systematic review of CIT conduct where CIT officers did respond. As part of this internal assessment process, the City and FPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XI.    SCHOOL RESOURCE OFFICER PROGRAM

207.    Ferguson's existing school resource officer (SRO) program offers a unique opportunity to build trust and cooperation between Ferguson's youth and law enforcement on a daily basis.  This program, through education and the promotion of mutual respect, also provides Ferguson the opportunity to reduce students' unnecessary involvement in the juvenile and criminal justice systems, which can have profound negative effects on students' engagement and success in school and the broader community.  In light of these dynamics, FPD agrees that its SRO program will build positive relationships between officers and youth, avoid unnecessary negative police actions such as arrests, and develop alternatives that promote keeping students in school and out of the criminal justice system.

## A.      Revision of SRO Program and Training and Qualifications of SROs

208.    FPD agrees to use SROs who:  (a) have the ability to work effectively with students, parents/guardians, teachers, and school administrators; (b) possess strong interpersonal communication skills; (c) have the ability to competently engage in public speaking; (d) have effective teaching skills; (e) have effective counseling skills; (f) understand the importance of diversion programs and alternatives to arrest for youth; (g) are respectful to the youth and families of all backgrounds and cultures; and (h) have an interest in promoting and enriching the lives of young people.  In selecting an SRO, the recommendation of the School District and the principal of the school to which the officer will be assigned shall be considered.

209.    FPD agrees to ensure that, after an officer is selected for the position of SRO and prior to assuming SRO responsibilities, the officer receives sufficient training that is consistent with FPD's Training Plan and the terms of this Agreement.

210.    Within 120 days of the Effective Date, in consultation with the Ferguson-Florissant School District (FFSD) and consistent with the agreements with the FFSD, the Monitor, and subject to approval by DOJ, FPD will develop an SRO program and operations manual that clearly defines the role of each SRO and promotes the role of SRO as one of educator, counselor, mentor, and law enforcement problem-solver, consistent with best practices. The manual will address youth-appropriate law enforcement techniques; use of restorative approaches to address student behaviors; arrests of students; notification to parents/guardians when students are arrested; searches of students; special considerations regarding use of force within and around schools; procedures to receive and respond to complaints regarding SROs; selection of SROs and SRO assignments; training requirements; weapons qualifications; required equipment and supplies; opportunities for community-stakeholder meetings; SROs' role in identifying candidates for FPD's Explorer program and the City's Police Academy Assistance program; and the collection, analysis, and use of data regarding law enforcement activities in the FFSD schools.

211.    Within 90 days of the Effective Date, FPD agrees to review and make a good-faith effort to amend its Memorandum of Understanding (MOU) with FFSD, to delineate authority and specify procedures for law enforcement interactions with students while on school grounds, consistent with this Agreement.  Before providing SRO services at any school in which FPD is not currently engaged, the City will enter into an MOU with the appropriate school

district consistent with this Agreement.  Further, any subsequent MOU with FFSD shall be consistent with this Agreement.

### B.      SRO Non-Involvement in School Discipline

212.     FPD agrees to ensure that SROs and other FPD officers participate only in situations where police involvement is necessary to protect physical safety and do not participate in any situation that can safely and appropriately be handled by a school's internal disciplinary procedures.  Incidents involving minor offenses committed by students, including, but not limited to, disorderly conduct, peace disturbance, loitering, trespass, profanity, dress code violations, and fighting not involving a weapon and not resulting in physical injury, will be considered school discipline issues to be handled by school officials rather than criminal or municipal code violations warranting FPD involvement, unless necessary to protect the physical safety of any person.  Nothing herein is intended to prevent victims from reporting crimes or seeking assistance from SROs or other FPD officers.

213.     FPD agrees to ensure that SROs and other FPD officers who intervene in an incident in order to ensure physical safety employ age-appropriate conflict resolution techniques to de-escalate the situation whenever possible and refer the matter to school personnel at the earliest opportunity.

214.     FPD agrees to ensure that SROs continue to contribute positively to their school communities by serving as educators in addition to their responsibilities to protect the safety of students and school personnel.  Nothing in this Agreement limits or is intended to limit FPD's role in providing mentoring, counseling, education, and support to students, faculty and school officials.

### C.      Minimizing School Arrests and Force

215.     FPD agrees to develop and implement policies that discourage the arrest of students on school grounds except as necessary to ensure the physical safety of students, school personnel, and the public.  The City agrees not to execute arrest warrants for municipal ordinance violations against students during school hours or school-sanctioned events on school grounds.

216.     FPD agrees to ensure that officers document in sufficient detail the basis for any arrest on school grounds, including any factors that justify arresting the youth at school and factors that support a determination of probable cause.

217.    FPD agrees to ensure that, upon arresting a student, officers notify the student's parent/guardian of the arrest as soon as practicable.  The officer must notify the student's parent/guardian of the nature of the incident leading to arrest, the arrest charges, and if the student was removed from school grounds, the location of the student and relevant contact information.  If a parent/guardian is not notified within two hours of the arrest, the arresting officer must document, in writing, the reason for the delay.

218.    FPD agrees to ensure that officers do not use restraints—including, but not limited to, handcuffs—on a student on school grounds, unless the objective circumstances indicate that the restraints are necessary to ensure the immediate physical safety of any person.

219.    An FPD officer may not remove a student from school grounds with the intent of circumventing the requirements of this Agreement.

220.    Within one year of the Effective Date, FPD agrees to assist FFSD to develop a conflict resolution program in the schools; a system for referrals to school discipline personnel; alternatives to arrest; and diversion programs for students who are charged with offenses to minimize the involvement of students and youth in the juvenile and criminal justice systems. These programs will be structured to assess the underlying causes of the student's misbehavior and to develop and implement steps to address those underlying causes, and, if authorized by FFSD, will be developed in consultation with the Monitor and be approved by DOJ.

221.    FPD will require that SROs exercise their discretion to refer youth to alternatives, rather than arrest them, whenever possible.

222.    FPD agrees to ensure that SROs and other FPD officers do not use force on a student on school grounds unless necessary to address an immediate threat to the physical safety of the officer or any other person.  In those situations where an officer must use force, the officer must act in accordance with all applicable use-of-force policies and the terms of this Agreement.

223.    FPD will ensure that FPD officers de-escalate school-based incidents whenever possible. SROs should work with the FFSD to emphasize the use of restorative approaches to address behaviors and to minimize the use of law enforcement intervention.

**D.    SRO Supervision and Evaluation**

224.    FPD agrees to ensure that supervisors visit SROs to observe SRO activity in schools at least once every two weeks.

225.    FPD agrees to ensure that supervisors solicit formal feedback on SRO performance from teachers, school administrators, parents/guardians, and students at least once a semester.

226.    FPD agrees to ensure that, at least once per semester, SRO supervisors meet with SROs and school administrators to review incidents in which SROs and/or other FPD officers were involved in the discipline, arrest, or restraint of a student.  The review will evaluate the effective use of skills learned through professional development and identify areas for continuous improvement.

### E.    Ongoing Assessment and Improvement

227.    Within 180 days of the Effective Date, the City and FPD will develop protocols for at least annually conducting cost-feasible data-driven and qualitative assessments of FPD's SRO program.  These assessments will be designed to ensure that FPD's SRO program is accomplishing the objectives of reducing students' unnecessary involvement in the criminal justice system, building trust between students and Ferguson law enforcement, and ensuring the protection and safety of students.  Assessments will include review and analysis of calls for service in schools, as well as officer uses of force, arrests, or charges brought on school grounds; decisions not to arrest when arrest was permitted by FPD policy; complaints regarding FPD officers on school grounds; and student and staff perceptions of school safety and officer fairness, including breakdowns by protected characteristics for all assessments.  As part of this internal assessment process, the City and FPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XII.    BODY-WORN AND IN-CAR CAMERAS

228.    In an effort to bring continued transparency regarding police activities; improve the effectiveness and reliability of use-of-force and misconduct investigations; enhance supervision of FPD stops, searches, and arrests; and provide material for officer training, the City will equip FPD officers with body-worn and in-car cameras, and will ensure that such devices are used consistent with law and policy.  All aspects of FPD's use of body-worn and in-car cameras will be designed and implemented to promote transparency, provide learning

opportunities to officers, and increase officer safety, while ensuring officer accountability and respect for individual privacy rights.

### A.     Body-Worn and In-Car Camera Requirements

229.    Within 180 days of the Effective Date, the City agrees to ensure that all FPD patrol officers, patrol supervisors, jail personnel, and other FPD employees reasonably expected to regularly interact with the public are equipped with, and required to wear while on duty, fully functioning body-worn cameras and microphones.  The City further agrees to ensure that all marked FPD vehicles that are in use are equipped with fully functioning in-car cameras with microphones.  Within this time period, the City will work with the vendor to obtain any hardware, software, or other equipment necessary to enable body-worn and in-car camera recordings to be stored, organized, maintained, and retrieved consistent with the terms of this Agreement.  The City has already secured an agreement with a vendor to meet the objectives within this Agreement.

230.    The City agrees to commit sufficient funds to maintain all body-worn and in-car cameras in working order, and to retain staffing hours sufficient to maintain and retrieve camera footage for investigatory, training, evidentiary, and public access purposes.

231.    Within 60 days of the Effective Date, the City agrees to develop and implement policies to direct the use of body-worn and in-car camera equipment.  Such policies will establish clear and specific direction regarding when officers are required to activate body-worn and in-car camera devices, as well as when officers must stop recording during an event.

   a.   The body-worn camera policy will require activation of body-worn cameras for all investigatory stops; all arrests; all searches, except where specifically articulated and approved privacy considerations require a search not to be recorded; all encounters with subjects believed to be in a mental health crisis; and other scenarios as appropriate; and

   b.   The in-car camera policy will require activation of in-car cameras for all traffic stops and pursuits until the motor vehicle stop is completed and the stopped vehicle departs, or until the officer's participation in the motor vehicle stop ends; all requests for consent to search a vehicle, non-consensual vehicle searches, and canine deployments; all prisoner transports; and other scenarios, as appropriate.

232.     Consistent with best practices, officers shall have discretion not to record in certain situations, such as when interviewing victims or witnesses who are reluctant to cooperate if recorded.  In such cases, officers shall articulate on camera their reason for not recording the activity.  FPD policy will expressly describe the situations in which officers have the discretion not to record and will make clear that, except in such situations, officers must record all interactions with members of the public.

233.     The use of a body-worn camera shall not alter or satisfy an officer's obligation to use an in-car camera as required by policy, nor shall use of an in-car camera alter or satisfy an officer's obligation to use a body-worn camera as required by policy.

234.     Officers shall document the existence of any camera footage on all required reports, and shall immediately report to their supervisor, and in writing, any non- recorded event that should have been recorded under FPD policy, as well as any interruptions or terminations of recordings.  Intentional failure to activate or continue recording devices as required, or use otherwise contrary to FPD policy, shall result in discipline.

235.     Officers shall inform individuals that they are being recorded at the earliest reasonable and safe opportunity.

236.     The City agrees to ensure that recording equipment assigned to officers or their cars is functioning properly at the beginning and end of each shift.  Officers shall report immediately any improperly functioning equipment.  The City agrees to supplement officer equipment checks by developing and implementing a schedule for testing body-worn and in-car camera recording equipment to confirm that it is in proper working order.

237.     The City agrees to ensure that body cameras are worn in a manner that prevents obstruction of the camera viewpoint to the greatest extent possible.

238.     The City agrees to ensure that body-worn cameras are only used in conjunction with official law enforcement duties.  Cameras shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities or conversations unrelated to their official duties; when officers are having conversations with other FPD personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room).

239.     Officers shall be prohibited from accessing body- or in-car camera footage for personal use or from copying camera footage to their own personal computers, computers

accessible by the general public, or public websites.  Nothing within this paragraph shall preclude the City from releasing body-worn or in-car camera footage to the public consistent with the requirements of paragraph 249 below.

**B.    Supervisory Responsibilities Related to Body-Worn and In-Car Cameras**

240.    Supervisors shall ensure that officers under their command use body-worn and in-car recording equipment consistent with policy and this Agreement and shall hold officers under their command accountable when they do not use body-worn and in-car recording equipment consistent with policy and this Agreement.  An investigation with respect to why a body-worn camera or in-car camera was not used will be initiated.  The failure to use body worn and in-car camera equipment as required by FPD policy will result be grounds for discipline consistent with FPD policy.

241.    Supervisors shall be required to periodically inspect body worn cameras and in-car video cameras for functionality.  Supervisors shall immediately report any equipment problem to a designated FPD or City official.  The City agrees to take all necessary steps to promptly repair equipment to ensure consistent availability of fully functioning body-worn and in-car cameras for all appropriate officers.

242.    The City agrees to ensure that supervisors regularly review body-worn and in-car camera recordings in a manner that promotes close and effective supervision and that is consistent with this Agreement.  Specifically, supervisors shall:

a.  Identify and review all relevant body-worn and in-car camera recordings as part of conducting mandatory supervisory reviews of specific incidents, such as stops, searches, arrests, or uses of force.  If an Electronic Control Weapon (ECW) was used during an incident, supervisors shall also obtain and review relevant ECW camera footage, if any;

b.  Identify and review all available body-worn and in-car camera recordings in the course of conducting misconduct investigations.  If an ECW was used during an incident, supervisors shall also obtain and review relevant ECW camera footage, if any;

c.  Identify and review all available body-worn and in-car camera recordings of all officers listed in any FPD report regarding any incident involving injuries to a prisoner or an officer, uses of force, vehicle pursuits, or misconduct complaints.

55

If an ECW was used, supervisors shall also obtain and review relevant ECW camera footage, if any.

d.   Regularly, and at least on a quarterly basis, conduct both systematic and random audits of the body-worn and in-car camera recordings of officers under their command in order to assess the quality and appropriateness of officer interactions with the public, identify training or professional development needs, and ensure that officers are using body-worn and in-car camera equipment consistent with policy and this Agreement.

243.   Supervisors shall incorporate the knowledge gained from reviewing body-worn and in-car camera footage into their ongoing evaluation, supervision, and training of officers.

244.   The City will ensure that the Training Coordinator, in consultation with other FPD supervisors, will conduct regular reviews of body-worn camera and in-car camera footage to identify training needs and scenarios, which shall be addressed by, and incorporated into, training curricula and programs.

**C.     Storage and Public Availability of Recordings**

245.   Within 180 days of the Effective Date, the City agrees to develop and implement protocols regarding the storage, retention, and public accessibility of body-worn and in-car camera recordings.

246.   The City will ensure that all recordings are stored by officers in a centralized location or on a remote server at the end of the officer's shift and are properly categorized and accessible within 24 hours of the recording being made.  Recordings will be categorized according to the kind of incident or event captured in the footage.

247.   The City agrees to take appropriate precautions to ensure the integrity and security of every recording, including through the adoption of specific policies for logging and tracking all body-worn and in-car camera recordings.

248.   The City will retain and preserve all non-evidentiary recordings for at least 90 days, and all evidentiary recordings for at least two years or, if a case remains under investigation or in litigation, until at least one year after the final disposition of the matter, including appeals.  To the extent that this Agreement is still in effect five years after the Effective Date, the Parties agree to reconsider the retention timelines herein.

56

249.     In order to continue to promote transparency, foster accountability, and enhance public trust in FPD, the City agrees to make body-worn and in-car camera recordings publicly available to the maximum extent allowable under Missouri law and consistent with individual privacy rights.

**D.     Ongoing Assessment and Improvement**

250.     Within 180 days of the Effective Date, the City and FPD will develop protocols for regularly, and at least annually, conducting cost-feasible data-driven and qualitative assessments of body-worn and in-car camera use.  These assessments will be designed to ensure that FPD officers are using body-worn and in-car cameras in a manner that increases transparency and accountability, and that FPD is using body-worn and in-car cameras as training and officer safety tools.  Assessments will include review of use of cameras for training purposes; any failures to use recording equipment in accordance with policy; and data regarding recording equipment deficiencies or malfunctions.  As part of this assessment process, the City Manager and Chief of Police will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XIII.   SUPERVISION

251.     First line supervisors and FPD command staff play a critical role in ensuring lawful, effective, and community-centered policing.  The City will ensure that FPD supervisors provide the oversight and guidance necessary for officers to police lawfully, safely, and effectively; establish and enforce a culture of community policing throughout the Department; and prevent, identify, and correct misconduct.

**A.     Supervisory Character and Duties**

252.     FPD supervisors shall model appropriate conduct, including abiding by the highest standards of integrity; strictly adhering to the Constitution and other laws, FPD policy, and the terms of this Agreement; and consistently demonstrating professionalism, courtesy, and respect towards all people with whom they interact.  All individuals selected to serve in a supervisory capacity shall have a demonstrated record of conducting themselves in a manner that is consistent with these standards.  Individuals who have misconduct allegation(s) pending, or

who have had a Class 1 misconduct allegation sustained within the previous 12 months, shall be presumptively ineligible to be promoted to supervisor.

253.     FPD supervisors shall provide close and effective supervision and accordingly shall:  (a) establish and enforce throughout the department the expectation that officers will police in a manner that is consistent with the Constitution and other laws, FPD policy, and community policing principles; (b) provide leadership, counseling, direction, and support to officers as needed; (c) lead efforts to engage individuals and groups and ensure that officers are working actively to engage the community and increase public trust; (d) respond to, document, review, and investigate stops, searches, citations, arrests, uses of force, and other officer conduct as required by policy and this Agreement; (e) identify misconduct and ensure that it is adequately addressed through corrective action, training, or discipline; and (f) identify training and professional development needs and opportunities on an individual, squad, and department-wide level.

254.     FPD supervisors shall document the performance of their supervisory duties in FPD's records management system or the Early Intervention System, as appropriate. Supervisors shall be required to document, at a minimum:

a.  All disciplinary referrals and non-disciplinary counseling;

b.  All actions taken to ensure officers are performing community outreach, working to build public trust, and otherwise engaging in community policing;

c.  All occasions where supervisors respond to the scene as required by policy;

d.  All reviews of officer conduct, including reviews of use of force and other reports as required by policy and this Agreement; and

e.  Any training or professional development needs supervisors identify, as well as the specific actions taken in response to those needs.

255.     Supervisors will be held accountable for the quality and effectiveness of the supervision they provide.  Supervisors' performance evaluations and promotions will be based upon the fulfillment of supervisory duties.  The failure to fulfill supervisory duties will result in corrective action, training, or discipline, as deemed appropriate by the Chief of Police.

**B.     Supervisor Staffing and Officer Assignment to Supervisors**

256.     Within 180 days of the Effective Date, the City agrees to develop and implement a staffing plan that enables close and effective supervision.  This staffing plan will be developed

in consultation with the Monitor, consistent with best practices and the requirements of this Agreement, and subject to the approval of DOJ.

257.    The City will have an adequate number of captains and lieutenants to ensure close and effective supervision of first line supervisors, and an adequate number of first line supervisors to allow for close and effective supervision of officers.  On-duty first line patrol supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.

258.    The City will ensure that all FPD officers are assigned to supervisors in a manner that provides consistency in policing practices from shift to shift and among geographic areas in the City.  The City will assign enough sergeants so that the span of control in the field for sergeants is no more than eight officers.  Officers should work with no more than three supervisors who will be responsible for evaluating a group of officers they consistently supervise based on supervisor observations and data on officer performance.  Data on officer performance and activity must be developed that can be used by sergeants to measure officer performance.

### C.    Early Intervention System

259.    Within one year of the Effective Date, the City will purchase, install, train FPD supervisors on, and implement an Early Intervention System (EIS) that is consistent with this Agreement.  The EIS will be designed to serve as a management tool that promotes supervisory awareness and proactive identification of potentially problematic behavior among officers, and ensures the delivery of individualized interventions to correct identified problematic or potentially problematic officer behavior.

260.    The EIS will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve department-wide data, as well as data for each officer. In consultation with the Monitor and to be approved by DOJ, the City will develop policies setting forth in detail the specific information that the EIS will capture, as well as data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation, audits, access to the system, and confidentiality of personally identifiable information.

261.    The City may either enhance its current data management system or contract with another qualified service provider to implement the EIS relational database.  The parties agree that the City will procure a satisfactory system to fulfill the requirements of the EIS.

262.    The EIS relational database will capture all information necessary to ensure supervisory awareness and the early identification of problematic individual and department-wide conduct.  Among the information captured will be:  (a) all uses of force; (b) all injuries and deaths to persons in custody; (c) all instances in which force is used and a subject is charged with Failure to Comply, Resisting Arrest, Assaulting an Officer, Disorderly Conduct, or similar charges; (d) all instances in which an officer issues three or more citations during a single encounter; (e) violations of FPD's body-worn and in-car camera policies; (f) all instances in which FPD learns that a declination to prosecute any crime or municipal code violation was based upon concerns of the Prosecutor about an officer's credibility or that a motion to suppress evidence was granted on the grounds of a constitutional violation by an FPD officer; (g) all misconduct complaints, including the disposition of each allegation; (h) judicial proceedings where an officer is the subject of a Full Order of Protection or other restraining order, which officers shall be required to report; (i) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with or against the City or its agents that result from the actions of FPD personnel; (j) all disciplinary action taken against employees; (k) all non-disciplinary corrective action required of employees; (l) all awards and commendations received by employees, including those received from civilians; (m) sick leave usage, especially in concert with regular days off and holidays; and (n) training history for each officer.  The EIS will include appropriate identifying information for each involved employee (e.g., name, badge number, shift, and supervisor if known) and demographic information regarding each civilian (e.g., protected characteristics).

263.    All required information shall be entered into the EIS database in a timely, accurate, and complete manner by those FPD supervisors and other responsible individuals.  All information captured within the EIS database will be organized and accessible in a manner that facilitates supervisory awareness and the early identification of problematic individual and department-wide conduct.

264.    The EIS will allow for and require close monitoring of officer conduct, including peer-group comparisons between officers with similar assignments and duties.  FPD will set and

implement threshold levels for each EIS indicator which, when reached, will trigger supervisory review.  The City will ensure that once a review of a particular officer has been triggered as a result of a particular threshold, each subsequent event involving the same indicator will trigger supervisory review.  The Monitor and DOJ will review and approve the EIS threshold levels.  In addition to using threshold indicators that trigger mandatory supervisory review, the City will ensure that FPD command staff and other supervisors regularly review EIS data to evaluate the performance of officers across all ranks, units, and shifts.

265.    The City will ensure that FPD command staff collect and, at least quarterly, analyze EIS information related to supervisor, squad, and officer trends.

266.    The City will ensure that FPD first line supervisors and Lieutenants review EIS data for all officers under their direct command at least monthly, and whenever an employee first comes under their supervision.  At least quarterly, supervisors will review broader, pattern-based reports.

267.    Within one year of the Effective Date, FPD will retain or internally develop the expertise necessary to implement individualized interventions to respond to identified problematic or potentially problematic officer conduct.  Non-disciplinary interventions in response to threshold triggers and other identified areas of concern will be timely implemented and designed to assist officers in avoiding or correcting potentially problematic behavior.  All interventions will be documented in writing and entered into the EIS. FPD will review, evaluate, and document in writing the progress and effectiveness of the intervention strategy.

268.    The City will properly maintain all necessary equipment and software sufficient to permit implementation, maintenance, and use of the EIS as set out in this Agreement and FPD policy.  The City will maintain all officer specific information in the EIS for at least one year following the officer's separation from FPD, unless prohibited by law.  Information necessary for non-individual aggregate statistical analyses will be maintained indefinitely.

269.    In addition to providing training to supervisors and others directly responsible for using the EIS as required in Section XVII.J, the City will also ensure that all FPD employees are provided with information regarding the scope and function of the EIS within 60 days of its implementation.

### D.      Ongoing Assessment and Improvement

270.     Within 180 days of the Effective Date, the City and FPD will develop protocols for regularly, and at least annually, conducting cost-feasible data-driven and qualitative assessments to ensure that FPD officers are being closely and effectively supervised, and that supervisors are conducting themselves with integrity and are consistently performing the supervisory duties required by FPD policy.  As part of this assessment process, the City and FPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures, including training or staffing adjustments; and document measures taken.

## XIV.   OFFICER ASSISTANCE AND SUPPORT

271.     Physical and mental wellness has a direct impact on officers' ability to perform their jobs safely, constitutionally, and effectively.  Fatigue and stress impact health, judgment, and performance and can thus negatively impact officer well-being.   Recognizing these dynamics, and the pressures of being a law enforcement officer generally, the City will continue its officer assistance and support efforts to support officer resilience and their physical and emotional health and will provide officers with resources to maintain their physical and mental health by implementing the paragraphs below.

### A.      Support Services for Officers and Their Families

272.     The City currently provides an Employee Assistance Program (EAP) to city employees, including police officers, which allows access to no- or low-cost counseling and mental wellness services including: confidential counseling services; crisis counseling; stress management counseling; and mental health evaluations.  The City will continue to provide the current EAP, or a similar program, to FPD officers.  The City will review this program to ensure that it comports with best practices and current professional standards.

273.     The City will compile, periodically review and revise as necessary, and maintain a list of mental and physical health service providers available as part of the EAP to all officers and employees.

274.     Mental health counseling services provided to FPD employees will remain confidential in accordance with federal law and generally accepted practices in the field of mental health care.

275.     The City will require and specify a mental health evaluation before returning an officer to full duty from administrative or desk duty following a traumatic incident (e.g., serious injury, officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death or serious injury) and as directed by the Chief of Police or the Director of Human Resources.

276.     Officers shall not be permitted to work more than 14 hours per day or 64 hours per week, except under exigent circumstances, such as natural disaster, public demonstrations, or periods of civil unrest, during which rest and recovery periods shall be in keeping with relevant protocols, as set out below.

277.     FPD officers will continue to have access to fitness equipment, free of charge, at Ferguson's Firehouse Number 1 or at the Ferguson community center, as long as the City retains control over such buildings.

278.     The City currently contracts with an identity fraud service for City employees. The City will continue to contract for the services that it currently provides, or similar services, and may require employees to pay the applicable charge for such services.

**B.     Officer Support During Public Demonstrations and Periods of Civil Unrest**

279.     The City will develop well-being protocols to be activated during officer deployments during public demonstrations or civil unrest.  These protocols will include:

  a. Close monitoring and periodic affirmative checks of officers' well-being by supervisors;

  b. Availability of mental health and medical professional(s) to monitor officers and diagnose potential health issues;

  c. Inclusion of health and safety guidance during pre-deployment briefings;

  d. Close monitoring of officer fatigue and indications of stressors;

  e. Implementation of measures to ensure that officers are given adequate time off to rest and recover;

  f. Guidance for responding to threats to officers or their families that are extreme, immediate, and credible; and

  g. During prolonged periods of demonstrations or unrest, the deployment of police counselors or psychologists to provide individual counseling to officers and their family members.

### C.        Ongoing Assessment and Improvement

280.     Within 180 days of the Effective Date, the City Manager and Chief of Police will develop cost-feasible protocols for regularly, and at least annually, assessing FPD's officer assistance and support programs to ensure the City is providing officers with support to maintain their physical and mental health.  As part of this assessment process, the City Manager and Chief of Police will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XV.    RECRUITMENT

281.     Transforming FPD into a law enforcement agency that has the confidence of the entire Ferguson community and that consistently polices effectively and constitutionally requires that the City retain a diverse workforce of highly qualified officers.  Highly qualified officers are those who have respect for and knowledge of law; a keen sense of integrity and ethics; are skilled communicators and problem-solvers; are slow to lose their temper; and who have a service mentality alongside courage, initiative, common sense, humility and civility.  A broad range of diversity *throughout the ranks* of the Department—such as diversity in life experience, cultural background, race, ethnicity, gender, sexual orientation, and language—fosters the high-quality policing described above and is critical to improving understanding and effectiveness in dealing with all communities.  Given recent events, many potential law enforcement officers may not recognize the opportunity that working on the Ferguson police force provides.  The City and FPD therefore must make greater effort than would many municipalities and police departments to attract and retain this high-quality, diverse workforce.  The recruitment requirements set out below are intended to continue to ensure these efforts.

### A.        Recruitment Plan

282.     Within 180 days of the Effective Date, the City agrees to develop, in consultation with the Neighborhood Policing Steering Committee, once established, a written Recruitment Plan that includes clear goals, objectives, and action steps for attracting and retaining a high-quality and diverse work force with the attributes described in paragraph 281 above.  The Recruitment Plan will be consistent with best practices and subject to the approval of the Monitor and DOJ.

283.     The City agrees that the Recruitment Plan will, at a minimum, require the following:

    a.  That the City will offer salaries that will place FPD among the most competitive similarly sized agencies in St. Louis County;

    b.  Affirmative recruitment outreach to a broad spectrum of community stakeholders, including community meetings in each Ward regarding recruitment, and outreach to local colleges, high schools, criminal justice students, and members of the military;

    c.  Broad distribution of recruitment information, including information regarding career opportunities, the Academy Assistance Program, compensation, the testing and hiring process, and applicable deadlines and requirements.  Such information will, at a minimum, be readily accessible on City and FPD websites and available upon request to City or FPD officials;

    d.  That candidates be allowed to submit initial applications online to the Director of Human Resources;

    e.  That an associate's degree or higher or military service with separation under honorable conditions or any service-connected disability where, with or without reasonable accommodations, the individual can perform the essential functions of the job, will be positive factors in hiring for open FPD positions; and

    f.  Opportunities for officers, civilians, and members of City government to assist the City's efforts to attract a broad spectrum of highly-qualified applicants.

284.     The City will implement the Recruitment Plan within 60 days of its being approved.  The Chief of Police will articulate the requirements to rank and file officers, and the City Manager, in consultation with the Chief of Police, will revise the plan annually, in consultation with the Monitor and DOJ.

285.     Within 120 days of the Effective Date, the City will conduct an in-depth review of its current hiring processes and hiring criteria to ensure that no process, criterion, or requirement has a statistically significant disparate impact on members of a protected group.  If the City determines that any step in the hiring process may result in a disparate impact based on protected characteristics, the City will determine whether there are alternative selection procedures

available that would select equally highly-qualified candidates while having less of a disparate impact and if there are, will implement those alternative selection procedures.

**B.      Ferguson Police Department Academy Assistance Program**

286.    The City agrees to continue the FPD Academy Assistance Program to seek qualified, local candidates to serve as police officers.

287.    The FPD Academy Assistance Program will continue to be available to any individual eligible to attend the St. Louis County and Municipal Police Academy ("Academy"), with a preference for Ferguson residents, low-income individuals, and graduates of the Ferguson-Florissant School District, Hazelwood School District, or Riverview Gardens School District. The City agrees to continue its Academy Assistance Program which provides:

    a.   One candidate will be selected every year to apply to the Academy as an Open Enrollment Recruit;

    b.   That the program will cover costs associated with applying to and attending the Academy as an Open Enrollment Recruit, and will allow the recipient to work for the City of Ferguson during which time he/she will receive the same employee benefits as other similarly-situated employees; and

    c.   Recipients will not have to repay the amount of the assistance after completing three years of service as a full-time Ferguson Police Officer.

**C.      Background Investigation and Screening System**

288.    The City agrees to the following background investigation and screening protocol for hiring of sworn police officers and shall implement such protocols within 90 days of the Effective Date.  These protocols will require:

    a.   A full psychological screening of candidates who are selected for conditional offers of employment by an appropriately qualified and trained psychiatrist or psychologist;

    b.   A full background investigation that includes a check of police records, education, employment, military history, credit history, and driving records;

    c.   A review of personnel files from candidates' previous employment, unless the City is unable to obtain such files after making all reasonable efforts, and a requirement that FPD seek to speak with the candidates' previous supervisor(s);

    d.   A thorough, objective, and timely pre-employment investigation that includes

requesting a candidate's history of using lethal and less lethal force, use-of-force training records, and complaint history if a candidate has previous law enforcement experience;

e.  A polygraph or other comparable test of candidates who are selected for conditional offers of employment;

f.  Contacting the Missouri Peace Officers Standards and Training (POST) program to review the license status and any known disciplinary history of potential hires before making an offer of employment;

g.  Checking the National Decertification Index (NDI) administered by the International Association of Directors of Law Enforcement Standards and Training (IADLEST);

h.  Determining whether the candidate has been named in a civil action in either St. Louis County and/or in the County where the officer lives (and elsewhere as feasible), including by checking Case.net, and evaluating the relevancy of the legal action; and

i.  Implementing validated pre-employment screening mechanisms to ensure temperament and skill-set suitability for policing.

289.   The background investigation and screening need not be completed for candidates whose applications do not meet the minimum criteria, or for candidates who do not advance beyond the initial interview.  The background investigation and screening information will be documented and maintained with the candidate's employment application.  Consistent with its obligations to review hiring processes to ensure they do not have a statistically significant disparate impact on a protected group, the City will ensure that the decision to exclude an applicant following the background investigation is documented and independently reviewed by the Director of Human Resources.

## D.   Ongoing Assessment and Improvement

290.   Within 180 days of the Effective Date, the City and FPD will develop protocols for regularly, and at least annually, conducting cost-feasible data-driven and qualitative assessments of its recruitment efforts.  These assessments will be designed to ensure that FPD's recruitment practices are achieving the objective of retaining a diverse workforce of highly-qualified officers.  Assessments will include review of application and hiring information;

analysis of participation in FPD's Academy Assistance programs, particularly among communities of color; and review of the background investigation system, including applications rejected on account of the background investigation.  As part of this assessment process, the City and FPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XVI.   PERFORMANCE EVALUATIONS AND PROMOTIONS

291.    The City agrees to ensure its policies for performance evaluations and promotions support and recognize officers who police effectively, lawfully, and ethically.   The City will revise its policies to achieve such goals.  The City further agrees to ensure that poor performance, inappropriate conduct, or conduct that otherwise undermines officer or public safety and community trust is reflected in officer evaluations and promotion decisions.

### A.    Performance Evaluations

292.    Within 240 days, the City will ensure its performance evaluation system is consistent with best practices to recognize and promote the importance of community engagement, problem-solving efforts, and community trust building.  The City will revise its relevant policies to achieve this goal.  Performance evaluations will identify areas where officers have excelled and areas that require further training and supervision to improve officer performance and place them in a position to advance their careers, public safety, and community-police relationships.

293.    As part of this revised performance evaluation system, the City will use a formalized system documenting annual performance evaluations of each officer, and quarterly evaluations for probationary employees, by the officer's direct supervisor.  When evaluating officer performance, FPD supervisors shall consider an officer's demonstrated integrity and ethical decision making; success at implementing community policing and bias-free policing principles; success at implementing de-escalation strategies and tactical retreat, or otherwise safely avoiding using force or using less force than they could have under the law; and additional factors, including:

    a.   Communication and decision-making skills;

    b.   Civilian commendations and "sustained" and "not sustained" complaints;

    c.   Disciplinary actions;

68

     d.   The quality and accuracy of officer reports, search warrants, and supportive affidavits or declarations; and

     e.   Creativity and innovation.

294.    Performance evaluations will include a written discussion by the supervisor of any areas in which the officer's performance needs to improve, and areas of particular growth and achievement during the rating period.  As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation.

295.    FPD will use informal and formal reward systems to recognize and promote constitutional policing and effective community engagement.

296.    Supervisors will meet with their subordinates on an ongoing basis to discuss their performance and will document the supervisor's ongoing efforts and communications regarding officer performance challenges and areas of growth.

297.    Performance evaluations for each supervisor (whether first-line or commander) will include assessment of the supervisor's ability and effectiveness in conducting the supervisory reviews as required by this Agreement, including monitoring, deterring, and addressing misconduct by officers they supervise.  Supervisors who fail to adhere to FPD policy regarding supervision of voluntary encounters, stops and detentions, searches, citations, and arrests—or who conduct inconsistent or low-quality review of such police activity—will be subject to discipline, including, but not limited to, demotion.

**B.**    **Promotions**

298.    Within 240 days of the Effective Date, the City agrees to ensure its promotional systems comport with best practices and establish clear criteria that prioritize effective, constitutional, and community-oriented policing as factors in promotion.

299.    The City agrees to develop a promotional assessment process in which candidates for promotion participate in a series of systematic, job-related, realistic scenarios observed and reviewed by experts, in areas including, but not limited to, community-oriented policing, neighborhood problem solving, crisis management and de-escalation, supervision, and management.  Factors to be considered in making promotional decisions will include, but not be limited to:

     a.   Demonstrated integrity and ethical decision-making;

69

b.  Demonstrated commitment to community engagement, and effective use of
    community-policing and neighborhood problem-solving strategies;

c.  Demonstrated commitment to bias-free policing;

d.  Effective use of de-escalation and crisis management techniques;

e.  Number and circumstances of uses of force, including any found out-of-policy;

f.  Disciplinary and complaint history;

g.  Communication and interpersonal skills;

h.  Education;

i.  Creative and innovative work;

j.  Whether the officer has served as a Police Training Officer or in another capacity
    as a trainer within FPD;

k.  The quality and accuracy of officer reports, search warrants, and supportive
    affidavits or declarations; and

l.  Demonstrated recognition that success of officer activity is reflected by crime
    prevention and investigation, increased community trust, and public safety.

300.    The City agrees to develop and use specific criteria regarding the impact of
findings of misconduct on promotional eligibility.  Officers with pending investigation(s) or
disciplinary action in a matter alleging serious misconduct will be presumptively ineligible for
promotion until such investigation(s) and/or action(s) are concluded.

301.    Supervisors who conduct high-quality review and supervision will receive
preference for assignments and promotion.

   **C.    Ongoing Assessment and Improvement**

302.    Within 180 days of the Effective Date, the City Manager and Chief of Police will
develop protocols for at least annually conducting cost-feasible data-driven and qualitative
assessments of FPD's promotional and performance evaluation practices.  These assessments will
be designed to ensure that officers who police effectively, lawfully, and ethically are recognized,
and that the performance of officers who engage in conduct that undermines public trust or
otherwise perform poorly is accurately reflected in evaluations.  Assessments will include
reviews of performance guidelines and performance evaluations conducted by supervisors, as
well as the collection and assessment of feedback from FPD officers.  As part of this assessment
process, the City Manager and Chief of Police will identify deficiencies and opportunities for

70

improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XVII.  SUPPLEMENTAL RECRUIT AND IN-SERVICE TRAINING

303.    To ensure that officers have the knowledge and skills to police constitutionally and carry out the requirements of this Agreement, the City agrees to provide and require the training set out below for each of the substantive areas of this Agreement.  The training below will be provided in accordance with the requirements set out in Section V above.

304.    Unless otherwise noted, the City agrees to provide the training set out below within two years of the Effective Date of this Agreement.

### A.      Information Regarding this Agreement

305.    The City will ensure that, within 60 days of the Effective Date, the requirements of this Agreement are explained to all FPD and Court officers, and officers and employees are provided the opportunity to raise questions or concerns regarding the Agreement and their obligations pursuant to it.

### B.      Community Policing, Critical Thinking, and Problem-Solving Policing Training

306.    The City agrees to provide FPD officers initial and ongoing annual in-service training on community and problem-solving policing, critical thinking, and communication skills, for all current and new FPD sworn employees.  This training will include:

a.  Methods and strategies to improve public safety and prevent crime through problem-solving techniques;

b.  Effective communications skills, including how to recognize and overcome communication obstacles (such training may include Tact, Tactics, and Trust (or "T3" training));

c.  Critical thinking, leadership, ethics, social intelligence, and interpersonal skills, such as the "Blue Courage" training;

d.  Community engagement techniques, including how to establish formal partnerships and actively engage community organizations and diverse groups within the community to form positive relationships;

e.  Policing in accordance with the concepts of procedural justice, fairness, and

71

legitimacy;

    f.  How to promote and facilitate use of FPD's Community Mediation Program; and

    g.  Conflict resolution and verbal de-escalation of conflict.

**C.**    **Training to Promote Bias-Free Policing**

   307.  The City agrees to provide FPD and court employees initial and ongoing annual in-service training related to bias in policing to provide officers and court employees the knowledge and skills to identify bias and minimize its impact upon law enforcement activities and interactions with members of the public.  This training will include:

    a.  Methods and strategies for more effective policing that rely upon non-discriminatory factors, including problem-oriented policing strategies;

    b.  Identification of key decision points where prohibited discrimination can take effect at both the incident and strategic-planning levels, and self-evaluation;

    c.  Constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;

    d.  The protection of civil rights as a central part of the police mission and as essential to effective policing;

    e.  The existence and impact of stereotyping and implicit or subconscious bias on officer decision-making and public interactions; and

    f.  Cultural competency, cultural awareness, and sensitivity, including the impact of historical trauma on current police-community interactions.

**D.**    **Stop, Search, and Arrest Training**

   308.  The City agrees to provide officers with initial and ongoing annual in-service training on voluntary encounters, stops/detentions, searches, citations, and arrests, including the requirements of this Agreement.  Where appropriate, training will be taught by a competent legal instructor with significance experience with Fourth Amendment issues, and will:

    a.  Address Fourth Amendment and related law, FPD policies, and requirements in this Agreement concerning searches and seizures;

    b.  Address the differences between various police contacts by the scope and level of police intrusion; differences between probable cause, reasonable suspicion, and mere speculation; and truly voluntary and consensual encounters;

    c.  Provide guidance on the facts and circumstances, in addition to legal and policy

72

limitations, that should be considered in initiating, conducting, terminating, and
expanding a stop or search;

d. Incorporate role playing scenarios and other adult-learning mechanisms to
facilitate officer ability to exercise good judgment about whether and how to
conduct searches or frisks;

e. Provide guidance on stopping and searching people for discretionary and non-
violent offenses, including providing guidance about procedural justice,
alternatives to conducting investigatory stops and searches, and the impact on
civilians of conducting apparently arbitrary stops and searches; and

f. Provide instruction on how to collect the pedestrian and vehicle stop data required
by this Agreement.

### E.    First Amendment Training

309.   The City agrees to provide to all FPD officers initial and ongoing annual in-
service training regarding First Amendment protected activity, appropriate police responses to
the exercise of such activity, and common pitfalls and oversteps in responding to such activity.
This training will also address policing public demonstrations and crowd control.  This training
may overlap with training on Stop, Search, and Arrest, and on Use of Force.  Officers will also
be trained on protocols for obtaining supervisory approval for seizures, searches, citations, and
arrests and other significant police actions that result from First Amendment related activity.

### F.    Use-of-Force Training

310.   The City agrees to provide FPD officers initial and ongoing annual in-service use-
of-force training.  This training will include:

a. Fourth Amendment and other relevant law, FPD policy, and the requirements of
this Agreement related to force;

b. Use-of-force reporting requirements;

c. Proper use-of-force decisionmaking, illustrated through role-playing scenarios
and interactive sessions;

d. De-escalation techniques, both verbal and tactical, that empower officers to make
arrests without using force and instruction that disengagement, area containment,
surveillance, waiting out a subject, summoning reinforcements, using cover,
calling in specialized units, tactical disengagement, or delaying arrest may be the

73

appropriate response to a situation, even when the use of force would be legally justified;

e.  Principles of procedural justice, and avoiding the use of force in response to minor resistance;

f.  Proper threat assessment, including how implicit racial and gender bias can impact officers' threat assessments;

g.  Recognizing failures to comply based on a medical or mental condition, physical or hearing impairment, language barrier, drug interaction, or emotional crisis, and how to respond without force to persons in those situations;

h.  The duty to safely intervene when another officer is using force that is unnecessary or objectively unreasonable, how to do so safely, and how to prevent or stop a peer's unreasonable force;

i.  Firearms training, including: firearm use at night or with reduced light; stress training; the proper techniques for unholstering, displaying, pointing, and aiming a firearm, and for determining when it is appropriate to do so;

j.  The proper use of ECWs, including:

1.  The importance that all officers view and use ECWs as a tool of necessity, not convenience, consistent with best practices and this Agreement;

2.  Training on ECW display in combination with verbal commands to avoid force;

3.  The risks of prolonged or repeated ECW exposure, including that the application for more than three cycles or 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious physical injury;

4.  The increased risks that ECWs may present for a subject who is pregnant, elderly, a child, frail, a person of low body mass, or in medical or mental health crisis; and

5.  Disadvantages of drive-stun mode, including lack of effectiveness, ease of abuse, and tendency to escalate encounters.

k.  Canine handlers will participate in canine and canine handler training every four weeks.

311.   FPD agrees to train dispatchers on force-related topics, including but not limited to the following:

    a.   Understanding the force review process, to ensure that supervisors are notified of all uses of force;

    b.   Knowing when to contact emergency medical personnel in use-of-force incidents; and

    c.   Assisting supervisors to ensure that use-of-force reporting is accurate and complete by providing information about which officers were on the scene, who may have called 911, and other relevant facts.

### G.   Crisis Intervention Training

312.   The City agrees to provide all officers and recruits with initial and ongoing annual in-service on responding to individuals in crisis.  The initial and annual training will address the circumstances in which a specialized Crisis Intervention Training (CIT) officer should be dispatched or consulted, and how situations involving individuals in crisis should be addressed if a specialized CIT officer is not immediately available.

313.   In addition to providing crisis intervention training to every FPD officer, the City agrees to provide 40 hours of initial specialized CIT training, and eight hours of annual specialized training thereafter, to CIT officers.  The training will include how to conduct a field evaluation, suicide intervention, community mental health resources, common mental health diagnoses, the effects of drug and alcohol abuse, perspectives of individuals with mental illness and their family members, the rights of persons with mental illness, civil commitment criteria, crisis de-escalation, and scenario-based exercises.  The training will include on-site visitation to mental health and substance abuse facilities and interaction with individuals with mental illness and substance abuse disorders.

314.   Within 180 days of the Effective Date, and annually thereafter, all FPD call-takers, dispatchers, and their supervisors will receive crisis intervention telecommunicators training that is adequate to enable them to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis.

### H.   School Resource Officer Training

315.   The City agrees to provide School Resource Officers with initial and ongoing annual in-service training on:  working with youth, including youth-specific de-escalation

techniques and conflict resolution; child and adolescent brain development; age-appropriate responses to youth conduct; awareness of impact of mental illness and trauma on youth; practices proven to improve school climate; mentoring, counseling, and classroom presentation skills; working with children with disabilities; non-involvement of SROs in school discipline; working collaboratively with school administrators; and the consequences of student involvement in the criminal and juvenile justice systems.

**I.      Body-Worn and In-Car Camera Training**

316.    The City agrees to provide initial and ongoing annual in-service training for all FPD sworn employees regarding body-worn and in-car camera equipment.  The City agrees to ensure that all FPD members who will be using body-worn and in-car camera equipment or reviewing body-worn and in-car camera recordings will be properly trained within 180 days of the Agreement.  Training will be sufficiently adequate in quality, quantity, type, and scope to ensure FPD members properly use and maintain recording equipment and that FPD members ensure proper organization, maintenance, and public access to recordings to the extent allowable under state law and appropriate in light of privacy considerations.

**J.      Supervisor Training**

317.    The City agrees to develop and implement a supervisory training course for all new and current supervisors, including commanders.  This training will specifically train supervisors to carry out all supervisory duties established in policy and this Agreement, and provide specific instruction, including scenario-based instruction, on methods for ensuring supervisory duties are fulfilled, including:

  a.   Applicable legal requirements sufficient to properly guide officer conduct;

  b.   How to evaluate and document officer performance;

  c.   How to conduct use-of-force investigations, including instruction in ensuring appropriate response to use-of-force incidents and instruction in investigative techniques;

  d.   How to conduct misconduct investigations, including specific instruction in investigative techniques; data and case management; the particular challenges of administrative police misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; and the proper application of the preponderance of the

76

evidence standard;

e.   How to appropriately and meaningfully use, access, review and incorporate into training body-worn and in-car cameras;

f.   How to appropriately use the Early Intervention System as a supervisory management tool.  At a minimum, all supervisors, including commanders, will be trained to evaluate and make appropriate comparisons in order to identify any significant individual or group patterns; understand and utilize the range of non-punitive corrective action they can take to modify officers' behavior and improve performance; manage risk and liability; promote constitutional policing; and address underlying stressors to promote officer well-being;

g.   How to identify biased police practices when reviewing investigatory stop, arrest, and use-of-force data; and

h.   How to evaluate complaints of improper stops, searches, and arrests for potential biased police practices.

318.   All supervisory training set forth in policy and this Agreement will be sufficiently adequate in quality, quantity, type, and scope to ensure close and effective supervision.  FPD officers will receive supervisory training prior to assuming a supervisory rank.  FPD supervisors will receive supervisory in-service training.

### K.   Officer Wellness Training

319.   The City agrees to provide initial and ongoing annual in-service training to all FPD officers on identifying and managing mental health stressors related to law enforcement; the connection between officer mental and physical well-being and officer safety, judgment, and performance; the link between mental and physical well-being; and how to access available physical and mental well-being services.  The City agrees to involve qualified mental health professionals in developing and providing this training and to provide similar training to officers' families.

320.   The City will support regular workshops for FPD officers on issues including officer safety, mental and physical health and illnesses, physical fitness, and nutrition.  The City agrees to reach out to medical and public health partners for existing programs or search local and state health departments' for available resources and training programs.

321.    The City agrees to provide initial and in-service training for supervisors and officers to assist them in identifying and effectively assisting other officers who are under severe stress or otherwise in need of assistance.

### L.    Accountability Training

322.    The City agrees to provide initial and ongoing annual in-service training to all FPD and court employees on:

   a.   How to properly handle complaint intake, including how to provide complaint materials and information; the consequences for discouraging misconduct complaints or otherwise failing to properly accept complaints; and strategies for turning the complaint process into a positive police-civilian interaction; and

   b.   Employees' specific responsibilities regarding the duty to identify and report misconduct, as well as the duty to fully cooperate with all misconduct investigations.

## XVIII. MUNICIPAL COURT REFORM

323.    To ensure that the Ferguson Municipal Code is enforced for the purpose of protecting public safety, and to enable the fair and impartial resolution of municipal charges, the City agrees to implement the requirements set forth below.

### A.    Ensuring that Municipal Code Enforcement is Driven by Public Safety

324.    As required by state law, the City agrees to ensure full compliance with the cap placed on revenue from municipal fines and fees codified within Senate Bill 5, as well as all other provisions of that statute.  *See* Senate Bill 5, codified at Mo. Rev. Stat. § 479.350 *et.seq*. The City agrees to provide DOJ and the Monitor access to all data, information, and analysis used to complete and submit the City's compliance reports required by that statute.  The City further agrees to maintain Municipal Code Ordinance 2014-3565.

325.    Within 60 days of the Effective Date, the City will remove the Ferguson Municipal Court from the oversight of the City Finance Director and ensure the Finance Director has no involvement in court operations.  Consistent with Missouri law, the Ferguson Municipal Court will report directly to the St. Louis County Circuit Court and Missouri Supreme Court. Where coordination with City officials is required for administrative purposes, members of the Ferguson Municipal Court will report directly to the City Manager.

### B.     Comprehensive Amnesty Program

326.    The City agrees to implement a comprehensive amnesty program immediately upon entering this Agreement that, at a minimum, incorporates the following measures:

a.  Prosecution will be declined in all open cases not yet adjudicated that were initiated prior to January 1, 2014, and all warrants associated with those cases will be eliminated, except where the prosecutor finds good cause to continue prosecution, in which case the City may continue to prosecute the case and maintain the municipal arrest warrant consistent with the terms of this Agreement;

b.  To the extent that it has not already done so, the City will eliminate all pending charges, fines, and fees related to Failure to Appear violations (previously imposed pursuant to Ferguson Municipal Code § 13-58) without requiring a defendant to make a bond payment, appear in court, or take any other action;

c.  To the extent that it has not already done so, the City will, without requiring a defendant to make a bond payment, appear in court, or take any other action, eliminate all pending fines and fees imposed pursuant to:

1.  Ferguson Municipal Code § 13-60 (authorizing fee of up to $75 plus court costs when an individual withdraws a complaint that resulted in a violation being issued);

2.  Ferguson Municipal Code § 13-63 (authorizing special deterrent fees as part of parole and probation);

3.  Ferguson Municipal Code § 13-70(2) and (3) (authorizing fees for continuing court proceedings, issuing and serving warrants, mileage, and witness fees);

4.  Ferguson Municipal Code § 44-50 (authorizing city-imposed towing fees); and

d.  In all cases in which a defendant has made total payments that exceed the amount of the initial fines and fees imposed for a municipal ordinance violation, including payments for associated failure to appear violations, the City will recommend that all fines are stayed and the case closed, with no further collections. The City will provide this amnesty without requiring a defendant to make a bond payment, appear in court, or take any other action.  In all cases where payments have already been made that do not total or exceed the amount of the original fine,

79

including payments for associated failure to appear violations, the City will recommend lowering the fine and fee debts owed to the amount of the initial fines and fees imposed, less any form of payment already made by the defendant.

327.    The City agrees to complete implementation of the comprehensive amnesty program within 30 days of the Effective Date, including the elimination of all relevant charges, fines and fees from pending case files as set forth above.  The City agrees not to execute any municipal arrest warrant or collect any fines or fees identified above while it is implementing the comprehensive amnesty program.

## C.    Revision of Ferguson Municipal Court Practices

328.    Within 90 days of the Effective Date, the City will develop and implement all necessary ordinances and policies to ensure that the practices of the Ferguson Municipal Court are grounded in the fair administration of justice and comport with all constitutional and other legal requirements.  Such ordinances and policies will incorporate the requirements set forth below.

### 1.  Increasing Transparency of Court Operations

329.    The City agrees to make public through a variety of means—including prominent display on the City website—a clear and accurate description of the municipal court payment process, including information regarding:  any pre-established fines and fees; a person's court obligations once they are charged with a municipal ordinance violation; a person's rights and responsibilities for challenging a charge; payment and community service options; how to seek an ability-to-pay determination; and the potential consequences for non-payment or missed court dates.

330.    The City will develop and implement a plan for a public education campaign aimed at providing members of the broader Ferguson community with accurate and complete information regarding the operations of the Ferguson Municipal Court.  The public education campaign will include specific measures to inform the public that appearing in court without being able to pay pending fines or fees will not result in arrest or jail time.

331.    The City agrees to make information broadly available, including on the City's website, regarding cost-free legal assistance that may be available to individuals with pending municipal charges.

## 2. *Ensuring Adequate Notice*

332.     The City agrees to provide all individuals charged with a violation of the Ferguson Municipal Code with adequate and reliable information regarding the charges brought against them, the options and requirements for resolving the charges, and the consequences for failing to resolve the charges in a timely matter.

333.     The City will ensure that all citations, summonses, arrest notification forms, and other charging documents used by FPD contain (or at a minimum are contemporaneously supplemented with a separate document that contains) clear and detailed information regarding the recipient's rights and responsibilities.  Such information will include:

   a.  The specific municipal violation charged;

   b.  The recipient's options for addressing the charge, including whether in-person appearance is required or if alternative methods, including online payment, are available;

   c.  Information regarding all pending deadlines;

   d.  A clear statement notifying the recipient of the right to challenge the charge in court and instructions regarding how to do so;

   e.  The exact date, time, and location of the court session at which the recipient must or may appear;

   f.  Information regarding how to seek a continuance for a court date;

   g.  The specific fine imposed, if the charged offense has a preset fine;

   h.  A clear statement that the recipient is entitled to have the amount of the imposed fine proportioned to the recipient's ability to pay;

   i.  The range of possible penalties for failing to meet court requirements; and

   j.  Clear instructions regarding how to acquire information regarding a pending charge, including how to contact a clerk of the Ferguson Municipal Court by phone or in person.

334.     Within 60 days of the Effective Date, the City will develop and implement a plan to regularly, and at least on a monthly basis, audit citations, arrest notification forms, and other notices of violations used by officers to ensure that such documents are completed properly and in a manner that provides individuals with thorough and accurate information as required by this

81

Agreement.  The City will develop this plan in consultation with the Monitor and submit it to
DOJ for approval.

335.    The City agrees to maintain up-to-date contact information for individuals with
cases pending in the Ferguson Municipal Court, including ensuring that court staff request
updated address and other contact information each time a defendant appears in court or
otherwise communicates with court staff and ensuring that any updated information received is
maintained in the defendant's municipal court file.

### 3.  Online Payment System

336.    Within 60 days of the Effective Date, the City will revise its online payment
system to allow late payments, payment plan installments, and all other court payments to be
made online except where prohibited by law.

337.    Within 60 days of the Effective Date, the City agrees to contract with the provider
of its current online payment system, or another qualified provider, to establish an online system
by which a person charged with a violation can access specific details about a case, including
pending charges, court dates, deadlines, owed fines and fees, and payments already made. This
system will be developed in consultation with the Monitor and submitted to DOJ for approval.

338.    The City agrees to ensure that all online court systems include the privacy
protections necessary to protect a defendant's personal information.

### 4.  Eliminating Unnecessary Barriers to Resolving Cases

339.    Within 60 days of the Effective Date, the City will develop and implement a plan
to identify and eliminate unnecessary barriers to resolving municipal cases.  As part of this plan,
the City agrees to:

    a.  Ensure that nothing in any City ordinance or any other City directive requires that
an in-person court appearance be made for any offense beyond those offenses
listed in Missouri Supreme Court Rule 37.49 as requiring an in-court appearance;

    b.  Implement a process for requesting a continuance of a required court appearance,
including by phone, fax, or in-person, whether or not represented by counsel.
Requests shall be considered in good faith and granted upon a showing of good
cause for the continuance;

    c.  Ensure that the City website provides accurate information regarding the hours

and location of the Ferguson Municipal Court and Ferguson Municipal Court Clerk's Office.  The City will ensure that the Court and Court Clerk's office are consistently staffed during posted business hours;

d.  Accept partial payments pursuant to criteria established by the Municipal Judge and not reject any payment an individual wishes to make against any court fine, fee, or outstanding debt; and

e.  At a minimum, the court will accept payments for all court-related fines and fees in the form of credit card payments, money orders, and cash.

### 5. *Imposing Fines and Fees, and Conducting Ability-to-Pay Determinations*

340.  Within 60 days of the Effective Date, the City will ensure that defendants are provided with appropriate ability-to-pay determinations consistent with the following requirements:

a.  The Court will affirmatively inquire as to a defendant's financial capacity prior to initially assessing fines, fees, and costs;

b.  Where a showing of indigency is made, the Court will proportion all fines, fees, and costs imposed by the Court to the financial resources of the defendant;

c.  Individuals who indicate they cannot afford to pay will not be asked to prove their indigency beyond completion of a standard affidavit under penalty of perjury;

d.  Objective and consistent criteria will be established for proportioning fines, fees, and costs to a defendant's income in cases where a defendant makes a sufficient showing of indigency.  These criteria not only will take into account the income of the defendant, but will also consider any documented fines or fees owed to other municipal courts; and

e.  The City agrees to ensure that ability-to-pay determinations are conducted prior to the court imposing any initial fine or fee, upon any increase in the fine or related court costs and fees, and upon a defendant's request for an ability-to-pay determination at any point in a case, including in cases with preset fines.

341.  The City agrees to maintain a public list of preset fines (Traffic Violations Bureau or "TVB" fines) for all municipal ordinance violations for which preset fines are allowed under Missouri law.  The City further agrees to recommend to the Municipal Judge TVB fine amounts

that are not overly punitive, that take into account the income of Ferguson residents, and that are under no circumstances greater than regional averages for specific offenses.  The TVB fine recommendations will be developed in consultation with the Monitor and subject to approval by DOJ.

342.     The City agrees not to impose additional charges, fines, fees, or costs in response to any alleged or found "Failure to Appear" violation, or pursuant to Ferguson Municipal Code §§ 13-60, 13-63, 13-70(2), or 13-70(3).

### 6.  Community Service and Payment Plan Options

343.     Within 60 days of the Effective Date, the City will ensure that defendants are provided with appropriate alternative sentence and payment plan options consistent with the following requirements.

344.     The City agrees to provide all defendants with the option of performing community service in lieu of paying fines and fees within 120 days of the Effective Date.  In advance of that date, the City will work with local and regional community organizations to develop a comprehensive community service program.  The community service program will establish reasonable rates at which community service is credited against pending fines and fees, and will establish reasonable time periods for the completion of community service obligations that take into account a defendant's existing employment and familial obligations.  The community service program will be developed in consultation with the Monitor and subject to approval by DOJ.

345.     The City agrees to ensure that defendants are provided with options for court-managed payment plans with reasonable periodic payments.  Such policies will provide:

   a.  An ability-to-pay determination to assess a periodic payment amount that is reasonable in light of the defendant's financial resources;

   b.  Procedures for a person to seek a reduction in the periodic payment amount;

   c.  Procedures allowing individuals, without appearing in court, to seek requests for extensions of payment obligations, to be granted upon a showing of good cause; and

   d.  Multiple opportunities each month, at varied days and times, for individuals on payment plans to appear before the Municipal Judge to petition the Court for payment plan modifications, extensions, or other relief.

84

346.     If a person fails to timely fulfill community service obligations or satisfy a court debt within the time allotted by a court payment plan, the City agrees to collect outstanding debts in a manner consistent with the processes set forth in this Agreement.

### 7.  *Requirements for Municipal Arrest Warrants*

347.     The City agrees not to use municipal arrest warrants as a means of collecting civil court debt.

348.     Within 60 days of the Effective Date, the City will establish and implement protocols, through policy or ordinance, to ensure that arrest warrants related to municipal code violations will be issued, if at all, only after all other mechanisms available for securing a person's appearance in court have been exhausted.  Such protocols will also ensure that arrest warrants are not being issued in response to a person's financial inability to pay a fine or fee. Such protocols will require, at a minimum, that:

    a.  The City provide individuals who have missed a required court appearance or payment with notice of the missed requirement, notice of a new court date or payment deadline, and notice of the potential consequences for failing to satisfy that subsequent requirement;

    b.  If a defendant fails to satisfy a subsequent required court appearance, the court will conduct a hearing on why a warrant should not issue, including an assessment of ability to pay any pending fine or fee.  The court shall not issue a warrant for any individual who appears at the show cause hearing;

    c.  The City agrees to provide effective notice of any motion for an order to show cause.  The City will, at a minimum, provide this notice through first-class mail, and may attempt to contact the person by telephone or text message if such contact information is available; and

    d.  If the above mechanisms are unsuccessful at securing payment or otherwise resolving the case, the municipal court may, in its discretion, issue an arrest warrant.  The City agrees that, upon arresting any person pursuant to an outstanding municipal arrest warrant, such detentions shall comport with the requirements of this Agreement.

### 8. *Bond*

349.    The City agrees to ensure that no person is held in custody after arrest because the person cannot afford to post a monetary bond.

350.    Within 60 days of the Effective Date, the City will develop and implement a plan to eliminate the use of a fixed monetary bond schedule.  This plan will require that all individuals arrested by FPD for an initial violation of law or an outstanding municipal warrant will, except as otherwise provided by state law, receive a court date and be released on their own recognizance as soon as practicable after booking, and in any case within 12 hours of booking, except:

   a.  In circumstances where an arrestee has a documented history of failing to appear for a required court appearance, the City may require an unsecured bond not to exceed $200 prior to release.  In such circumstances, the City will first provide the arrestee with the option of pleading guilty and paying the amount of the fine in full without needing to subsequently appear in court, unless the arrestee is charged with an offense for which an in-person appearance is required by Missouri Supreme Court Rule 37.49.  If the person cannot or does not elect to resolve the charge through payment of a fine, the City will:

   1.  Provide the arrestee with a new court date;

   2.  Clearly instruct the arrestee that failure to appear as required may result in assessment of the amount of the unsecured bond;

   3.  Prior to assessment, conduct a show cause hearing as to why the unsecured bond shall not be assessed, with actual notice to the arrestee; and

   4.  In no case require payment of the bond amount prior to release.

   b.  Where any person who is arrested for assaultive or threatening conduct (including assault on a law enforcement officer) or who presents a danger to the victim, the public, or any other person, the City may authorize individuals to be held beyond 12 hours.  The City agrees that:

   1.  No person arrested pursuant to a municipal arrest warrant will be held beyond 12 hours;

   2.  The Chief of Police or his or her designee must authorize all detentions beyond 12 hours; and

3. Any person held beyond 12 hours must be brought before a court within 24 hours of arrest.

### 9.  License Suspensions and Reinstatements

351.    The City agrees to report a defendant's failure to appear or pay a fine in a case involving a moving traffic violation to the Missouri Department of Revenue only to the extent required by Missouri law.

352.    In cases in which a defendant's driver's license has been suspended for failing to appear or pay a fine in a case involving a moving traffic violation, the City agrees to provide compliance letters that satisfy the requirements of Missouri Revised Statute § 302.341.1 immediately once a defendant appears in court following the suspension.  The City agrees to ensure that compliance letters will not be conditioned upon payment of outstanding fines or fees in full.

### 10. Trial Procedures

353.    Within 180 days of the Effective Date, the City agrees to develop and implement, in consultation with the Monitor and with approval of DOJ, trial procedures and protocols to ensure that all trials within the Ferguson Municipal Court are conducted fairly and impartially, and in compliance with all applicable constitutional and other legal requirements.

### 11. Court Records

354.    The City agrees to ensure that all online court systems enable the collection of aggregated court data consistent with the court data collection and reporting requirements of this Agreement.  The City will continue development of an electronic court records management system that is sufficient to reliably ensure that all case information is tracked and accessible to court officials as appropriate.  The City agrees to complete development and implementation of the electronic court records management system within 180 days of the Effective Date.

355.    The City will ensure that the electronic records management system has appropriate controls to limit user access and ability to alter case records.  The records management system will comport with applicable law, including Supreme Court of Missouri Operating Rules 1.10 and 2.

356.    The City will provide the Missouri State Courts Administrator (MSCA) with all required and requested information in a timely fashion, and will ensure that such information is

87

accurate.  Consistent with paragraph 324, the City agrees to make all information provided to the MSCA, as well as other court data collected pursuant to policy or this Agreement, readily accessible on the City and court websites.

### 12. Ensuring Independence from City Prosecutor

357.    Within 60 days of the Effective Date, the City will develop and implement policies to ensure that the Ferguson Municipal Court operates impartially, independently from the City Prosecutor, and in a manner that eliminates existing and potential unlawful conflicts of interest.  Consistent with Missouri law, such protocols shall require that the City Prosecutor, not court staff, perform all prosecutorial duties, including:  maintaining case files separate and apart from those maintained by the court; reviewing case files and filings; setting fine recommendations; responding to all discovery requests; and prosecuting all charges by information.

### 13. Ensuring Impartiality of Municipal Judge

358.    The City agrees to ensure that the Municipal Judge appointed to serve on the Ferguson Municipal Court is sufficiently independent to avoid impropriety, the appearance of impropriety, and existing or potential conflicts of interest.  Consistent with this requirement, the City has prepared revisions to Ferguson Municipal Code § 13-26.  The City agrees to enact and maintain this revised ordinance.

### 14. Ensuring Appropriate Accommodations for Defendants with Mental Illness or Intellectual or Developmental Disabilities

359.    The City agrees to implement appropriate mechanisms for providing defendants with mental illness or intellectual or developmental disabilities with information about their available options for diversion from the municipal justice system.

### D.    Ongoing Assessment and Improvement

360.    Within 60 days of the Effective Date, the City will develop protocols for regularly conducting cost-feasible data-driven and qualitative assessments of court practices.  These assessments will be designed to ensure that court proceedings are administered fairly and in accordance with policy and federal and state law.  Assessments will include analysis of aggregated court data each month, including the number of cases heard, cases resolved, fine amounts imposed and collected, warrants issued, and warrants outstanding; an analysis of fine

practices; review of information on the frequency and duration of detentions in Ferguson City Jail; and review of license suspension and compliance letter practices, including breakdowns by protected characteristics for all assessments.  As part of this internal assessment process, the City will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XIX.   ACCOUNTABILITY

361.    Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy of governance and community confidence.  Well functioning accountability systems also promote employee safety and morale.  The provisions set out below are designed to ensure that Ferguson's accountability systems are effective, fair, and transparent.

### A.    Principles of Accountability

362.    The City will require that all FPD officers and court employees adhere to the following principles of accountability.  Within 120 days of the Effective Date, the City will review applicable policies and personnel regulations to ensure incorporation of the following principles to which employees must adhere.  Any violation of the personnel rules and regulations, including of provisions relating to the principles of accountability, shall be subject to appropriate discipline, up to and including termination.

#### 1.  Duty to Report Misconduct

363.    The City will require that every City employee, including every FPD officer regardless of rank, who observes or becomes aware of any act of misconduct by an employee against a member of the public report the incident to a supervisor for appropriate documentation and investigation.  The failure to report an allegation of misconduct, as defined in this agreement, will result in discipline, up to and including termination.

#### 2.  Duty of Candor

364.    The City will require that every City employee, including every FPD officer regardless of rank, be truthful at all times in spoken, written, or electronic communications, whether under oath or not, in all matters and official investigations relating to the scope of their employment.  The penalty for a material breach of this duty of candor by an officer will be termination.

### *3. Duty to Facilitate Reporting and Investigation*

365.     The City will require all FPD officers to wear nameplates or nametags as part of the standard uniform that will allow members of the public to identify officers with whom they interact.  FPD supervisors will be required to inspect personnel at roll call prior to shifts to ensure that officers under their command are complying with this requirement.  An officer's repeated failure to wear a nameplate or nametag without justification or a supervisor's repeated failure to inspect the nameplates or nametags of officers under his or her command will require an investigation and may result in discipline.

366.     FPD officers shall provide their names and badge numbers to members of the public upon request.  The unjustified failure to provide identifying information to a member of the public will result in discipline.

367.     The City will require employees to cooperate with administrative investigations to the fullest extent permitted by law, including appearing for an interview when requested and providing all requested documents and evidence.  The unjustified failure to comply will result in discipline, up to and including termination.

### *4. Duty Not to Retaliate Against Complainants or Otherwise Discourage Complaints*

368.     The City will expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person—civilian or employee—who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.  Officers or other City employees who retaliate against any person who reports or investigates alleged misconduct will be subject to discipline, up to and including termination.  Officers or other City employees who discourage the filing of a misconduct complaint, refuse to accept a misconduct complaint, or provide false or misleading information about filing a misconduct complaint will be subject to discipline, up to and including termination.

### B.   Misconduct Complaint Intake, Investigation and Adjudication

369.     Within 180 days of the Effective Date, the City and FPD will develop and implement policies to ensure that all allegations of misconduct are courteously received, centrally documented and tracked, and fully and fairly investigated as required by this

agreement.  Where allegations are sustained, discipline will be imposed fairly and consistently, and officers and complainants will be provided information as appropriate and consistent with this Agreement and applicable law.  These policies will include the requirements set out below.

### 1.  Complaint Intake

370.    The City agrees to accept misconduct complaints from all parties, including complaints made by a complainant or on the complainant's behalf, complaints made by a third party, or anonymous complaints.  Written complaints from civilians or FPD officers or employees will be accepted by mail, email, online through an easily usable form clearly identified on the City's website, or by personal delivery to any employee.  Verbal complaints will be accepted by phone or in person.

371.    The City Attorney will notify FPD's Chief of Police or the Chief's designee if the City Attorney or any City prosecutor becomes aware of an allegation of FPD employee conduct made in the Ferguson Municipal Court or any other judicial forum that, if true, would violate the law or FPD policy.  Such allegations will be documented, tracked and investigated in the same manner as other misconduct complaints.

372.    The City agrees to develop an easily understandable and usable Complaint Form that individuals may choose to use when making a misconduct complaint, although it shall not be required that complainants use this form.  The Complaint Form will not contain any language that could reasonably be construed as discouraging the filing of a complaint.  The City agrees that it will not support the prosecution of anyone because they have complained about law enforcement misconduct, even if the complaint is unfounded.

373.    The fact that a complainant does not speak, read, or write English, or is deaf or hard of hearing, shall not be deemed a reason to not accept or investigate a complaint.

374.    The City agrees to make Complaint Forms and other materials outlining the complaint process—including relevant telephone numbers and email addresses to obtain additional information—widely and permanently available, including at City and FPD websites; the lobby of City Hall; all Ferguson schools staffed by FPD employees; FPD headquarters; and the Ferguson Municipal Court.  All FPD officers will know how to inform members of the public about how to make a complaint and will carry Complaint Forms in their FPD vehicles.  The City agrees to make available a secure complaint drop box at the Police Station and City Hall, which will be regularly checked and accessible only by the Chief of Police or his or her designee.

375.    FPD officers shall immediately notify a supervisor of a complaint received in the field.  An FPD supervisor receiving a complaint regarding an incident that just occurred shall accept and immediately begin the investigation of the complaint, unless the supervisor was involved in or directed the conduct complained of, in which case the supervisor shall contact the shift commander, who shall assign another supervisor to immediately begin investigating the complaint.

376.    Where the alleged misconduct involves a critical incident, the commanding officer will notify the Chief of Police, who will ensure that the appropriate authorities, including another jurisdiction, are notified to conduct an independent investigation.

### 2. *Complaint Tracking*

377.    Upon a complaint being received, the Chief or designee shall assign a Complaint Tracking Number.  FPD will ensure that the complainant (if known) is contacted and provided with a Complaint Tracking Number within 72 hours of the complaint being received.  All complaints will be logged in a centralized electronic tracking system immediately upon being received, and in all cases within 24 hours from when the complaint was received.

378.    Within 180 days of the Effective Date, the City will develop and implement an electronic centralized tracking system for all complaints of misconduct.  The system will capture accurate and reliable information regarding each complaint, from when the allegation was initially made to final disposition, including a description of the allegation, the final approved disposition, and any discipline imposed.  This system will be used to show lengths of time for investigations, notifications made to the complainant, and status of complaints, and to make periodic assessments of compliance with FPD policies and procedures and this Agreement.

379.    The City agrees to track, as separate categories of misconduct complaints, allegations related to:  violations of the duty of candor; discriminatory policing, including allegations that an officer conducted a stop or arrest based on an individual's protected characteristics or used a slur based on an individual's protected characteristics; unlawful stop, search, citation, or arrest practices; allegations of excessive use of force; and allegations of judicial misconduct or misconduct by employees of the Ferguson Municipal Court.

### 3.  Complaint Investigation

380.    The Chief of Police will designate a member of the command staff to coordinate the classification and investigation of misconduct complaints.

381.    FPD will develop and implement a policy and protocol for the classification and investigation of misconduct complaints.  FPD agrees that this policy and protocol will provide for the assignment of misconduct complaints that involve critical incidents—or other misconduct complaints as the Chief of Police deems appropriate—to an independent, outside entity for investigation.

382.    The City will ensure that all misconduct investigators possess excellent investigative skills, a reputation for integrity, and the ability to be fair and objective.  A misconduct complaint investigation may not be conducted by any officer involved in the incident in question, including officers who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct.

### 4.  Misconduct Complaint Investigation

383.    The City agrees to ensure objective, comprehensive, and timely investigations of all allegations of law enforcement misconduct.  Investigators shall be required to consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations based upon that evidence.  There will be no automatic preference for an officer's statement over a non-officer's statement, nor will investigators disregard a witness statement merely because the witness has some connection to the complainant or because of any criminal history.  The City agrees that all administrative investigations will be completed within 60 days of the receipt of the complaint, including assignment, investigation, review and final approval of a disposition, unless the Chief of Police extends the investigation.  In these cases, the investigator must justify the need to extend and formally request the extension directly to the Chief of Police or his or her designee.  In these cases, investigation will be completed within 120 days.

384.    Nothing in this Agreement or FPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work-related incident or activity.  The City agrees to make clear in policy and training that all officer statements in incident reports, arrest reports,

use-of-force reports and similar documents, and statements made in interviews such as those conducted in conjunction with routine use-of-force review and investigation processes, are part of each officer's routine professional duties, and are not compelled statements under *Garrity v. New Jersey*, 385 U.S. 493 (1967).  FPD policies shall make clear that where an officer believes that providing a verbal or written statement will be self-incriminating, the employee must affirmatively state this in writing at the time the request for the statement is made and before the statement is due, and will not be required to provide a statement unless formally compelled upon approval by the Chief of Police, who will consult with the relevant prosecuting agency as appropriate.  FPD policies shall require that in all misconduct investigations, prior to taking a statement from or questioning a subject employee, the employee shall be informed of his or her rights and potential consequences related to providing a voluntary or compelled statement, and shall be required to sign a form indicating that the officer has been advised of these rights and potential consequences and indicating whether the statement is being compelled or provided voluntarily.

385.     The City agrees to develop policies for conducting concurrent administrative and criminal investigations of allegations of misconduct.  The City agrees to ensure that, if at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall ensure that the employee's constitutional rights are protected.  The investigator shall notify the Monitor and DOJ, as well as the Chief of Police who shall ensure that a bifurcated investigation is initiated.  FPD will have an independent agency handle the criminal investigation.

386.     The City will require that any time an investigator determines that there may have been additional misconduct or violations beyond those initially alleged, the investigator shall take all necessary steps to ensure that such misconduct is fully and fairly documented and investigated.

### 5.  *Complaint Adjudication*

387.     The resolution of any misconduct complaint must be based upon the preponderance of the evidence.  A misconduct investigation shall not be closed simply because the complaint is withdrawn unless there is documentation of the circumstances of the complaint being withdrawn, and approval by the Chief.  If the complainant is unable or unwilling to provide additional information beyond the initial complaint, the investigation will continue as

necessary to resolve the original allegation(s) where possible based on the available evidence and investigatory procedures and techniques.  In each investigation, the fact that a complainant pled guilty or was found guilty of an offense shall not determine whether an FPD officer committed the alleged misconduct, nor shall it be the sole reason to discontinue the investigation.

388.     The investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:

      a.   "Unfounded," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did not occur or did not involve the subject employee;

      b.   "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;

      c.   "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or

      d.   "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate the law or FPD policy.

389.     The Chief of Police or the Assistant Chief of Police will approve all investigation dispositions involving FPD officers.  The City Manager will approve all investigation dispositions involving members of the Ferguson Municipal Court.

390.     In addition to determining a disposition, administrative investigations will assess and document whether:  (a) the conduct was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and (c) the incident suggests that FPD or the City should revise its policies, strategies, tactics or training.  This information will be shared with the relevant FPD commander(s), who shall ensure that recommended changes are implemented and documented.

391.     Sustained allegations of misconduct will be subject to appropriate non-disciplinary corrective actions, such as additional training, counseling or other action, and shall be subject to discipline as determined appropriate by the Chief of Police in consultation with the Director of Human Resources and the City Manager.  Any decision by the Chief of Police to terminate an officer must be approved by the City Manager in accordance with Section 4.4 of the City's Charter.  Discipline will be based on the nature of the allegation and any mitigating or

aggravating factors and not the identity of the officer or the complainant or the status of either the officer or complainant within the broader community.  Where an allegation is sustained, the City will ensure that disciplinary penalties are decided and communicated to the officer in a timely manner.

392.   FPD agrees to develop and implement a transparent and consistent schedule of disciplinary penalties that establishes a presumptive range of discipline for each type of rule violation, sets out defined mitigating or aggravating factors justifying departure from the presumptive discipline range, and requires that any departure must be justified in writing.

393.   The Chief of Police, in consultation with the Director of Human Resources and the City Manager, will approve all discipline of FPD officers.  Any decision by the Chief of Police to terminate an officer must be approved by the City Manager in accordance with Section 4.4 of the City's Charter.  All disciplinary decisions will be documented, maintained in the investigative file and the officer's personnel file, and reported within the complaint tracking system and EIS systems consistent with FPD policy and best practices.

394.   FPD agrees to participate in the National Decertification Index administered by the International Association of Directors of Law Enforcement Standards and Training, and to provide the Index, as well as Missouri POST, with all information regarding sustained misconduct findings, subject to any legal limits on such disclosures.

### 6.   *Communication with Subject Employee and Complainant*

395.   The City agrees to develop and implement policies to ensure that the subject employee receives appropriate notice and information regarding the misconduct investigation and the disciplinary process.  The subject employee will be kept informed periodically regarding the status of the investigation and will be notified of the outcome of the investigation in writing upon its completion.  Subject employees will be allowed to present mitigating circumstances prior to the imposition of any disciplinary penalty.

396.   Each misconduct complainant will be kept informed periodically regarding the status of the investigation.  The complainant will be notified of the outcome of the investigation in writing within 21 business days of the completion of the investigation, including regarding whether any disciplinary or non-disciplinary action was taken.

**C.**     **Internally Discovered Violations of Policy that Do Not Involve Members of the Public**

397.     Within 180 days of the Effective Date, the City agrees to develop and implement policies for ensuring that FPD supervisors can quickly resolve violations of policy that:  (a) do not stem from an interaction with a member of the public, and (b) are not reported from outside of FPD.  For all such violations, FPD supervisors:

      a.  Will fully and accurately document the violation and assign the violation a Complaint Tracking Number;

      b.  Will, where appropriate, recommend a disciplinary penalty for approval by the Chief of Police; and

      c.  May, in certain limited circumstances, elect to address the violation through non-disciplinary counseling or remedial training, but only where the violation is a first-time offense and the conduct alleged is so minor that it is correctible through these methods.  A second or subsequent violation in a six-month period will be ineligible for resolution through non-disciplinary methods.

398.     The FPD Chief of Police or his or her designee will review all reports of internally discovered violations of policy that do not stem from an interaction with a member of the public, including the supervisory response, to determine whether additional investigation is required and to approve the recommended discipline or corrective action.

**D.**     **Community-Centered Mediation of Misconduct Complaints**

399.     Within one year of the Effective Date the City agrees to affiliate with the Community Mediation Services of St. Louis to provide a community-centered mediation program to act as an alternative to the misconduct investigation process described above for certain civilian allegations of officer misconduct.  The misconduct complaint mediation program will be designed to increase understanding and trust between community members and FPD officers, and to prevent future misconduct and complaints of misconduct.  The program will be developed and administered consistent with best practices and will specifically provide that:

      a.  Misconduct complaints will only be resolved through mediation where both the complainant (or his or her designee) and the subject employee agree to participation in the mediation process;

      b.  Only certain misconduct complaints will be eligible for mediation, as set out in

97

FPD policy;

    c.  Officers who have participated in two or more mediation sessions within the previous 12-month period will not be eligible to have misconduct complaints made against them resolved through mediation; and

    d.  Where the mediator determines that the officer is not participating in the mediation program in good faith, the mediation shall end and the complaint investigation shall resume.

400.    The City will provide appropriate resources to ensure that the misconduct mediation program is effective and operating in a way that is consistent with best practices. The program will be administered by an individual with experience in police mediation or the administration of mediation programs, including the selection and training of mediators. This individual may also be used to develop and administer the community mediation program required in paragraphs 32-34. Mediators conducting misconduct mediations will reflect the diversity of and come from the communities served by the program and will be trained consistently with best practices.

### E.    Ongoing Assessment and Improvement

401.    Within one year of the Effective Date, the City will develop protocols for regularly, and at least annually, conducting cost-feasible data-driven and qualitative assessments to measure the effectiveness of FPD's accountability practices. These assessments will be designed to ensure that members of the community can readily make a complaint alleging police or court misconduct and that such complaints are investigated and adjudicated consistently with FPD Policy. Assessments will include: an analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of complaint investigations, and disciplinary actions taken; an analysis of problematic complaint trends; and an analysis of whether there are disparities in disposition decisions or disciplinary penalties. As part of the assessment process, the City and FPD will identify deficiencies and opportunities for improvement, implement appropriate corrective action and improvement measures as the City and FPD deem necessary and feasible, and document any such measures taken.

## XX.   CIVILIAN OVERSIGHT

402.    To promote transparent and community-centered law enforcement, the City agrees to continue and expand its commitment to establishing meaningful civilian oversight of FPD.

403.    In November 2014, the City formed a Civilian Review Board Task Force to engage the community and make recommendations to the City Council for the establishment of a Civilian Review Board.  After almost a year of focused community engagement, and, in consultation with the National Association of Civilian Oversight of Law Enforcement (NACOLE), the Task Force submitted its final 33-page report and recommendations on October 6, 2015.  The City will continue to work with the Task Force, as necessary, until the Ferguson Civilian Review Board (CRB) is established by ordinance, which will be subject to review by DOJ.  DOJ has deferred to the Task Force's determinations regarding the most appropriate form of civilian oversight for Ferguson, subject to the assessment of the Monitor, set out in paragraph 410, below.

404.    In establishing the CRB, the City, in consultation with the Task Force, will ensure that the ordinance sets forth protocols for selecting CRB members who are representative of all areas and groups within the City.  Consistent with the Task Force's recommendation, the following persons are not eligible to serve on the CRB:  (a) current or past employees of FPD; (b) current City employees; (c) any person convicted of a felony in this state or any other state; and (d) the spouse of those ineligible persons listed above.  The members of the CRB shall appoint one of their members to serve as Chairperson.

405.    The City, in consultation with the Task Force, will ensure that the CRB is established and operational within 270 days of the Effective Date.  The CRB will:

a.  Receive and review, make findings, and recommend disciplinary action for (a) all Force Review Board investigations involving a complaint of misconduct and a sampling of other Force Review Board investigations as determined appropriate by the CRB, and (b) all investigations of complaints by members of the public against members of the police department that allege misconduct involving excessive use of force, abuse of authority, discourtesy, or use of offensive language, including, but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability, pursuant to Mo. Rev. Stat. § 590.653 and

99

policies consistent with Mo. Rev. Stat. § 590.653 developed by the City and subject to approval by DOJ;

b. The CRB shall be notified when any FPD investigation of misconduct is preliminarily completed, and shall be provided with the opportunity to review, comment, and make recommendations to the Chief of Police prior to the Chief's approval of the FPD investigation.  The CRB's review of investigations may include a review of all evidence relevant to the underlying misconduct complaint;

c. All findings and recommendations of the CRB, and the basis therefore, shall be submitted to the Chief of Police for appropriate action consistent with FPD policy and this Agreement.  In accordance with Mo. Rev. Stat. § 590.653, no finding or recommendation shall be based solely upon an unsworn complaint or statement, nor shall prior unsubstantiated, unfounded or withdrawn complaints be the basis for any such findings or recommendations.  Disciplinary recommendations shall be consistent with the disciplinary matrix approved by DOJ (see Section XIX);

d. Within 180 days of the establishment of the CRB and appointment of its members, the CRB will develop and recommend a program to promote awareness throughout the broader Ferguson community about the options available for filing misconduct complaints, and about the misconduct complaint process.  Within 90 days of the finalization of the CRB's program, the City will implement the program to the extent feasible and appropriate;

e. Review and assess FPD policies and procedures, as well as training plans and curricula, and make recommendations for modifications to policies, procedures, and training;

f. Serve on officer hiring and promotion panels, except that members of the CRB serving on hiring and promotion panels shall not participate in the review of complaints or complaint investigations;

g. Develop and implement ways to educate the public on policing and to assist in enhancing FPD's relationship with the Ferguson community; and

h. Review crime data, racial profiling data, and complaint statistics to identify patterns and trends.

406.     The City agrees to ensure that the CRB has the resources, training, and capacity to fulfill each of these responsibilities, as set forth below.

407.     The City agrees to enact appropriate City ordinances and take any additional measures necessary to ensure that the CRB effectively performs each of its assigned civilian oversight functions.  These measures include:  authorizing the CRB to have timely access to appropriate video, reports, and records related to the complaint being investigated in accordance with applicable law; providing appropriate meeting space; ensuring the CRB's independence from FPD and the City; and other measures necessary to enable the CRB to effectively fulfill its mandate.  The City will designate a current employee to perform certain administrative functions of the CRB such as coordinating and posting notice of meetings, uploading information to the City's website, and similar functions.

408.     The City agrees to work with appropriate organizations in the field of civilian oversight, such as NACOLE and civilian oversight bodies in other jurisdictions, to develop and implement a plan for training all CRB members in civilian oversight.  The CRB training plan will be developed in consultation with the Monitor, consistent with best practices, and subject to DOJ approval.  The City will specifically provide training regarding:  relevant constitutional and state law; FPD policies and procedures; implicit bias; proper investigation techniques, including gathering and objectively analyzing evidence, as well as resolving inconsistent statements; and proper application of the preponderance of the evidence standard.

409.     Within 12-18 months of the CRB's creation, the Task Force will conduct a comprehensive assessment of the CRB's operations to ensure that it is providing effective civilian oversight.  If the Task Force determines that the CRB is not effectively fulfilling its mandate, the City will work with the Task Force to ensure that the policies, procedures, and composition of the CRB are modified as necessary to ensure effective oversight.

410.     The Monitor will develop protocols to assess (a) whether the CRB is representative of the broader Ferguson community by reflecting the racial, ethnic, geographic, and housing diversity within the region, considering the applicants willing to serve on the CRB, and (b) whether the CRB is effectively serving the civilian oversight functions described in Mo. Rev. Stat. § 590.653 and this Agreement.

## XXI.   DATA COLLECTION, REPORTING, AND TRANSPARENCY

### A.   Data Collection

411.    The City and FPD agree to ensure the collection and tracking of all FPD and municipal court data that is:  (a) necessary to enable the City's ongoing assessment and improvement of its law enforcement practices, as discussed throughout this Agreement; (b) necessary to enable the Monitor to conduct the outcome assessments set out in Section XXII; and (c) otherwise required by this Agreement, FPD policy, and state and federal law.

412.    To ensure that collected data is complete, accurate, and reliable, the City agrees to work with the Monitor to develop and implement a cost-feasible data collection plan and related protocols, to be approved by the Monitor and DOJ.

### B.   Public Availability of Policies and Reports

413.    The City agrees to make publicly available on request and on the City's website all FPD and municipal court policies and protocols, as well as all public reports described in this Agreement.  Any exceptions will be limited to information that must remain confidential to protect public safety and approved by DOJ and the Monitor.

414.    On at least an annual basis, the City will make data collected pursuant to paragraph 411 publicly available on the City website in summary form, unless prohibited by law.

### C.   Annual Report

415.    Within 60 days following the expiration of each year of the term of this Agreement, the City agrees to produce an annual report describing FPD and Ferguson Municipal Court activity.  The purpose of the annual report will be to inform the public of the City's law enforcement achievements and challenges, as well as new programs and steps taken to address challenges and build on successes.  The annual report will further provide information regarding the City's implementation and status of this Agreement.  The annual report shall not include any specific information or data that may not be disclosed pursuant to applicable law.  Subject to applicable law, the annual report will address:

> a. Community engagement and problem-solving policing efforts, identifying successes, obstacles, and recommendations for future improvement;
>
> b. Disparate impact of any police or court program or activity and measures taken to eliminate unnecessary disparate impacts;

102

c.  Voluntary contact, stop, search, and arrest data and any analysis of that data that was undertaken;

d.  First Amendment protected activity data and associated analyses;

e.  Use-of-force data and associated analyses;

f.  Crisis Intervention Team specialized members, training, and activities;

g.  SRO program successes and challenges;

h.  Initiatives that the City has implemented for officer assistance and support;

i.  Recruitment efforts, challenges, and successes;

j.  In-service and supplemental recruit training;

k.  Misconduct complaint data, including but not limited to the number of misconduct complaints made and investigated; the outcome of investigations; and the mode of resolution (e.g. full investigation, mediation, etc.), as well as analysis of that data to identify trends;

l.  Activities and achievements of the Civilian Review Board, Neighborhood Policing Steering Committee, Ferguson Youth Advisory Board,  Apartment Neighborhood Association, and any other board or commission that has been active or accomplished achievements during the year;

m.  Court operation data and related trends and analyses; and

n.  Additional topics as deemed appropriate by the City in its discretion to promote transparency and identify the accomplishments, actions, and continuing needs of the City.

## XXII.  MONITORING, COMPLIANCE ASSESSMENT, AND ENFORCEMENT

### A.      Independent Monitor

416.    The Parties will jointly select an Independent Monitor ("Monitor"), which will be a team of individuals highly qualified in policing, civil rights, monitoring, and related areas, to assess and report on whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in constitutional and otherwise lawful policing and administration of justice, and increased community trust between the public and the Ferguson Police Department and Court.  The Monitor will work with the Parties to identify and address any barriers to compliance.

417.     The Monitor will have only those duties, responsibilities, and authority conferred by this Agreement.  The Monitor is not intended to replace or assume the role or duties of the Chief of Police or any other City official.  Nothing in this Agreement alters the authority of the City Manager or the fact that the Chief of Police retains authority over FPD, including the authority to oversee its operations.  The Monitor will be subject to the supervision and orders of the Court, consistent with this Agreement and applicable law.

418.     In order to assess, assist, and report on FPD's implementation of this Agreement and whether the goals of this Agreement are being achieved, the Monitor will conduct the activities specified in this Agreement, including assisting FPD in its development of the policies, procedures, practices, training curricula, systems and programs required by this Agreement.

### B.     Selection and Compensation of the Monitor

419.     Within 90 days of the Effective Date, or additional time if agreed to by the Parties, the City and DOJ together will select a Monitor acceptable to both Parties, to assess and report on FPD's implementation of this Agreement.  The selection of the Monitor shall be pursuant to a process jointly established by the City and DOJ, and shall not be subject to any formal procurement requirements.  The Parties' Monitor selection will be subject to the approval of the Court with jurisdiction over this Agreement.

420.     If the Parties are unable to agree on a Monitor within the timeframe agreed to by the Parties, each Party will submit the names of three monitoring teams, along with the teams' monitoring proposals (including cost proposals), to the Court, and the Court will select a Monitor from among the candidates submitted.

421.     The Monitor will be appointed for a period of five years beginning on the Effective Date and will have its appointment extended automatically should the City not demonstrate full and effective compliance at the end of this five-year period.  The extension of the Monitor beyond seven years will be allowed only if the Court determines that such extension would facilitate full and effective compliance with this Agreement.  The Monitor's appointment will terminate prior to five years if the City has achieved the necessary full and effective compliance for a period of two consecutive years.

422.     The City will bear all reasonable fees and costs of the Monitor.  DOJ and the City recognize the importance of ensuring that the fees and costs borne by the City are reasonable, and accordingly fees and costs will be an important factor to be considered in selecting the

Monitor.  In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, the City, DOJ, and the Monitor will attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court.  The City will provide the Monitor with office space and reasonable office support such as office furniture, telephones, Internet access, secure document storage, and photocopying.

423.     The Monitor, at any time after its initial selection, may request to be allowed to hire, employ, or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by this Agreement.  Any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement will be subject to the provisions of this Agreement.  The Monitor will notify the City and DOJ in writing if the Monitor wishes to select such additional persons or entities.  The notice will identify and describe the qualifications of the person or entity to be hired or employed and the monitoring task to be performed.  If the City and DOJ agree to the Monitor's proposal, the Monitor will be authorized to hire or employ such additional persons or entities.  The City and DOJ have ten business days to disagree with any such proposal.  If the City and DOJ are unable to reach agreement within ten business days of receiving notice of the disagreement, they will seek the Court's assistance in resolving the dispute.  Should the City or DOJ determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority, or failed to satisfactorily perform the duties required by this Agreement, the City or DOJ may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors.

C.     **Duties of the Monitor**

*1.  Develop Monitoring Plan and Review Methodology*

424.     Within 90 days of assuming the duties of Monitor, the Monitor will develop a plan for conducting:  (a) reviews of policies, training curricula, and other written materials requiring Monitor review or approval; (b) evaluations and audits of whether the material requirements of this Agreement have been implemented; and (c) outcome assessments, including the community surveys required by this Agreement.  The Monitor will submit this plan to the Parties for review and approval.  This plan will:

a.  Clearly delineate the requirements of this Agreement to be assessed, indicating

105

which requirements will be assessed together;

    b.  Set out a schedule for conducting a review or audit of each requirement of this Agreement within the first two years of this Agreement, and a review or audit of each requirement at least annually thereafter; and

    c.  Set out a schedule for conducting outcome measure assessments for each outcome measure at least annually, except where otherwise noted in this Agreement, with the first assessment occurring within 18 months of the Effective Date.

425.    Where the Monitor recommends and the Parties agree, the Monitor may refrain from conducting a compliance review of a requirement previously found to be in compliance by the Monitor pursuant to audit or review, or where outcome assessments indicate that the outcome intended by the requirement has been achieved.

426.    At least 30 days prior to the initiation of any assessment, review, or audit of the requirements or outcome measures of this Agreement, the Monitor will submit a proposed methodology for the assessment, review, or audit to the Parties.  The Parties will submit any comments or concerns regarding the proposed methodology to the Monitor no later than 15 days prior to the proposed date of the assessment, review, or audit.  The Monitor will modify the methodology as necessary to address any concerns or will inform the Parties in writing of the reasons it is not modifying its proposed methodology.  Any unresolved disputes involving the Monitor's methodology may be submitted to the Court for resolution.

## 2.  *Evaluate and Audit Implementation of the Agreement*

427.    The Monitor will conduct reviews or audits as necessary to determine whether the City and FPD have implemented and continue to comply with the requirements of this Agreement.  Compliance requires that the City and FPD:  (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice. Compliance reviews and audits will contain the elements necessary for reliability and comprehensiveness.  Compliance reviews and audits may be conducted using sampling and compilation data where appropriate.

### 3.  *Recommend and Provide Technical Assistance*

428.    The Monitor may make recommendations to the Parties regarding measures necessary to ensure timely, full, and effective implementation of this Agreement and its underlying objectives.  Such recommendations may include a recommendation to change, modify, or amend a provision of this Agreement, a recommendation for additional training in any area related to this Agreement, or a recommendation to seek technical assistance.  In addition to such recommendations, the Monitor may also, at the request of DOJ or the City and based on the Monitor's reviews, provide technical assistance consistent with the Monitor's responsibilities under this Agreement.  The Monitor does not have the authority to modify the requirements of this Agreement through these recommendations or otherwise.

### 4.  *Conduct Community Surveys*

429.    Within one year of the Effective Date, and every year thereafter, the Monitor will conduct a reliable, comprehensive, and representative survey of members of the Ferguson community, including police officers, regarding their experiences with and perceptions of FPD, public safety, and the municipal court.  Analysis of the results of this survey may be used to demonstrate sustained continuing improvement with this Agreement.

430.    To conduct the annual community surveys, the Monitor will:

   a.  Develop a baseline of measures on public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters;

   b.  Develop a baseline of measures on public satisfaction with the municipal court, attitudes among court personnel, and the quality of individuals' encounters with court personnel;

   c.  Design, conduct, and analyze baseline and subsequent annual surveys of a representative sample of Ferguson residents, law enforcement personnel, and detained arrestees;

   d.  Review and consider prior law enforcement and court surveys in Ferguson as well as current or recent concerns, in designing the survey;

   e.  Engage in informal conversation with Ferguson residents, FPD officers, court staff, and DOJ representatives, and observe community meetings;

   f.  Ensure that the resident and arrestee surveys are designed to capture a

representative sample of individuals of all relevant protected characteristics served by FPD and the municipal court;

g.  Conduct the survey in English and non-English languages as necessary to allow for representation of the entire Ferguson community; and

h.  Formally discuss the survey methodology with FPD supervisors and DOJ, and consider these opinions in development of the baseline survey and improvements to subsequent surveys.

431.    FPD and the City agree to cooperate with the design and execution of the surveys.

432.    The report of the baseline survey and subsequent annual surveys will be posted on the City's website and publicly distributed.

433.    The City and FPD will analyze the results of the survey and will use this analysis to modify and improve FPD policies, training, and practices as needed.

### 5.  Conduct Outcome Assessments

434.    In addition to compliance reviews and audits, the Monitor will conduct qualitative and quantitative assessments to measure whether implementing this Agreement is resulting in constitutional and otherwise lawful law enforcement.  Within 120 days of assuming the duties of Monitor, the Monitor will review and recommend any changes to the outcome measures detailed below that the Monitor deems useful in assessing whether implementation of this Agreement is resulting in constitutional and otherwise lawful law enforcement.  The Parties will adopt any recommendations upon which they agree.  If the Parties disagree on whether to adopt a particular outcome measure recommended by the Monitor, the Party seeking adoption may seek Court resolution.

435.    These outcome assessments will include analyzing, at least annually, the following:

a.  The results of the community surveys set out above;

b.  Community engagement measurements, including:

1.  FPD officers' (including supervisors and commanders) participation in community meetings and events, development/continuation of partnerships between FPD and community members, and engagement in positive interactions with community members that did not previously have strong relationships with the police department;

108

    2.   Development and maintenance of long-term programs to promote and foster positive police-youth interactions (such as Police Athletic/Activities League and Explorer Program);

    3.   Responses to calls for service in different areas of, and housing types within, Ferguson;

    4.   Relationship with the Neighborhood Policing Steering Committee, Civilian Review Board, Youth Advisory Board, Apartment Neighborhood Association, and any other civilian engagement and oversight groups;

    5.   Level of participation in and effectiveness of Community Mediation Program; and

    6.   Level and effectiveness of police-community problem-solving partnerships.

c.   Bias-free policing measurements, including regression analyses sufficient in type and scope to determine whether any police or court program, initiative, activity, or service has a disparate impact on the basis of protected characteristics. Such analyses will control for factors other than protected characteristics, including but not limited to crime rates, income level, and ability to pay. Examples of the regression analyses that will be conducted are analyses of whether:

    1.   FPD officers are more likely to stop; cite; search, including searches based on probation and parole conditions; seize contraband; or arrest, including on municipal warrant arrests, persons with a protected characteristic;

    2.   FPD officers are more likely to stop, cite, search, or arrest persons with a protected characteristic for discretionary and non-violent offenses, including Manner of Walking, High Grass and Weeds, Barking Dog, Trash Service, and Housing/Zoning code offenses;

    3.   FPD officers are more likely to use force, including all types of force identified in the use-of-force outcome measurements below, based on protected characteristics;

    4.   FPD officers are more likely to deploy canines, based on protected characteristics, and related disparate impact of canine bites;

    5.   FPD officers are more likely to impound vehicles based on the protected characteristics of the vehicle owner or occupant;

6. The Ferguson Municipal Court is more likely to issue or recall municipal arrest warrants based on protected characteristics;

7. The Ferguson Municipal Court is more likely to dismiss charges or modify charges, including reducing charges to lesser charges, based on protected characteristics;

8. The Ferguson Municipal Court is more likely to impose fines or bond requirements, or higher fine or bond requirements, based on protected characteristics; and

9. The Ferguson Municipal Court is more likely to reduce fines based on a protected characteristic.

d. Voluntary contact, stop, search, citation, and arrest measurements, including:

1. Total number of stops, searches, citations, and arrests—overall and broken down by geographic area, arrest charge, protected characteristics of subject (if any), and the rate at which the encounters resulted in a summons or arrest;

2. Number and rate of stops and searches for which there is sufficient documented reasonable suspicion—overall and broken down by geographic area, arrest charge, and protected characteristics of subject (if any);

3. Number and rate of increase or decrease of instances in which supervisory approval was necessary for the issuance of citations;

4. Number of citations or other forms of charges issued per stop, broken down by geographic area, arrest charge, and protected characteristic;

5. Number and rate of increase or decrease of arrests for offenses requiring supervisory approval before transport and arrests not permitted absent continuing unlawful conduct or inability to identify subject;

6. Number of correctable violations issued, broken down by offense, and ratio of correctable violations to citations for each eligible offense;

7. Data related to the documented reasonable suspicion to stop and probable cause to search or arrest, broken down by the actual or perceived protected characteristics of the person(s) stopped/arrested;

110

8. Number of civilian complaints regarding stops, searches, seizures, and arrests, overall and by disposition, geographic area, type of stop or seizure, and protected characteristics;

9. The state prosecutor's acceptance and refusal rates for prosecution from arrests made by FPD and reasons for refusals, when made available by the prosecutor, and any factors and information provided indicating that a failure to prosecute was due to the quality of the case or concerns regarding officer conduct, overall and broken down by zone, arrest charge, and protected characteristics of the subject; and

10. Number of searches that resulted in a finding of contraband, overall and broken down by geolocation, arrest charge, and protected characteristics of the subject.

e. First Amendment measurements, including:

1. Number of citations and arrests requiring supervisor approval under the First Amendment section of this Agreement, broken down by geolocation, arrest charges, and protected characteristics of the subject;

2. Number of incidents in which the officer's reported rationale for the police action indicates that the action taken was related to (i) an individual recording or observing officer activity, (ii) public protest activity, (iii) media coverage of events, or (iv) an individual's expression of criticism of law enforcement;

3. Number of complaints in which a person claims he or she was not permitted to observe, record, criticize, or protest police activity, or was retaliated against for such conduct;

4. Number of members of the press arrested or otherwise interfered with; and

5. Number of incidents in which a recording device or recording was seized, searched, or destroyed, and the reason for these actions.

f. Use-of-force measurements, including:

1. Number of use-of-force incidents (including force used in the FPD jail) as compared to number of arrests, with use-of-force incidents broken down by force type, geographic area, and type of related arrest (if any);

2. Number of injuries to officers and members of the public, and the rate at which officer and subject injuries decrease or increase—overall and broken down by severity of injury;

3. Number of force complaints, broken down by disposition of complaints, source of complaint (internal or external), force type, and geographic area;

4. Rate at which ECW and canine deployment and apprehension decreases or increases compared to the use of force overall and by weapon;

5. Number of force incidents associated with obstruction arrests and similar violations;

6. Number of uses of force (including force used in the FPD jail) found to violate policy, broken down by force type, geographic area, and arrest charge;

7. Number of officers found to have used force in violation of policy or law more than one time;

8. Force reviews or investigations indicating a policy, training, equipment, or tactical deficiency;

9. Quality of use-of-force investigations and reviews, and number and rate of use-of-force administrative investigations that are returned for further investigation or lack of completeness; and

10. Number of use-of-force incidents recorded through the use of body-worn and/or in-vehicle cameras compared to the number of use-of-force incidents not recorded.

g. Response to individuals in crisis measurements, including:

1. Number of calls for service involving persons in crisis, broken down by whether CIT officers responded to the calls;

2. The rate of individuals diverted from the criminal justice system to the health care system; and

3. Number of police interactions where force was used on persons in crisis, including the type of force used; the reason for the interaction (e.g., suspected criminal conduct, wellness check); the threat to public safety, including whether the person was armed and if so, with what; the type of resistance

112

offered, if any; attempts at strategic disengagement; and injuries to officers, persons in crisis, or third parties.

h. Policing in schools measurements, including:

1. Number of calls for service and other reports of crime occurring on school grounds during school hours or school-sanctioned events;

2. Number of citations, arrests, and uses of force and restraints on school grounds during school hours or school-sanctioned events, broken down by school, charges, and protected characteristics of the subject;

3. Number of cases diverted toward conflict resolution, school discipline process, alternatives, and diversion programs, broken down by school, arrest charges, and protected characteristics of the subject;

4. Number and type of complaints about officer conduct on school grounds during school hours or school-sanctioned events;

5. Student and staff perceptions of school safety and officer fairness, and SRO views of the program, based on surveys and other tools to be developed by the City and FPD; and

6. Disparities in officer uses of force, arrests, or charges brought on school grounds, by the protected characteristic of the subject student.

i. Court practices measurements—which, unless otherwise indicated, will include breakdowns by offense, whether the defendant was represented by an attorney, and the protected characteristics of the defendant—including:

1. Number of cases pending before the Ferguson Municipal Court;

2. Number of cases heard by the Court each month, including a breakdown of the race of the defendant, and a breakdown of how cases were resolved;

3. Number of missed court appearances;

4. Number of continuance requests granted and denied;

5. Number of warrants issued, and total warrants pending, each month;

6. Amount of initial fines imposed and collected, separate from any additional charges imposed during a case;

7. Number of ability-to-pay determinations conducted;

8. Number of cases designated for resolution through community service each month;

9. Number of cases assigned and cleared from payment plans each month;

10. Number of unsecured bonds assessed, and dollar amount of unsecured bonds assessed and collected, each month;

11. Number of Missouri Department of Revenue license suspensions initiated by the Court, and the number of compliance letters enabling license reinstatement issued by the Court; and

12. Number and nature of complaints regarding court services, broken down by protected characteristics of the defendant.

436.    In conducting these outcome assessments, the Monitor may use any relevant data collected and maintained by FPD (e.g., crime trend pattern analysis), provided that the Monitor has determined, and the Parties agree, that this data is reasonably reliable and complete.

### 6.  *Conduct Comprehensive Assessment*

437.    Three years after the Effective Date, the Monitor will conduct a comprehensive assessment to determine whether and to what extent the outcomes intended by this Agreement are being achieved, and whether any modifications to this Agreement may be appropriate in light of changed circumstances, unanticipated impact (or lack of impact) of the requirement, or the feasibility compared with need for the requirement.  Where the Parties agree with the Monitor's recommendations, the Parties will modify this Agreement accordingly.  This provision in no way diminishes the Parties' ability to stipulate to modifications to this Agreement as set out below. Nothing in this assessment will enable the Monitor to unilaterally modify the terms of this Agreement.

### 7.  *Publicly Report Assessment and Status of Agreement Implementation*

438.    The Monitor will file with the Court, every six months, written, public reports that include the following:

a. A description of the work conducted by the Monitor during the reporting period;

b. A list of each Agreement requirement, indicating which requirements have been:

1. Incorporated into implemented policy;

2.   The subject of sufficient training for all relevant FPD officers and employees; and

3.   Found by the Monitor to have been fully implemented in practice.

c.   The methodology and specific findings for each review and audit conducted, where appropriate, redacted as necessary for privacy concerns.  An unredacted version will be filed under seal with the Court and provided to the Parties.  The underlying data for each review will not be publicly available but will be retained by the Monitor and provided to either or both Parties upon request;

d.   For any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

e.   The methodology and specific findings for each outcome assessment conducted; and

f.   A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of this Agreement.

439.   The Monitor will provide a copy of the six-month reports to the Parties in draft form within 15 calendar days after the end of each reporting period.  The Parties will have 15 calendar days upon receipt of the report to informally comment on the draft report.  The Monitor will consider the Parties' responses and make appropriate changes, if any, before issuing the report.

### 8.   *Regularly Communicate with the Court, Parties, and Public*

440.   The Monitor will maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of FPD's implementation of and compliance with this Agreement.  To facilitate this communication, the Monitor will conduct monthly meetings, which will include participation by, at a minimum, the Chief of Police, counsel for the City, FPD's Compliance Coordinator (described below), and representatives of DOJ.

441.   The Monitor will meet with community stakeholders, including the CRB, NPSC and the Ferguson City Council, to explain the Monitor's reports and inform the public about this

115

Agreement's implementation process, as well as to hear community perspectives on police interactions.

### D.    Monitor and DOJ Access and Confidentiality

442.    To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City or FPD.  The Monitor will have access to all necessary individuals, facilities, and documents, which will include access to Agreement-related trainings, meetings, and reviews such as critical incident reviews and disciplinary hearings.  FPD will notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, arrest of any officer, or any high-profile event expected to garner media attention.

443.    The City and FPD agree to ensure that the Monitor will have timely, full, and direct access to all City and FPD staff, employees, critical incident scenes, and facilities that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement.  The Monitor will cooperate with the City and FPD to access people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.

444.    The City and FPD will ensure that the Monitor will have full and direct access to all City and FPD documents and data that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any documents or data protected by the attorney-client privilege or that constitute attorney work product.  The attorney-client privilege may not be used to prevent the Monitor from observing reviews, trainings, or disciplinary hearings.  Should the City and FPD decline to provide the Monitor with access to documents or data based on privilege, the City and FPD will inform the Monitor and DOJ that it is withholding documents or data on this basis, and will provide the Monitor and DOJ with a log describing the documents or data and the basis of the privilege for withholding.  If DOJ objects to the City's classification, it may seek resolution of the propriety of the assertion of the attorney-client privilege from the Court.

445.    For the purpose of implementing this Agreement, DOJ and its consultants and agents will have full and direct access to all City and FPD staff, employees, facilities, documents, and data related to the Agreement, except any documents or data protected by the attorney-client privilege or that constitute attorney work product.  DOJ and its consultants and

agents will cooperate with the City and FPD to access involved personnel, facilities, and documents in a reasonable manner that, consistent with DOJ's responsibilities to enforce this Agreement, minimizes interference with daily operations.  Should the City or FPD decline to provide DOJ with access to documents or data based on attorney-client privilege, the City and FPD will inform DOJ that it is withholding documents or data on this basis, and will provide DOJ with a log describing the documents or data and the basis of the privilege for withholding. If DOJ objects to the City's classification, it may seek resolution of the propriety of the assertion of the attorney-client privilege from the Court.

446.     The Monitor and DOJ will provide the City and FPD with reasonable notice of a request for copies of documents.  Upon such request, working with the Monitor and DOJ to determine a cost-effective and timely manner of production, the City and FPD will provide copies of the requested documents in a timely manner (electronic, where readily available).

447.     The Monitor will have access to all records and information relating to criminal investigations of FPD officers as permitted by law.  The Monitor will have access to all documents in criminal investigation files that have been closed by FPD after the Effective Date. The Monitor will also have reasonable access to all arrest reports, warrants, and warrant applications initiated after the Effective Date, whether or not contained in open criminal investigation files.  Where practicable, arrest reports, warrants, and warrant applications initiated after the Effective Date will be obtained from sources other than open criminal investigation files.

448.     The Monitor and DOJ will maintain all non-public information provided by the City and FPD in a confidential manner.  Other than as expressly provided in this Agreement, this Agreement will not be deemed a waiver of any privilege or right the City and FPD may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document.

449.     Except as required or authorized by the terms of this Agreement or with the Parties acting together:  the Monitor, including any agent, employee, or independent contractor thereof, will not make any public statements or issue findings with regard to any act or omission of the City or FPD, or their agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to this Agreement.  Any press statement made by

117

the Monitor regarding its employment or monitoring activities under this Agreement first will be approved by DOJ and the City.

450.    Members of the Monitoring Team may testify as to their observations, findings, and recommendations before the Court with jurisdiction over this matter, but no member of the Monitoring Team will testify in any other litigation or investigative or pre-litigation proceeding with regard to any act or omission of the City, FPD, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject of which the Monitor may have received knowledge as a result of his or her performance under this Agreement.  This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

451.    Unless such conflict is waived by the Parties, the Monitor will not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City or its departments, officers, agents or employees.

452.    The Monitor is not a state or local agency, or an agent thereof, and accordingly, the records maintained by the Monitor will not be designated as public records subject to public inspection.

453.    The Monitor will not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement brought by non-parties to this Agreement.

### E.    City of Ferguson Consent Decree Coordinator

454.    The Parties agree that the City will reassign a current City employee for the duration of the Agreement, to serve as the Consent Decree Coordinator.  The Consent Decree Coordinator will serve as a liaison between the City, FPD, the Monitor, and DOJ, and will assist with the City and FPD's implementation of this Agreement.  At a minimum, the Consent Decree Coordinator will:

a.    Assist the Monitor in coordinating review, audit, and implementation activities;

b.    Facilitate the provision of data, documents, other material, and access to FPD employees to the Monitor and DOJ, as needed;

c.    Ensure that all documents and records are maintained as provided in the Agreement; and

      d.   Assist in assigning Consent Decree related tasks to FPD personnel, as directed by the City Manager, the Chief of Police, or their designees, and in tracking the handling of those tasks.

### F.    City of Ferguson Data Collection, Self-Assessment, and Report

455.    The City and FPD agree to collect and maintain all data and records:  necessary to:  (a) document implementation of and compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable outcome assessments, reviews, and audits; and (b) allow FPD or other City entities to perform ongoing quality assurance in each of the areas addressed by this Agreement.

456.    Within 180 days of the Effective Date, FPD will file with the Court, with a copy to the Monitor and DOJ, a status report.  This report will delineate the steps taken by FPD during the reporting period to implement this Agreement; FPD's assessment of the status of its progress; plans to correct any problems; and responses to any concerns raised in the Monitor's previous semi-annual report.  Following this initial status report, FPD will file a status report every six months thereafter while this Agreement is in effect.

### G.    Court Jurisdiction, Modification of this Agreement, and Enforcement

457.    This Agreement will become effective upon entry by the Court.

458.    To ensure that the requirements of this Agreement are properly and timely implemented, the Court will retain jurisdiction of this action for all purposes until such time as the City and FPD have achieved full and effective compliance with this Agreement and maintained such compliance for no less than two consecutive years.  At all times, the City and FPD will bear the burden of demonstrating by a preponderance of the evidence full and effective compliance with this Agreement.  DOJ reserves its right to seek enforcement of the provisions of this Agreement, and to seek additional enforcement and implementation mechanisms, if it determines that the City and FPD have failed to fully comply with any provision of this Agreement.  DOJ will consult with officials from the City before instituting enforcement proceedings and will make a good-faith attempt to resolve any disputes before seeking intervention from the Court.

459.    The City and DOJ may jointly agree to make changes, modifications, and amendments to this Agreement.  Such changes, modifications, and amendments to this Agreement will be encouraged when the Parties agree, or where the Monitor's reviews,

assessments, and/or audits demonstrate, that an Agreement requirement as drafted is not furthering the purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose.  Where the Parties or the Monitor are uncertain whether a change to this Agreement is advisable, the Parties may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension.  During this suspension, the Parties may agree to temporarily implement an alternative requirement.  The Monitor will assess whether the suspension of the requirement, and the implementation of any alternative provision, is as or more effective at achieving the purpose as was the original/current Agreement requirement, and the Parties will consider this assessment in determining whether to jointly stipulate to make the suggested change, modification, or amendment.

460.    The Parties agree to defend the provisions of this Agreement.  The Parties will notify each other of any court or administrative challenge to this Agreement.  In the event any provision of this Agreement is challenged in any city or state court, removal to a federal court will be sought by the Parties.

461.    The City and FPD agree to require compliance with this Agreement by their respective officers, employees, agencies, assigns, or successors.

### H.    Termination of this Agreement

462.    This Agreement will terminate when the City has been in full and effective compliance for two consecutive years.  "Full and effective compliance" means achieving both sustained compliance with all material requirements of this Agreement, and sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to this Agreement's outcome measures.

463.    If the Parties disagree whether the City has been in full and effective compliance for two years, either Party may seek to terminate this Agreement.  In the case of termination sought by the City, prior to filing a motion to terminate, the City agrees to notify DOJ in writing when the City has decided that it is in full and effective compliance with this Agreement and that such compliance has been maintained for no less than two consecutive years.  Thereafter, the Parties will promptly confer as to the status of compliance.  If, after a reasonable period of consultation and the completion of any audit or evaluation that DOJ and/or the Monitor may wish to undertake, including on-site observations, document review, or interviews with City and FPD personnel, the Parties cannot resolve any compliance issues, the City may file a motion to

120

terminate this Agreement.  After the receipt of the City's motion, DOJ will have the right to file a written response.  The parties agree to jointly seek a hearing on the motion, and the burden will be on the City to demonstrate by a preponderance of the evidence that it is in full and effective compliance with this Agreement and have maintained such compliance for at least two years.

464.    This Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action.  Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

## XXIII. DEFINITIONS

465.    The following terms and definitions will apply to this Agreement:

1. "Active resistance" means a person's physical actions are intended to prevent an officer from placing the subject in custody and taking control, but are not intended to harm the officer.  Examples include breaking the officer's grip and hiding to avoid detection.  Verbal statements, bracing, pulling away, or tensing alone do not constitute active resistance.

2. "Aggravated aggressive resistance" means a person's actions create an objectively reasonable perception on the part of the officer that the officer or another person is subject to imminent death or serious physical injury as a result of the attack or attempted attack.  Aggravated aggressive resistance represents the least encountered but most serious threat to the safety of an officer or another person.

3. "Aggressive resistance" means a person attempts to attack or does attack an officer.  Lunging toward the officer and striking the officer with hands, fists, kicks, or any weapon are examples of aggressive resistance.  Neither passive nor active resistance constitute aggressive resistance.

4. "Apprehension" means the arrest, capture, or taking into custody of a person.

5. "Arrest" means the taking of one person into custody by another.  To constitute arrest there must be an actual restraint of the person.  The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the person arresting him.  An arrest is a restraint of greater scope or duration than an investigatory stop or detention.  An arrest is lawful when supported by probable cause.

6. "Bite" means any physical contact between a canine's teeth and a person or animal.  This physical contact need not result in broken or punctured skin to be a bite.

7. "Bite ratio" means the number of canine apprehensions that result in a bite, divided by the number of canine apprehensions.  Accidental and unintentional bites shall be included in the numerator.

8. "Best practices" means guidelines or standards that represent the most efficient and current means for achieving constitutional and effective policing accepted by nationally recognized

121

police professionals or organizations in the relevant subject area, as determined by the Parties.

9. "Canine apprehension" means any time a canine is deployed and plays a clear role in the capture of a person.  The mere presence of a canine at the scene of an arrest shall not count as a canine apprehension.

10. "Canine handler" means a sworn member of FPD who has been certified by a canine trainer used by FPD as meeting all requirements of FPD's certification program.

11. "Canine deployment" means any situation, except one involving an on-leash article search only, in which a canine is brought to the scene and used in an attempt to locate or apprehend a suspect, whether or not a suspect actually is located or apprehended.  This includes all situations in which a canine is removed from a vehicle for this purpose and all instances in which a subject surrenders after an announcement is made warning that the canine will be released if the subject does not surrender.

12. "Chief" or "Chief of Police" means the Chief of Police of the Ferguson Police Department or a properly designated Acting or Interim Chief.

13. "City" refers to the City of Ferguson, Missouri, including its agents, officers, and employees.

14. "Complainant" means any person, including an FPD officer or employee, who makes a complaint against FPD or an FPD officer or employee.

15. "Complaint" means any allegation of misconduct regarding FPD services, policy, or procedure; any claim for damages; or any criminal matter that alleges possible misconduct by an FPD officer or employee.

16. "Compliance" means that the City and FPD:  (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice.

17. "Consent search" means a search conducted based on the consent or permission of the individual whose person or property is searched.

18. "Court" refers to the United States District Judge for the Eastern District of Missouri presiding over this case.

19. "Critical firearm discharge" means a discharge of a firearm by an FPD officer, including accidental discharges and discharges where no person is struck. Range and training firings, destruction of animals, and off-duty hunting discharges where no person is struck are not critical firearms discharges.

20. "Crisis Intervention Team" is a first responder model of police-based crisis intervention that involves a dynamic collaboration of community, health care, and advocacy partnerships committed to improving the way law enforcement and the community respond to individuals in crisis.

21. "Critical incident" means any officer-involved shooting, death in police custody, or death as a result of being in police custody.

122

22. "Department of Justice" or "DOJ" refers to the United States Department of Justice's Civil Rights Division.

23. "Discipline" or "disciplinary action" means a personnel action for violation of an established law, regulation, rule, administrative rule, or FPD policy, including, but not limited to, a verbal reprimand, written reprimand, suspension, or dismissal.

24. "Discriminatory policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies based on protected characteristics. Discriminatory policing does not include using race, ethnicity, or any other protected characteristics in any reliable and current suspect-specific description.

25. "ECW" or "Electronic Control Weapon," means a weapon, including those manufactured by TASER International, designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and override the subject's voluntary motor responses.

26. "ECW application" means the contact and delivery of an electrical impulse to a subject with an Electronic Control Weapon.

27. "Effective Date" means the day this Agreement is entered by the Court.

28. "Exigent circumstances" means emergencies in which a reasonable person would believe that imminent bodily harm to a person or persons or the destruction of evidence is likely.

29. "Firearm" means a handgun, shotgun, or any other weapon designed to expel a projectile by the action of an explosive.

30. "FPD" or "the Department" refers to the Ferguson Police Department and its agents, officers, supervisors, and employees (both sworn and unsworn).

31. "Force" means any physical effort used to control or restrain another, or to overcome the resistance of another.

32. "Frisk" or "pat down" means an officer passing his or her hands over a person in a search for weapons or contraband.

33. "Full and effective compliance" means achieving both sustained compliance with all material requirements of this Agreement and sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to the Agreement's outcome measures.

34. "Imminent threat" means an immediately impending danger.

35. "Impact weapon" means any authorized intermediate weapon or object used to strike a subject and inflict pain or injury through blunt force.

36. "Implement" or "implementation" means the development or putting into place of a policy, plan, or program, including the appropriate training of all relevant personnel, and the consistent and verified performance of the policy, plan, or program in actual practice.

37. "Improvised weapon" means any object, other than those objects approved and authorized by the Department, used to apply force, and any Department-approved weapon used by an officer who has not received required training or certification to use the weapon.

38. "Incidental" means occurring merely by chance or without intention or calculation.

39. "Include(s)" and "including" mean "including, but not limited to."

40. "Interview" means questioning for the purpose of eliciting facts or information.

41. "Investigatory stop" or "investigatory detention" means a "*Terry*" stop, i.e., a temporary restraint for investigatory purposes where the subject of the stop or detention would reasonably believe that she or he is not free to leave.  A juvenile's age is a consideration in determining whether the juvenile would not feel free to leave.  An investigatory stop or detention may be a pedestrian, vehicle, or bicycle stop.

42. "LEP" means Limited English Proficient, and refers to a person who does not speak English as his/her primary language and has a limited ability to read, write, speak, or understand English. LEP individuals may be competent in certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing).

43. "Less-lethal force" means force neither intended nor likely to cause death or serious physical injury, but that can cause death or serious physical injury.  Less-lethal force includes, but is not limited to, the use of an ECW, an impact weapon such as an asp or baton, and OC spray.

44. "Lethal force" means any use of force likely to cause death or serious physical injury, including the use of a firearm; neck hold; or strike to the head, neck, or throat with a hard object.

45. "Low-level force" means force lesser than lethal and less-lethal force.  Low-level force includes but is not limited to takedowns; physical striking to parts of the body other than the head, neck, or throat; hand controls; pressure point techniques; and physical escort techniques.

46. "Mental health condition" or "mental illness" means a medical condition that disrupts an individual's thinking, perception, mood, or ability to relate to others such that daily functioning and coping with the ordinary demands of life are diminished.  This includes, but is not limited to, serious mental illnesses such as major depression, schizophrenia, bipolar disorder, obsessive compulsive disorder, panic disorder, posttraumatic stress disorder, and borderline personality disorder.  This also includes dual diagnosis of mental illness and another condition, such as drug and/or alcohol addiction.

47. "Mental health crisis" means an incident in which someone with an actual or perceived mental illness or developmental disability is experiencing intense feelings of personal distress (e.g., anxiety, depression, anger, fear, panic, hopelessness), obvious changes in functioning (e.g., neglect of personal hygiene, unusual behavior), or catastrophic life events (e.g., disruptions in personal relationships, support systems, or living arrangements; loss of autonomy or parental rights; victimization; natural disasters), which may, but do not

124

necessarily, result in an upward trajectory of intensity culminating in thoughts or acts that are dangerous to him- or herself and/or others.

48. "Misconduct" means a violation of departmental policies or procedures; a violation of federal, state, or local criminal laws; a constitutional violation, whether criminal or civil; a violation of personnel rules; or a violation of administrative rules or regulations.

49. "Non-custodial interview" means an encounter during which an officer asks questions of a subject the officer seeks to investigate for a possible offense, and during which the subject is free to leave and/or decline any of the officer's requests at any point.

50. "Non-disciplinary corrective action" refers to action other than discipline taken to enable or encourage an officer to improve his or her performance.

51. "Necessary force" means the minimum amount of force required, because no reasonably effective alternative appears to exist, to effect a legitimate public safety objective. Legitimate public safety objectives include protecting any person from injury, effecting a lawful detention or arrest, and conducting a lawful search.

52. "Neck hold" means any of the following types of holds:  (a) arm-bar control hold, which inhibits breathing by compression of the airway in the neck; (b) carotid restraint hold, which inhibits blood flow by compression of the blood vessels in the neck; (c) lateral vascular neck constraint; (d) a hold with a knee or object to the back of a prone subject's neck.  A neck hold is considered lethal force.

53. "Open Enrollment Recruit" means a person admitted to the St. Louis County and Municipal Police Academy through the Open Enrollment Recruit Program.

54. "Passive resistance" means a person is not compliant with officer commands but is taking only minimal physical action to prevent being taken into custody and control and does not pose an immediate threat to the officer or the public.  Bracing, tensing, linking arms, or verbally signaling an intention to avoid or prevent being taken into custody constitute passive resistance.

55. "Personnel" means all FPD employees.

56. "Police officer" or "officer" means any law enforcement agent employed by or volunteering for FPD, including corrections officers, supervisors, and reserve officers.

57. "Policies" or "policies and procedures" means written regulations or directives, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of FPD personnel, and providing specific direction on how to fulfill those duties, functions, or obligations. These include general orders, special orders, policies, procedures, and standard operating procedures.

58. "POST" means the Missouri Peace Officer Standards and Training Program.

59. "Preponderance of the evidence" means that a given fact or outcome is more likely than not to be true.

60. "Pretextual stop" means a lawful police stop or detention initiated for the purpose of investigating potential criminal activity for which the officer has neither reasonable suspicion nor probable cause.

61. "Probable cause" means that the facts and circumstances known to the officer at the time would justify a prudent person in believing the suspect committed or was committing an offense.

62. "Procedural justice" refers to a concept involving four central principles designed to build public confidence in the police: 1) treating people with dignity and respect; 2) giving individuals a chance to be heard during encounters; 3) making decisions fairly and transparently, based on facts; and 4) conveying goodwill and trustworthiness.

63. "Proportional force" means force that reflects the totality of the circumstances surrounding the situation, including the presence or absence of imminent danger to officers or others. Proportional force does not require officers to use the same type or amount of force that the subject uses.  The more immediate the threat and the more likely that threat will result in death or serious physical injury, the greater the level of force that may be objectively reasonable and necessary to counter it.

64. "Protected Characteristics" include race, color, ethnicity, national origin, gender, gender identity, sexual orientation, age, immigrant status, disability, and limited English proficiency.

65. "Qualified mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, social work, or psychiatric nursing, who is currently licensed in the State of Missouri to deliver the mental health services he or she has undertaken to provide.

66. "Reasonable force" means that force which is objectively reasonable under the circumstances and the minimum amount of force necessary to effect an arrest or protect the officer or other person.

67. "Reasonable suspicion" means articulable facts that, within the totality of the circumstances, lead an officer to reasonably believe that the suspect has committed, is committing, or is about to commit a crime.

68. "Reportable use of force" means any use of force that is greater than that required for unresisted searching or handcuffing.  Additionally, unholstering or pointing a firearm, and any use of force which results in injury or a complaint of pain are reportable uses of force for the purposes of this Agreement.

69. "Seizure" occurs when an officer's words or actions convey to a reasonable person that he or she is not free to leave.

70. "Serious physical injury" means physical injury that creates a substantial risk of death, causes death or serious and protracted disfigurement, or causes impairment of the function of any bodily organ or limb.

71. "Social contact" means a voluntary, consensual encounter between the police and a subject with the intent of engaging in casual and/or non-investigative conversation.  The subject is free to leave and/or decline any of the officer's requests at any point.

72. "Specialized CIT Officer" means an officer who has received specialized, comprehensive training on how to respond to persons in mental health crisis, including persons under the influence of drugs or alcohol.

73. "Supervisor" means sworn FPD personnel at the rank of sergeant or above, or anyone acting in those capacities, and non-sworn FPD personnel with oversight responsibility for other personnel.

74. "Unit" means any designated organization of officers within FPD, including area and specialized units.

75. "Vehicle stop" means any instance where an FPD officer directs a civilian operating a motor vehicle of any type to stop and the driver is detained for any length of time.

76. "Will" or "shall" or "agrees to" means that the provision imposes a mandatory duty.

Respectfully submitted this 17th day of March, 2016,

For Plaintiff UNITED STATES OF AMERICA:

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

ROBERT J. MOOSSY
Deputy Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section

CHRISTY E. LOPEZ
Deputy Chief, Special Litigation Section

JUDE J. VOLEK
Special Counsel, Special Litigation Section

CHIRAAG BAINS
Senior Counsel, Civil Rights Division
CHARLES HART
Trial Attorney, Special Litigation Section
AMY SENIER
Trial Attorney, Special Litigation Section
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 514-2000

For Defendant THE CITY OF FERGUSON:


JAMES W. KNOWLES, III
Mayor


STEPHANIE E. KARR
City Attorney
Curtis, Heinz, Garrett & O'Keefe P.C.
130 South Bemiston
Suite 200
Clayton, Missouri 63105


So Ordered, this _____19th_____ day of ___April___, 2016


CATHERINE D. PERRY
United States District Court Judge
Eastern District of Missouri


129