UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　Plaintiff,<br><br>　　　　v.<br><br>**THE CITY OF FERGUSON,**<br>　　Defendant. | )<br>)<br>)　Case No. 4:16-cv-180<br>)<br>)　Hon. Catherine D. Perry<br>)<br>)<br>)<br>) |

**INDEPENDENT MONITOR'S**
**<u>WINTER 2020 SEMIANNUAL REPORT</u>**

**I.　INTRODUCTION**

Pursuant to Paragraph 438 of the Consent Decree entered into between the United States Department of Justice ("DOJ") and the City of Ferguson, Missouri (the "City") (together, the "Parties"), the Independent Monitor (the "Monitor" or the "Monitoring Team") submits this Winter 2020 Semiannual Report, which details the City's progress during the reporting period of April 1, 2019 through September 30, 2019 and highlights additional activities associated with the City's implementation efforts through January 31, 2020.[1]

During Years One, Two, and Three, the City's implementation efforts were punctuated with clear forward momentum in some areas and persistent barriers to progress in others.[2] The Monitoring Team is pleased that a strong working relationship endures between the City and the

---

[1] In accordance with Paragraph 439 of the Consent Decree, the substance of this report has been agreed to by the Parties.

[2] Throughout this report, each year of implementation is referred to as "Year One," "Year Two," "Year Three," "Year Four," and "Year Five." The monitorship officially began on July 22, 2016, when the former Monitor was appointed by the Court. Accordingly, the implementation years are identified as follows: Year One: August 2016 - July 2017; Year Two: August 2017 - July 2018; Year Three: August 2018 - July 2019; Year Four: August 2019 - July 2020; and Year Five: August 2020 - July 2021.

DOJ, particularly with respect to the development of core policies. Through a collaborative and iterative process with both the community and the DOJ, the City has developed initial draft policies in nearly all of the priority areas identified by the Parties during Year One. With respect to reform of the Ferguson Municipal Court ("FMC"), the City has developed and implemented most court-related provisions of the Consent Decree. Significantly, at the close of 2019, the City reported its near total compliance with the Consent Decree's Comprehensive Amnesty Program ("CAP").[3] While a final audit of the CAP by the Monitoring Team has yet to be completed, compliance with the CAP would represent a significant achievement by the City as it required the review and assessment of thousands of cases by FMC staff as well as coordination with the DOJ, the Monitoring Team, and the City Prosecutor.

    Other areas of the Consent Decree, including implementation of the community engagement, training, and data analytics provisions, have failed to progress year after year. Fortunately, at the close of Year Three, the City filled a number of key positions in order to address these delays. In July 2019, Jason Armstrong was sworn-in as the City's new Police Chief. Courtney Herron, the FMC Administrator and Nicolle Barton, the Consent Decree Coordinator, were hired in September 2019. Ms. Herron stepped into her role in the Court swiftly, preparing and assisting with the Monitor's Fall 2019 Court audit as well as with all other implementation efforts pertaining to the FMC. Ms. Barton has been instrumental in serving as a much needed liaison between the City, the DOJ, and the Monitoring Team as well as in tracking and coordinating the City's implementation efforts. In the late fall of 2019, the City contracted with AH Datalytics, a data consulting firm which immediately began providing

---

[3] A detailed review of the City's compliance with the Comprehensive Amnesty Program, including the Monitor's review and audit of the implemented program, will be contained in the Monitor's next written report to the Court.

data-related assistance to the City by conducting a "gap analysis" designed to measure the requirements of the Consent Decree against the City's current data-collection capabilities. Because the hiring and onboarding of these individuals did not occur until the summer and fall of 2019, little progress beyond policy development was achieved during the reporting period.[4] Although much work remains, these individuals, in combination with Assistant Chief Frank McCall, Captain Harry Dilworth, and Interim City Manager Jeffrey Blume, have worked quickly to turn what had become perpetual areas of impasse into opportunities for renewed momentum. In the short time since these individuals joined the City's implementation efforts, the Monitor has observed a renewed focus on and energy around the Consent Decree, including a more strategic approach toward implementation, the development of internal processes that better ensure compliance with the Consent Decree, and, for the first time, consistent tracking by the City of implementation efforts and benchmarks outlined in the Monitor's Workplan.

The Monitor hopes that this revitalized commitment to the Consent Decree will lead to substantial focus during Year Four on two areas that remained largely stagnant during Year Three: (1) the development of a comprehensive training program; and (2) implementation of community engagement and policing practices that are consistent with the overall aims of the Consent Decree. With respect to training, as the City completes policy development in new areas, it faces a backlog with respect to implementing those policies via roll call briefings and incorporating them into a robust and consistent in-service training program. The City should assess its roll call procedures and seek guidance from the DOJ and the Monitoring Team, as needed, with respect to how its procedures could be streamlined and/or implemented more

---

[4] The "reporting period" ran from April 1, 2019 through September 30, 2019. The "next reporting period" refers to October 1, 2019 through March 30, 2020.

efficiently. Furthermore, although the City completed an initial draft of a training plan in December 2019 (thanks to a tremendous effort by Assistant Chief McCall), much work remains with respect to finalizing this plan, including, for example, outlining the specific requirements of the Consent Decree and whether they are met by various training programs offered by the state of Missouri. The Monitor recommends that the City consider hiring a Training Consultant, with experience in creating such documents, to provide assistance with these processes, just as AH Datalytics has done with respect to data analytics. With both training and data, the City's retention of an expert with concrete experience in specialized tasks for a concentrated period of time is likely to result in a more efficient and cost-effective path to substantial compliance. A robust training program and plan is essential to adequately training on finalized policies. These plans should be developed carefully and strategically and rolled-out on a timely basis in order to ensure that the City implements policies efficiently during Year Four.

Finally, as stated in the Monitor's Fall 2018 Status Report, *see* Dkt. No. 100 at 7-8, and repeatedly thereafter, the Monitoring Team continues to believe that a community engagement and/or outreach coordinator is critical to not only achieving substantial compliance with the Consent Decree, but to achieving a sustainable, community-oriented approach to policing that fosters trust and transparency within Ferguson. The community engagement provisions of the Consent Decree must be approached holistically; they should be developed not only to meet the specific paragraphs of the decree, but also in consideration of the greater purpose and goals of the decree with respect to community relations. It will serve neither the City nor the community to approach this core aspect of the Consent Decree by simply checking off community engagement tasks paragraph-by-paragraph as though they exist independent of the remainder of the agreement. Community engagement remains a critical aspect of the decree and is one area

that has not yet been adequately contemplated or resourced by the City.  This must be addressed and prioritized during Year Four.

### A. The Monitoring Process

During the reporting period, and through January 31, 2020, the Monitoring Team supported the City in its efforts to achieve substantial compliance and conducted reviews and audits to determine compliance with both the Consent Decree and the Year Three Workplan.  As with prior status reports, this report details the City's progress with respect to three critical phases of compliance: (1) policy revision and review; (2) training and implementation; and (3) auditing and compliance assessment.

#### 1. Policy Revision and Review

The Parties continue to work collaboratively to execute the policy revision and review protocol as follows:[5]

i.  *Kick-off/Announcement of Policy Area:* FPD notifies DOJ and the Monitor of its intent to begin drafting or revising policies in an identified subject area;

ii. *Technical Assistance:* The appropriate Subject Matter Expert on the Monitoring Team provides FPD and DOJ with technical assistance in the form of model policies and/or initial guidance as to best practices in the identified subject area;

iii. *Gap Analysis:* FPD and DOJ conduct an assessment or gap analysis of FPD's current state of affairs (i.e., ascertain how FPD's existing policies, practices, and systems differ from the Consent Decree's requirements and best practices);

iv. *Solicitation of Community Input:* Several provisions of the Consent Decree require community involvement in the implementation of specific policies, including those designed to improve police/community relations.  The Parties are committed to soliciting community feedback on other policies as well, even where not explicitly required by the Consent Decree.  While the Parties continually evaluate the best means of involving community stakeholders in the policy development process, the Parties have found that policy forums are an effective means of inviting and obtaining community input.

---

[5] The steps outlined in the process are not necessarily intended to be implemented sequentially.  Rather, the Parties and the Monitoring Team determine the appropriate methodology on a case-by-case basis.

v. ***Policy Revision:*** FPD and DOJ revise policies, practices, and systems in the target subject area to the extent required under the gap analysis;

vi. ***Return to Monitor/SME:*** Upon completion of a draft policy, the Parties submit the policy to the Monitor and/or appropriate Subject Matter Expert for review. The Subject Matter Expert will review the policy and either provide approval or arrange for a conference call to discuss additional revisions; and

vii. ***30-Day Comment Period:*** Once the Monitoring Team has approved a draft policy, the City will email the policy to FPD officers from varying ranks and units. Officers will have a meaningful opportunity to review and comment on the new or revised policy or procedure during a 30-day period. At the same time, FPD will post the policy to the FPD website for review by the community. Community members will also have 30 days to provide comment on the draft policy or procedure. At the close of the 30-day period, the Parties will determine whether any modifications to the draft policy are appropriate. If modifications are made, the revised policy shall be submitted to the Monitor for review and final approval. After the Monitor has approved the final policy, officers will be provided roll call training and the finalized policy will be implemented and published.

### 2. Training and Implementation

Training is required in order to move policies out of development and into implementation. Under the Consent Decree, training takes on two forms: *first*, roll call trainings are delivered via lecture, PowerPoint, and/or short assessment; and *second*, in-service training is provided to FPD personnel. Under the Year Three Workplan, the City was tasked with creating a training schedule by February 28, 2019. *See* Dkt. No. 100-1 at 14. The City still has not finalized a comprehensive training schedule. However, it did design and implement roll call trainings on an *ad hoc* basis as accompanying policies were finalized. Specifically, during the reporting period, under the leadership of Captain Dilworth, the City rolled-out a number of roll call trainings pertaining to the suite of use of force policies.

In general, the City's scheduling and execution of roll call trainings has been time consuming and has resulted in a backlog of trainings that have yet to be completed despite the fact that the accompanying policies were finalized during Year Three. To address this, the City

should confer with the Training Committee and with the DOJ in order to design an approach to roll call trainings that allows for more expeditious development and roll-out and includes sergeants and other department personnel in the delivery of training. To the extent needed, the Monitoring Team is readily available to provide technical assistance as well.

With respect to in-service trainings, the City submitted an initial draft of a training plan to the DOJ and the Monitoring Team for review in December 2019. While this document represents a substantial effort and strong first draft, it does not yet reflect the robust training plan contemplated by the Consent Decree. Enhancing and finalizing a roll call and in-service training schedule and plan <u>must</u> be a priority for the City during the next reporting period. Further delays with respect to training will prevent timely implementation of finalized policies.

As stated previously, the Monitor recommends that the City hire a consultant to assist in this critical aspect of implementation. Continued reliance on sworn officers to develop highly technical plans, presentations, and curricula assessments—on top of their daily duties—all but ensures there will be persistent delays in the development and roll-out of a comprehensive training program.

### 3. Auditing and Assessing Compliance

As previous reports have indicated, with the exception of the FMC, much of the implementation phase of the Consent Decree remains to be completed. The Monitoring Team conducted its fourth and fifth Municipal Court audits in March and November 2019. The details of those audits, as well as a complete assessment of the City's compliance with the Comprehensive Amnesty Program, will be contained in a supplemental FMC Status Report to be published in early Spring 2020. The remaining subject areas did not enter the implementation stage during the reporting period. As noted above, the development of the

training schedule and plan is essential for ensuring that Consent Decree subject areas enter the implementation stage on a timely basis.

## II. DETAILED STATUS UPDATE

The Monitor issued a Year Three Workplan as Appendix D to the Fall 2018 Status Report.  *See* Dkt. 100-1 at 10-27.  The Workplan provided benchmarks for the City's achievement of both short and long term implementation goals.  Many of the deadlines outlined in the Workplan were not achieved by the City.  As a result, the Monitoring Team and Ms. Barton, the Consent Decree Coordinator, collaborated extensively before developing a Year Four Workplan.  Together, they discussed how and when action items would and could realistically be achieved by the City.  Based on those discussions, the Monitor developed a Year Four Workplan, attached hereto as **Appendix A**.  The Year Four Workplan has been updated to reflect what the Monitor considers to be realistic and achievable goals during Year Four.  In the future, if the City is determined to be "out of compliance" with a specific Workplan provision at the close of Year Four, the Monitoring Team requests that all Parties conference to discuss that provision and to support the City in developing a plan for achieving compliance as soon as possible with respect to that action item.  Subsequent status reports will detail the agreed-upon schedule or procedure developed by the City to remedy the "out of compliance" measure.  Where delays or missed deadlines occur as a result of circumstances beyond the City's control, the Monitoring Team will detail those in its semiannual status report.  This protocol, which promotes both transparency and accountability, is possible now that the City has invested in a Consent Decree Coordinator, a dedicated individual who can facilitate the implementation process and help guide the City in decisions regarding the allotment of resources and the prioritization of tasks in accordance with the Monitor's Workplan.

The remainder of this report details the status of implementation with respect to the six stated priority areas—community policing and engagement; bias-free police and court practices; stops, searches, citations, and arrests; use of force; recruitment; and accountability—as well as municipal court reform, the school resource officer program, body-worn and in-car camera policies, First Amendment protected activities, and data collection and analysis.

### A. Community Policing and Engagement

The Monitoring Team, once again, requests that the City prioritize community policing and engagement during the next reporting period. One of the most important areas of the Consent Decree continues to see little progress and attention. For this reason, the Monitoring Team strongly encourages FPD to develop a comprehensive plan for addressing <u>all</u> outstanding action items in the area of community policing and engagement. Where possible, a dedicated community engagement and/or outreach coordinator should be utilized to oversee implementation in this area.

The appointment of Former Assistant Chief Al Eickhoff as community outreach coordinator, followed shortly by his departure from FPD, resulted in lost ground with respect to implementation of the community policing and engagement provisions of the Consent Decree during the reporting period. However, Assistant Chief McCall assumed the role thereafter and, with the addition of a Consent Decree Coordinator, the City has taken significant steps toward increasing attention to this area since September 2019. The Monitor commends Ms. Barton for beginning to develop a Community Engagement Plan and for working with Chief Armstrong and Benjamin Horwitz from AH Datalytics to identify ways in which data collection may be used to track community policing practices within FPD. Next, the City should seek to finalize the City's Community and Neighborhood Policing Plans as well as the Community Engagement

Plan and to complete development and implementation of its staffing, shift sequencing, and deployment plans in Year Four. Consent Decree ("CD"), ¶¶ 20, 26-27, 29-30. To facilitate this process, the City should develop and submit to the Monitor a schedule of monthly command staff meetings in which FPD discusses and analyzes significant crime trends, policing complaints, neighborhood quality of life issues, and community priorities for policing by the end of the reporting period. CD, ¶ 28. These plans are specifically intended to support a community-oriented approach to policing. *See* CD, ¶¶ 28, 29-30, 256-58.

The City reported that its policy for responding to NPSC recommendations remains in development. CD, ¶ 23. During the next reporting period, the NPSC should consult with the City as it works to finalize the Community Engagement Plan and the plan for responding to and acting upon NPSC recommendations. The Civilian Review Board ("CRB") should also provide feedback and support during the development of the Community Engagement Plan.

### 1. Civilian Oversight

As stated in the Monitor's Spring 2019 Status Report, the City successfully filled longstanding vacancies on the CRB during the reporting period; however, as of January 2020, there is at least one position that remains vacant. The Monitoring Team appreciates the City's efforts to fill these vacancies and to train new members on the role and responsibilities of the CRB, and hopes that the City will commit to continuing to fill all CRB vacancies in a timely manner. In December 2019, attorneys from the DOJ met with CRB members to discuss and answer outstanding questions regarding the board's operations and practices. The Monitor notes the importance of Paragraph 407 of the Consent Decree, which requires the City to take any measure necessary to safeguard the CRB's ability to perform its civilian oversight functions, including ensuring the CRB's independence from FPD and the City. *See also* CD, ¶ 404

(discussing eligibility to serve on the CRB). During the next reporting period, the Parties, and, to the extent needed, the Monitoring Team, will review the City's compliance with these provisions of the Consent Decree.

Within sixty days of the City's implementation of the misconduct complaint mediation program—which will serve as an alternative to the misconduct investigation process for certain civilian allegations of officer misconduct—the CRB should develop and recommend a program to promote awareness of the options available for filing and proceeding with misconduct complaints in Ferguson.

### 2. Community Dialogues & Mediations

During the reporting period, the City made substantial progress toward launching its community dialogue and mediation programs. CD, ¶¶ 19, 32-34. The City formally selected Community Mediation Services of St. Louis ("CMS") as the neutral facilitator who will facilitate small-group structured dialogues between police officers and community members and oversee the City's community-centered mediation program and anticipates finalization of its contract with CMS in time for the program's launch in March 2020. To that end, the City reported that it has already invited the NPSC and the Ferguson Youth Initiative to provide input regarding topics that would be both meaningful to the community and productive areas of discussion. The City should also seek to finalize its Neighborhood Mediation Plan during the reporting period.

### 3. Surveys

Paragraphs 429 and 430 of the Consent Decree require the Monitoring Team to conduct annual surveys of members of the Ferguson community, including Ferguson residents, law enforcement personnel, and detained arrestees. In particular, the surveys are aimed at gathering information about (1) the community's experiences with and perceptions of FPD, public safety,

11

and the municipal court; and (2) police officers' attitudes regarding their jobs and the Ferguson community.

In partnership with the National Police Foundation ("NPF"), the Monitoring Team launched a community survey from April 8 – September 17, 2019. The survey was available online at: www.tinyurl.com/FergusonMOsurvey. In addition, hardcopies of the survey were available at Ferguson City Hall, Ferguson Public Library, and the Urban League's Ferguson location. During the survey period, the Monitoring Team held numerous community events intended to bolster community support for and interest in the survey, distributed flyers advertising the survey, and promoted the survey online. Despite these efforts, the 2019 community survey ("Survey 1") had only 125 respondents. The NPF analyzed survey results and generated a report of Survey 1, attached hereto as **Appendix B.** According to the NPF's analysis, the individuals who chose to take the survey do not reflect the entire demographic makeup of the community of Ferguson, with an overrepresentation of affluent, educated, white residents. For example, nearly half of all respondents live in Ward 2 and more than 75% of the respondents identify as white. App. B at 6-7. Although the results of Survey 1 are not representative of the Ferguson community at large, they are important in that they inform the Monitor's understanding of community concerns, help establish a survey process that can be improved upon and repeated annually, and identify the underrepresented community groups to whom outreach should be directed during the roll-out of the 2020 Survey ("Survey 2").

While the NPF's analysis of the survey speaks for itself, the Monitor highlights a few key takeaways for the Court's consideration. In general, the majority of respondents agreed that they trust FPD, have confidence in the department, would feel comfortable calling FPD if needed, and believe the agency would take complaints against officers seriously. *Id.* at 3. A

majority of respondents who interacted with FPD over the past year reported that they were very satisfied with the way they were treated by the officer. *Id.* at 14.  While respondents reported that the police do a good job of being available when needed, responding promptly to calls, and treating people fairly, they reported that FPD does a poor job of fighting crime, dealing with neighborhood problems, and being visible on the streets. *Id.* at 1.  These findings suggest that although FPD appears to maintain transparency and trust among the survey respondents generally, there remains a real need for increased community engagement and community policing by FPD.

When asked open ended questions about FPD, a number of themes emerged, including a perceived negative impact of the Consent Decree on the department, such as a lack of enforcement of crime, shortage of officers, and a general lack of confidence in leadership. *Id.* at 5.  More than 21% of respondents indicated that they felt the Consent Decree prevented FPD from adequately enforcing the law and doing its job. *Id.*  Another 21% of respondents indicated they felt crime was increasing and that FPD was not enforcing traffic or other laws, and 29% indicated a belief that the police department was understaffed. *Id.*  7.8% of respondents also commented on leadership issues within the department. In over 13% of the open-ended responses, however, respondents had only positive things to say about FPD.  *Id.*  The Monitoring Team will use the results of Survey 1 to, among other things, assess baseline measures of public satisfaction with FPD and FMC, continue to engage in constructive conversations with residents, City personnel, and the DOJ, and inform the Parties' approach to implementation.

The NPF also assisted with the roll-out of an officer survey during the reporting period. The officer survey, which was available to FPD officers in November and December 2019,

measured the officers' perceptions of FPD and the Ferguson community. Results from the officer survey will be shared with FPD officers during the next reporting period and will be published in the next semiannual status report.

### 4. Monitoring Team

To further support the City in its implementation of community engagement provisions of the Consent Decree during Year Four, the Monitoring Team has engaged an additional subject matter expert, Dr. Leigh Anderson, to evaluate and audit the City's compliance with provisions in this area. Dr. Anderson will work in combination with Steve Parish to: provide technical support to the City as it completes policy development; audit the City's ongoing community policing and engagement efforts; and strengthen the administration of the Monitoring Team's roll-out of Survey 2. Dr. Anderson has vast experience working with state and federal agencies in the area of public safety, and her knowledge of law enforcement and community-oriented policing practices will be a great asset to the Monitoring Team. Together, Mr. Parish and Dr. Anderson will work to not only support the City's progress with respect to community policing and engagement, but to ensure structure and accountability for the City in this area during Year Four.

### B. Bias-Free Police & Court Practices

The Parties developed an initial policy pertaining to fair and impartial policing and posted the draft policy to the City's website for community input. During the next reporting period, the Parties should host any additional policy forums, including a proposed forum designed to solicit youth input in this area. The Parties should finalize this policy, inclusive of community and Monitor feedback, during Year Four.

To further promote bias free policing and court practices, the Consent Decree requires that all FPD police and court employees provide timely and meaningful access to police and court services to all, including individuals who have a limited ability to speak, read, write or understand English ("LEP individuals"). CD, ¶ 67. During the reporting period, the City did not achieve any progress in this area. Accordingly, during the next reporting period, the City should prioritize development of a plan for initiating policy development. In particular, the City should, in collaboration with the DOJ, host public forums related to these policies by the close of Year Four.

### C. Voluntary Contacts, Stops, Searches, Citations, and Arrests

During the reporting period, the Parties completed policy development in the area of voluntary contacts, stops, searches, citations, and arrests. The initial suite of draft policies, inclusive of officer and community feedback, was submitted to the Monitoring Team for review. The Monitoring Team provided some suggested edits to the policies, which underwent final review and revision by the Parties. The Parties submitted this first suite of policies, including policies pertaining to stops, *Miranda*, search and seizure, and warrantless searches, for the Monitoring team's approval in early January 2020. CD, ¶¶ 79-89. A second suite of policies, including policies pertaining to stop orders or "wanteds," correctible citations, and the Fourth Amendment, generally, are in development. CD, ¶¶ 90-98. Policy development in this area should be complete and roll call trainings on the first suite of policies should be conducted in this area by the close of Year Four.

### D. Use Of Force

During the reporting period, the City commenced roll call training on the suite of use of force policies—the first set of policies for which policy development was complete. Roll call

training and post-training assessment has been completed with respect to use of force, firearms, electronic control weapons, less lethal shotgun ammunition, baton, oleoresin capsicum ("OC") spray, canines, and vehicle pursuit. CD, ¶¶ 128-70. During the next reporting period, roll call training will be conducted with respect to use of force reporting, use of force response and investigation, the use of force review board, and critical incidents. CD, ¶¶ 172-94. All roll call trainings should be complete by the end of the next reporting period, and the City should commence use of force in-service training by the close of Year Four. Additionally, Paragraph 172 of the Consent Decree requires FPD to develop a comprehensive process for reporting and investigating all FPD officer uses of force. CD, ¶ 172. Accordingly, during Year Four, FPD officers must begin reporting, either electronically or in paper form, and supervisors should begin reviewing, all use of force data.

### E. Recruitment

The Parties completed a draft Recruitment Plan for attracting and retaining a high-quality and diverse work force quite some time ago. Approval of this plan has been delayed as the City has not yet developed a method for complying with Paragraph 283(a) of the Consent Decree, which requires the City to offer salaries that will place FPD among the most competitive of similarly sized agencies in St. Louis County. The City has reported that a salary study is underway and is likely to be completed during the next reporting period. Accordingly, the Recruitment Plan should be finalized by the City during Year Four. Once complete, the provisions of the Recruitment Plan must be explained to rank and file members of FPD, with documentation of this training provided to the Monitoring Team. Upon implementation, the Monitoring Team will review job applications and background investigation files to assess compliance.

## F. Accountability

During the reporting period, the Parties considered and incorporated community feedback regarding policies and guidelines relating to complaint intake and investigations, including the Community-Police Mediation Process, Community Mediation Services of St. Louis Agreement to Mediate, Internal Investigations, Professional Standards and Internal Investigations Disciplinary Guidelines, and Non-Disciplinary Responses to Minor Violations. These policies were submitted to the Monitoring Team, who approved them in their finalized forms. As a result, the accountability suite of policies represents the second set of policies for which policy development is complete. CD, ¶¶ 362-400. During the next reporting period, the City should begin roll call training on these policies. The Monitor also understands from the City that FPD plans to build out its Professional Standards Unit and to enlist a professional standards officer to enhance FPD's implementation of policies in this area.

## G. School Resource Officer Program

As stated in Court during the October 2, 2019 status conference, the Ferguson-Florissant School District has opted to engage another department for its School Resource Officer ("SRO") Program during the 2019-2020 school year. Pursuant to Paragraph 459 of the Consent Decree, the Parties "may jointly agree to make changes, modifications, and amendments to this Agreement." The Parties "may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension." Because FPD officers will not be participating in a SRO Program this year, or anytime in the foreseeable future, the Parties have agreed to suspend further implementation of the SRO provisions of the Consent Decree. The Monitor agrees with the Parties' proposed suspension as it relates to Paragraphs 207-27 of the

Consent Decree.[6]  At the beginning of Year Five, the Parties will reassess whether further suspension of implementation of these provisions is warranted.

### H. Body-Worn and In-Car Cameras

During the reporting period, the Parties reviewed and incorporated community feedback into the initial draft policies and submitted the revised policies to the Monitoring Team for final approval.  The Monitoring Team provided a number of additional comments, which the Parties are reviewing and incorporating into the finalized policies.  The suite of body-worn and in-car camera policies will be completed during the next reporting period.  CD, ¶¶ 228-50.  The City should begin implementation of these policies by initiating and completing roll call trainings and initiating its in-service training program with respect to these policies by the close of Year Four.

### I. First Amendment Protected Activity

During the reporting period, the Parties continued to draft policies in the area of First Amendment protected activity by incorporating, where appropriate, feedback provided by the community during policy forums held during Year Three.  Although policy development is not yet complete in this area, the City and the Monitoring Team took measures to ensure that First Amendment activity was protected during the anniversary events planned in August 2019 to commemorate Michael Brown and mark the fifth anniversary of his death.  The City proactively met with the DOJ and the Monitoring Team in anticipation of numerous planned and unplanned community events.  During the weekend of August 9-11, 2019, SME Robert Stewart and former St. Louis Police Commissioner, Daniel Isom, were in Ferguson on behalf of the Monitoring Team to provide technical support, assistance, and to observe the City's interactions with the

---

[6] Given this period of suspension, the SRO-related provisions of the Consent Decree have been removed from the Year Four workplan.

public. The Monitoring Team was pleased that FPD thoughtfully prepared for these events and with FPD's performance with respect to protected First Amendment activity that weekend. The Parties will continue to work toward completion of policy development during the next reporting period, posting the draft policies for public comment, incorporating feedback where appropriate, and completing policy development in this area by the close of Year Four. CD, ¶¶ 110-27.

### J. Data Collection

During Year Three, a lack of progress with respect to data collection and analysis delayed implementation efforts in numerous subject areas contained in the decree. The Monitor is pleased to report that the City engaged a data consulting firm, AH Datalytics, during the reporting period in order to advance its data collection and analysis efforts. AH Datalytics has commenced a gap analysis and initiated the development of a comprehensive data collection plan. Under their guidance, the City now has the tools required to commence implementation of many of the Consent Decree's data-related provisions during Year Four.

### III. CONCLUSION

The Monitoring Team remains pleased that policy development has resulted in the finalization or near finalization of policies in various subject areas, including use of force and accountability, and that Year Four is likely to see the completion of policy development with respect to all of the Parties' stated priority areas. To avoid an implementation bottleneck associated with delayed roll call trainings, the City should prioritize a system for developing and conducting roll call trainings regularly and efficiently. Additional resources should be dedicated to the development of a robust training plan and to the implementation of in-service trainings. Finally, the City must continue to develop its community policing and engagement

efforts during Year Four.  This area of the Consent Decree has fallen behind other subject areas and must become a priority for the City if substantial compliance with respect to implementation is to be achieved.

As always, the Monitoring Team appreciates the continued effort put forth by the DOJ and the City in achieving the aims of the Consent Decree and looks forward to continuing to work collaboratively as the City moves through the implementation phase of the decree.

Date: January 31, 2020

Respectfully submitted,

*/s/ Natashia Tidwell*
Natashia Tidwell
Hogan Lovells US LLP
125 High Street
20th Floor
Boston, MA 02110
617-371-1076
*natashia.tidwell@hoganlovells.com*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the foregoing was filed electronically on January 31, 2020 with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, and was served by ECF notice by operation of the Court's electronic filing system.

*/s/ Natashia Tidwell*