UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-180-CDP |
| | ) | |
| CITY OF FERGUSON, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |


STATUS CONFERENCE
VIA VIDEOCONFERENCE


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


JANUARY 12, 2021


APPEARANCES:

Independent Monitor:  Natashia Tidwell, Esq.
                      **SAUL EWING ARNSTEIN & LEHR LLP**

                      Courtney A. Caruso, Esq.
                      **HOGAN LOVELLS US LLP**

For Plaintiff:        Amy Senier, Esq.
                      Charles Wesley Hart, Jr., Esq.
                      Megan R. Marks, Esq.
                      Nancy Glass, Esq.
                      **UNITED STATES DEPARTMENT OF JUSTICE**

For Defendant:        Aarnarian (Apollo) D. Carey, Esq.
                      **LEWIS RICE LLC**

*REPORTED BY:*        *Gayle D. Madden, CSR, RDR, CRR*
                      *Official Court Reporter*
                      *United States District Court*
                      *111 South Tenth Street, Third Floor*
                      *St. Louis, MO  63102      (314) 244-7987*
             (Produced by computer-aided mechanical stenography.)

## INDEX

Statement by the Court . . . . . . . . . . . . . . . . Page  3
Statement by Mr. Carey . . . . . . . . . . . . . . . . Page  5
Statement by Ms. Nicolle Barton . . . . . . . . . . . Page  6
Statement by Mr. Carey . . . . . . . . . . . . . . . . Page 10
Statement by Chief Jason Armstrong . . . . . . . . . . Page 11
Statement by Mr. Carey . . . . . . . . . . . . . . . . Page 19
Statement by Ms. Glass . . . . . . . . . . . . . . . . Page 20
Statement by Ms. Tidwell . . . . . . . . . . . . . . . Page 25
Statement by Chief Jason Armstrong . . . . . . . . . . Page 34
Statement by Ms. Nicolle Barton . . . . . . . . . . . Page 40
Statement by Ms. Glass . . . . . . . . . . . . . . . . Page 41
Statement by Ms. Tidwell . . . . . . . . . . . . . . . Page 43
Statement by the Court . . . . . . . . . . . . . . . . Page 44
Statement by Ms. Glass . . . . . . . . . . . . . . . . Page 45
Statement by Ms. Caruso . . . . . . . . . . . . . . . Page 46
Statement by the Court . . . . . . . . . . . . . . . . Page 46
Statement by Ms. Tidwell . . . . . . . . . . . . . . . Page 47
Statement by the Court . . . . . . . . . . . . . . . . Page 48

1          (Proceedings commenced at 10:59 a.m.)

2          THE COURT:  All right.  Thank you.  And I did -- I

3   guess I would ask, Ms. Glass; I thought you were going to have

4   other attorneys on the -- on the video as well.

5          MS. GLASS:  Your Honor, our plan this morning, if

6   it's acceptable to the Court, would be for my colleagues,

7   Megan Marks, Charles Hart, and Amy Senier, to be present but

8   off camera, and I'll be the -- unless something unexpected

9   comes up, I'll be the one presenting for the United States.

10  Mr. Volek will not be joining us this morning.

11         THE COURT:  All right.  That's fine.  So -- and let

12  me ask the clerk; are we -- is the YouTube started?

13         DEPUTY CLERK:  Yes.  We are live with YouTube.

14         THE COURT:  Okay.  The livestream has started.  All

15  right.  So this is the case of the United States of America

16  versus the City of Ferguson.  It's Case No. 4:16-CV-180, and

17  we are here for a quarterly status conference and hearing that

18  is open to the public and is being provided to the public

19  through both a telephone line and a YouTube livestream, which

20  is audio only, and I do want to mention and I may, if I

21  remember, mention this again later to any of the people who

22  are observing the hearing that under the policy of the United

23  States Courts, you are not allowed to broadcast or record this

24  proceeding in any way, and if anyone should do that and we

25  were able to figure out who it was, there could be

 1   consequences, including having you be barred from further

 2   proceedings.

 3        So with that said, I would ask counsel for the

 4   department, the United States, to please identify yourself for

 5   the record.

 6        MS. GLASS:  Good morning, Your Honor.  Nancy Glass

 7   for the United States.

 8        THE COURT:  All right.  And I would ask counsel for

 9   the City of Ferguson to identify yourself for the record.

10        MR. CAREY:  Good morning, Your Honor.  Apollo Carey

11   for the City of Ferguson, Missouri.

12        THE COURT:  All right.  And I would ask counsel for

13   the -- the Monitor and counsel, associated counsel, to please

14   identify yourselves for the record.

15        MS. TIDWELL:  Good morning, Your Honor.  Natashia

16   Tidwell and Courtney Caruso on behalf of the Monitoring Team.

17        MS. CARUSO:  Good morning.

18        THE COURT:  All right.  Good morning.

19        So all right.  We are here to hear, you know, the

20   updates that you all have provided.  I do hope that the

21   pandemic ends soon or we can all get vaccinated in a way that

22   we will be able to have these hearings in the courtroom, but

23   as of now, we are having only very limited hearings in public,

24   and they are mainly in criminal cases where the interests of

25   justice require that we go forward and that we have them in

1  person.  It's not so much whether they're public or not.  It's

2  whether they're in person.  And so we don't have the ability

3  to do that at this time for this case.  So that's why we're

4  doing this again by videoconference.

5          So I would start, Mr. Carey, by asking you to make

6  any -- excuse me -- statements or provide the updates that you

7  wish to give at this time.

8          MR. CAREY:  Thank you, Your Honor.  I appreciate the

9  opportunity to do so this morning.  Just so that Your Honor is

10  aware of -- you know, obviously, when we're in person, I

11  always like to introduce the folks in the room, but, you know,

12  just so that the Court and the public is aware of who is all

13  participating today for the City of Ferguson, on the camera

14  view, as you can see, to my left is Chief Jason Armstrong, our

15  Ferguson police chief, and then to my right is our consent

16  decree coordinator, Ms. Nicolle Barton.  Who you don't see,

17  who is also in the room, but we have -- you know, she has

18  decided to sort of stay in the dead space -- our court

19  administrator, Courtney Herron, who is sort of in the dead

20  space there.  On the line, I am aware of our city manager,

21  Jeff Blume, being on the line.  Also, I believe our mayor,

22  Ella Jones, is -- is attending as well.  I'm not quite sure.

23  There may be a couple of other council people on the line, but

24  I haven't been notified of their presence yet, so -- and how

25  we'll do this, Your Honor, if it's okay with you, is we'll

1  start off with our consent decree coordinator providing

2  some -- some pretty -- some very crucial updates about some

3  status of the outstanding issues on the Consent Decree, and

4  then we'll allow our police chief to supplement that with a

5  couple of additional comments if that's okay with you.

6          THE COURT:  I just did the -- I forgot to unmute

7  myself, which I'm always telling lawyers they're not muted or

8  they're muted.  So I apologize for doing that myself.

9          Ms. Barton, we'll go ahead and hear your updates.

10 Thank you.

11         MS. BARTON:  Thank you, Your Honor.  Good morning.

12         I'll start out by while working on our use-of-force

13 forms and our use-of-force review forms and benchmarks, we

14 realized we needed to make some minor language changes on some

15 of our use-of-force policies.  We've been working with the

16 Department of Justice on amending the language to ensure these

17 policies meet best practice standards.  We are currently

18 working on a supervisor checklist for our use-of-force

19 investigations and benchmarks to ensure supervisors are

20 performing a thorough and complete review of the use-of-force

21 reports.  We hope to have our use-of-force forms, vehicle

22 pursuit forms, and use-of-force review forms finalized and

23 ready to go live by the end of January.

24         Once our use-of-force forms are live, we will begin

25 working with Benchmark on our accountability modules.  This

1  section will include tracking complaints, early intervention

2  systems, and performance of officers.  I'm working with the

3  Department of Justice on creating what we hope to be an ideal

4  stop, search, and arrest form.  FPD has been meeting with

5  REJIS in hopes that we would be able to customize these forms

6  to provide us with a system to fit our needs and Consent

7  Decree requirements.  We will be working with the Department

8  of Justice and the Monitor Team over the next quarter to

9  review these forms and ensure they capture the outcome

10  assessments required under paragraph 435.

11          I'm working with the Department of Justice, the

12  Monitor Team, and Community Mediation Services to develop our

13  2021 schedule for the next series of small group dialogues

14  between the community and police.  We plan to use the outcomes

15  of our community dialogues to continue building our community

16  policing and engagement plans.

17          Captain Dilworth is finalizing the search roll call

18  training materials to provide to the Department of Justice for

19  their approval.  This training will be added to the 2021 roll

20  call schedule.

21          In regards to our Training Plan Committee, we have

22  recruited two professors from local universities, Professor

23  Lee Slocum from University of Missouri and Professor Joseph

24  Schafer from St. Louis University.  They have been a great

25  addition to an already dedicated Training Plan Committee, and

1/12/2021 Status Conference

8

1    we are so pleased to have them on board.

2              We are entering into Phase I of our use-of-force

3    audit, and we have provided all requested information to the

4    Monitor Team for this phase of the audit.

5              During this quarter, we have finalized all the

6    body-worn camera and in-car camera policies and completed the

7    roll call trainings on these policies.

8              We have been working with the Department of Justice

9    on our correctable citation policy, and this is finally ready

10   to submit to the Monitor Team for review.

11             I have been working with Suffolk County, New York,

12   who will be providing Ferguson Police Department with a "Train

13   the Trainer" model of bias-free policing training in February.

14   This is a 24-hour training, and all FPD certified trainers

15   will be attending this training.  With the Department of

16   Justice and Monitor Team's approval, this will become

17   Ferguson's bias-free policing in-service training, and all FPD

18   staff will be required to complete this training in 2021.  We

19   are so excited to implement this training.

20             And, finally, we have turned over the after-action

21   reports and use-of-force documentation from the May 2020

22   protests as requested by the Department of Justice.

23             Thank you.

24             THE COURT:  Either Mr. Carey or Ms. Barton, I just

25   would ask -- I know in the -- when you were discussing the

1   accountability module, you mentioned Benchmark, and when you

2   were talking about other reporting, you mentioned REJIS.

3   Would you just state for anyone who might -- a member of the

4   public who might be listening who doesn't know -- who those

5   people or those entities are that you're referring to?

6          MS. NICOLLE BARTON:  Yes, ma'am.

7          So Benchmark is a software system that we have hired

8   to help us develop all of our of use-of-force policies,

9   tracking system, our use-of-force review, vehicle pursuit

10  tracking system, and that will also house our early

11  intervention systems.  So we'll track our system complaints

12  and track officer performance.  REJIS is a regional system

13  that tracks all of the crime analysis data and our records

14  management system.  So they're two totally separate systems

15  that house different information and track different data

16  requirements for our Consent Decree.

17         So REJIS is -- what we're hoping to do with REJIS is

18  help us track all of our stop, search, and arrests because

19  that's a system that the officers are able to use when they're

20  pulling someone over for a traffic stop, when they're issuing

21  a citation, and it has all those required fields that are

22  required by not only the State but now our Consent Decree to

23  track the data that we need to use for tracking for the

24  Consent Decree as well.

25         THE COURT:  All right.  Thank you.

1/12/2021 Status Conference

10

1         And, yes, under the Consent Decree, we do need to be

2    able to monitor the performance and track what is happening,

3    and that is -- has -- does require a lot of -- well, we used

4    to call it paperwork, but now it's data collection and forms

5    and things that are readily able to be collected and analyzed,

6    and so that's what, as I understand, is going on here and

7    you're working on.

8         Yes, Mr. Carey, next.

9         MR. CAREY:  Yes, Your Honor.  One of the things that,

10   you know, we talked about during our status hearing in the

11   past and some of our citizens have expressed some concern

12   about is a situation -- excuse me -- are situations where, you

13   know, other police departments or officers from those police

14   departments are called in to the City of Ferguson to assist

15   FPD with, you know, a particular function.

16        For example, two -- two situations come to mind.  Of

17   course, in the past, when we've had protests, we've talked

18   about our Code 1000 situations where we've had planned

19   protests, where we know we're going to need additional backup

20   for FPD to -- to sort of help police those situations, and

21   then we also have those situations where we have unplanned

22   occurrences, emergency occurrences that just happen, where FPD

23   may need to call in a backup from a different police

24   department.

25        So Chief Armstrong is going to explain for the

1 public's benefit and also for the Court's benefit the

2 difference between those two situations as it relates to the

3 Consent Decree and how the City is functioning in those two

4 situations and also maintaining its compliance with the

5 Consent Decree.  So if Chief Armstrong would like to do that,

6 that would be great.

7          THE COURT:  All right.  And as I understand it, what

8 you're talking about is this is sort of an explanation for why

9 if the citizens see police departments, police officers from

10 other departments responding to things going on in Ferguson,

11 you know, there's a reason for that, and these are some of the

12 reasons, and so -- and the situations where that might occur.

13          MR. CAREY:  Absolutely, Your Honor.

14          THE COURT:  Right.  And so, Chief Armstrong, yes,

15 we'd be glad to hear from you.

16          CHIEF JASON ARMSTRONG:  Thank you and good morning,

17 Your Honor.  So the first thing that I wanted to talk about is

18 a program and a system that we have here in St. Louis County

19 called the Code 1000, and what the Code 1000 system is -- it's

20 a system we created for when there is an event going on in a

21 particular jurisdiction and they may not have the resources to

22 effectively and safely manage or respond to that event.  We

23 have a Code 1000 system where other agencies, other

24 jurisdictions, you know, send officers, send resources into

25 the jurisdiction where the incident is going, is going on at,

12

1    and -- and so the Consent Decree, you know, addresses these

2    occasions because, you know, they recognize, you know, what

3    happened with the unrest in 2014, that, you know, a lot of

4    police departments had to come in here to help Ferguson manage

5    and respond to what was going on.

6          And the Consent Decree has language in it that talks

7    about when we have these, these incidents, going on when we

8    need to bring in other agencies to help and assist us, you

9    know, what that help should look like and what the -- what are

10   the mandates that the Consent Decree puts on us when we're

11   getting this help.  And -- and what the Consent Decree

12   explains is, you know, when we're getting this help, you know,

13   it is Ferguson Police Department's responsibility to request

14   that the agencies that are coming in to help and assist us,

15   you know, follow certain provisions that are spelled out in

16   the Consent Decree or things that we instituted into our

17   policies here at Ferguson Police Department.

18         And so what we've done, you know, since I've been

19   here, when we've had to call on the resources of the Code

20   1000 -- so the Code 1000 primarily is built for events that we

21   know about beforehand, planned events.  So say if there's a

22   planned protest, and so if we know there's going to be a

23   protest on a particular date, then I can call and activate the

24   Code 1000 group, and we can go ahead and start working on what

25   resources we may need, and so as part of that planning, we

1    always create an incident action plan, and so anybody familiar

2    with, you know, the Incident Command System or the National

3    Incident Management System, it's all these forms and

4    documentation that we use in public safety and first

5    responders that, you know, just kind of spell out everybody

6    that's going to be a part of that response; everybody gets the

7    same documentation so everybody understands what's going on

8    and everybody can be on the same page so we all know what to

9    expect and what everybody's roles and responsibilities are,

10   you know, as we're responding to the event.

11           And so -- so every Code 1000 that we've had -- since

12   I've been here, I speak to -- when we put together the

13   incident action plan, a part of that document has specifically

14   been the paragraphs from the Consent Decree that are spelled

15   out that we have to make the formal request to agencies that

16   are coming to assist us and -- and the requests that we're

17   making to them of, you know, what actions they can take or

18   they should take or what we would like to see, and so, you

19   know, what's documented in every one of our incident action

20   plans that we've had to put together in the last year and a

21   half or so -- that exact verbiage has been copied from the

22   Consent Decree and put in that document because that document

23   is sent out to every agency that is participating in the Code

24   1000 response, and so that's kind of our way of documenting

25   for Consent Decree purposes just to be able to show that we

14

1   are making that request, you know, when we do have these Code

2   1000 responses.

3           And so as we looked at the Consent Decree and the

4   verbiage in there and, you know, what -- what it appears the

5   intent behind the verbiage that was in the Consent Decree --

6   you know, me personally, you know, I feel it was largely

7   surrounding, you know, big events such as a protest or if you

8   had, you know, an active shooter or just -- just some big

9   event where you just had just a large amount of police

10  agencies converging into Ferguson to help and assist, and so

11  that's kind of how we -- you know, we managed that with the

12  Code 1000 response.

13          So another -- another instance that we have where we

14  may get some outside help is for unexpected events, which are

15  more -- you know, we would more so classify those as just

16  emergency situations, you know, that arise.  And, you know, I

17  don't necessarily know or my takeaway is not necessarily that,

18  you know, the verbiage in the Consent Decree is really

19  addressing this, and so we really haven't had a lot of

20  conversations surrounding what that looks like for us as it

21  pertains to the Consent Decree because I just don't think that

22  was really at the heart of what the Consent Decree was

23  addressing, but recently, some concerns, you know, have been

24  brought up from some of our citizens because they saw some

25  officers from another police department that responded to an

15

1   address here in Ferguson, and so I just wanted to share some

2   information on what contributed to that and what happened with

3   that, and, you know, naturally, this is something that, you

4   know, it wasn't really on our radar previously the way that

5   this shaped out, and so this is something that we've been in

6   contact with -- communication with the DOJ about, and we'll

7   continue to talk through this to see, you know, exactly what

8   this looks like for us moving forward.

9           But on the day in question, a 911 call came into our

10  dispatch center, and the lady on the phone was very panicked

11  and was in a frantic state, and she told us that there were 50

12  people outside of her house that were coming to beat up her

13  son or fight her son, and she also said that somebody in the

14  crowd had brandished a gun already and somebody had busted out

15  her window.  And so this lady is calling in; she's screaming

16  like, you know, "Send help.  Send help.  Send help.  Send help

17  now."

18          And at the moment that that call came in, all of our

19  officers, all of the Ferguson officers, were on other calls,

20  so we had -- so nobody was in service at that exact second,

21  and so when we have a situation like that happen, you know, we

22  start calling the supervisor and telling him, "Hey, we got

23  this call over here.  You know, we need officers to start

24  breaking free," but there is a lag time in that process.  If,

25  you know, an officer is standing there talking to you about,

1  you know, a concern or an issue that you have, you know, we

2  don't just turn and just run out.  You know, there's a --

3  there's a dialogue that goes along with that just out of

4  courtesy, you know, to the citizens and to the residents.

5         And so on that particular day, given the gravity of

6  what the caller told us, "There's 50 people outside," and in

7  addition, as we were talking to the caller on the phone, she

8  stopped talking to us, and so when I say she stopped talking

9  to us is she didn't hang the phone up; she just stopped

10 communicating.  So the phone line was still open, and the

11 dispatcher keeps calling her and calling her, "Ma'am, ma'am,

12 are you still there?  Are you still there?"  And there's

13 nothing but silence on the line.  And so, you know, those --

14 those are critical, you know, incidents that have the

15 potential to be critical incidents.

16        And so at that time, our dispatchers, who we also

17 dispatch for the neighboring city to Ferguson, Calverton Park,

18 so we can see them on our screen.  So we can see if they're

19 busy on calls or if they're in service, and so the Calverton

20 Park officers were in service at that time, and so with the

21 gravity of the situation, our dispatchers called Calverton

22 Park and asked them if they could go ahead and respond to that

23 location while we were simultaneously working on getting some

24 Ferguson officers to break free from the calls and the

25 services that they were providing so we could get them over

1   there to that, to that location, and so that's what happened

2   is Calverton Park officers responded to that location because

3   of the gravity of the situation, and Ferguson officers

4   responded also.  We just got there after the Calverton Park

5   officers got there because all our officers were tied up.

6          And so that's a little bit different scenario really

7   than what the Consent Decree, you know, kind of highlights and

8   really addresses, and so, you know, with this coming up and

9   some of the dialogue that's come along with it, you know, it's

10  one of the things we recognize that we need to have some

11  further conversation on and look and see, you know, how we can

12  best address, you know, scenarios like that because they are

13  going to arise and they are going to happen, and my primary

14  responsibility here is if somebody needs help, I have to get

15  them help.  If somebody's in danger, I have to get them the

16  help that they need, you know, in that moment.

17         And so, you know, so situations like that are not

18  uncommon.  They don't happen frequently, and when -- when

19  those outside agencies respond to help us in a case like that,

20  they're there in a support role, and so, you know, their

21  primary responsibility is just -- is for the safety of people,

22  and so their ideal thing is to get there and just try to make

23  the scene safe.  And we get there; we handle the report; we

24  handle the accident; we handle everything.  Those agencies

25  aren't coming in here and writing the reports for us or

18

1  anything like that.  We handle everything.  It's just that

2  they have to do anything before we get there.  It's almost

3  like they're a witness to our report at that point in time.

4  And so we're going to write the report and all the

5  documentation, and any officer that had to contribute anything

6  to that response, they have to write a statement, essentially,

7  you know, as a witness to what they did or what they saw when

8  they got there, when they showed up, and so that's primarily,

9  you know, how it's done or how it's worked.

10        And so it's just as these concerns have recently been

11  brought up that we've been talking about, you know, we just

12  have to have some more conversations with the Department of

13  Justice to see exactly, you know, how we would classify that

14  and if there is something specific to the Consent Decree that

15  is addressing, you know, when we have, you know, those

16  incidents or issues arise.  You know, we just have to get

17  together and work through it a little bit more to see what

18  that should look like, that, you know, we would still be in

19  compliance with everything that the Consent Decree, you know,

20  requires of us.

21        But that particular incident that day, it was just

22  about getting somebody the help that they needed when they

23  needed it, and that always should be a top priority for us.

24        THE COURT:  All right.  Thank you.  And I do -- I

25  think that's a good explanation of the two different types of

1  situations where someone would be called in from another

2  jurisdiction.

3       All right.  Mr. Carey.

4       MR. CAREY:  Yes, Your Honor, just -- you know, just

5  to conclude that point, you know, that Chief Armstrong was

6  making, that does present, you know, a situation where we, you

7  know, have to just sort of work through the logistics of what

8  those unexpected emergency calls look like for Consent Decree

9  compliance purposes, whether or not the Consent Decree was

10 even designed to touch those, you know, and if so and if the

11 Consent Decree was, then, you know, what do we need to do

12 policy wise to -- to help flesh out, you know, those

13 situations.  So, you know, I think the parties will get

14 together and figure out that dilemma and, you know, have

15 something to share with the public, you know, in the future on

16 those things.

17      THE COURT:  All right.  And, Mr. Carey, can you just

18 keep your voice up just a little?  You're a little quiet.

19      MR. CAREY:  For sure.  No worries.

20      THE COURT:  Thank you.

21      MR. CAREY:  I'll talk up a little bit, but I'm

22 actually done talking for now.  The City is actually done with

23 our presentation, so we'll yield the floor to -- to Your Honor

24 to decide.  I mean I can't remember if the Department of

25 Justice goes next or if it's the Monitor.

20

1          THE COURT:  I think the Department of Justice does,

2    and we'll ask them for any comments, and then, obviously, we

3    can discuss all of this once we've heard from everybody.

4          So, Ms. Glass.  This is Nancy Glass on behalf of the

5    Department of Justice; correct?

6          MS. GLASS:  That's right, Your Honor.  Good morning

7    and thank you for this opportunity for us to brief the Court

8    and the public on progress in implementing the Consent Decree.

9    We also wanted to say we appreciate all the public comments

10   that we got before today's hearing.  We really find the

11   feedback in these comments helpful and appreciate the time and

12   effort that individuals and groups took in putting those

13   comments together.  I'm going to try to address as many as

14   possible of them as I can in my remarks.

15         As Ms. Barton and Chief Armstrong's presentations

16   made clear, Ms. Barton has really been critical in

17   coordinating and moving forward the City's compliance in

18   implementing the Consent Decree, and we're just very grateful

19   to her for her diligence and her work with these efforts.  As

20   she reported, more progress has been made in virtually every

21   area of the Consent Decree.  I'm just going to add a few

22   points beyond the updates that Ms. Barton already provided.

23         In general, we'd like the public to know that in this

24   year five of implementation, we intend to shift somewhat in

25   our focus.  Certainly, there are some foundational tasks in

21

1   implementation that still need to be done and, for example, in

2   training and policy writing, but in addition to getting those

3   tasks done, we do intend to focus more on evaluating the

4   City's progress on the ground and auditing its compliance with

5   the new policies that have been issued.

6          So our work on cameras is a good example of this

7   shift in policy.  As Ms. Barton reported, the City says that

8   it's now completed its roll call trainings on the new camera

9   policies.  So at our virtual site visit in December, we asked

10   the City to provide documentation relating to how cameras are

11   being used.  There's no audit scheduled yet, but the point is

12   we're planning ahead, and when the time comes, we want the

13   City to be ready to provide the documentation that's needed to

14   show that these new policies are being implemented correctly.

15          On use of force and the First Amendment, we are

16   waiting for documentation from the City related to use of

17   force at the protest in August.  As Ms. Barton reported, the

18   City has provided its after-action reports relating to the May

19   protests.  After we received that report after the last

20   hearing, we did ask the City to provide us the documentation

21   that was underlying that report.  The City provided that last

22   week.  So we now have the incident reports, use-of-force and

23   investigative reports that the after-action report was based

24   on, and we're working on reviewing those.  We've also asked

25   for but -- and are waiting to receive the police department's

1    video relating to any incidents in the May protests, and when

2    we get that, we'll review it carefully.

3            I wanted to respond to a public comment expressing

4    concern about the scope of our review of police department

5    action for the summer protests, and we absolutely agree with

6    the point that our review cannot be limited to simply

7    reviewing what police officers write in their reports.  So to

8    that end, when we -- our review of the video will be very

9    important.

10           We also -- in the event that any complaints about

11   police conduct are filed with the CRB or with the police

12   department, we will review those, and we invite members of the

13   public, in particular, individuals who were at the protests,

14   who have information, to share.  They're welcome to share it

15   directly with us.  The best way to do so is by email.

16           On the community survey, we're glad to hear from the

17   Monitoring Team that the survey will be active soon, and we do

18   look forward to getting valuable feedback from the community

19   about how -- community police relations, the public safety,

20   the municipal courts, among other topics covered by the

21   survey.  We agree with the public comments expressing concern

22   about the lack of representative responses in the last survey,

23   and we appreciate the Monitoring Team's efforts this time

24   around to ensure that they get a more representative sample.

25   We just wanted to say as well we appreciate Mayor Jones' offer

23

1   of mobile hotspots and laptops to -- for use in getting survey

2   responses from the public efficiently and safely on the

3   ground.

4          On the CRB, there's been a lot of activity since the

5   last court hearing in meetings between the CRB and the City,

6   and they have made progress in working out agreements,

7   particularly, around sharing information.  There are a few

8   areas that still need to be resolved, as reflected in the

9   public comments, and we expect to discuss those issues

10  directly with the CRB and the City in meetings over the next

11  month.  The CRB does have an important role to play, both

12  under the Consent Decree and the municipal code.  We expect

13  that role to last well beyond Consent Decree implementation,

14  and we're really glad the work that the City and the CRB are

15  putting in to institutionalizing their practices and

16  relationship.

17         Relating to the NPSC, there was a public -- some

18  public comments expressing concerns about lack of capacity of

19  the NPSC during the pandemic.  That is concerning, and we

20  certainly agree that the City should be providing any

21  resources that the NPSC needs to do its important work, and we

22  would just urge the NPSC to reach out to the City if there are

23  particularly -- particular resources they need.

24         On the issue Chief Armstrong and Mr. Carey discussed

25  regarding the difference between Code 1000 responses and other

24

1   jurisdictions responding to emergency calls for service, the

2   only thing I would just add is that, you know, we have spoken,

3   as Chief Armstrong mentioned, with the City to clarify

4   expectations.  The particular incidents that gave rise to the

5   public comments and concerns, we think -- we didn't have

6   concerns with how that was handled, at least with regard to

7   implicating the Consent Decree, and we'll continue monitoring.

8          Finally, just two areas that are still probably more

9   accurately characterized as being in Phase I of compliance,

10  and that's training and data.  Now that most of the critical

11  policies are complete, the police department is working on

12  issuing roll call trainings on those policies, and because

13  this came up in a comment to us and also has come up at other

14  hearings, I just wanted to take a moment to discuss the role

15  of the roll call trainings, which is to brief officers as

16  efficiently as possible on the changes in policy because the

17  policies can't come into effect and officers can't be held

18  accountable until they've been told about changes in policy,

19  but no one thinks that the roll call trainings, which are

20  really just performing a briefing function, could replace a

21  comprehensive, scenario-based training program, which is

22  required by the Consent Decree.  We absolutely recognize and

23  agree with the public comments stating that the policies will

24  remain just that, on paper; they won't become part of

25  department practice until there's also a robust in-service

25

1  training program to put them into practice, and we do expect

2  in year five that the City will be turning its attention to

3  creating a training program.

4         Finally, on the data, Ms. Barton gave a good overview

5  of all the progress with regard to use of force, and I just

6  wanted to add that we do intend as well to turn to thinking

7  about how annual reporting will be done as well.

8         And that's all I had, Your Honor, unless the Court

9  has any questions.

10        THE COURT:  I do not have any questions at this time.

11  I think I'd prefer to hear from the Monitor next, and then we

12  can see if there are further questions we all might want to

13  discuss.  So, Ms. Tidwell.

14        MS. TIDWELL:  Thank you, Your Honor, and thank you to

15  the City and to DOJ for their updates.  We look forward to

16  working with the parties on getting more clarification on the

17  issues of mutual aid and Code 1000 and sort of what the

18  distinction or sort of what the Consent Decree's applicability

19  to both is, and we'll be working with the parties on those

20  issues in the coming weeks and months.

21        Just to pick up on one of the issues that Ms. Glass

22  raised in her remarks with regards to the community survey, so

23  we do have -- the Police Foundation has agreed to launch the

24  survey.  It's active now online, and we will send out an

25  announcement with the URL or the login address to our listserv

26

1   members and to the parties so that they can distribute it as

2   well and put it on the City's website.  So the City -- so the

3   survey is active for online participants.

4           As Your Honor remembers and as we've discussed in

5   prior court hearings, one of the issues is that, you know, we

6   can't do in-person -- you know, our plan to do some in-person

7   surveying to boost representation in areas that were

8   underrepresented in the last survey -- we are unable to do

9   that due to COVID, and so working with the parties and with

10  Dr. Leigh Anderson, our community engagement consultant, we've

11  tried to figure out ways or sort of work with the parties and

12  with the City -- and Mayor Jones has been really helpful in

13  this regard -- in trying to overrepresent or sort of

14  oversample in some of those harder-to-reach areas of the

15  Consent Decree to sort of -- to hone in on.

16          And so the Police Foundation has worked with us.

17  They go out and develop the survey and handle reporting, but

18  they worked with us on development of a postcard that would be

19  sent to not only people who have had recent interaction with

20  the municipal court in Ferguson but also to a sample, a

21  representative sample, of registered voters within Ferguson,

22  and the postcard would contain both the URL or the web address

23  for the survey, but also to address and to hopefully mitigate

24  the digital divide and the inability of some people to access

25  the survey online, we'll also include a phone number to my

1/12/2021 Status Conference

27

1   firm in Boston where a person can request that a survey be

2   mailed to them along with a self-addressed return envelope,

3   and so we have -- the postcards have been developed.  The

4   issue now with the Police Foundation mailing them out is just

5   we just have to finalize the contract between the Monitoring

6   Team, the City, and the Police Foundation because, Your Honor,

7   the payment structure for the Consent Decree is that our

8   bills, the Monitoring Team's bills, get submitted through the

9   City, and so that would include our subject matter experts and

10  any other consultants that we engage, to include the Police

11  Foundation, and so we have -- last week, we gave the City a

12  revised contract for -- from the Police Foundation, and my

13  hope is that Mr. Carey and the City officials will be able to

14  review that and return that back to us relatively soon so that

15  we can get the postcards mailed out, but the Police

16  Foundation, knowing sort of the -- you know, the anticipation

17  for the survey and getting it started, has agreed to launch

18  the survey even though the contract is not fully executed at

19  this point.  And the --

20          THE COURT:  And so just so it's clear, the survey is

21  up and live now.  So although it doesn't -- for people who

22  don't have the capacity to go online to get it, the postcards

23  and the phone number aren't out, distributed yet, but they

24  will be shortly, and -- but people can go in online, and then

25  this is where the mayor, I believe, did offer some places

28

1    where there would be hotspots or ability for people to -- if

2    they didn't have Internet -- to, perhaps, answer the survey

3    online.  Is that correct?

4         MS. TIDWELL:  That's right, Your Honor, and then we

5    will also -- when we send out the announcement with the web

6    address, the URL for the survey, we'll send the phone number

7    for people to request to have a survey mailed to them.  So you

8    certainly don't have to wait to get a postcard in the mail

9    with the phone number.  The phone number will be sent out as

10   well so that people could call and have a survey mailed to

11   them.

12        THE COURT:  Right.  And I would encourage if there

13   are people listening to this, members of the public and, of

14   course, anyone else who -- you know, people associated with

15   the City, to please, you know, publicize this to the extent

16   you're able to.  Tell your friends and neighbors that there

17   will be ways to do it even if you don't have Internet access,

18   and try to get -- we'd like to see as much participation as

19   possible.  Everyone wants that.

20        All right.  Go ahead, Ms. Tidwell.

21        MS. TIDWELL:  Thank you, Your Honor.  And then we did

22   have some radio spots.  St. Louis Public Radio was able to

23   help us with that to -- to, hopefully, boost participation or

24   at least sort of to get people knowledgeable and sort of aware

25   that the survey is coming, and Dr. Anderson will be planning a

1    trip, a return to Ferguson, to do some, you know, not

2    in-person survey taking but, certainly, some -- some more

3    publication and on-the-ground sort of promotion of the survey

4    in the coming weeks.

5             THE COURT:  All right.  Thank you.

6             MS. TIDWELL:  And so moving on from there, Your

7    Honor, the -- as we reported during the court hearing in, I

8    think it was, June and in September, one of the issues that

9    we've faced this year is in trying to push out or issue our

10   second semiannual report for calendar year 2020, and I

11   decided -- I had made the decision that we would issue an

12   update on the Comprehensive Amnesty Program along with that

13   report, and that just took longer to put together than I had

14   anticipated, and so rather than issuing an interim report or

15   providing some other means to sort of update as to what had

16   gone on, to provide some update as to the work of the parties

17   or the -- the City, in particular, during this year, we held

18   back the report while we tried to sort of piece together the

19   Comprehensive Amnesty Program.  And, certainly, as part of

20   some of the feedback that we've gotten, some of the helpful

21   feedback, you know, we'd look to -- we don't anticipate

22   another kind of delay as to what happened this year, but

23   certainly, we would look to ways to update the community as to

24   these delays, some other mechanism beyond sort of coming to

25   these court hearings and saying that it was delayed.  We will

30

1   find some other way to get that out because we know that it is

2   important for people to be updated on the status of these

3   things, but the semiannual report has now been given to the

4   parties who would have -- I think it's 15 days under the

5   Consent Decree to look through it, to get us back any helpful

6   feedback that they might have, and then we would issue that

7   report after the parties complete their review.  So we sent

8   that to them this morning so that we would be able to say to

9   you at the court hearing today that we had sent the report to

10  the -- to the parties, and so we have done that, and we look

11  forward to hearing from them.

12          The report will include the work plan for year five,

13  for 2021, and so this is much like last year at this time.

14  The work plan for the year comes out -- it came out, I think,

15  at the end of January last year, so we anticipate that that

16  will be about the same this year.  Just, you know, as

17  Ms. Glass mentioned, some of the issues or areas of priority

18  for year five will be training, the training plan.  We're

19  happy to hear Ms. Barton again reiterate that the City has

20  some help from two folks from the academic spaces in the

21  St. Louis/Ferguson area, and so we hope that they'll be

22  helpful in the development of the robust training plan that's

23  needed under the Consent Decree, something beyond the roll

24  call training, as Ms. Glass mentioned.  We, again, sort of --

25  you know, our call for the City to engage someone for that

1   task specifically, as they did for the consent decree

2   coordinator position, but also to have someone dedicated to

3   the training function who has skills in that area.  We, you

4   know, again, affirm sort of our belief that that would be

5   really helpful in terms of putting together curriculum and

6   navigating or figuring out sort of where the State-required

7   POST certification trainings and the Consent Decree trainings

8   overlap and identifying gaps and figuring out how to address

9   those.  Excuse me.  So we hope that the City will consider

10  that still or if the academic support that they've gotten from

11  the area colleges are not able to fulfill that, that they look

12  to hiring out either on an interim basis or for a long term.

13          The other areas that we would be looking to in year

14  five would be auditing.  As Ms. Glass mentioned and

15  Ms. Barton, the City did respond to the Monitoring Team's

16  response for records for the use-of-force audit, and so now

17  the -- the Monitoring Team, Bob Stewart and I, will look

18  through the City's response and determine what level of

19  records we need in order to conduct a fulsome audit of

20  use-of-force reporting.  The -- rather than wait for Benchmark

21  and the other data related, which will certainly make auditing

22  easier, we decided to move forward with the use-of-force audit

23  even before the use-of-force report was generated

24  electronically through Benchmark because the policies in that

25  area were far enough along that we felt that it was time to

1    start auditing in that area, and so we will be doing it the

2    old-fashioned way with paper.  Mr. Stewart will schedule a

3    site visit to the City to conduct a review of reports that

4    we've identified that fall within the audit reports.  So our

5    body-worn camera footage or whatever it is that's needed to

6    assess compliance with the use-of-force provisions and the

7    use-of-force reporting provisions.

8            And lastly, Your Honor, just with regards to the

9    municipal court and the Comprehensive Amnesty Program, as the

10   semiannual report will -- will detail in a little bit more, a

11   little bit more at length, the Comprehensive Amnesty Program

12   is just about completed.  The City is at or near complete

13   implementation with the exception of two provisions of the

14   good-cause criteria, good-cause criteria number three and

15   good-cause criteria number five.

16           And so good-cause criteria number three deals with

17   license suspension and cases kept open if the defendant has an

18   open "operating after suspension" charge and if that charge

19   did not, essentially, stem from the defendant having failed to

20   appear at another court hearing or failed to pay a fine at

21   another court hearing.  And so there are about 800 cases that

22   remain open under good-cause criteria number three, and so

23   within this year, the Monitoring Team will be working with the

24   parties and with the Court to try to determine how the -- the

25   city prosecutor and how the City determine that the cases left

1/12/2021 Status Conference

33

1  open did not fall, were not generated from a defendant having

2  failed to appear or the defendant having failed to pay a fine,

3  and so as soon as we have some sort of comfort that the cases

4  that were left open under this criteria were assessed or

5  evaluated to make sure that they actually fall within that

6  criteria, then we'll be able to sign off on compliance with

7  good-cause criteria number three.

8          The remaining criteria, good-cause criteria number

9  five, deals -- is the sort of catchall provision that permits

10  a case to be kept open in the interests of justice, and as we

11  noted in -- in our report, I think, in 2019, in looking at the

12  eight or so cases that were kept open under good-cause

13  criteria number five, I think about six of them deal with yard

14  maintenance and sort of those kinds of things, and so we'll be

15  working with the City to try to delve a little bit deeper as

16  to whether or not, you know, a six- or seven-year-old failure

17  to maintain your yard or whatever it is falls within sort of

18  in the interests of justice needs to be kept open under

19  good-cause criteria number five.

20          And, oh, one other point just on auditing, Your

21  Honor.  In year -- in this year, the next area of our focus

22  would be the accountability provisions even though, you know,

23  once again, Benchmark may not be -- the module for that may

24  not be at completion, but we would be working with the City

25  and with the parties to start auditing in that area as well.

34

1          And I think that's it.

2          THE COURT:  All right.  Thank you.

3          Mr. Carey, can you discuss in a little more detail

4   the issue of training and the comprehensive training plan and

5   where the City stands on that?  I know the citizens are very

6   interested in what's going on.  I know the roll call training

7   has been, you know, successfully done on many of the policies,

8   but we need to, you know, add the rest, and so I -- and this

9   was raised, I think, in one of the citizen letters, and so I

10  think that's one thing I'd like to hear you comment on a

11  little more.

12         MR. CAREY:  Your Honor, yes.  I think it'd probably

13  be appropriate for Chief Armstrong to give a little more

14  detail to you on where we are with that aspect of the

15  training.

16         CHIEF JASON ARMSTRONG:  Yes.  Thank you, Your Honor.

17         So as was mentioned earlier, there are really two

18  components when we talk about training.  We have the roll call

19  trainings, which, as Ms. Glass explained, that's nothing more

20  than just a review of a policy, and so that is not an

21  extensive, in-depth training class, and so what the Consent

22  Decree calls for is for us to have pretty much an extensive

23  in-service training platform, a program that we want to make

24  sure that our officers are getting the training that they need

25  and also the training that is required as to the Consent

1    Decree.  And so the Consent Decree, you know, spells out what

2    those trainings should look like and what they should include,

3    and as we try to develop those, you know, we have to send them

4    to the DOJ for their approval and so on of what that looks

5    like, and we're a small department.  We're a small department.

6    We are understaffed, and we do not have a training

7    coordinator.  We do not have a dedicated training professional

8    on this police department, and so we have people that have

9    other duties and other responsibilities that also try to work

10   on this training in addition to the other duties that they are

11   fulfilling.

12           And so one of the things that we tried last year --

13   we, you know, had pretty much worked through the bulk of our

14   use-of-force policies, and we took a stab at trying to create

15   our own in-service, use-of-force training, and so the process

16   that we utilized in doing so is we communicated with some

17   other cities across the nation that are under consent decrees

18   that already have DOJ-approved use-of-force training programs

19   and training classes that they are implementing, that they're

20   working off of, and so we got some examples, you know, from

21   some other cities, and so we took that, and we compiled it to

22   try to create our own use-of-force training that would meet

23   the standard of our in-service training, the standard demanded

24   under the Consent Decree.  And so we put that training class

25   together and sent it to the DOJ to see what they thought about

36

1    it, and -- and that training and the feedback that we got from

2    the DOJ is that we were nowhere near what their expectation

3    was for what they would want to see in that training class and

4    how they would want to see that training provided, and -- and

5    it took us an enormous amount of time to do that work and to

6    put that together, and when we got it to them, you know, the

7    response was, "No, this is not what we're looking for."

8         And so that really laid the foundation for, okay, you

9    know, we -- as we are currently set up and as we are currently

10   staffed, you know, we don't have that professional with that

11   background that has took the time to dedicate to creating

12   these trainings that -- that would -- that would commute the

13   standards and the requirements under the Consent Decree, and

14   so after that, we kind of went back to the drawing board, and

15   we had some additional conversations, you know, with the

16   Department of Justice, and so I think, you know, they sent us

17   some recommendations, and I think that's how we got to some of

18   the professors here in the St. Louis area, for us to try to

19   talk with them and see what other kind of additional help or

20   resources we could get in that area because typically and what

21   every other city or what every other police department in the

22   state of Missouri works off of is Missouri Peace Officer

23   Standards and Training Council, so Missouri POST.  And so --

24   you know, so Missouri POST mandates that every police officer

25   in the state of Missouri has to get a minimum 24 training

1   hours each year, and they dictate, you know, some of those

2   training hours have to be in specific areas, and then the

3   other hours can just be in electives, you know, for the

4   officers, and so we have -- you know, regionally, we've had --

5   so, locally, we have the St. Louis County Academy that they

6   put on training classes that all of their training classes are

7   Missouri POST-approved, and so an officer goes to that

8   training class, and then they get their POST credit that goes

9   towards their mandated 24 hours so they're able to maintain

10  their law officer certification.

11       And so when we first started working on our training

12  program, that was largely what we looked at, to see what

13  classes were provided at the St. Louis County Academy and see

14  how that matched up with, you know, the requirements of the

15  Consent Decree.  The problem that we ran into or the problem

16  that that presents to us is -- I can't say every last one of

17  them, but for the most part, what we've looked at with the

18  training that was offered and provided that meets the State of

19  Missouri's level and authorized mandates for training does not

20  meet the Department of Justice standards of training, and so

21  those training classes where we could go there and we could --

22  we could -- you know, we could get the training and then just

23  authorize -- it's approved training through the State of

24  Missouri, but it doesn't meet the Department of Justice

25  requirements and demands for how the training is to be taught

38

1  and what -- you know, what all the components, you know, have

2  to go into it and everything that has to be provided to the

3  Department of Justice for them to sign off that we've met our

4  Consent Decree requirements.

5          And so, you know, like I said, we're a small

6  department, so we don't have our own training academy, we

7  don't have our own training division, you know, to create all

8  of those things, and so it's really us trying to figure out

9  how do we get this done and -- and what additional resources

10  can we get at our disposal to assist us in getting this done

11  really is what the challenge is before us because there are

12  plenty of training classes out there, but like I said, there

13  is just different levels of requirements and standards, I

14  would say, as far as what, you know, every other police

15  department and every officer is authorized to get compared to

16  what Ferguson has to get.  And so really, we're just -- you

17  know, it doesn't exist in this area, and we're having to

18  create it or find ways to create it.

19          And so with the bias-free policing program, you know,

20  we were able to contact another agency that has gone through

21  the DOJ process and has an approved training, and they're

22  coming here to put it on for us, but, you know, that takes a

23  lot of heavy lifting, and so, you know, that's not something

24  that we could do every month -- have a different agency come

25  into town just to put on this training.  So it's -- you know,

1   it's a lengthy process in us trying to get there, and so, you

2   know, we are trying to get some more help and some more

3   assistance and resources on the training front to where we

4   could create, you know, more of that content ourselves and get

5   it approved by the DOJ where we have more flexibility on how

6   it gets presented because, you know, part of the challenge for

7   me is, you know, we could have somebody come, but now, you

8   know, I have to be able to send officers, you know, to the

9   training class.  So now I'm taking officers off the road, you

10  know, that need to be out there responding to things.  So now

11  we're talking about scheduling:  How many officers do I have

12  on this team?  How many officers on that team?  So there's a

13  lot that goes into this.  Because of our staffing level right

14  now, you know, that makes it, you know, a challenge for us,

15  and that's why it's difficult for us to be able to use an

16  outside entity like St. Louis County Police Academy.  You

17  know, even if they had a class that met the Department of

18  Justice standards, those classes may be put on four or five

19  times a year at most.  That's not enough for me to get all of

20  my officers into that training, for all Ferguson officers to

21  attend that training in a year because if it's only offered

22  five times, I don't have enough people to be able to send

23  enough people to the training class each time that it's

24  offered.  So those are some of the challenges, you know, that

25  are presented to us, and we're looking at it to try and find a

40

1    way to work through those to make sure that we're meeting the

2    requirements of the Consent Decree.

3            THE COURT:  Well, and as you indicated, the work that

4    you're doing with the New York -- Suffolk County, New York, on

5    bias-free policing training is a good model, but there are

6    other ways to do this.  Am I correct in understanding that the

7    two professors that Mr. Carey mentioned are people who are

8    going to assist you in at least figuring out a little more on

9    how you might be able to do this?  Is that correct?  Is that

10   what part of what you -- what they're working on?

11           MS. NICOLLE BARTON:  Hi, Your Honor.  It's Nicolle.

12   So the two professors that we've recruited actually have

13   joined our Training Plan Committee, and I just want to

14   piggyback off of what Chief Armstrong said, you know, that we

15   don't have our own police academy.  When I got here, myself,

16   Assistant Chief McCall, and our Training Plan Committee did a

17   thorough review of what St. Louis County Police Academy does

18   offer, and we took a look at -- we set it side by side with

19   our Consent Decree, and we realized really quick though

20   St. Louis County Police Academy does offer trainings in lots

21   of areas, that they only touch on areas.  They may touch on

22   certain policing.  They may touch on problem-solving policing;

23   they may touch on bias-free policing, but it's not really a

24   robust training with the requirements that we would need to

25   have, and so we realized really quickly -- when we looked at

1  that, we did a thorough gap analysis of what St. Louis County

2  has and can offer us and what we need to have in-house, and we

3  realized that we did need to look outside of that to help us

4  create or to help us find departments that had really good,

5  robust, in-service training that we could work with them on,

6  and that's how we ended up working with Suffolk County, New

7  York, for our bias-free policing training.

8          So, you know, and as Chief Armstrong stated, we're

9  very short-staffed and we just don't have, you know, the

10 manpower to dedicate someone to do that, and our two

11 professors that we've added to the Training Plan Committee --

12 we haven't had an outside discussion on if they can help us or

13 consult with us as far as our overall training.  They're

14 offering their insight and their expertise on our training

15 plan and looking at, you know, our -- our PowerPoint

16 presentations and helping offer assistance in that area.  So

17 we really still need a dedicated person that can help us with

18 the development of training overall.

19         THE COURT:  All right.  Ms. Glass, do you have any

20 comments on the City's efforts in this regard and where we

21 think we're headed next?

22         MS. GLASS:  Thank you, Your Honor.  I just wanted to

23 be clear on one point in Chief Armstrong's comments relating

24 to the use of County courses.  DOJ has no objection to

25 Ferguson using -- making use of the -- at least in part of the

42

1    community or -- excuse me -- of County resources for classes

2    and having that be part of its training plan.  In a lot of

3    ways, that makes a lot of sense to not create everything from

4    scratch.  We've never been given a set of lesson plans or

5    details about a County course and assessed it and said it

6    doesn't pass muster.  So my understanding was that the City

7    was turning more to creating its own resources more because of

8    staffing issues and its own needs, but in the event that, at

9    any point, the City decides that it wants to use the County

10   courses it has available, we're certainly open to reviewing

11   those materials and seeing if they would meet the Consent

12   Decree requirements both in method of presenting

13   information -- so best practices for adult learning and that

14   kind of thing -- and also for the content that's required by

15   the Consent Decree, and we do intend to continue discussions

16   with the City about the resources needed to actually build a

17   sustainable training program.

18            THE COURT:  Yeah, and as I understand what Ms. Barton

19   is saying, that the City did do the kind of gap analysis or

20   whatever analysis of what the County offers and does see that

21   there are -- that the offerings may lack the specificity in

22   certain areas that are needed, but what you're saying is the

23   training offered by the County academy may provide a basis or

24   at least a ground-level training that would be appropriate but

25   they'd need more, and so I hope you all will continue to

43

1   discuss this with one another because it is a crucial area,

2   and we've -- you know, we've talked about it a lot, and I know

3   everybody wants to get it done.  The City's lack of resources

4   is always a continuing problem.

5           Ms. Tidwell, do you have anything to add on this

6   training issue?

7           MS. TIDWELL:  I would just say, Your Honor, you know,

8   I agree with Ms. Glass that having the -- conducting a gap

9   analysis or at least sort of getting the City to start the

10  trainings with what the County provides and then looking to

11  what's -- you know, what's leftover and maybe thinking of a

12  way to develop that separately, it could be -- you know, it

13  could be as simple as, you know, a couple of provisions of the

14  Consent Decree that aren't covered or a couple of areas that

15  the police department may internally be able to put together

16  itself or to -- to develop on its own, but we won't know until

17  we sort of get it in front of us and we take a look.  And so,

18  hopefully, the resources that they've brought on board, that

19  they've recruited will help them to sort of look at it with

20  that kind of critical eye to see maybe it could be developed

21  internally, whatever the gaps are.  Certainly, having Suffolk

22  County come in and do this "Train the Trainer," even though

23  it's specifically for bias-free policing, may help the City to

24  identify its own internal capacity for providing training, and

25  maybe some of these folks who are doing the "Train the

44

1  Trainer" can be people who can train in other areas or sort of

2  provide that bridge between what the County provides and

3  what's required under the Consent Decree.  So I'm hopeful

4  that, you know, if everybody rolls up their sleeves, that we

5  can get there, but it's just -- you know, it's just a matter

6  of we just have to see it, and then we can assess and sort of

7  move on from there.

8           THE COURT:  Right.  And so I would encourage the City

9  to follow through with that and provide that information.  I

10  mean I think you all can have some discussions with the

11  Training Committee as well as the department or however the

12  City chooses to approach it, but getting, you know, the basic

13  concept that you've all discussed before of taking -- if there

14  is -- you know, if some basic stuff is available from the

15  County or otherwise, doing that, but then as Ms. Tidwell says,

16  having -- figuring out what you can add onto it to bring it up

17  to the level you need, and, perhaps -- I know you've done a

18  lot of work, Ms. Barton -- and the City -- on getting the

19  Suffolk County people in to do this "Train the Trainer," and

20  that may be a good model for you to see how they do it, and it

21  also may identify which of your own trainers may have real

22  interest, you know, your internal people who are doing some of

23  the training for the department, in addition to their other

24  duties.  It may identify people who maybe really can take on a

25  higher role in that and devote more resources and more time to

1  it.  So I would just encourage everyone to keep working on it.

2  I know, you know, it's another one of those things we wish

3  could go faster, but just keep working and let's see if, at

4  the next report, we can have -- you know, hear a little more

5  about this.

6          Are there any other areas, Ms. Tidwell or Ms. Glass,

7  that you think I should ask the City about, or is there

8  anything else the City wants to say?  I think you all have

9  covered most of the areas that I thought you were going to

10  cover today, and your remarks have dealt with some of the

11  things that were raised in the comments from the public that

12  were sent in, and I appreciate the public remaining interested

13  in this.  I know there are some -- there are a number of

14  issues that the parties are continuing to work on, obviously,

15  and so I look forward to getting the Monitor's report and then

16  also seeing how the survey goes as well as the other things

17  you've mentioned here today.

18          Ms. Glass, from the department's perspective, do you

19  have other points or issues you'd like to raise or comment on?

20          MS. GLASS:  Thank you, Your Honor.  The one

21  additional thing -- with the Court's permission, I just wanted

22  to provide our community email address since I did invite

23  members of the community to share any information, in

24  particular -- well, on any topic but, in particular, relating

25  to the police action in regard to the summer protests.  So if

1    that's all right --

2            THE COURT:  Yes, please.

3            MS. GLASS:  Thank you.  It's

4    community.ferguson@usdoj.gov.  That's

5    community.ferguson@usdoj.gov.  Thank you, Your Honor.

6            THE COURT:  All right.  And, Ms. Tidwell, I know

7    you've advertised it, but can you also provide the address for

8    where people can send you comments if they wish to do that?  I

9    know it's up on the websites.

10           MS. TIDWELL:  Yeah.  I'm going to ask Ms. Caruso to

11   do that, and then she can probably also give the address for

12   the community survey because I know that I cannot do that

13   because I'll mess it up.  So I'm going to turn it over to her.

14           MS. CARUSO:  Sure.  So the easy one is our email

15   address, which is fergusonmonitor@hoganlovells.com, and that's

16   hoganlovells.com, and then the URL, which is a little bit

17   trickier, so we will, of course, follow up with an email, is

18   https://tinyurl.com/fergusoncommunitysurvey.  That one's a

19   little lengthier, so we'll send that out via email if anyone

20   has questions, but, again, it's

21   https://tinyurl.com/fergusoncommunitysurvey.

22           THE COURT:  All right.  Here's what I'll ask all of

23   the lawyers to do for me is send to me or to my office the

24   appropriate -- these emails in writing, and I'll ask the

25   City -- and the City, I'd like to have you include also the

47

1  one where you want the comments, whatever it is, and I'll make

2  sure that we have those appropriately listed on the Court's

3  website as well so that if anyone goes to our court website,

4  which is under -- moed.uscourts.gov is where we are, but

5  it's -- but if you look at -- we'll put -- we'll make sure we

6  have that prominently displayed on the page for Ferguson.

7  There's a page on the website that says "Cases of

8  significance" or something of that manner, and there's one

9  that talks about -- has this, this case, and so we'll make

10 sure that we can get those prominently displayed, including

11 the URL for the survey so that that will be an additional

12 place where citizens can go to look for this information, but

13 then you all post it as well, as you've indicated, so we'll

14 try and have alternate places.

15         All right.  Thank you, Ms. Glass.

16         Ms. Caruso or Ms. Tidwell, anything else from the

17 Monitor that you think you'd like to add at this time?

18         MS. TIDWELL:  Excuse me.  One more thing, Your Honor,

19 that I forgot to mention.  The Monitoring Team has been

20 discussing with the parties -- and it was part of the public

21 comment -- a mechanism for comments that are sent to the

22 Monitoring Team in advance of these hearings, having those

23 posted somewhere so that folks can refer back to them, and so

24 we have discussed it amongst us.  We anticipate that they'll

25 be put on the Monitoring Team's website.  We're just trying to

48

1   figure out, sort of navigate sort of what the -- you know,

2   whether it's everything.  We're working with the parties to

3   figure out sort of, you know, how -- the mechanism for how

4   that's going to happen, but we anticipate that it will be, you

5   know, if not all of them, close to all of the comments in

6   their entirety, but we're just finalizing getting sign-off on

7   everyone on that.

8          THE COURT:  Right.  And so that will be on the

9   Monitoring Team's website, and I do think that's the

10  appropriate place to put that kind of comments at this time.

11  So that is good once you can get that set up.

12         MS. TIDWELL:  Okay.

13         THE COURT:  Thank you for reminding me of that.

14         Mr. Carey, anything further from the City with regard

15  to anything?

16         MR. CAREY:  No, Your Honor.  The City, at this point,

17  rests.

18         THE COURT:  All right.  Well, I -- I will just say,

19  you know, to everyone, I know -- I know this -- I know I've

20  said this before, and I know it may not be much comfort to

21  citizens who are wishing we had moved faster and that

22  everything had moved faster on this, but progress is still

23  being made, and it is -- everyone is working hard.  The

24  combination of the lack of resources at the City, which is a

25  problem every city and every police department has in the

1   United States, is, actually, during the pandemic, a massive

2   problem, but it's a problem that I believe that the City of

3   Ferguson is working to deal with as best they can, but the

4   lack of resources and then the issues of the things the

5   pandemic has done to slow down the progress and the inability

6   to have in-person meetings, I know, has been a frustration,

7   and we all just have to hope that we will be -- at some point,

8   be able to be in the same rooms with one another and that the

9   City can reach out to the members of the public and others

10  here can as well, but I do appreciate -- I just -- I will say

11  to the members of the public, please be patient.  Don't think

12  that because it may not always be obvious, that work is not

13  being done.  There is a lot of work being done.

14          And I do want the City to step up on the training

15  issue.  We've heard that a lot.  We want the City to keep

16  doing that, but I do also want everyone to know that we are --

17  everyone is trying to work hard, and it is just even more

18  difficult than it was before because of the pandemic, and

19  we're hoping that things will change.

20          I will schedule and I will work with the parties to

21  come up with a date for another hearing in a few months, and I

22  hope by then maybe everybody will be able to say we've all

23  gotten our vaccine.  No.  We'll do it before everybody gets

24  their vaccine because I'm not sure that's going to happen as

25  quickly as we'd like, but we'll do it -- you know, there will

1   be another meeting like this within the next two to three

2   months, probably late March, early April, or somewhere in that

3   range, and maybe end of April.  I'm not sure.  I'll talk to

4   the parties, but we will do that again.

5          And so I appreciate everyone participating here

6   today, and this concludes this hearing session, and court is

7   in recess.  Thank you, all.

8       (Proceedings concluded at 12:13 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

<u>CERTIFICATE</u>

I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 50 inclusive.

Dated at St. Louis, Missouri, this 5th day of February, 2021.

*/s/ Gayle D. Madden*

_____

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter