**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 4:16-cv-180** |
| **v.** | ) | |
| | ) | **Hon. Catherine D. Perry** |
| **THE CITY OF FERGUSON,** | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

**INDEPENDENT MONITOR'S WINTER 2021 STATUS REPORT**

## I.      INTRODUCTION

Pursuant to Paragraph 438 of the Consent Decree entered into between the United States Department of Justice ("DOJ") and the City of Ferguson, Missouri (the "City") (together, the "Parties"), the Independent Monitor (the "Monitor" or the "Monitoring Team") submits this Winter 2021 Semiannual Report detailing the City's progress during the reporting period, which includes the second half of Year Four and the first half of Year Five,[1] through January 31, 2021.[2]

In the City of Ferguson, and throughout the country, the year has largely been defined by the COVID-19 pandemic, the ongoing fight for racial justice, and political and economic uncertainty.  Undoubtedly, these dynamics have affected the City's progress with respect to implementation, slowing progress with respect to community engagement and training provisions in particular.  The Monitoring Team has been similarly impacted by these and other unforeseen

---

[1] Throughout this report, each year of implementation is referred to as "Year One," "Year Two," "Year Three," "Year Four," and "Year Five."  The monitorship officially began on July 22, 2016, when the former Monitor was appointed by the Court.  Accordingly, the implementation years are identified as follows: Year One: August 2016 - July 2017; Year Two: August 2017 - July 2018; Year Three: August 2018 - July 2019; Year Four: August 2019 - July 2020; and Year Five: August 2020 - July 2021.

[2] In accordance with Paragraph 439 of the Consent Decree, the substance of this report has been agreed to by the Parties.

events and, as such, did not file a second semiannual report in 2020.  The Monitor nevertheless commends the City for its continued dedication to the Consent Decree during this time, particularly given the strain COVID-19 has placed on its personnel and resources.  The Monitor appreciates that City officials and officers have not only served on the front lines during the pandemic, but have continued to show commitment to the provisions of the Consent Decree in the face of these challenges.

Notably, despite unprecedented circumstances, the Ferguson Police Department ("FPD") and Ferguson Municipal Court continued to make steady progress with respect to implementation of the Consent Decree.  The City has developed work-around procedures for remote community meetings, crafted new policies and trainings, and endeavored to maintain strong working relationships with the DOJ and the Monitoring Team.  In November 2020, the City hosted a "virtual site visit" with the Monitoring Team and DOJ in which all parties conferenced in a virtual Zoom room to discuss implementation of various aspects of the Consent Decree and to collaborate in identifying barriers to implementation and solving those challenges together.  This productive "site visit" will be repeated February 24-26, 2021 and will focus on the areas of accountability, community engagement, training, policies pertaining to FPD's solicitation of assistance from neighboring police departments, and court reform, among others.

The summer of 2020 marked the one-year anniversary of the hiring of Chief Jason Armstrong and Consent Decree Coordinator Nicolle Barton, both of whom have been instrumental in driving progress with respect to policy development, data analytics, and training. As referenced in the Monitor's prior report, Ms. Barton has spearheaded a more strategic approach toward implementation that emphasizes internal processes and frequent check-ins with DOJ and the Monitoring Team as well as a commitment to tracking and meeting the compliance metrics

2

established by the Monitor's workplans.  In general—with the exception of specific community-facing programs discussed *infra*—the City developed draft policies and plans and submitted them to the relevant party for approval in compliance with the deadlines enumerated in the Year Four Workplan.  *See* Dkt. No. 128-1.  The focus of Year Five, broadly speaking, will be for the City to (1) revise and finalize the outstanding Training and Community Policing and Engagement Plans; (2) continue to move policies into the implementation phase by addressing backlogs in training; and (3) launch and promote the City's community policing and engagement programs.  These focus areas are no surprise to the City; in its prior report, the Monitor directed the City to focus its Year Four efforts on the development of a comprehensive training program and implementation of community engagement and policing practices consistent with the overall aims of the Consent Decree.  As outlined in further detail below, the City made progress with respect to drafting policies, plans, and schedules in these areas, but still has not moved through the critical implementation phase that operationalizes these efforts; this must be a focus of Year Five.

Recently, the City's progress in these areas has been undermined by a lack of resources.  COVID-19, combined with other factors such as burnout, has consolidated public safety resources and resulted in staffing shortages.  As a result, FPD currently employs only 34 sworn staff, despite having capacity and need for 45.  Chief Armstrong has made every effort to address these staffing shortages, and he and his staff are to be commended for doing what they can to move progress forward with respect to the Consent Decree despite these challenges.  The Monitoring Team urges the City to ensure FPD has its support in hiring additional staff, particularly supervisors and patrol officers.  Adequate staffing is critical not only to obtaining the aims of the Consent Decree, but also to improving officer well-being, workload, and overall ability to effectively engage with and serve the community.  The Monitor acknowledges the strain on resources—both financial and

3

personnel—that COVID-19 has caused, but must emphasize that recruitment and staffing are fundamental objectives of the Consent Decree on which many other elements depend. Paragraph 281 emphasizes that "[t]ransforming FPD into a law enforcement agency that has the confidence of the entire Ferguson community and that consistently polices effectively and constitutionally requires that the City retain a diverse workforce of highly qualified officers. . . . Given recent events, many potential law enforcement officers may not recognize the opportunity that working on the Ferguson police force provides. The City and FPD therefore must make greater effort than would many municipalities and police departments to attract and retain this high-quality, diverse workforce." Over the last six months, FPD has been trying to do more with less, and the Monitor praises the efforts of Chief Armstrong, Assistant Chief McCall, and Ms. Barton in continuing to drive forward the goals of the Consent Decree despite lack of resources to help implement on the ground. However, as the Consent Decree indicates, success in this area requires partnership between the City and FPD. This is needed now more than ever to ensure that FPD can move the areas discussed herein into the implementation phase during Year Five.

Training is one area in particular in which additional resources and support is needed to move written policies into implemented action. The Monitor was pleased that FPD recruited two local university professors—Professors Lee Slocum, Ph.D., University of Missouri - St. Louis and Joseph Schafer, Ph.D., St. Louis University—to join its training committee. These professors will provide invaluable support and expertise to the City during the revision and development of its comprehensive training plan. In addition, the Monitor continues to believe that a Training Director will be necessary for the City to come into full compliance with the training requirements of the Consent Decree. The development and execution of a robust training program, led by an individual with technical skills in this area, continues to be a roadblock to implementation. The

4

Monitor urges the City to prioritize the hiring of an FPD Training Director in order to accelerate the pace of training, and thus, the City's overall implementation timeline.[3]   These additional training resources continue to be necessary for the City to quicken its pace toward achieving substantial compliance.

### A.    The Monitoring Process

As with prior status reports, this report details the City's compliance with the Year Four and Year Five Workplans as well as progress with respect to: (1) policy revision and review; (2) training and implementation; and (3) auditing and compliance assessment.

### 1.    Policy Revision and Review

The Monitor is pleased to report that many of the policies discussed herein have completed the policy revision and review phase.   Since March 2020, to account for delays and challenges associated with COVID-19 and to ensure sufficient time for public comment, the 30-day comment period was extended for certain policies.   The Parties otherwise continue to work collaboratively to execute the policy revision and review protocol as follows:[4]

i.   ***Kick-off/Announcement of Policy Area:*** FPD notifies DOJ and the Monitor of its intent to begin drafting or revising policies in an identified subject area;

ii.   ***Technical Assistance:*** The appropriate Subject Matter Expert on the Monitoring Team provides FPD and DOJ with technical assistance in the form of model policies and/or initial guidance as to best practices in the identified subject area;

iii.   ***Gap Analysis:*** FPD and DOJ conduct an assessment or gap analysis of FPD's current state of affairs (i.e., ascertain how FPD's existing policies, practices, and systems differ from the Consent Decree's requirements and best practices);

---

[3] The City has indicated that it is in the process of hiring a Professional Standards Inspector (at the rank of Captain). Once hired, the Monitor encourages FPD to utilize that individual to assist with areas of the Consent Decree crucial to implementation, such as training, where feasible.

[4] The steps outlined in the process are not necessarily intended to be implemented sequentially.   Rather, the Parties and the Monitoring Team determine the appropriate methodology on a case-by-case basis.

iv. ***Solicitation of Community Input:*** Several provisions of the Consent Decree require community involvement in the implementation of specific policies, including those designed to improve police/community relations. The Parties are committed to soliciting community feedback on other policies as well, even where not explicitly required by the Consent Decree. While the Parties continually evaluate the best means of involving community stakeholders in the policy development process, the Parties have found that policy forums are an effective means of inviting and obtaining community input.

v. ***Policy Revision:*** FPD and DOJ revise policies, practices, and systems in the target subject area to the extent required under the gap analysis;

vi. ***Return to Monitor/SME:*** Upon completion of a draft policy, the Parties submit the policy to the Monitor and/or appropriate Subject Matter Expert for review. The Subject Matter Expert will review the policy and either provide approval or arrange for a conference call to discuss additional revisions; and

vii. ***30-Day Comment Period:*** Once the Monitoring Team has approved a draft policy, the City will email the policy to FPD officers from varying ranks and units. Officers will have a meaningful opportunity to review and comment on the new or revised policy or procedure during a 30-day period. At the same time, FPD will post the policy to the FPD website for review by the community. Community members will also have 30 days to provide comment on the draft policy or procedure. At the close of the 30-day period, the Parties will determine whether any modifications to the draft policy are appropriate. If modifications are made, the revised policy shall be submitted to the Monitor for review and final approval. After the Monitor has approved the final policy, officers will be provided roll call training and the finalized policy will be implemented and published.

## 2. Training and Implementation

Training is required in order to move policies out of development and into implementation. Under the Consent Decree, training takes on two forms: *first*, roll call trainings are delivered via lecture, PowerPoint, and/or short assessment; and *second*, in-service training is provided to FPD personnel for applicable policies. Under the Year Four Workplan, the City was directed to ensure that all finalized policies are maintained in a manner easily accessible to the public and to officers and employees. Consent Decree ("CD") ¶ 46; Dkt. No. 128-1 at 4. The City met this provision by creating an Interactive Dashboard that contains General Orders as well as their accompanying status (e.g., *finalized*, *awaiting training*, *Monitoring Team review*, etc.) and maintaining a

hardcopy of all finalized policies at FPD.  The City must be sure to keep these electronic and hard-copy repositories up to date as it finalizes additional policies.

The City was also tasked with creating a training schedule and training plan by the end of Year Four.  CD ¶¶ 49-51; Dkt. No. 128-1 at 4.  Although the City submitted a revised draft of the training plan by the required deadline, the City must work over the course of Year Five to implement into the plan the additional comments and recommended changes provided by the DOJ and the Monitoring Team to that plan.  The Monitor hopes that the addition of local professors to the training committee, as well as a Training Director, will accelerate this process as there remains substantial work to complete with respect to this provision.

Although the City did implement roll call trainings on an *ad hoc* basis, it suffered from delays in the scheduling and execution of these trainings, which were only exacerbated by COVID-19 restrictions limiting the number of individuals allowed in one room for group trainings.  The Monitor advises the City to prepare on remote and/or socially distanced trainings for the remainder of Year Five.  To the extent needed, the Monitoring Team remains readily available to provide technical assistance to resolve roll call training backlogs.

With respect to supervisors, the City developed an initial curriculum for its Supervisor Training Program during Year Four.  The DOJ and the MT reviewed this draft program and have identified specific areas of modification and further development.  The City will address those areas, incorporate feedback, and commence its Supervisor Training Program during Year Five.

Finally, as stated above (*see infra*, pp. 4-5) and in prior reports, the Monitor recommends that the City hire a Training Director to assist in this critical aspect of implementation.  A Training Director will provide the required expertise and will streamline this process, expediting the City's path toward substantial compliance.  Continued reliance on the Consent Decree Coordinator and

sworn officers to develop highly technical plans, presentations, and curricula assessments—on top of their daily duties and when they are already short-staffed—all but ensures continued delays in the development and roll-out of FPD's comprehensive training program.

### 3.      Auditing and Assessing Compliance

Once the City moves through roll call training and into in-service training, implemented policies will be ripe for auditing.  As previous reports have indicated, with the exception of some of the Ferguson Municipal Court ("FMC") policies and the use of force suite of policies, the majority of policies have not been fully implemented by the City.  Although the Monitoring Team's regularly scheduled biannual audits of the Municipal Court were disrupted as a result of COVID-19 travel restrictions, FMC personnel shared some information remotely, which enabled the Monitoring Team to provide the court audit contained herein.  The Monitoring Team hopes to restart in-person court audits in the coming months.  In December 2020, the Monitoring Team commenced its audit of FPD's compliance with the use of force provisions of the Consent Decree. The remaining subject areas did not enter the implementation stage during the reporting period.

## II.    DETAILED STATUS UPDATE

This report details the status of the City's compliance with the Year Four Workplan. Concomitant with this report, the Monitor publishes the Year Five Workplan, attached hereto as **Appendix A**, which expands upon objectives achieved during Year Four and outlines additional goals and stated metrics for the City to achieve by the end of Year Five.  The workplan is the product of consultation with the City and the DOJ, and reflects deadlines that the Monitor believes are realistic and achievable, taking into account the ongoing public health and economic crises. The report outlines the status of implementation with respect to: community policing and engagement; bias-free police and court practices; stops, searches, citations, and arrests; municipal

8

court reform; use of force; recruitment; accountability; body-worn and in-car camera policies; First Amendment protected activities; data collection and analysis; and officer wellness.[5]

A.    **Community Policing and Engagement**

The City, and particularly Ms. Barton, dedicated significant effort to drafting and submitting numerous draft policies and plans to the Monitoring Team in order to meet the deadlines set forth in the Year Four Workplan.  These efforts included completing first drafts of the Community Policing and Engagement Plan, the policy for responding to Neighborhood Police Steering Committee ("NPSC") recommendations, FPD's crime prevention plan, and the small group dialogue and neighborhood mediation plans.  *See* Dkt. No. 128-1 at 1-3.  In Year Five, the City should continue this commitment toward developing a robust community policing and engagement program and focus on revising these plans and policies in order to incorporate feedback and comment provided by the DOJ and the Monitoring Team so that these plans may be finalized and implemented by the close of Year Five.

The Monitor continues to believe the City would benefit immensely from hiring a dedicated community outreach coordinator to orchestrate these efforts.  Although the Monitor has prioritized the immediate need for recruitment and training resources as explained above, a community engagement and/or outreach coordinator is critical to implementing the City's Community Policing and Engagement Plan and to achieving a sustainable, community-oriented approach to policing that fosters trust and transparency within Ferguson, and has recommended

---

[5] The Ferguson-Florissant School District has engaged another department for its School Resource Officer ("SRO") Program.  Because FPD officers will not be participating in an SRO Program this year, or anytime in the foreseeable future, the Parties agreed to suspend further implementation of the SRO provisions of the Consent Decree until a change in circumstances warrants an end to the suspension.

hiring such an individual in its prior reports.  *See* Dkt. Nos. 100 at 7-8, 128 at 4-5.  This is all the more important in light of the COVID-19 pandemic, which has delayed progress with respect to this area and which is likely to have lasting ramifications on community interactions and engagement for years to come.  An individual dedicated to thoughtfully approaching the City's community-facing programs will be best positioned to ensure that those programs are implemented timely, approached holistically, and modified to meet the changing needs of the community based on public health, political, economic, or other changing circumstances.

In particular, the Monitor cautions the City against relying too heavily on the Consent Decree Coordinator to build out compliance with this aspect of the Consent Decree; the goal is for FPD officials to develop a robust community policing and engagement program that will endure long after the Consent Decree concludes.  The community policing and engagement provisions should be integrated holistically into the department with responsibilities shared among officers, supervisors, and other FPD staff.  The City will benefit, in both the short and long-term, from a dedicated community outreach coordinator who can assist Ms. Barton and expedite compliance in this area while also formulating meaningful and enduring relationships with the community and within the department that are necessary to achieve the underlying aims of the Consent Decree.  The Monitor was pleased to hear the City Attorney's report that Ferguson's City Council has inquired about hiring someone for this position.  The Monitor encourages renewed energy toward hiring for this position so that the community may benefit from an individual whose sole focus is, among other things: planning, developing, coordinating, and implementing the Community Policing and Engagement Plan; enhancing FPD's relationships with local community members, neighborhood associations, youth, advocacy groups, and other key stakeholders; and

collecting and analyzing data to recommend strategies to enhance the department's approach to community policing and engagement with the community.

Through the efforts of Ms. Barton, the City has worked diligently to ensure ongoing collaboration with the NPSC and the Civilian Review Board ("CRB") during the ongoing period of remote-work and virtual meetings. Both groups' subcommittees reviewed and collaborated on the development of the Community Policing and Engagement Plan. CD, ¶¶ 20, 26-28. The NPSC subcommittee in particular met bi-weekly from February through July 2020 as they worked to review and revise the draft plan that was submitted to the Monitoring Team. During Year Five, the City should incorporate the feedback provided by the DOJ and Monitoring Team as well as additional feedback provided by the NPSC, CRB, and by the public during small group dialogue sessions in order to finalize this policy.

The City and FPD also developed a policy for pursuing, receiving, and seeking to act upon suggestions and recommendations made by the NPSC during Year Four. CD, ¶ 23. The City submitted the draft NPSC policy to the DOJ and Monitoring Team, which each provided comment and feedback for incorporation by the City. The NPSC is currently reviewing the policy and will make additional comments and suggestions prior to the finalization of this policy. The Monitor understands that the NPSC has had difficulty meeting during the pandemic,[6] but that Ms. Barton has offered to provide technical assistance to ensure remote meetings continue to be held on a recurring basis. To the extent additional assistance is requested, the NPSC should reach out to Ms. Barton as needed.

Paragraph 25 of the Consent Decree requires the City to assist with the establishment of a Neighborhood Association in each of Ferguson's apartment complexes, including but not limited

---

[6] The NPSC subcommittee, however, has continued to meet regularly and as needed.

to Canfield Green, Parkridge, and Northwinds.   The City has established neighborhood associations in each of the apartment complexes within the City, but should use the remainder of Year Five to develop more robust relationships with those associations by tracking meetings and FPD's responses to local concerns.

Per the Year Four Workplan, the City was expected to submit a crime prevention plan and staffing plan that enables close and effective supervisions and shift sequences to better support a community-oriented approach to policing.  CD, ¶¶ 27-30.  The Monitor commends the City for launching the crime dashboards on FPD's website and incorporating data provided by AH Datalytics into the staffing study, but notes that these plans are in need of further revision and refinement (as well as public comment) prior to finalization.  In particular, the staffing study will require an accompanying plan detailing the revised schedule of monthly command staff meetings and shift sequences designed to best support community-oriented policing.

Finally, the City is working directly with the Collaborative Reform Initiative – Technical Assistance Center ("CRI-TAC") to develop enhanced community engagement practices within FPD.  CRI-TAC provides technical assistance resources to law enforcement agencies on a range of public safety, crime reduction, and community policing topics.  The City is working to arrange an on-site visit with CRI-TAC.  The Monitoring Team commends the City's work with CRI-TAC and hopes that it will lead to robust community policing and engagement practices and, if feasible, additional assistance with respect to training in this area.

### 1.    Community Dialogues & Mediations

The City made significant progress working with Community Mediation Services of St. Louis ("CMS") during Year Four.  Specifically, the City finalized the Neighborhood Mediation Plan and commenced community-centered mediations and a pilot group structured dialogue as

required by the workplan.[7]  CD, ¶¶ 19, 33-34; Dkt. No. 128-1 at 1-2.  The City's virtual pilot of its small group dialogue program was successful and proved that the dialogues required by the Consent Decree could practically and effectively be conducted in a virtual setting.  The pilot dialogue included participation from various stakeholders in the community, including apartment building managers and owners, residents, police officers, and members of the NPSC.

The City surveyed participants in the pilot dialogue session and inquired about their experiences, including whether they thought the conversation was well-managed and whether they felt comfortable during the conversation.  The City will analyze these survey results— together with feedback and observations offered by CMS personnel—and modify the plan as needed before formally launching the program on Zoom during Year Five.  Upon launch, the City should focus on extending this program to community members and groups who previously have not had strong or positive relationships with FPD or the City.  Given that the participants of the initial pilot were individuals that already had a baseline level of engagement with the City, outreach to disengaged and/or marginalized community members when rolling out this program is all the more critical.

During Year Five, the City should focus on building out community outreach plans for the neighborhood mediations and small group dialogues.  The City should also use the small group dialogues as opportunities to solicit additional feedback from the community on the Community Policing and Engagement Plan.  The Monitoring Team anticipates that these community programs will be fully implemented during Year Five and thus, ripe for auditing in Year Six.

---

[7] Although originally scheduled for April 2020, the pilot dialogue program did not launch until September 15, 2020. The Monitoring Team takes no issue with the delay in the launch of this program given the logistics that were required to convert it to a remote format as a result of the COVID-19 pandemic.

### 2.    Surveys

In partnership with the National Police Foundation ("NPF"), the Monitoring Team has launched its second annual community survey, available online at: www.tinyurl.com/FergusonMOsurvey.  Any individual seeking a hardcopy of the survey may call **857-413-2866** to request one; upon request, the Monitoring Team will mail a hardcopy survey along with a prepaid envelope to the requestee.  To maintain consistency and ensure that results can be measured against the 2019-2020 baseline responses, the Monitoring Team has launched the same survey developed and administered by the NPF.  To drive participation in the 2021 survey, the Monitoring Team will advertise the survey online—via email, on social media, and through the radio—as well as through thousands of postcards that will be mailed directly to Ferguson residents.  The postcards provide basic information about the survey, invite individuals to take the survey online by following the URL provided or by scanning the QR code, and offer a phone number to call for individuals who would like to request a hard copy.  The postcards will be mailed to approximately 4,000 residents with oversampling of residents from Ward 3—the neighborhood from which the fewest responses were received last year.  A sampling of individuals who have had recent interactions with FMC will also be mailed the survey, even if those individuals reside outside of Ferguson.[8]

In addition, Dr. Leigh Anderson, one of the Monitoring Team's Community Engagement subject matter experts, has designed an outreach plan that includes field distribution of postcards as well as community education opportunities related to the survey.  Her efforts will include visiting local businesses, working in conjunction with apartment complexes, neighborhood

---

[8] The survey analysis will allow the Monitoring Team to review survey results from residents (broken down by ward) as well as non-residents.

14

associations, and faith leaders, and collaborating with the Ferguson Library and Recreation Center to ensure information about the survey is visible and accessible to the public. The Monitoring Team anticipates running the survey from January through April 2021 and reporting survey results to the community in the next status report. If individuals or community members are interested in assisting the Monitoring Team in its efforts to engage the community and increase survey participation, please reach out to the Monitoring Team directly via email at FergusonMonitor@hoganlovells.com.

### B.      Bias-Free Police & Court Practices

Implementation in the area of fair and impartial policing and court practices was delayed when the Teen Summit, originally scheduled for Saturday, March 21, 2020, was cancelled as a result of the COVID-19 pandemic. Although the City did not meet the stated deadlines outlined in the Year Four Workplan, the Monitoring Team notes that this delay was not caused by the City's own negligence. In fact, the City impressively pivoted and modified its plans in order to ensure that youth input was adequately included in the draft policies. Specifically, as a substitute for the Teen Summit, which would have included a session dedicated to the discussion of FPD's draft bias-free policing policy, the City launched a questionnaire on the topic of bias-free policing that was distributed to high school students in the Ferguson Florissant School District. The survey garnered 128 responses from local high school students. The City incorporated the feedback received from Ferguson youth into the draft policies and recirculated the policy for approval by the Monitoring Team. Professor Kimberly Norwood, the Monitoring Team's subject matter expert in this area, reviewed the policy and returned her comments and revisions to the City for incorporation and finalization. Next, the City is expected to conduct roll call training on this policy by the close of Year Five.

To further promote bias free policing and court practices, the Consent Decree requires that all FPD police and court employees provide timely and meaningful access to police and court services to all, including individuals who have a limited ability to speak, read, write or understand English ("LEP individuals"). CD, ¶ 67. By the close of Year Four, the City submitted initial draft LEP policies to the Monitoring Team and the DOJ. These policies require additional development in order to align with best practices in this area. Accordingly, the City should use the remainder of Year Five to incorporate feedback received from the DOJ and the Monitoring Team, solicit additional community comment, and train/brief appropriate personnel on these policies.

In early February 2021, trainers from the Suffolk County Police Department (New York) delivered a training at FPD on Tactical Policing with Impartial Perceptions. The training was very well received by FPD staff—it was substantively robust, emphasized best practices in this area, and offered an opportunity for team-building and enhanced camaraderie within the department. Additionally, representatives from community groups were invited to attend part of the training, and were given an opportunity to provide feedback on the training to FPD. This is an important next step in enabling FPD to hone its expertise and practices in this area and progress FPD command staff and officers into certified instructor positions so that FPD may more readily train in the area of Bias Free Policing in the future.

## C.    Municipal Court Reform

As required by Paragraph 323 of the Consent Decree, the Monitoring Team has collaborated with DOJ and the City to support the City's efforts to reform the Municipal Code, which must protect public safety and enable fair and impartial resolution of municipal charges. The Consent Decree delineates measures that are designed to (1) ensure enforcement of the Municipal Code is driven by public safety; (2) implement the Comprehensive Amnesty Program;

16

(3) reform the practices of the Municipal Court; and (4) ensure ongoing assessment and improvement of the Municipal Court.

### 1.   Policy Development

Pursuant to Paragraph 328 of the Consent Decree, the City has worked cooperatively with both the DOJ and the Monitoring Team to develop and implement most of the ordinances and policies necessary to ensure the fair administration of justice, the constitutionality of FMC procedures, and the legality of its processes. During the reporting period, the Parties continued development of policies intended to formalize Consent Decree provisions that, in some instances, had been carried out in practice by municipal court personnel but had yet to be committed to policy.

For instance, the Court Procedures and Trials policy, FMC Policy 1.0, outlines the procedures governing the Judge, City Prosecutor, and Court Clerk during each municipal court proceeding, and the rights of defendants appearing in that court. CD, ¶ 353. Pursuant to Paragraph 359, FMC has included mechanisms for providing individuals with mental illness or intellectual disabilities with information about their available options for diversion from the municipal justice system. For example, FMC Policy 1.0 includes information on how to request that a case be sent to mental health court and includes an attachment brochure for the St. Louis County Municipal Mental Health Court. Additionally, the City revised the "Rights in Municipal Courts" brochure, which explains the right to be referred to mental health court. Similarly, FMC Policy 3.0 governs how the court will assess fines and fees owed for various offenses; outlines how a defendant's eligibility to pay is assessed; and details the alternative options for payment of fines and fees including: reduction of the amount of fines/fees owed based on indigency; payment plans or

17

paying fines/fees owed in installments; and paying fines/fees owed through community service hours.  CD, ¶¶ 340-346.  Both policies are currently in draft form.

Other policies undergoing development during this reporting period are designed to provide greater access to court operations for traditionally underserved populations.  FMC Policy 7.0, Limited English Proficiency Services, outlines the requirements and processes for the municipal court's provision of interpreters and similar assistance to individuals for whom English is a second language.

The Parties and the Monitoring Team will continue working collaboratively on these aforementioned policies to prepare them for public comment during Year Five.

### 2.    The Comprehensive Amnesty Program

Pursuant to Paragraph 424 of the Consent Decree, the Monitoring Team established a biannual audit schedule for provisions addressing Municipal Code and Municipal Court reform. The first audit was conducted in August 2017.  Beginning in 2018, audits were conducted on a biannual basis (typically each spring and fall).  The Monitor's last Municipal Court audit was in November 2019.[9]  This report details the results of the Monitor's audit of the City's compliance with Consent Decree Paragraphs 326 and 327, specifically the Comprehensive Amnesty Program.

The Consent Decree calls for the implementation of a Comprehensive Amnesty Program to address the significantly large number of cases that had languished in the municipal court due, in part, to the imposition of unnecessary barriers to prompt disposition.  Specifically, Paragraph 326(a) requires the City to decline prosecution of cases initiated prior to January 1, 2014 that were

---

[9] Due to COVID-19 public health restrictions, audits were suspended in the spring and fall of 2020.  The Monitoring Team hopes to resume its audit schedule later this year.

open and without a disposition, except in cases where the City Prosecutor found good cause to continue the prosecution.  To realize the program's goals, the Parties worked collaboratively to develop agreed upon good cause criteria to evaluate these charges.  The Parties also agreed that the City Prosecutor would document which good cause criteria was used to justify the decision to keep cases open for continued prosecution.

The City initially identified 7,932 pre-2014 charges that did not yet have a disposition and that were eligible for review pursuant to the Comprehensive Amnesty Program.  By the fall of 2018, the City had declined prosecution of 6,188 of those charges.  The following table details the good cause criteria under which the remaining 1,744 pre-January 1, 2014 charges were kept open:

| Criteria | Description of Good Cause Criteria | Number |
|---|---|---|
| 1 | Involving assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 316 |
| 2 | Involving an identified victim who is available to assist in further prosecution. | 563 |
| 3 | Involving the following charges: Driving While License Suspended or Driving While License Revoked, and (a) the original Driving While License Suspended charge was issued because of something other than failing to appear or pay pursuant to RSMo 302.341.1; and (b) the defendant is unable to show that either his license was reinstated or that he/she is no longer driving. | 857 |
| 4 | Involving a defendant convicted of an additional offense since 2014 that involves assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 0 |
| 5 | Where the City Prosecutor reasonably believes that, in the interests of justice and public safety, the case should proceed. | 8 |
| **Total number of pre-2014 cases that remain open for prosecution:** | | **1,744** |

As reported in the Monitor's Spring 2019 Status Report, the Monitoring Team's initial audit of the City's compliance with the Comprehensive Amnesty Program included a review of 10% of the pre-2014 cases that were kept open under at least one of the good cause criteria listed above. Among the 175 cases reviewed, the audited sample included all cases that were kept open under good cause criteria number two and which pertained to a failure to comply with law enforcement, as well as all cases kept open under good cause criteria number five.

With respect to charges kept open under good cause criteria two, the Monitoring Team's review raised issues of concern. Specifically, none of the 51 case files that were audited contained notes by the City Prosecutor documenting a recent effort to confirm whether a victim was available to assist in further prosecution of the case. In fact, only one of the cases included any recent notes—i.e. notes created between 2017 and 2019 as part of the Comprehensive Amnesty Program—explaining why the case was kept open. In some instances, more than seven years had passed since the alleged conduct occurred, which raised the question of whether victims were still available or willing to assist or provide information necessary to successfully adjudicate these cases. The willingness to assist and availability of these victims is particularly relevant given that approximately 60% of the charges remaining open under good cause criteria two are for theft, the majority of which are corporate victims from whom the defendants allegedly shoplifted.

The Parties agreed that the cases kept open pursuant to good cause criteria two raised legitimate questions and, through the summer and fall of 2019, worked collaboratively to craft a solution that achieved the dual purpose of freeing a large number of defendants from the threat of arrest for offenses in which a successful prosecution was unlikely, and equally importantly, securing the rights of victims to be heard. The result of this effort was a process involving the mass mailing of letters to identified victims asking that they indicate whether they preferred to

continue their case.  Where the victim did not respond or where the letter was returned as undeliverable, the City Prosecutor dismissed the charges.

As part of the November 2019 audit, the City reported that, for 428 of the 563 charges left open pursuant to good cause criteria two, the identified victim did not respond to the letter inviting further participation in the prosecution's case.  In all, the City received 21 responses: eight (8) victims indicated a desire to continue their case and 13 stated that they no longer wished to participate in the prosecution.[10]  Another 28 cases were closed after the defendant pleaded guilty to the offense.  Currently, there are nine (9) good cause criteria two charges remaining, down from 563 in 2018.

As reflected in the table below, the City has also reduced the number of charges in the remaining good cause criteria categories since the Monitoring Team originally reported the number of pre-2014 open cases in 2018.  629 of the Paragraph 326(a) Comprehensive Amnesty Program charges were either nolle prossed or dismissed by the City Prosecutor, and a small number of additional cases were closed by the court.[11]  However, we note that there were a number of cases closed because of a defendant's guilty plea, including 24 charges initially kept open under good cause criteria one, 28 charges under good cause criteria two, and 84 charges under good cause criteria three.  The following represents the status of the Paragraph 326(a) charges as of the current reporting period:

---

[10] The City Prosecutor kept one case open without a response from the victim due to a companion domestic assault charge in the same matter.

[11] A small number of cases containing duplicate charges were also dismissed.

| Criteria | Description of Good Cause Criteria | Number |
|:---:|:---|:---:|
| 1 | Involving assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 224 |
| 2 | Involving an identified victim who is available to assist in further prosecution. | 9 |
| 3 | Involving the following charges:<br><br>Driving While License Suspended or Driving While License Revoked, and<br><br>(a) the original Driving While License Suspended charge was issued because of something other than failing to appear or pay pursuant to RSMo 302.341.1; and<br><br>(b) the defendant is unable to show that either his license was reinstated or that he/she is no longer driving. | 727 |
| 4 | Involving a defendant convicted of an additional offense since 2014 that involves assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 0 |
| 5 | Where the City Prosecutor reasonably believes that, in the interests of justice and public safety, the case should proceed. | 8[12] |
| **Total number of pre-2014 charges that remain open for prosecution:** | | **968** |

While the Monitoring Team is unable to assess the Comprehensive Amnesty Program's exact impact on the reduction in volume of pre-2014 charges until a more comprehensive remote (and to the extent possible, in-person) audit is complete, it is clear that, to date, the program's implementation has been tremendously successful. At least 7,545 charges, and likely more, have

---

[12] Each of these eight case files contained a memorandum from the City Prosecutor explaining the decision to keep the case open. The Monitoring Team observed that six of these cases involved the exterior of real property, including issues associated with trash accumulation or tree removal. During the next reporting period, the Monitoring Team will meet with the Parties to discuss in more detail the application of criteria number five to these specific cases.

been dropped as a direct result of Paragraph 326(a) since DOJ initiated its investigation of the municipal court, including at least 6,927 pre-2014 charges that were dropped as a result of the Consent Decree by the end of 2018.  Thus, the City is nearing complete implementation of the Comprehensive Amnesty Program as contemplated by Paragraph 327.

During the next reporting period, the Monitoring Team will seek to assist the City in reaching full implementation by working with the Parties to develop an audit methodology to assess the City's evaluation of cases left open under good cause criteria number three.  Although there are 118 fewer remaining charges in that category than there were in 2019, the Monitoring Team notes that the reduction is due, in large part, to defendants having pleaded guilty (84) rather than outright dismissal.  As such, the Comprehensive Amnesty Program's impact on this category of cases is modest and cannot be deemed in compliance with Paragraph 326(a) without a review by the Monitoring Team to determine whether the agreed upon criteria were fully and fairly applied.  Specifically, the Monitoring Team will need to assess: (1) how the City determined whether the cases left open in this category were based on something other than a decision by the Missouri State Department of Revenue to suspend a defendant's driver's license after failure to pay a fine or appear for a scheduled court date; and (2) where it is determined that a case originated in the State Department of Revenue, did the City provide the defendant an opportunity to show that his/her license has been reinstated or that he/she is no longer driving.  The Monitoring Team looks forward to working with the Parties during the next reporting period to ensure that open prosecutions in this category are properly classified.

The Monitoring Team is pleased to report that the Comprehensive Amnesty Program's remaining provisions—Consent Decree Paragraph 326, Sections (b), (c), and (d)—have been fully implemented.  Pursuant to Paragraph 326(b), the City has eliminated all pending charges, fines,

and fees related to Failure to Appear ("FTA") violations through an order issued by the Municipal Court Judge, without requiring defendants to make bond payments, appear in court, or take any other action.  During each biannual audit since 2017, the Monitoring Team reviewed reports from the municipal court file system to confirm that there were no active or pending FTA cases. Pursuant to Paragraph 326(c) of the Consent Decree, the City repealed all or parts of Ferguson Municipal Code § 13-60, § 13-63, § 13-70(2) and (3), and § 44-50, and eliminated all pending fines and fees imposed pursuant to the applicable provisions of these sections.  The Monitoring Team's audits confirmed that all cases related to these obsolete provisions have been cleared out of the Municipal Court's electronic file and can report that there are no active or pending cases associated with these provisions.  As such, efforts related to Paragraph 326 (b-c) have resulted in the disposal of more than 50,000 charges.

Finally, pursuant to Paragraph 326(d) of the Consent Decree, where a defendant made total payments exceeding the amount of the initial fines and fees imposed for a municipal ordinance violation, including payments for associated FTA violations, the City recommended that any additional fines be stayed and the case closed without requiring defendants to make a bond payment, to appear in court, or to take any further action.  Where payments did not total or exceed the original fine amount, the City recommended lowering the amount owed to the amount of the initial fines and fees imposed, minus any payment amount already made by the defendant. The Municipal Court judge entered orders reducing the amount due for each defendant as recommended by the City, and FMC staff updated the court's electronic file system to account for the fine reduction in each case.  Since 2016 and up through the March 2019 audit,[13] the Monitoring

---

[13] Based on the City's compliance with Paragraph 326(d) for the previous four (4) audit periods and the small number of cases identified during the March 2019 audit (21), the Monitoring Team did not review FTA cases as part of the November 2019 audit.

Team has reviewed a random sample of 10% of the defendants for which FTA fees were reduced and confirmed that the FMC electronic file system reflects the appropriate FTA fee reductions. The Monitoring Team estimates that the City has waived $314,973.56 in FTA fees across 2,071 charges.

In sum, the City has implemented all aspects of the Comprehensive Amnesty Program as required under Paragraph 326 of the Consent Decree, except for those related to good cause criteria numbers three and five, as explained above.  In addition to complete implementation of the program, Paragraph 327 of the Consent Decree also requires that the City agree not to execute any municipal arrest warrants or to collect any fines or fees identified in Paragraph 326 while implementing this program.  CD, ¶ 327.  The City has fully complied with this provision, although the Monitoring Team will continue to audit compliance.  The Monitor recognizes the City's commendable work with respect to the implementation of the Comprehensive Amnesty Program and is optimistic that the City will achieve complete implementation with respect to Paragraphs 326 and 327 in Year Five.

### D.    Voluntary Contacts, Stops, Searches, Citations, and Arrests

Policy development and roll call trainings in the area of voluntary contacts, stops, searches, citations, and arrests was delayed during Year Four, and as a result, implementation of these policies was not completed by the end of the year.  Specifically, although the initial suite of draft policies, inclusive of officer and community feedback, was submitted to the Monitoring Team for review, a few select policies remained outstanding, including the Citations and Arrests, Wanteds/Stop Orders, and Correctible Violations.  CD, ¶¶ 90-98.  Policy development with respect to these policies should be completed and roll call trainings should be conducted in Year Five so that the Monitoring Team may commence an audit in this area during Year Six.

25

### E.     First Amendment Protected Activity

During Year Four, the City drafted initial policies on officer response to First Amendment Protected Activity and, because of the pandemic, doubled the time allowed for the public to submit comments to the policy.  At the beginning of Year Five, the City began working to implement feedback received from the community into the final policies, which will be submitted to the Monitoring Team later in Year Five.  Roll call trainings should be conducted in Year Five so that the Monitoring Team may commence an audit in this area during Year Six.

### F.     Use Of Force

During Year Four, the City developed and trained FPD on the majority of all use of force policies.  *See* CD, ¶¶ 128-170, 172-194.  At the close of Year Four, only the Force Review Board ("FRB") policy and the use of force reporting and investigation forms remained for development and training.  Pursuant to the Year Five Workplan, the City will complete development and training with respect to the use of force forms and the FRB policy this year.  Additionally, Paragraph 172 of the Consent Decree requires FPD to develop a comprehensive process for reporting and investigating all FPD officer uses of force.  CD, ¶ 172.  FPD officers began reporting *in paper form* all use of force data during Year Four, but are required to commence *electronic* reporting during Year Five.  The City is also expected to commence the development and implementation of in-service and supervisor training this year.

Given the status of implementation, the Monitoring Team provided notice to the City that it intended to commence an audit of FPD's compliance with the Consent Decree's use of force provisions.  In accordance with Paragraph 426 of the Consent Decree, the Monitoring Team will assess whether FPD has (1) incorporated the use of force provisions into its policies; (2) trained

all relevant FPD personnel as necessary to fulfill their responsibilities under those policies; and (3) is carrying out the requirements of those policies in practice.

The Use of Force Audit will be conducted to ensure that FPD officers are using appropriate force and that FPD monitors and investigates levels of force employed by its officers in accordance with governing laws and policies.  In December 2020, the Monitoring Team commenced its pre-audit requests for information from the City.  Requests to the City include use of force reports, arrest statistics for specific offenses, and records of use of force training conducted by FPD.  Upon receiving responses from the City, the Monitoring Team began, in February 2021, to make document requests on a rolling basis.  These requests seek videos, photographs, reports, or other materials relevant to the audit.  Finally, over the next few months, as it receives documentation from the City, the Monitoring Team will assess compliance with relevant use of force provisions.  Following the audit, the Monitoring Team will report results to the Parties along with associated findings and recommendations.  The substance of this audit report will be presented to the public and incorporated into the Monitor's semiannual status report.

### G.    Body-Worn and In-Car Cameras

In August 2020, the City finalized the suite of body-worn and in-car camera policies, and the secondary policy for off-duty officers.  *See* CD, ¶¶ 228-50.  Once finalized, the City resubmitted the revised policies to the Monitoring Team, who approved them in September 2020.  Roll call trainings have also been completed.  In-service training programs should commence at the end of Year Five or beginning of Year Six.  The Monitoring Team will commence auditing of this area during Year Six.

### H.      Recruitment

The Parties have long since completed a draft Recruitment Plan for attracting and retaining a high-quality and diverse workforce.  Approval of this plan has stagnated due to the City's delayed execution of a salary study required to comply with Paragraph 283(a) of the Consent Decree (requiring the City to offer salaries that will place FPD among the most competitive of similarly sized agencies in St. Louis County).  Although the City completed its salary study during Year Four, the methodology it utilized is being assessed by the Parties and may require further modifications by the City.  The Parties continue to work in good faith to negotiate an agreed-upon methodology for the salary study.  The Monitor notes the critical need to resolve this matter and implement the City's recruitment plan as the competitiveness of FPD salaries bears directly on the City's ability to bring additional resources to FPD.  The Monitor urges the Parties to resolve this issue in the near term so that the City can meet its commitment to finalize and implement  the Recruitment Plan by the close of Year Five.

Additionally, Paragraphs 285 and 290 of the Consent Decree require the City to "conduct an in-depth review of its current hiring processes and hiring criteria to ensure that no process, criterion, or requirement has a statistically significant disparate impact on members of a protected group," and to develop data-driven and qualitative protocols for regularly assessing its recruitment efforts.  CD, ¶¶ 285, 290.  The City is also required to continue the FPD Academy Assistance Program to seek qualified, local candidates to serve as police officers.  CD, ¶¶ 286-87.  The City should work with its data and technology consultants and Human Resources Department, as needed, to identify current gaps in compliance with these provisions by the close of Year Five.

### I.    Accountability

During Year Four, policy development was completed with respect to accountability policies and guidelines.  CD, ¶¶ 362-400.  The City submitted roll call training materials to DOJ, who reviewed and provided comment to the City during the fall of 2020.  The City has finalized these training materials and should commence and complete roll call training on accountability policies by the end of Year Five.  Next, the City must incorporate these policies into an in-service training program.  Depending on the completion of roll call training in this area, the Monitoring Team may be able to commence an audit review of the City's accountability policies at the end of Year Five.

### J.    Data Collection

The City's engagement with AH Datalytics proved fruitful during Year Four.   AH Datalytics conducted a gap analysis and developed a comprehensive data collection plan for the City by February 5, 2020.  The City also engaged Benchmark Analytics ("Benchmark") to assist with implementing the City's data plan.  Specifically, Benchmark will be used to fill data gaps in the areas of use of force and accountability, among other areas.  The City has also started to develop its electronic use of force reporting system with Benchmark.  Throughout the remainder of Year Five, the City should continue to work with Benchmark, AH Datalytics, and any other necessary vendors to fill data gaps identified during the gap analysis and bring data components of the Consent Decree into compliance.

### K.    Officer Assistance, Support, and Wellness Training

In recognition of officer workload, the political climate, and the stresses associated with the ongoing COVID-19 pandemic, the City has indicated that it will refocus on the myriad ways in which it can better support its officers during Year Five.  The Monitor commends these efforts

and has drafted the Year Five Workplan to incorporate officer assistance, support, and wellness provisions accordingly.  CD, ¶¶ 272-279, 319-321.  Specifically, these paragraphs recognize that physical and mental wellness has a direct impact on officers' ability to perform their jobs safely, constitutionally, and effectively.  During Year Five, the City should continue to offer assistance that supports the resilience, physical, and emotional health of its officers.

By the close of Year Five, the City should: (1) identify Consent Decree requirements that have already been implemented in this area and are ready for auditing by the Monitoring Team; (2) review its Employee Assistance Program to ensure it comports with best practices and current professional standards; (3) develop well-being protocols to be activated during officer deployments in and around public demonstrations or civil unrest; (4) identify qualified mental health professionals to develop and provide trainings on these topics; and (5) conduct and/or host officer wellness trainings and workshops.  Compliance with these provisions is critical not only to ensuring the wellbeing and safety of FPD officers, but also to promoting good judgment and high performance within the department.

## III.   CONCLUSION

The Monitoring Team recognizes and complements the intrepid efforts put forth by FPD, and specifically Chief Armstrong, Assistant Chief McCall, and Ms. Barton, to continue driving toward substantial compliance in the face of challenges presented during the close of Year Four and throughout Year Five.  Despite the challenging and uncertain circumstances, Year Four nevertheless saw near finalization of all policies in the Parties' stated priority areas. To avoid further delays with respect to training, the City should once again prioritize a system for developing and conducting roll call trainings regularly and efficiently, and should hire a Training Director and/or solicit additional resources to support this critical aspect of

implementation.  Finally, the City must continue to build a robust community policing and engagement plan during Year Five, ideally with the help of a dedicated community engagement/outreach coordinator.  Year Five marks a tipping point with great opportunity to move numerous policy areas into implementation, and then, into position for auditing and assessment by the Monitoring Team during Year Six.  The Monitoring Team appreciates the continued effort put forth by the DOJ and the City in working together to achieve the aims of the Consent Decree and looks forward to continuing to work collaboratively as the City moves through Year Five.

Date: February 23, 2021                                 Respectfully submitted,

                                                        */s/ Natashia Tidwell*
                                                        Natashia Tidwell
                                                        Saul Ewing
                                                        131 Dartmouth Street
                                                        Suite 501
                                                        Boston, MA 02116
                                                        *natashia.tidwell@saul.com*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing was filed electronically on February 23, 2021 with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, and was served by ECF notice by operation of the Court's electronic filing system.

                                                        */s/ Natashia Tidwell*