**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　**Plaintiff,**<br><br>　　　　**v.**<br><br>**THE CITY OF FERGUSON,**<br>　　**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Case No. 4:16-cv-180**

**Hon. Catherine D. Perry**

## INDEPENDENT MONITOR'S WINTER 2022 STATUS REPORT

### I.    INTRODUCTION

Pursuant to Paragraph 438 of the Consent Decree entered into between the United States Department of Justice ("DOJ") and the City of Ferguson, Missouri (the "City") (together, the "Parties"), the Independent Monitor (the "Monitor" or the "Monitoring Team") submits this Winter 2022 Status Report detailing the City's progress during the reporting period, which includes the second half of Year Five and the first half of Year Six,[1] through January 31, 2022.[2]

During the reporting period, the Ferguson Police Department ("FPD") and Ferguson Municipal Court ("FMC") continued to show commitment to the provisions of the Consent Decree in the face of ongoing challenges related to the COVID-19 pandemic.  Although the City experienced significant and disruptive transitions since the last reporting period, the Monitoring Team welcomed the appointments of Frank McCall as Chief of FPD and of Eric Osterberg as City Manager during the summer of 2021.  The Monitoring Team and the DOJ have longstanding,

---

[1] Throughout this report, each year of implementation is referred to as "Year One," "Year Two," "Year Three," "Year Four," and "Year Five."  The monitorship officially began on July 22, 2016, when the former Monitor was appointed by the Court.  Accordingly, the implementation years are identified as follows: Year One: August 2016 - July 2017; Year Two: August 2017 - July 2018; Year Three: August 2018 - July 2019; Year Four: August 2019 - July 2020; Year Five: August 2020 - July 2021; and Year Six: August 2021 – July 2022.

[2] In accordance with Paragraph 439 of the Consent Decree, the substance of this report has been agreed to by the Parties.

productive relationships with Chief McCall, and the Monitoring Team was pleased that Chief McCall, who has demonstrated steadfast and daily commitment to implementing the terms of the Consent Decree, was recognized by the City for his many years of dedication to FPD, the Consent Decree, and the Ferguson community.  The Monitoring Team looks forward to working with City Manager Osterberg in his new role.

Under Chief McCall, and with the critical support of Consent Decree Coordinator Nicolle Barton, the City has continued to make progress in drafting policies and plans and submitting them to the DOJ and the Monitoring Team for final review.  Indeed, the City has nearly completed policy development as well as roll call trainings in the prioritized policy areas.  The goals of Years Five and Six, however, remain similar to those stated in the Monitor's January 2021 report. Namely, the City should continue to prioritize (1) finalizing the Training and Community Policing and Engagement Plans; and (2) moving policies into and through in-service training so that they are fully implemented within FPD.

The Monitor last reported  that the City's progress in these areas had been undermined by a lack of resources resulting from COVID-19, burnout, slow-moving hiring practices, and salaries that were not among the most competitive of similar sized agencies in St. Louis County as required by the Consent Decree.  Although the City's new leaders have improved the pace of hiring—and have indeed hired quite a few new staff members over the past year, including fully staffing the dispatch center—it has been difficult to hire and replace personnel at a rate that would result in a full complement of FPD officers.  The Monitor expressed concern last year when it reported that FPD employed only 34 sworn staff, despite having capacity and need for 45.[3]  Most recently, FPD demonstrated an even more dire personnel shortage of only 27 staff (including three individuals

---

[3] As of July 2021, FPD was budgeted for 47 sworn staff.

2

in a Police Training Officer ("PTO") program).  As of the filing of this report, FPD has 31 commissioned officers.  This extreme shortfall in staffing has resulted in occasions where less than 20 officers are on patrol and where the department has no capacity to absorb shortages due to injuries, flu, COVID, or other incidents.  These staffing shortages continue to be a safety concern for the City and must be addressed immediately.

The Monitoring Team once again urges the City to ensure FPD has the support and budgeting it needs in order to hire additional staff, particularly supervisors and patrol officers. Adequate staffing is critical not only to implementing the Consent Decree, but also to improving officer safety, well-being, workload, and overall ability to effectively engage with and serve the community.  Recruitment and staffing are fundamental objectives of the Consent Decree, and frankly, many provisions, such as training and community policing, cannot be adequately implemented without proper staffing to support those efforts.  As we have before, we emphasize Paragraph 281 of the Consent Decree:

> Transforming FPD into a law enforcement agency that has the confidence of the entire Ferguson community and that consistently polices effectively and constitutionally requires that the City retain a diverse workforce of highly qualified officers. . . . Given recent events, many potential law enforcement officers may not recognize the opportunity that working on the Ferguson police force provides.  The City and FPD therefore must make greater effort than would many municipalities and police departments to attract and retain this high-quality, diverse workforce.

Success in the Consent Decree requires that FPD be afforded resources, including the staff, to achieve the aims of each provision.  The Monitor encourages the City Council, City officials, and even community members, to support this need to every extent possible.

### A.   The Monitoring Process

As with prior status reports, this report details the City's progress with respect to: (1) policy development; (2) training and implementation; and (3) compliance assessment.

### 1.    Policy Revision and Review

The City has largely completed the policy revision and review phase with respect to the Consent Decree's largest subject areas.  The Parties otherwise continue to work collaboratively to execute the following protocol:[4]

i.    ***Kick-off/Announcement of Policy Area:*** FPD notifies DOJ and the Monitor of its intent to begin drafting or revising policies in an identified subject area;

ii.    ***Technical Assistance:*** The appropriate Subject Matter Expert on the Monitoring Team provides FPD and DOJ with technical assistance in the form of model policies and/or initial guidance as to best practices in the identified subject area;

iii.    ***Gap Analysis:*** FPD and DOJ conduct an assessment or gap analysis of FPD's current state of affairs (i.e., ascertain how FPD's existing policies, practices, and systems differ from the Consent Decree's requirements and best practices);

iv.    ***Solicitation of Community Input:*** Several provisions of the Consent Decree require community involvement in the implementation of specific policies, including those designed to improve police/community relations.  The Parties are committed to soliciting community feedback on other policies as well, even where not explicitly required by the Consent Decree.  While the Parties continually evaluate the best means of involving community stakeholders in the policy development process, the Parties have found that policy forums are an effective means of inviting and obtaining community input.

v.    ***Policy Revision:*** FPD and DOJ revise policies, practices, and systems in the target subject area to the extent required under the gap analysis;

vi.    ***Return to Monitor/SME:*** Upon completion of a draft policy, the Parties submit the policy to the Monitor and/or appropriate Subject Matter Expert for review.  The Subject Matter Expert will review the policy and either provide approval or arrange for a conference call to discuss additional revisions; and

vii.    ***30-Day Comment Period:*** Once the Monitoring Team has approved a draft policy, the City will email the policy to FPD officers from varying ranks and units.  Officers will have a meaningful opportunity to review and comment on the new or revised policy or procedure during a 30-day period.  At the same time, FPD will post the policy to the FPD website for review by the community.  Community members will also have 30 days to provide comment on the draft policy or procedure.  At the close of the 30-day period, the Parties will determine whether any modifications to the draft policy are appropriate.  If modifications are made, the revised policy shall be submitted to the Monitor for review and

---

[4] The steps outlined in the process are not necessarily intended to be implemented sequentially.  Rather, the Parties and the Monitoring Team determine the appropriate methodology on a case-by-case basis.

final approval.  After the Monitor has approved the final policy, officers will be provided roll call training and the finalized policy will be implemented and published.[5]

viii.   ***Public Access:*** Once the policy has been finalized, FPD will post it to its website along with the "status" of the policy (e.g., finalized, awaiting training, etc.).  If and when a policy is later updated, its status will read: "new updated policy," and the changed provisions in the policy will be highlighted so that the public may easily review the amended provisions.  *See   https://www.arcgis.com/apps/MapSeries/index.html?appid=7aed307d6ad94f22a6c fb046644f2597*.

## 2.    Training and Implementation

Both roll call and in-service training are required in order to implement finalized policies. The City has implemented roll call trainings on an *ad hoc* basis once policy development is completed.  It made significant progress in roll call trainings over the course of Year Five and into Year Six, with all but one area—First Amendment Protected Activity—complete with respect to roll call training.  However, FPD has been slow to develop and implement in-service training. This is mainly due to the fact that the development of in-service training is a resource-intense exercise that must be completed for each policy area.

The Monitor has consistently emphasized the need for the City to focus on the development of a comprehensive training program and in-service trainings that implement the written policies and operationalize the Consent Decree.  FPD continues to require assistance in this area if it is going to develop and implement in-service trainings on a timely basis.  The City was initially tasked with creating a training schedule and training plan by the end of Year Four, *see* CD, ¶¶ 49-51, but that schedule and plan have remained in development.  While the addition of community members, including two local professors to the training committee, has benefited FPD, the Monitor continues to believe that without a Training Director, this area of the Consent Decree will remain stalled.  The DOJ has also provided FPD with a technical expert who can

---

[5] Since March 2020, to account for delays and challenges associated with COVID-19 and to ensure sufficient time for public comment, the 30-day comment period was extended for certain policies.

assist in the development, coordination, and scheduling of trainings.  Given the current staffing shortages and continued reliance on the Consent Decree Coordinator, sworn officers, and community members to develop highly technical plans, presentations, and curricula assessments, continued delays are all but guaranteed.  Accordingly, the Monitor once again urges the City to hire a Training Director who can prioritize the development and implementation of a comprehensive training program.

To further support the City with respect to the development of a robust training program, the Monitoring Team has onboarded a new subject matter expert: Retired Boston Police Department Superintendent Lisa Holmes.  Superintendent Holmes is the Principal and Founder of Elite Consulting.  She has decades of experience in law enforcement and specializes in the development, implementation, and auditing of police department training curricula at the recruit, patrol, and supervisory levels.  Most recently, she served as Superintendent of the Boston Police Department's Bureau of Professional Development, where she oversaw the Boston Police Academy, Cadet, and Firearms Training units.  She has experience conducting not only routine training for incoming officers, but also developing and launching anti-bias training modules in particular.  Superintendent Holmes also served as Deputy Superintendent in the Bureau of Professional Standards where she oversaw the Internal Investigations, Anti-Corruption, Recruit Investigation, and Audit & Review units.  In addition, she is a part-time lecturer at the University of Massachusetts.  Superintendent Holmes brings her highly specialized skillset in law enforcement training to the Monitoring Team and will be providing technical support to the City as it prioritizes progress in this area during Year Six.

### 3.    Auditing and Assessing Compliance

Once the City completes in-service training, the implemented policy is ready to be audited. As previous reports have indicated, with the exception of FMC policies and the use of force suite

of policies, the majority of policies have not been fully implemented by the City.  Accordingly, the Monitoring Team conducted audits in only these two areas during the reporting period.  These audits are discussed further herein.  The remaining subject areas did not enter the implementation stage during the reporting period.

### 4.   The Monitorship

Pursuant to Paragraph 421 of the Consent Decree, the Monitor was appointed for a period of five years, a period that is "extended automatically should the City not demonstrate full and effective compliance at the end of this five-year period."  CD, ¶ 421.  At the end of Year Five, the City had not demonstrated full and effective compliance with the Consent Decree.  Accordingly, pursuant to this provision of the Consent Decree, the Monitor's appointment was automatically extended  for an additional two years, at which point "the extension of the Monitor beyond seven years will be allowed only if the Court determines that such extension would facilitate full and effective compliance."  *Id.*

## II.   DETAILED STATUS UPDATE

This report details the status of the City's implementation efforts and compliance with the Year Five Workplan.  The report specifically outlines the status of implementation with respect to: community policing and engagement; bias-free police and court practices; stops, searches, citations, and arrests; municipal court reform; use of force; recruitment; accountability; body-worn and in-car camera policies; First Amendment protected activities; data collection and analysis; and officer wellness.[6]

---

[6] The Ferguson-Florissant School District has engaged another department for its School Resource Officer ("SRO") Program.  Because FPD officers will not be participating in an SRO Program this year, or anytime in the foreseeable future, the Parties agreed to suspend further implementation of the SRO provisions of the Consent Decree until a change in circumstances warrants an end to the suspension.

### A.      Community Policing and Engagement

Although the City timely complied with workplan deadlines to complete initial drafts of its Community Policing and Engagement Plan, the policy for responding to Neighborhood Police Steering Committee ("NPSC") recommendations, and FPD's crime prevention plan, *see* Dkt. No. 128-1 at 1-3, these policies have not yet been finalized and likely will not be so until the close of Year Six.  Throughout Year Six, the City has worked to incorporate feedback from the DOJ, Monitoring Team, NPSC, and community members, and to revise and finalize these plans.  The City, with the leadership of Ms. Barton, has been working on a comprehensive Community Policing and Engagement Plan that incorporates a neighborhood policing plan and a crime-prevention plan, which is dependent upon FPD reorganization and shift schedules.  The City plans to use feedback received from police officers and community members during a series of small group dialogues to revise the plan.  In June 2021, three subject matter experts from the Collaborative Reform Initiative – Technical Assistance Center ("CRI-TAC") conducted a site visit at FPD with the goal of helping  FPD to develop enhanced community engagement practices.  Outcomes from this visit will also be incorporated into the finalized plan.

Through the efforts of Ms. Barton, the City has worked diligently to ensure ongoing collaboration with the NPSC and the Civilian Review Board ("CRB") during the ongoing period of remote-work and virtual meetings.  Both groups' subcommittees reviewed and collaborated on the development of the Community Policing and Engagement Plan.  CD, ¶¶ 20, 26-28.  The City also developed a draft policy for pursuing, receiving, and seeking to act upon suggestions and recommendations made by the NPSC.  CD, ¶ 23.  By the end of Year Five, the City submitted the draft NPSC policy to the DOJ and Monitoring Team, which each provided comment and feedback for incorporation by the City.  An additional review of the policy by the Monitoring Team also took place in October of 2021, during which additional feedback on the draft policy was provided

8

to the City.  The NPSC is currently reviewing the policy and will make additional comments and suggestions prior to its finalization.

Paragraph 25 of the Consent Decree requires the City to assist with the establishment of a Neighborhood Association in each of Ferguson's apartment complexes, including but not limited to Canfield Green, Parkridge, and Northwinds. The City has established neighborhood associations in each of the apartment complexes within the City, however, the Monitor understands that management turnover has taken place at some of these locations, necessitating that the City use the remainder of Year Six to re-establish and develop more robust relationships with those associations.  There is a need to not only build relationships, but to operationalize those relationships by putting into motion strategies and techniques to support these associations by responding to local concerns.  Ms. Barton has been working with FPD to ensure that the meetings and root interactions are tracked consistently in order to build continuity and ensure FPD responsiveness.

In Year Six, the City must continue and in some aspects, renew its commitment toward developing a robust community policing and engagement program. As previously stated, the Monitor continues to believe the City would benefit immensely from hiring a dedicated community outreach coordinator to orchestrate these efforts.  While FPD—and Ms. Barton in particular—have been instrumental in establishing the foundation for these plans, next steps should focus on further integrating FPD senior officials and officers into a comprehensive community policing and engagement program.  In particular, the Monitor once again cautions the City against relying too heavily on the Consent Decree Coordinator to build out compliance with this aspect of the Consent Decree given that the goal is development of a robust community engagement program that will endure long after the Consent Decree concludes.  The Monitor is certain that a community engagement and/or outreach coordinator remains critical to achieving a

sustainable, community-oriented approach to policing that fosters trust and transparency within Ferguson, and has recommended hiring such an individual in each of its prior reports. *See e.g.,* Dkt. Nos. 100 at 7-8; 128 at 4-5.  This is all the more important in light of the COVID-19 pandemic, which is likely to have lasting ramifications on community interactions and engagement for years to come.  An individual dedicated to approaching the City's community-facing programs will be best positioned to ensure that those programs are implemented timely, approached holistically, and modified to meet the changing needs of the community based on public health, political, economic, or other changing circumstances.

The Monitor encourages renewed energy toward hiring for this position so that the community may benefit from an individual whose sole focus is, among other things: planning, developing, coordinating, and implementing the Community Policing and Engagement Plan; enhancing FPD's relationships with local community members, neighborhood associations, youth, advocacy groups, and other key stakeholders; and collecting and analyzing data to recommend strategies to enhance the department's approach to community policing and engagement with the community.

### 1.    Community Dialogues & Mediations

The City made significant progress working with Community Mediation Services of St. Louis ("CMS") during Year Five and into Year Six.  Specifically, the City finalized the Neighborhood Mediation Plan and commenced community-centered mediations.  As previously stated, the City hosted a pilot group structured dialogue in September 2020.  CD, ¶¶ 19, 33-34; Dkt. No. 128-1 at 1-2.  The City's virtual pilot of its small group dialogue program was successful and proved that the dialogues required by the Consent Decree could practically and effectively be conducted in a virtual setting.  The pilot dialogue included participation from various stakeholders in the community, including apartment building managers and owners, residents, police officers,

and members of the NPSC.  The City surveyed participants in the pilot dialogue session and inquired about their experiences, including whether they thought the conversation was well-managed and whether they felt comfortable during the conversation.  The City analyzed these survey results—together with feedback and observations offered by CMS personnel, the Monitoring Team, and DOJ—and modified the plan as needed before formally launching the program on Zoom.  Upon launch, the City sought to focus on ensuring the program extended to community members and groups who previously have not had strong or positive relationships with FPD or the City.  Given that the participants of the initial pilot were individuals that already had a baseline level of engagement with the City, the City recognized that outreach to disengaged and/or marginalized community members when rolling out this program is all the more critical.

The first series of dialogues ran in May and June 2021 and the second series was held in October and November 2021.  The dialogues were held with community members that signed up on the City's website or reached out to Ms. Barton directly.  During the first series, the conversations initially did not address issues of police accountability, transparency, and overall engagement, although there were many shared comments and concerns regarding quality of life issues within the City of Ferguson that served as a coalescing mechanism for the entire group. During the second series, the Monitoring Team observed that FPD and CMS had found ways to focus the conversations on FPD-related matters for discussion.  In both series, there were more participating officers than community participants; however, that did not appear to hinder community members from expressing their opinions regarding transparency, accountability, safety, and community engagement, among other critical topics.

CMS provided scribes during each of the sessions to ensure that comments from the community were memorialized.  Some highlights include individuals expressing pride in Ferguson's diverse community, "good" neighbors, historic buildings, strong neighborhood

associations, community events at the Ferguson Community Center, and FPD's genuine desire to protect and serve.  When discussing areas of concern, participants discussed frequent gun shots/shootings, teen safety, understaffing at FPD, the challenges for officers of enduring public criticism and officer burnout, increased traffic, homelessness and substance addiction, lack of responsiveness or action to citizen complaints/concerns, lack of adequate streetlights, security cameras, and the City's budget, among other things.  Participants also identified ways to improve trust between the public and FPD, including through enhanced communication, community policing and foot patrol, FPD's use of social media, officers' use of body cameras, ongoing transparency, and humanizing officers and community members.  Other topics of discussion included how the Ferguson community, together with the City and FPD, could deter crime and what types of programs, interactions, and strategies should be implemented within the community. At the conclusion of each series, this information was presented to the series participants and provided to FPD for integration into FPD policies and decision-making.

These dialogues were productive first steps in implementing a program that allows for regular community engagement by FPD.  They successfully create a neutral space for the exchange of information regarding the role of police officers in the community and how officers, both individually and collectively, can continue to address the topics of most concern to the community.  Because these dialogues have been conducted remotely thus far, officers were able to log in from their vehicles, sometimes using multiple devices to connect.  This shows a level of commitment to the dialogues and to community engagement that is a strong foundation upon which FPD should continue to build.  Of course, there is still more work to be done to create a regular cadence for these dialogues and to engage members of the community who are most disconnected from the City and from FPD in particular.  In the meantime, the City should continue

its plan to use the remainder of Year Six to integrate the themes and lessons learned from the dialogues into the Community Policing and Engagement Plan.

### 2. Community Survey

In partnership with the National Police Foundation ("NPF"), the Monitoring Team launched its second community survey at the close of Year Five (attached as **Appendix A**). As a reminder, the Monitor's first survey was conducted from April through August 2019 (the "Baseline Survey"). The second community survey ran from January through June 2021 (the "Second Survey").

Consistent with its initial methodology, the Second Survey was available online and via hardcopy. Community members were also offered the opportunity to call and request that a copy of the survey be mailed directly to them. In order to maintain consistency and ensure that results could be measured against the 2019-2020 baseline responses, the Monitoring Team launched the same survey developed and administered by the NPF. The Monitoring Team advertised the survey via email, on social media, and through the radio—as well as through thousands of postcards that were mailed directly to Ferguson residents—but found that social media "pushes" resulted in the most community interactions. Although postcards containing a QR code and phone number to request a hardcopy survey were mailed to approximately 4,000 residents with oversampling of residents from Ward 3—the neighborhood from which the fewest responses were received during the last survey—they resulted in only a limited number of total survey responses.

In addition, Dr. Leigh Anderson, the Monitoring Team's Community Engagement subject matter expert, designed an outreach plan that included field distribution of postcards as well as community education opportunities related to the survey. Her efforts included visiting local businesses, working in conjunction with apartment complexes, neighborhood associations, and

faith leaders, and collaborating with the Ferguson Library and Recreation Center to ensure information about the survey was visible and accessible to the public.

The results of the Second Survey did show some slight improvements in that respondents of the Second Survey were more diverse in terms of residency, race, education, and income levels.  App. A at 6-8.  Additionally, the number of total survey respondents between the Baseline and Second Surveys increased from 125 to 451.  There was particular increase in respondents from Ward 1 and Ward 3 (increasing 8% and 4% respectively) and a decrease in the overall percentage of respondents who identified as non-Ferguson residents.  The 55-64 years old age group remains the largest contributor to both surveys (32.77%  compared to 38.96% in the Baseline Survey).  A higher percentage of overall survey participants identified as Black or African American (22.07% compared to 12.5% in the Baseline Survey) and as residents of Ward 3 (18.37% compared to 14.29% in the Baseline Survey), while fewer participants identified as white (69.9% compared to 76.25% in the Baseline Survey).  There was also a decrease in the percentage of respondents reporting an annual household income of more than $100,000 (24.03% compared to 35.53% in the Baseline Survey).  While this is good progress, and reflects the Monitoring Team's enhanced efforts to more directly engage members of the community most affected by implementation of the Consent Decree, there remains much work to be done with respect to future survey engagement as the majority of respondents identified as white and respondents generally did not representatively map to Ferguson's demographics.

FPD finalized policies and conducted roll call trainings in the area of  voluntary contacts, stops, searches, citations, and arrests between the Baseline and Second Surveys.  With respect to specific FPD interactions, 0% of respondents stated that they were given a ticket or a fine during their interaction with FPD.  *Id.* at 12.  Notably, this coincided with a 15% increase in the number of respondents who were given  a "warning."  There was, however, a 10% decrease in the

percentage of respondents that reported an interaction with FPD in the past year, which may be related to fewer in-person interactions as a result of the COVID-19 pandemic. *Id.* at 9. When the community reported needing the police, 83% said FPD arrived somewhat or very quickly (compared to 63% in the Baseline Survey). *Id.* at 13. Additionally, about 90% of respondents were either satisfied or very satisfied with the way they were treated by the officer with whom they interacted. *Id.* at 14.

The majority of respondents remain likely or very likely to work with FPD to identify a person who has committed a crime or places where crimes have taken place, and to attend a meeting of residents in their neighborhood to discuss crime prevention. *Id.* at 4. That being said, approximately 1/3 of respondents indicated a lack of confidence in FPD. *Id.* at 3. This is true even though the majority of respondents agreed that they "trust the FPD to make decisions that are good for everyone in city," would feel comfortable calling FPD if they needed help, and believe that the agency would take complaints against officers seriously. *Id.* With respect to the "lack of confidence," more than 100 respondents indicated that FPD is doing a poor or very poor job of fighting crime, dealing with problems that "concern your neighborhood," and being visible on the streets. *Id.* The top three worries that constituents expressed include: (1) people using or selling guns; (2) people using or selling drugs; and (3) having their car broken into or stolen. *Id.* In the Baseline Survey, respondents identified "being hassled by youths or others drinking, loitering, or panhandling" as their second highest worry, but this has now dropped to the fourth area of concern.

The open-ended responses provide further insight into the survey respondents' views. Specifically, respondents expressed concerns over understaffing, lack of funding, and overall lack of FPD resources which interfere with FPD's ability to do their jobs. Some respondents expressed a belief that the Consent Decree limits FPD's ability to do its job effectively. 33% of

the written comments expressed dissatisfaction with a lack of enforcement of laws, particularly with respect to traffic violations.  These themes are consistent with written responses provided in the Baseline Survey as well.

Overall, respondents have agreed from year to year that when they have encountered an FPD officer face to face, that officer considered their views, seemed trustworthy, tried to be helpful, and took the matter seriously.  There remains much work to be done, however, to raise the community's overall confidence in FPD.  Rebuilding this trust is not an easy task, but will be enabled by implementation of FPD's revised policies, particularly in the area of community policing and engagement.  The Monitoring Team will continue to measure progress as reflected in community surveys over time.

B.    **Use Of Force**

During Year Five, the Monitoring Team provided an audit notice to the City informing it of its plan to commence an audit assessing compliance with the Consent Decree's use of force reporting and investigation provisions, including Consent Decree paragraphs 171-184, 186-188. The audit consisted of two phases.  Phase One assessed the timeliness, thoroughness, and accuracy of FPD's use-of-force reports and the quality of its investigations as required in the Consent Decree and FPD policy, and Phase Two assessed FPD's compliance with Consent Decree ¶173, which requires "all officers using force above unresisted handcuffing" to document the use of force in writing.  The Monitoring Team has completed Phase One of this audit and expects to conclude Phase Two by the close of Year Six.  A summary of the Monitoring Team's audit and findings is attached hereto as **Appendix B**.

The City will work with Warren County in Ohio during the spring and summer of 2022 to develop a comprehensive in-service training module for FPD's use of force policies.  FPD will

16

continue to hold weapons-specific trainings in-house (firearms, K9, Taser trainings, etc.) while working to develop an in-service umbrella training for all other of use of force policies.

To further support implementation and auditing in this area, the Monitoring Team has engaged Darryl Owens, who will serve as a subject matter expert in the area of use of force.  Mr. Owens is a Boston Police Officer and Use of Force and Defensive Tactics Lead Instructor at the Boston Police Academy where he trains recruit and veteran officers.  He is also a curriculum writer and instructor for the Empower Communications Group, working on de-escalation and crisis intervention in particular.  Mr. Owens previously was a Minister with the Boston Church of Christ and a Chaplain for the Boston Police Department.  In addition to welcoming Mr. Owens, the Monitoring Team extends our gratitude to subject matter expert Bob Stewart, who will be transitioning off the team after four years of providing technical support in this area.

### C.       Bias-Free Police & Court Practices

During Year Five, the City launched a questionnaire on the topic of bias-free policing that was distributed to high school students in the Ferguson Florissant School District.  This questionnaire served as a replacement to the Teen Summit that was originally scheduled for March 2020, but which was cancelled due to the pandemic.  The survey sought data regarding youth experiences with FPD officers and inquired about how youth-FPD relationships and interactions could be improved.  The survey had 142 respondents.  Although a number of the youth did not report having been the victims of biased policing, they responded overwhelmingly that a maximization of the relationship between youth and FPD depended on increased exposure between the two groups, including more FPD school visits, mentoring, and attendance at community events.  During Year Six, and specifically during the fall of 2021, the Monitoring Team provided technical assistance to FPD by analyzing data that was collected from the Bias-Free Policing Youth Survey.  From the Monitoring Team's perspective, the data demonstrates that

17

Ferguson's youth yearn for increased opportunities to build relationships and trust with FPD.  The City should seize this opportunity by continuing to work with schools and other youth programs and partners to foster these relationships.  The Monitor praises ongoing efforts by  FPD in this area, including its ongoing externship program whereby it hosts youth from local schools.

The City has completed roll call training with respect to its bias-free policing policies and has been working to finalize its in-service training program in this area.  As previously reported, in February 2021, trainers from the Suffolk County Police Department (New York) delivered a training at FPD on Tactical Policing with Impartial Perceptions.  The training was very well received by FPD staff—it was substantively robust, emphasized best practices in this area, offered an opportunity for team-building, and enhanced camaraderie within the department.  Additionally, representatives from community groups were invited to attend part of the training, and were given an opportunity to provide feedback on the training to FPD.  Since then, FPD has been working to modify the training to meet the needs of FPD and the requirements of the Consent Decree.  FPD presented the revised training to youth who were externing in the department and incorporated feedback from them as it finalized its revisions.  The City completed these revisions in December 2021 and provided the finalized training module to the DOJ and the Monitoring Team, specifically, Professor Kimberly Norwood, for review.  Once this training is approved, FPD will invite community members to see the revised training and will launch the training by the close of Year Six.

### D.    Municipal Court Reform

The Monitoring Team conducted a remote audit of the Ferguson Municipal Court during the fall of 2021.  This included members of the Monitoring Team observing virtual court (held via WebEx) as well as a review and analysis of court files.  Because of staffing changes at FMC which occurred over the summer and into the fall of 2021, the Monitoring Team is still working

with personnel at FMC to obtain all paperwork necessary for the Monitor's audit.  Accordingly, the Monitor will produce a supplemental report detailing the status of FMC reform and the Fall 2021 Audit following the completion of the audit.

### E.  Voluntary Contacts, Stops, Searches, Citations, and Arrests; Body-Worn and In-Car Cameras; and Accountability

The City finalized primary policy development and roll call trainings in these areas during Year Five, but is still working on the general order pertaining to Strip and Cavity Searches.  During the remainder of Year Six, FPD should prioritize development a Traffic Stops General Order and on in-service training modules for its body-worn and in-car camera policies as well as for its voluntary contacts, stop, search, citation, and arrest policies.

### F.  First Amendment Protected Activity

During Year Five, the City worked to incorporate public comment into its First Amendment Protected Activity policies.  FPD's General Order on the Right to Observe and Record Police Activity was approved in October 2021.  Since that time, FPD has drafted and submitted roll call training for this area to the DOJ and Monitoring Team for review.  The City should finalize and complete this training by the close of Year Six, after which it should prioritize development of its in-service training module.

### G.  Recruitment

Recruitment remains a critical need within FPD.  The Monitor urged FPD to finalize and implement its Recruitment Plan by the close of Year Five, but this remains an area of concern. The Monitor was pleased that during Year Six the City increased the salaries of Lieutenants and Captains and promoted two officers, including newly-minted Captain Harry Dilworth, who has been instrumental in the develop of roll call and in service training modules.  FPD personnel have also been working diligently to hire staff members as quickly as possible.  Nevertheless, as the

Monitor stated in the opening of this report, recruitment, retention, and overall staffing levels are the foundation upon which the Consent Decree is built.  Until FPD is able to achieve sustainable staffing levels, implementation of and full compliance with the Consent Decree will remain a monumental and sluggish undertaking.

### H. Data Collection

The City continues to work with Benchmark Analytics ("Benchmark") to assist with implementing the City's data plan.  During Year Six, the City launched its use of force reporting system within the Benchmark data system.  Although there have been some glitches with use of force reporting forms, Benchmark and FPD are currently working together to resolve issues as they arise.  During the remainder of Year Six, FPD will work with Benchmark to develop and launch FPD's accountability data system.

### I. Officer Assistance, Support, and Wellness Training

During Year Six, FPD, and specifically, Ms. Barton, worked with Show Me Hope to offer services and resources for community and officer wellness that can supplement benefits already offered by the City's Employee Assistance Program ("EAP").  In August 2021, Show Me Hope attended a roll call training at FPD to provide information to staff.  Show Me Hope developed a QR code through which FPD officers can sign up for counseling for themselves or their family members.  These services are being offered at no cost to the officers or their families.

In addition, the City is working with Baltimore Police Department to develop a training in this area that meets the requirements of the Consent Decree.  The Monitor praises the City's work in this area and encourages it to focus on the development of this training throughout the remainder of Year Six.

## III.      CONCLUSION

The Monitoring Team once again acknowledges the efforts put forth by FPD to achieve compliance with the Consent Decree, and appreciates in particular the work that Chief McCall and Ms. Barton have achieved despite the many challenges they have faced over the last two years.  The City has successfully moved into the implementation stage and must now focus on developing and launching in-service trainings on an efficient and timely basis.  This will of course become much more practical if and when FPD reaches sustainable staffing levels. Moreover, to avoid further delays with respect to training, the City should prioritize hiring a Training Director.  Once the City successfully moves through implementation, the Monitoring Team will shift its focus toward auditing and assessing compliance with the Consent Decree.


Date: February 15, 2022                                      Respectfully submitted,

                                                             */s/ Natashia Tidwell*
                                                             Natashia Tidwell
                                                             SAUL EWING ARNSTEIN & LEHR LLP
                                                             131 Dartmouth Street
                                                             Suite 501
                                                             Boston, MA 02116
                                                             *natashia.tidwell@saul.com*


## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing was filed electronically on February 15, 2022 with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, and was served by ECF notice by operation of the Court's electronic filing system.

                                                    */s/ Natashia Tidwell*