**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>    **Plaintiff,** )<br>)<br>    **v.** )<br>)<br>**THE CITY OF FERGUSON,** )<br>    **Defendant.** )<br>)<br>) | **Case No. 4:16-cv-180**<br><br>**Hon. Catherine D. Perry** |

## INDEPENDENT MONITOR'S FALL 2023 STATUS REPORT

### I.    INTRODUCTION

Pursuant to Paragraph 438 of the Consent Decree entered into between the United States Department of Justice ("DOJ") and the City of Ferguson, Missouri (the "City") (together, the "Parties"), the Independent Monitor (the "Monitor" or the "Monitoring Team") submits this Fall 2023 Status Report detailing the City's progress through September 30, 2023.

The City, Ferguson Police Department ("FPD"), and Ferguson Municipal Court ("FMC") have continued to experience significant, disruptive transitions over the last two years. Indeed, the City's progress toward compliance with the Consent Decree largely stalled during 2022 and into 2023, in large part due to turnover among the positions of Chief of FPD, City Manager, Consent Decree Coordinator, and Court Administrator. These transitions, which occurred during overlapping time frames, undermined continued forward momentum. Turnover in each of these critical roles necessarily resulted in delay, loss of institutional knowledge, and the need to create new internal management and accounting of the City's Consent Decree-related work. As a result, progress has remained slow.

In February 2023, Frank McCall resigned as Chief of FPD after holding the position for approximately one and a half years. The Monitoring Team welcomed the appointment of Chief

Troy Doyle in March 2023. In the approximately six months since Chief Doyle was appointed, he has worked collaboratively and cooperatively with both the Monitoring Team and DOJ, demonstrating commitment toward moving FPD into compliance with the Consent Decree. Since January 2023, the Monitoring Team has also been pleased to welcome Fire Chief John Hampton as Interim City Manager, Chris Crabel as Consent Decree Coordinator, and Michelle Richmond as Court Administrator. This team has proven to be organized, capable, and motivated to reach compliance with the Consent Decree, and since the summer, has substantially picked up the pace of the City's compliance efforts.

Among these transitions, the City has continued to make some progress with respect to drafting and revising specific policies and trainings that have been submitted to the DOJ and the Monitoring Team for review. However, the City has stagnated with respect to finalization of the comprehensive plans that must serve as the foundation of Consent Decree implementation, including: (1) the Training Plan; (2) the Community Policing and Engagement Plan, Neighborhood Policing, and Crime Prevention Plans; and (3) the Staffing Study/Recruitment Plan. The Monitoring Team has repeatedly emphasized the critical importance of the development and implementation of these plans for a number of years, including in its previous status reports. The Monitoring Team notes that these plans are interconnected in that each helps lay the foundation for the other and is required for Consent Decree implementation.

Although the City's new leaders have improved the competitiveness of FPD salaries and the pace of hiring, it remains difficult to hire and replace personnel at a rate that would result in a full complement of FPD.  The Monitor expressed concern over the last two years when it reported that FPD had capacity and need for approximately 50 sworn staff, but had been consistently carrying a staff of 30 or fewer.  This extreme shortfall is a safety concern for both FPD and the community. The Monitoring Team appreciates the efforts that Chief Hampton, Chief Doyle, and

Mr. Crabel have put into addressing this shortage since they have each assumed their respective positions. Adequate staffing is critical not only to implementing the Consent Decree, but also to improving officer safety, well-being, workload, and overall ability to effectively engage with and serve the community. The Monitor once again encourages the City Council, City officials, and even community members to support this need to every extent possible.

### A.    The Monitoring Process

As with prior status reports, this report details the City's progress with respect to the three phases of Consent Decree Implementation—policy development, training, and compliance assessment by the Monitoring Team. In most subject areas, there are two training components: (1) roll call training, a brief overview of a newly-finalized policy to ensure familiarity; and (2) in-service training, a more robust and substantive training that often encompasses an entire subject area rather than a specific policy. To the extent the City has not yet completed policy development or training (roll call or in-service) in a stated area, that area is not yet ripe to be assessed for compliance by the Monitoring Team. In areas comprised of multiple discrete policies, such as Force, the Monitoring Team has initiated compliance auditing even though there are still policy areas in development. The below chart details where each subject area stands with respect to overall implementation:

| Subject Area | Policy Development | Roll Call Training | In-Service Training | MT Assessment |
|---|---|---|---|---|
| Force | ✓ | ✓ | In progress | In progress |
| First Amended Protected Activity | ✓ | In progress | X | Not yet applicable |
| Bias-Free Policing | ✓ | ✓ | In progress | Not yet applicable |
| Bias-Free Court Practices | In progress | X | X | Not yet applicable |

| Voluntary Contacts, Stops, Searches, Citations, and Arrests | In progress | In progress | X | Not yet applicable |
|---|---|---|---|---|
| Body-Worn and In-Car Cameras | ✓ | ✓ | ✓ | Ready for auditing |
| Accountability | ✓ | ✓ | N/A | Ready for auditing |
| Supervisors | X | X | X | Not yet applicable |
| Crisis Intervention | X | X | X | Not yet applicable |
| Community Policing and Engagement | In progress | X | X | Not yet applicable |
| Municipal Court Reform | ✓ | ✓ | N/A | In progress |

## 1.    Policy Revision and Review

As is evident above, the City has largely completed the policy revision and review phase with respect to the Consent Decree's largest subject areas. The Parties continue to develop policies by following the below protocol:

i.    *Kick-off/Announcement of Policy Area:* FPD notifies DOJ and the Monitor of its intent to begin drafting or revising policies in an identified subject area;

ii.    *Technical Assistance:* The appropriate Subject Matter Expert on the Monitoring Team provides FPD and DOJ with technical assistance in the form of model policies and/or initial guidance as to best practices in the identified subject area;

iii.    *Gap Analysis:* FPD and DOJ conduct an assessment or gap analysis of FPD's current state of affairs (i.e., ascertain how FPD's existing policies, practices, and systems differ from the Consent Decree's requirements and best practices);

iv.    *Solicitation of Community Input:* Several provisions of the Consent Decree require community involvement in the implementation of specific policies, including those designed to improve police/community relations. The Parties are committed to soliciting community feedback on other policies as well, even where not explicitly required by the Consent Decree.  While the Parties continually evaluate the best means of involving community stakeholders in the policy development process, the Parties have found that policy forums are an effective means of inviting and obtaining community input.

v.    *Policy Revision:* FPD and DOJ revise policies, practices, and systems in the target subject area to the extent required under the gap analysis;

vi.   ***Return to Monitor/SME:*** Upon completion of a draft policy, the Parties submit the policy to the Monitor and/or appropriate Subject Matter Expert for review.  The Subject Matter Expert will review the policy and either provide approval or arrange for a conference call to discuss additional revisions; and

vii.   ***30-Day Comment Period:*** Once the Monitoring Team has approved a draft policy, the City will email the policy to FPD officers from varying ranks and units.  Officers will have a meaningful opportunity to review and comment on the new or revised policy or procedure during a 30-day period.  At the same time, FPD will post the policy to the FPD website for review by the community.  Community members will also have 30 days to provide comment on the draft policy or procedure.  At the close of the 30-day period, the Parties will determine whether any modifications to the draft policy are appropriate.  If modifications are made, the revised policy shall be submitted to the Monitor for review and final approval.  After the Monitor has approved the final policy, officers will be provided roll call training and the finalized policy will be implemented and published.

viii.   ***Public Access:*** Once the policy has been finalized, FPD will post it to its website along with the "status" of the policy (e.g., finalized, awaiting training, etc.).  If and when a policy is later updated, its status will read: "new updated policy," and the changed provisions in the policy will be highlighted so that the public may easily review the amended provisions. *See   https://www.arcgis.com/apps/MapSeries/index.html?appid=7aed307d6ad94f22a6c fb046644f2597.*

### 2.     Training and Implementation

Both roll call and in-service training are required in order to implement finalized policies. In general, where the City has completed policy development, it has moved those subject areas through roll call trainings. However, FPD remains slow to develop and implement a regular cadence of in-service training for many subject areas. This is mainly due to the fact that the development of in-service training is a resource-intense exercise that must be completed for each subject area and because FPD has yet to develop a comprehensive Training Plan.

The City has been working since July 2020 to incorporate feedback from the Monitoring Team and DOJ into a revised Training Plan. There has been some progress since that time, including efforts by the Training Committee, who has worked with FPD to revise the plan. In addition, a DOJ subject matter expert provided guidance on how police departments typically compose and use training plans. In May 2021, the City was given a template for an annual training plan that included a description of the overall purpose of a training plan; a timeline showing how

police departments generally plan for, design, present, and evaluate training; and a sample table of contents for a training plan. The Training Committee worked with the former Consent Decree Coordinator in late 2021 to draft a Training Plan using the revised format, but the City has not yet submitted a revised version of the plan, nor has it committed to producing the plan by a date certain. This remains an essential next step for the City and must be completed in order to reach compliance with the Consent Decree. The City also has not incorporated written feedback provided by DOJ in August 2020 on the Supervisor Training Program. Nor has the City hired a Training Director, who will provide the required expertise for these efforts. The Monitoring Team acknowledges and appreciates the efforts of the Training Committee over the past few years, but notes that absent formal and consistent guidance from the City in the form of a Training Director and/or external training consultants, the talent, skills, and efforts of the Training Committee cannot be fully utilized.

The Monitoring Team is pleased that in the last few months the City has made efforts to prioritize the development of a comprehensive training program by meeting with multiple outside consultants who can provide expertise to the City in building curricula in specific subject areas, as well as in establishing its own mechanism for the consistent delivery of officer training in all areas. The City has also revamped its job posting for a Training Director, acknowledging at the last quarterly status hearing that this position is essential to developing a comprehensive approach to training and to completing these long-outstanding tasks. The Monitoring Team once again emphasizes that the City cannot and will not reach substantial compliance with the Consent Decree until its Training Plan and program is fully developed and operational.

### 3.    Auditing and Assessing Compliance

Once the City completes in-service training, the implemented policy is ready to be audited. As previous reports have indicated, with the exception of FMC policies and the use of force suite

of policies, the majority of policies have not been fully implemented by the City. Accordingly, the Monitoring Team has conducted audits in only these two areas.

## II.    Subject Matter Updates

### A.    Community Policing and Engagement

The City submitted a combined Community Policing and Engagement Plan to DOJ and the Monitoring Team in July 2023. The Monitoring Team commends FPD, the Neighborhood Policing Steering Committee (NPSC), the Civilian Review Board (CRB), and other stakeholders on their work in collaborating on and developing this plan. The Monitoring Team provided specific feedback to the City with respect to the plan on September 18, 2023. As part of that feedback, the Monitoring Team highlighted that the plan sufficiently captures Chief Doyle's vision, the principles and tenets of problem orientated policing, and FPD's goals and objectives. However, additional specificity is required to fully address the Consent Decree requirements in this area, including the articulation of a detailed process through which FPD can realize its community policing and engagement objectives and measure progress. The City should continue to collaborate with groups such as the NPSC, neighborhood associations, affiliates from the various apartment complexes, and other community organizations, but its efforts to do so must be tracked and incorporated into a comprehensive policy and procedure.

A number of policies that are inherently tied to the Community Engagement and Policing Plan remain outstanding, These include the policy for responding to NPSC recommendations, a Crime Prevention Plan, and a Neighborhood Policing Plan. As previously stated by the Monitor, the crime-prevention and neighborhood policing plans are dependent upon FPD reorganization of shift schedules and on FPD's staffing study. Since 2021, the City has planned to use feedback from small group dialogues and from a Collaborative Reform Initiative – Technical Assistance Center (CRI-TAC) site visit (who sent three experts with the goal of helping FPD develop

enhanced community engagement practices) to revise and finalize these plans. Despite being fundamental to implementation of the Consent Decree, these plans have not yet been finalized, nor has a completion date been set by the City.

### 1.    Community Dialogues & Mediations

The City has made significant progress implementing community dialogues in partnership with Community Mediation Services of St. Louis ("CMS"). These dialogues are critical to implementing an engagement program that allows for regular community interactions. Dialogues create a neutral space for the exchange of information regarding the role of police officers in the community and how officers, both individually and collectively, can continue to address the topics of most concern to the community. The Monitoring Team commends the City on this accomplishment as these dialogues began in 2021, and continued with a second series of dialogues held in April 2023. The Consent Decree requires that all officers attend at least one dialogue series. Accordingly, FPD must schedule at least one more series to give all officers an opportunity to participate. Approximately two-thirds of FPD sworn personnel have participated to date.

The City should continue to seek—through a structured Community Engagement and Policing Plan—to encompass other methods for building community engagement between officers and community members, and should, where appropriate, provide for programs that promote and foster positive police-youth interactions.

### B.    Use Of Force

The City has completed development of all force policies, with the exception of the Force Review Board (FRB) policy. The City also developed and implemented an electronic use-of-force database in which FPD officers document all reportable uses of force and supervisors record their investigations into such force. CD ¶ 172. With assistance from DOJ, FPD arranged for trainers from the Police Executive Research Forum to travel to Ferguson in February of 2023 to deliver

its Integrating Communications, Assessments, and Tactics (ICAT) training in two, two-day sessions. This training covered many of the Consent Decree-required topics for annual in-service training on use of force.

Additionally, the Monitoring Team completed Phase Two of its audit assessing compliance with the Consent Decree's use of force reporting and investigation provisions, including Consent Decree paragraphs 171-184, 186-188. As a reminder, the audit consisted of two phases: (1) Phase One assessed the timeliness, thoroughness, and accuracy of FPD's use-of-force reports and the quality of its investigations as required in the Consent Decree and FPD policy; and (2) Phase Two assessed FPD's compliance with Consent Decree ¶173, which requires "all officers using force above unresisted handcuffing" to document the use of force in writing. A summary of the Monitoring Team's Phase Two audit and findings is attached hereto as **Appendix A**.

### C.    Bias-Free Police & Court Practices

The City has been working to finalize its in-service training program in this area since 2021, and specifically, to incorporate feedback provided by the DOJ and the Monitoring Team. Although there have been numerous delays, the City recently committed to finalization of training in this area by September 2023. Once finalized, the City will be well positioned to implement bias-free policing policies within FPD.

Under the Consent Decree, the City must also provide timely and meaningful access to police and court services to all, including individuals who have a limited ability to speak, read, write, or understand English (LEP individuals). An initial draft of Municipal Court Policy FMC 7.0 (LEP) was created in 2020. Minor revisions to FMC 7.0 were made on March 9, 2023 for consistency with FPD's draft LEP policy. The Municipal Court reviewed the draft policy for DOJ approval and submission to the Monitoring Team. The City met its target date of providing an

updated draft to DOJ on September 15, 2023. A mutually agreeable policy will need to be submitted to the Monitor for final approval.

### D.    Municipal Court Reform

#### 1.    Policy Development

FMC Policy 3.0 (Payment of Fines & Fees) is finalized and was signed by the Municipal Court Judge on August 25, 2021. FMC Policy 1.0 (Court Proceedings and Trials) is also finalized and was signed by the Municipal Court Judge on May 5, 2023. The City met its target date of providing an updated draft of FMC's policy for the review and audit of charging documents (i.e., citation, summonses, arrest notifications) on September 15, 2023. A mutually agreeable policy will need to be submitted to the Monitoring Team for final approval. Following the finalization of these policies, the City must develop a public education campaign to increase transparency, as required by ¶¶ 329-330.

#### 2.    The Comprehensive Amnesty Program

Through the Comprehensive Amnesty Program ("CAP"), the Parties sought to address, reduce, and remediate the effects of Ferguson Municipal Court practices that imposed unnecessary barriers to prompt disposition of a significantly large number of cases. As further detailed below, the Monitoring Team is pleased to report that the City has fully implemented the CAP and, as such, has achieved substantial compliance with Consent Decree Paragraphs 326 and 327.

Pursuant to ¶326(a), the City agreed to decline prosecution in all open cases, not yet adjudicated,[1] that were initiated prior to January 1, 2014, unless the City Prosecutor found good cause to continue the prosecution. In 2017, to realize the program's goals, the Parties worked collaboratively to develop and agree upon good cause criteria to evaluate these cases. The criteria

---

[1] A case is "not yet adjudicated" if the Defendant failed to respond to the citation or charging document by contesting the charge, paying the associated fine, or appearing in court to enter a plea of guilty or not guilty. Those defendants whose pre-2014 cases were still open and who were still paying associated fines and fees at the time of the Consent Decree's implementation, were permitted to seek relief under ¶326 (d).

were finalized in early 2018 as reported in the Monitor's Spring 2018 Semiannual Report. The Parties also agreed that the City Prosecutor would document which good cause criteria was used to justify the decision to keep cases open for continued prosecution.

By the fall of 2018, the City identified roughly **7,595** cases that were eligible for review and declined prosecution in all but **1,744** of those cases.  As initially captured in the Monitor's Spring 2019 Status Report, the following table summarizes the good cause criteria under which these cases were kept open:

| GCC | Criteria Description | Number |
|:---:|---|:---:|
| 1 | Involving assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 316 |
| 2 | Involving an identified victim who is available to assist in further prosecution. | 563 |
| 3 | Involving the following charges:<br><br>Driving While License Suspended or Driving While License Revoked, and<br><br>    (a) the original Driving While License Suspended charge was issued because of something other than failing to appear or pay pursuant to RSMo 302.341.1; and<br><br>    (b) the defendant is unable to show that either his license was reinstated or that he/she is no longer driving. | 857 |
| 4 | Involving a defendant convicted of an additional offense since 2014 that involves assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 0 |
| 5 | Where the City Prosecutor reasonably believes that, in the interests of justice and public safety, the case should proceed. | 8 |
| **Total number of pre-2014 cases that remained open for prosecution:** | | **1,744** |

As part of its 2019 audit, which included a review of the municipal court's treatment of cases tagged for review, the Monitoring Team expressed concern that the records associated with the GCC #2 cases did not appear to reflect any effort by the City Prosecutor to contact the

11

identified victim and assess their availability and willingness to participate in a continued prosecution. While a number of these cases involved assaultive behavior such as domestic violence, the vast majority were for shoplifting or similar offenses with large retail establishments identified as the alleged victim. In response, the Parties agreed to work collaboratively to develop a process by which the City Prosecutor could better access the viability of these open cases.

Later that year, the City launched a mass-mailing campaign in which identified victims were asked to indicate whether they preferred to continue their case. Where the victim did not respond or if the letter was returned as undeliverable, the City Prosecutor dismissed the charges. At the time, the City reported that 428 of the 563 letter recipients did not respond and that, of the 21 victims who did, only eight indicated a desire to continue their case. As a result of this effort, the City dismissed more than 500 of the remaining GCC #2 cases.

Since that time, the City has continued to make significant, yet sporadic, strides in reducing the number of amnesty-eligible cases. At the end of 2019, there were roughly 970 open cases, across 725 unique defendants. By 2021, the number of open cases had dropped to 527, spread among 377 unique defendants. At the end of 2022, the City reported that the number of cases had been reduced to 161 as reflected in the table below.

| GCC | Criteria Description | Number |
|---|---|---|
| 1 | Involving assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 145 |
| 2 | Involving an identified victim who is available to assist in further prosecution. | 8 |
| 3 | Involving the following charges:<br><br>Driving While License Suspended or Driving While License Revoked, and<br><br>(a) The original Driving While License Suspended charge was issued because of something other than failing to appear or pay pursuant to RSMo 302.241.1; and<br><br>(b) The defendant is unable to show that either his license was reinstated or that he/she is no longer driving. | 3 |

| 4 | Involving a defendant convicted of an additional offense since 2014 that involves assaultive behavior or reckless endangerment to others, including Driving While Intoxicated. | 0 |
| 5 | Where the City Prosecutor reasonably believes that, in the interests of justice and public safety, the case should proceed. | 5 |
| **Total number of pre-2014 cases that remained open for prosecution:** | | **161** |

In May 2023, FMC confirmed that, in collaboration with the City Prosecutor, all of these open cases would be closed pursuant to the CAP. The Monitor's audit of the City's data began in the summer and included an on-site visit and inspection of the court's recordkeeping system with the assistance of the Court Administrator, Ms. Richmond.  The Monitor's review revealed that all but two cases had been dismissed, both of which involved assault charges initiated in 2011. With Ms. Richmond's assistance, the Monitor was able to confirm that the victims in both cases were contacted and that neither indicated a willingness or desire to continue participation in the matter. As such, both cases were closed thereby completing implementation of Consent Decree 326(a).[2]

The Monitor recognizes the City's commendable work with respect to the CAP's implementation. However, the Monitor also notes that the work took more than six years to complete. During that time scores of people either pleaded guilty or were arrested for warrants associated with amnesty-eligible cases.  Nearly two-thirds of the amnesty-eligible cases resolved by guilty plea were for driving-related offenses that were initially kept open under GCC #3. Roughly 20% of the remaining guilty pleas in these pre-2014 cases were related to offenses with an identified victim. However, it is unclear whether the victims in those cases were contacted to determine their willingness to support further prosecution of the case.

Giving further perspective to the data over the course of the program, the oldest case, initiated on January 3, 2011, was ultimately dismissed by the City Prosecutor on March 30, 2021,

---

[2] The Monitoring Team also reviewed a random sample of cases closed pursuant to GCC #3 to confirm that the municipal court properly notified the Missouri Department of Revenue to release any hold on the defendant's driver's license pursuant to MO statute, Section 544.045.

more than ten years later. The case with the longest resolution time was open for more than twelve years, from January 13, 2011 to March 10, 2023, when it was finally dismissed. The most recent case, opened December 31, 2013, was dismissed eight years later, on March 23, 2021.  The quickest resolution for a pre-2014 case, 4.6 years, involved an offense originally charged on December 6, 2013.

The CAP's remaining components, described in ¶326 (b)-(d), have also been fully implemented. Pursuant to ¶326(b), the City has eliminated all pending charges, fines, and fees related to Failure to Appear ("FTA") violations without requiring defendants to make bond payments, appear in court, or take any other action. During each biannual audit since 2017, the Monitoring Team reviewed reports from the municipal court file system to confirm that there were no active or pending FTA cases.  Pursuant to ¶ 326(c), the City repealed all or parts of Ferguson Municipal Code § 13-60, § 13-63, § 13-70(2) and (3), and § 44-50, and eliminated all pending fines and fees imposed pursuant to the applicable provisions of these sections. The Monitoring Team's audits confirmed that all cases related to these obsolete provisions were cleared out of the municipal court's electronic filing system and that there were no active or pending cases associated with these provisions.

Finally, with respect to ¶326(d), where a defendant made total payments exceeding the amount of the initial fines and fees imposed for a municipal ordinance violation, including payments for associated FTA violations, the City recommended that any additional fines be stayed and the case closed without requiring defendants to make a bond payment, to appear in court, or to take any further action.  Where payments did not total or exceed the original fine amount, the City recommended lowering the amount owed to the amount of the initial fines and fees imposed, minus any payment amount already made by the defendant.  The Municipal Court Judge entered orders reducing the amount due for each defendant as recommended by the City, and FMC staff

updated the court's electronic file system to account for the fine reduction in each case.  As reported in the Winter 2021 Status Report, the Monitor estimates that the City has waived more than $300,000 in FTA fees across 2,071 charges since 2016. The Monitor is still working with the FMC staff to confirm the total amount of fines and fees waived as part of the CAP and will provide that information in a subsequent report.

### E.    Voluntary Contacts, Stops, Searches, Citations, and Arrests

The City has finalized primary policy development in these areas, including by substantially revising its policy governing Strip and Cavity Searches, which it recently disseminated for community and officer feedback. It has since incorporated that feedback, and obtained Monitoring Team approval. FPD also obtained Monitor approval for a new Correctable Violations policy, CD ¶ 94, on August 29, 2023. The new policy incorporated feedback that FPD received from the CRB. The next step will be for FPD to develop and deliver roll call trainings on these policies. The Parties also worked to draft a policy to audit FPD's provision of citations pursuant to CD ¶ 334 (and in furtherance of CD ¶ 105). That audit policy was approved by the Monitor in May 2023 and is still awaiting finalization.

Additionally, the Parties continue to work on revising FPD's policy on "wanteds," CD ¶¶ 96-98, on which DOJ provided feedback in June 2021. With the exception of a form for documenting strip and cavity searches, FPD has not yet revised or finalized its forms (e.g., Field Interview Report) related to stops, searches, and arrests. FPD has not demonstrated that it has implemented appropriate tracking and compliance for all voluntary encounters, investigatory stops and detentions, searches, citations, and arrests, and has not produced updated drafts of its Traffic Stops General Order or developed in-service training modules for its voluntary contacts, stop, search, citation, and arrest policies.

F.    **First Amendment Protected Activity**

FPD has completed policy development in this area, and has delivered roll call training on its revised General Order on the Right to Observe and Record Police Activity, which the Monitor approved in October 2021. The City also posted an updated draft of its General Order on Response to Public Protests/Demonstrations in August 2022 for a second round of public comment (having previously posted an earlier draft in April 2020). FPD is in the process of incorporating public comments, after which it will resubmit the policy to the Monitoring Team for approval. The Parties have identified in-service training on First Amendment Protected Activity as a goal for FPD to develop and implement prior to August 2024.

G.    **Recruitment**

As stated in each of the Monitoring Team's prior reports, recruitment remains a critical need within FPD. The Parties have long since completed a draft Recruitment Plan for attracting and retaining a high-quality and diverse workforce. The City has not yet established that it is in compliance with Paragraph 283(a) of the Consent Decree (requiring the City to offer salaries that will place FPD among the most competitive of similarly sized agencies in St. Louis County), and as a result, cannot yet submit this plan to the Monitoring Team for approval. In 2022, the City completed negotiations with the Collective Bargaining Unit (CBU) on a contract that established salary raises for positions in the CBU, effective beginning in the 2024-2025 fiscal year. And in 2023, the City Council approved a pay ordinance that established salary raises for the remaining FPD positions. The next step is for the City to prepare an analysis establishing that these improved salaries place FPD among the most competitive of similarly sized agencies, using data from the 2023 St. Louis Area Police Chiefs' annual survey.

As stated in the opening of this report, recruitment, retention, and overall staffing levels are the foundation upon which the Consent Decree is built and must be a priority area for the City.

The Monitor notes that the City has made key advances in promoting officers from within its ranks as well as in attracting new supervisors to oversee critical areas like Professional Standards. However, the shortfall between FPD's authorized force of 50 officers and its existing staffing levels will continue to hinder progress.

### H.    Accountability

FPD has continued to work with Benchmark Analytics to develop an electronic centralized tracking system for all complaints of misconduct. CD ¶¶ 377-79. FPD is currently refining the system as it starts to use it as the department's sole repository for complaint-related evidence, approvals and tracking. The recent hire of Dewey Rice to serve as the Lieutenant overseeing Professional Standards further demonstrates the City's commitment to this critical area. The Monitoring Team looks forward to working with Lt. Rice, FPD, and the CRB as it begins compliance auditing in this area during the next reporting period.

### I.    Body-Worn and In-Car Cameras

The City has completed development, and received approval from the Monitoring Team, on the suite of body-worn and in-car camera policies, and the secondary policy for off-duty officers. In 2021, FPD identified body-worn and in-car cameras as a priority for in-service training. The DOJ subject matter expert assisted FPD by preparing an on-line training on this topic. After approval by the Monitoring Team, FPD delivered this training beginning in November of 2022. This area is now ready for auditing by the Monitoring Team.

### J.    FPD's Field Training Officer Program (PTO)

Police Training Officers (PTOs) are highly qualified officers who provide field training to new recruits during their first months serving as police officers. CD ¶¶ 58, 59. In 2021, FPD identified the 40-hour training for new PTOs, required by Paragraph 60 of the Consent Decree, as a high priority area, and requested assistance from DOJ in this area. In response to this

request, a DOJ subject matter expert traveled to Ferguson in March 2022 and spent a week working with City and FPD staff to draft this training. At the end of the week, the team had created lesson plans and PowerPoint presentations for all 14 modules of the 40-hour course, but most of the modules still required some materials, such as instructions for role plays and hand-outs. This project is close to completion, but remains ongoing. The current status is as follows:

- o **Modules 1-6:** A working draft of these modules, reflecting feedback from the Training Committee and the DOJ, is currently awaiting finalization by the City and submission to the Monitoring Team for approval.

- o **Module 7, 11-14:** A working draft of these modules, reflecting feedback from the Training Committee and the DOJ, is currently awaiting finalization by the City and submission to the Monitoring Team for approval.

- o **Modules 8-10:** Under review by the Training Committee.

The Monitoring Team expresses its appreciation for the work of the Training Committee, who is diligently reviewing and providing feedback on each these modules.

## III.    CONCLUSION

The Monitoring Team acknowledges that despite stagnation for much of 2022 and into 2023, the new team at the City and FPD have demonstrated seriousness and commitment to achieving compliance with the Consent Decree. The Monitoring Team looks forward to seeing the City produce a roadmap and target dates for various outstanding projects, including comprehensive plans pertaining to training, staffing, and community policing and crime prevention. We also look forward to the City's filing of its annual report concerning status of Consent Decree implementation, which it has agreed to produce by the end of 2023. Renewed internal management systems, along with consistent reports to the public, are critical to the City taking control of and accountability for reaching substantial compliance.

Date: October 16, 2023                    Respectfully submitted,

                                          */s/ Natashia Tidwell*
                                          Natashia Tidwell
                                          Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
                                          One Financial Center
                                          Boston, MA 02111
                                          *ntidwell@mintz.com*


## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that the foregoing was filed electronically on October 16, 2023 with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, and was served by ECF notice by operation of the Court's electronic filing system.

                                          */s/ Natashia Tidwell*

# Appendix A

## Monitoring Team's
## <u>Use of Force Reporting & Investigation Audit Report</u>

This Audit Report presents the findings of the Independent Monitoring Team's first full audit of the City of Ferguson's (the "City's") and Ferguson Police Department's (FPD) compliance with the Consent Decree requirements relating to Use of Force Reporting & Investigation. The audit was conducted in two phases and consisted of a review of two years of FPD records, reports, and body-worn/in-car camera footage. In Phase One, the results of which are detailed in the Monitor's Winter 2022 Status Report, the Monitoring Team evaluated a targeted sample of Use of Force Investigations using a pre-determined and agreed-upon set of criteria. In this second phase, the Monitoring Team sought to assess whether FPD is consistently documenting when its officers use force as required in Consent Decree Paragraph 173.

## I.    <span style="font-variant:small-caps">Reviewers</span>

The following members of the Independent Monitoring Team participated in this audit:

> Darryl Owens, Boston Police Department (ret.)
> Bob Stewart, Bobcat Training & Consulting
> Natashia Tidwell, Lead Monitor

## II.    <span style="font-variant:small-caps">Introduction</span>

Paragraph 427 of the Consent Decree instructs the Monitoring Team to audit the City's and FPD's compliance with the Consent Decree's requirements. Pursuant to Paragraph 426 of the Consent Decree, in a series of communications, the Monitor notified the City, FPD, and United States Department of Justice ("DOJ") (collectively the "Parties"), that the Monitoring Team would conduct a multi-phased audit of FPD's compliance with certain Consent Decree provisions related to its use of force reporting.[1] Specifically, the Monitoring Team notified the Parties that, beginning in the winter of 2021, it intended to assess whether FPD is in compliance with Consent Decree ¶¶ 171-184, 186-188.

As a general matter, the above-referenced paragraphs and related provisions of the Consent Decree require FPD to, in part:

- Ensure that "all officers using force above unresisted handcuffing…document the use of force in writing before the end of the shift and [] immediately report the use of force to a supervisor. Each use-of-force report shall include "a narrative that explains with specificity the type of force forced; the legitimate police objective necessitating the use of force; details regarding the level of resistance encountered; and all efforts to de-escalate the situation to avoid the use of force and to minimize the level of force used, or reason why such efforts were not attempted." (¶173).

---

[1] Consent Decree Paragraph 426 permits the Parties, upon receipt of notice of the Monitoring Team's intent to conduct an audit or assessment, to submit any comments or concerns no later than 15 days prior to the proposed date of the audit or assessment. The Monitoring Team received comments and conferred with the Parties throughout the conduct of both phases of this audit.

- Ensure that, "[w]ith the exception of the lowest level of reportable force, an FPD supervisor []immediately responds to the scene of every reportable use of force by an FPD officer." (¶180).

- Ensure that supervisors conduct high-quality use-of-force investigations to ensure that "FPD officers use force only as permitted by the law, FPD policy, and [the Consent Decree] and are held accountable when they do not; that officers are positively recognized when they appropriately minimize or avoid use of force; that FPD identifies and corrects training, policy, equipment, tactical, and officer safety concerns raised by use-of-force incidents; and that FPD's response to officer use of force builds community trust and confidence." (¶¶171, 181-184, 186-188).

Recognizing the importance of thorough investigations of reported force as well as accurate reporting of all uses of force, the Monitoring Team intended that the audit be conducted in two phases. Due to on-going COVID-19 public health restrictions, the audit was conducted entirely remotely. The methodology and findings for each phase are detailed below.

## III.   AUDIT PHASE ONE: METHODOLOGY & SUMMARY OF FINDINGS

### A.    *Audit Methodology*

In the audit's initial phase, the Monitoring Team assessed the timeliness, thoroughness, and accuracy of FPD's use-of-force reports and the quality of its investigations as required in the Consent Decree and FPD policy. Pursuant to FPD General Order 4.1.2., *Use of Force: Review*, and ¶183 of the Consent Decree, FPD use-of-force incidents are assigned to one of the following categories:

- Type 1 Force - force that includes lethal force; force resulting in death or serious physical injury; force resulting in hospital admission; canine bites; use of an impact weapon to the head, neck, face, throat, spine, heart, kidneys and groin; certain applications of an Electronic Control Weapon ("ECW"); and any vehicle pursuit.

- Type 2 Force - force that causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to a Type 1 force. Type 2 force includes the use of an ECW; Oleoresin Capsicum ("OC") spray; weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks, leg sweeps, and takedowns); impact weapons (when the use is not to the head, neck, face, throat, spine, heart, kidneys and groin); use of force against a restrained person; and canine apprehension (when no bite is involved).

- Type 3 Force - force that is reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance, including pressure point compliance and joint manipulation techniques, but that is not reasonably expected to cause injury, does not result in an actual injury, and does not

result in a complaint of injury. Type 3 Force also includes the un-holstering in the presence of a person or pointing of a firearm or ECW at a person.

In 2019 and 2020, FPD reported 56 use-of-force incidents in the following categories:[2]

| Category | 2019 | 2020 |
|---|---|---|
| *Type 1 Force* | 0 | 1 |
| *Type 2 Force* | 19 | 12 |
| *Type 3 Force* | 16 | 9 |

Of these, the Monitoring Team analyzed a randomly-selected representative sample of 16 incidents of Type 1 and Type 2 force. As part of this review, the Monitoring Team requested each use-of-force report/investigation along with any accompanying evidence including, but not limited to:

- Body-worn and in-car camera video recordings;
- Any officer/witness statements;
- Audio/video recorded interviews;
- 911/Communications recordings; and
- Photographs.

In consultation with the Parties and to ensure consistency in its review, the Monitoring Team developed a rubric to rate each use-of-force report and resulting investigation in a number of categories.

### B.     *Summary of Phase One Findings*

Using the Use of Force Audit Checklist (Exhibit 1) as a guide for its review, the Monitoring Team rated each of the 16 use-of-force report/investigations tagged for review as Satisfactory or Unsatisfactory based on the following factors:

- <u>Documentation</u> – was the report timely, accurate, and complete and did the investigation include collection and review of relevant supplementary materials such as video footage and witness statements?

- <u>De-Escalation</u> – did the officer(s) provide verbal warning prior to using force or otherwise take meaningful steps to stabilize the incident, calm an agitated person, or take actions to de-escalate (or escalate) the situation?

- <u>Force Response</u> – was the use of force objectively reasonable and proportional to the level of resistance?  Was the force used on a restrained individual or as a retaliatory measure? Did the officer(s) provide immediate necessary medical assistance?

---

[2] Three (3) incidents were reported as involving both Type 2 and Type 3 Force. For purposes of this audit, those incidents were reviewed as Type 2 Force incidents. Consent Decree ¶183(a) requires officers to report Type 3 uses of force but goes on to provide that, absent extenuating circumstances, supervisors are not required to conduct a use-of-force investigation of these incidents.

- <u>Force Reporting</u> – was each use of force identified, reported by the required officer(s), and justified?

- <u>Force Investigation</u> – did the investigating supervisor conduct required interviews, identify and respond to deficiencies appropriately?

The Monitoring Team assigned a "Satisfactory" rating to 11 of the 16 reports/investigations reviewed (63%). Generally speaking, the Monitoring Team found that these reports were clearly written, timely, and thorough. The investigating supervisors avoided the use of boilerplate or "pattern language," and did an admirable job of locating and interviewing not only the involved officers but also any non-FPD witnesses to the underlying incident. The resulting reports largely consisted of detailed accounts of the incident itself, the type of force used, officer efforts to de-escalate the situation to avoid or minimize the use of force, and the level of resistance encountered. In each instance, the supervisors correctly judged whether officer uses of force were within policy or deficient in some respects. Where deficiencies were identified, verbal counseling, training, or similar remediation was recommended and implemented.

Additional observations from the "Satisfactory" reports/investigations included:

- The level of force employed by FPD officers was objectively reasonable and proportional to the level of resistance.

- In most instances, where feasible to do so, FPD officers made efforts to de-escalate, stabilize, or slow down the incident.

- There were no instances of FPD officers using force on a restrained individual or as a retaliatory measure.

- On one occasion, a report was returned to the investigating supervisor for deficiencies. The Command Level review and revision of this report resulted in verbal counseling and remedial training for the involved officer. However, it is not clear whether the initial reporting supervisor was similarly counseled.

- In one instance, a supervisor investigated and approved a use-of-force incident in which he/she was an involved officer (but not the primary officer).

The following observations, while outside the scope of this audit, warrant mention and may become the subject of future audits and/or discussion with the Parties:

- There were a number of instances in which FPD officers directed discourteous and profane language at detainees ("trash talk") or engaged in similarly unprofessional communications in public places.

- Deficiencies in FPD officers' tactics or decision-making including an incident in which an officer conducted an otherwise reasonable takedown of a fleeing

shoplifting suspect but held the suspect down by putting his foot on the arrestee's back while another officer handcuffed the suspect.

- In two instances, the charge of Assault on a Police Officer against a subject resisting arrest appeared to be unsupported by the evidence or unjustified.

The Monitoring Team assigned an "Unsatisfactory" rating to five of the 16 reports/investigations reviewed. One report/investigation, while otherwise satisfactory, was completed and submitted two years after the underlying incident. The deficiencies observed in the remaining four "Unsatisfactory" reports/investigations included:

- A 2019 incident of Type 1 (vehicle pursuit) and Type 2 Force (ECW deployment) in which the Monitoring Team determined that FPD's response to an investigation of an alleged shoplifting incident was disproportionate to the offense. The subject was apprehended and 'tased' multiple times following a vehicle pursuit into a neighboring jurisdiction. The resulting report/investigation did not appear to have been approved at the District Command level, as FPD policy requires. Rather, the investigating supervisor notes in their report that a lieutenant from a neighboring department, who was present for the arrest, advised that the officers did not use excessive force.

- A 2019 incident of Type 2 Force (ECW deployment) in which the involved officer failed to provide a verbal warning prior to deploying a TASER to subdue a potential emotionally disturbed person. The subject did not appear to be posing a threat to the officer at the time of the deployment and the officer did not appear to attempt to deescalate the situation or calm the subject. The investigating supervisor concluded that the force employed was proper and justified but appears to have accepted the arresting officer's report narrative without reviewing the body-worn camera footage or interviewing the non-FPD witnesses at the scene.

- A 2019 incident of Type 2 Force (ECW deployment) involving two potentially problematic TASER deployments during FPD's response to an ongoing fight inside a retail establishment. One responding officer's verbally abusive conduct arguably escalated the incident. The investigating supervisor did not interview all of the involved officers and failed to identify and correct the deficiencies in FPD's response or in the arresting officer's narrative report which conflicted in key respects with the body worn camera footage.

- In the lone 2020 incident to warrant an "Unsatisfactory" rating, the investigating supervisor properly documented the primary officer's failure to activate their body worn camera and ultimately determined that the officer's contention that the arrestee engaged in "aggravated aggressive resistance" that justified delivery of forearm strikes to the arrestee's torso/face was unsupported by the evidence (due, in part, to the officer's failure to activate his/her camera). However, the supervisor did not escalate the policy violation for discipline or other corrective action.

## IV.    AUDIT PHASE TWO: METHODOLOGY, RESULTS, AND OBSERVATIONS

### A.  Audit Methodology

In Phase Two of the Use of Force Reporting & Investigation audit, the Monitoring Team assessed FPD's compliance with Consent Decree ¶173 which requires "all officers using force above unresisted handcuffing" to document the use of force in writing. To identify and evaluate whether the absence of use-of- reporting from a particular incident evidenced that force was *not employed* or that force was *employed but not reported*, the Monitoring Team requested that the City provide a list of all 2019 and 2020 FPD arrests for the following offenses:

- Assault on a Law Enforcement Officer;
- Assault 1st Degree Law Officer/Gun;
- Assault 2nd Degree Law Officer/Hands/Fists;
- Assault 3rd Degree Law Officer/Simple;
- Disorderly Conduct;
- Failure to Comply w/Order of a Police Officer;
- Resist/Interfering (F) w/Arrest;
- Resist/Interfering (M) w/Arrest;
- Resisting or Interfering with Arrest, Detention or Stop; and
- Unlawful Possession/Firearm Certain Persons

The Monitoring Team selected these offenses based on its judgment that, due to the nature of each offense, force may have been employed in effecting the arrest (even if unreported).  In response to the Monitoring Team's request, FPD reported that there were 107 incidents in which an individual was charged with one or more of the identified offenses, comprising 56 arrest/incident reports.[3] The Monitoring Team compared that list with FPD's use-of-force reporting data and excluded from review those incidents for which FPD reported and investigated the use-of-force. The Monitoring Team reviewed the remaining arrest/incident reports, including the narrative summaries of each incident, and identified 18 cases for which additional analysis of body camera footage and other materials was needed to determine whether force was actually employed but not reported.[4]

This audit phase also included a review of one additional incident. During Phase One, the Monitoring Team requested records related to a July 2020 Type 2 Force incident. In response, the City informed the Monitoring Team and DOJ that the incident had been categorized incorrectly and that it did not, in fact, involve reportable force. The Monitoring Team and the Parties reviewed the body-worn/in-car camera footage accompanying the incident and agreed that further review and discussion was warranted, the results of which are detailed below.

---

[3] Several individuals were charged with more than one of the specified offenses.

[4] In the initial report of its Phase One findings, the Monitoring Team identified 20 incidents warranting review in Phase Two. However, upon further examination of FPD's Use of Force Reporting data, the Monitoring Team determined that force was reported in two of the incidents earmarked for review. It is not clear why these incidents were not reflected in the initial compilation of Use of Force data the City provided in response to the Monitor's 2021 request for documents.

### B. *Results & Observations*

As described above, the Monitoring Team reviewed a number of reports stemming from FPD arrests for one of several enumerated offenses. From that review, the Monitoring Team selected 18 incidents that, based on the accompanying narrative, indicated that the arresting officer may have used force in effecting the arrest.

### 1. <u>Monitoring Team's Review of Selected Incidents</u>

The Monitoring Team began by reviewing the body-worn/in-car camera video footage and other available reports from each of the 18 selected incidents to determine whether the arresting officer employed force. In slightly less than half of these cases (eight of 18), the Monitoring Team observed that FPD officers did <u>not</u> use force and, as such, a report was not needed. Further, the Monitoring Team's review revealed that, in many instances, FPD officers exercised restraint and deescalated arrestees to avoid using force. The Monitoring Team commends FPD for those efforts.

Conversely, the Monitoring Team observed that, in the majority of the incidents under review (10 of 18), the arresting officer used force in effecting the arrest and failed to submit a Use of Force report as the Consent Decree and FPD policy require. In a number of these cases, the arresting officer's report included a narrative description of the force employed. However, neither the officers themselves nor the reviewing supervisors took the additional steps necessary to ensure accurate reporting and investigation of the force used. While some of the cases involved Type 3 Force, which do not require a supervisory investigation, the Monitoring Team's review revealed that most involved a degree of force for which an investigation was warranted. These incidents included a lengthy m/v pursuit reaching speeds over 90 miles/ hour and instances in which FPD officers deployed ECWs/tasers.

The following table illustrates the results of the Monitoring Team's review, revealing that FPD accurately reported force in less than half (**44%**) of the incidents reviewed.

| No Force Used – No Report Required | Force Used – No Report on File |
|---|---|
| 8 = 44% | 10 = 56% |

While technically outside the scope of Phase Two, the Monitoring Team also evaluated each incident of unreported force using Exhibit 1, the Use of Force Audit checklist. In reviewing the incidents and associated reports, the Monitoring Team observed that a number of reports included one or more of the following potentially problematic attributes:

- **Gaps in the narrative description of the use of force.** Reports that clearly articulated the arrestee's level of resistance and the officer's application of restraints but lacked similar depth in describing the officer's techniques or tactics used to gain compliance.

- **Conclusive language about the use of force.** Reports in which the arresting officer confirms the reasonableness of their own use of force or describes the force used as the minimal amount necessary to gain compliance.

- **Minimizing descriptions for typically dynamic techniques.** Reports in which an officer describes, for example, a forceful takedown of an arrestee as "guiding" the subject to the ground.

In some instances, the force used appeared excessive, retaliatory, and in direct contravention of the Consent Decree and FPD policy. The Monitoring Team found two of the eight incidents deficient in a number of other key respects:

- In one report, the officer's narrative summary stated that he "removed [the arrestee's] feet from the ground" and used a "controlled body slam" to "place" the arrestee on the ground.  The video evidence clearly shows a dynamic and forceful application of force by the arresting officer, the officer's profanity-laced tirade, and what appears to be an acknowledgement that the force used was retaliatory. The subject, initially detained for trespassing, was subsequently charged with Failure to Comply and Resisting Arrest.

- The second incident was even more troubling. In his incident report, the arresting officer described the arrestee as verbally and physically assaultive and concluded that he "used reasonable force to secure [the arrestee] in his car. While the video evidence confirms that the arrestee made verbal threats and addressed the officer in disrespectful and profane terms, it also shows the officer with his hands around the arrestee's neck and striking the arrestee about the head and face with both open hand and closed fists. In the Monitoring Team's view, the officer's response was disproportionate, excessive, and retaliatory.[5]

### 2.  <u>The Monitoring Team's Supplemental Review of July 2020 Incident</u>

During the audit's initial phase, the Monitoring Team received a list purporting to encompass those FPD incidents in which force was used, reported, and investigated. Among the enumerated cases was a July 2020 incident that FPD initially described as involving Type 2 Force. When the Monitoring Team was unable to locate the accompanying report and investigation, FPD notified the Monitoring Team that the incident was mistakenly included in the original list and that, based on its review, did not involve force. The Monitoring Team and the DOJ reached a different conclusion, based on their own independent reviews of the body-worn and in-car camera footage. The competing viewpoints prompted a series of discussions to ensure alignment in the Monitoring Team and the Parties' interpretation of the Consent Decree's requirements, specifically its definition of "reportable force." The Monitoring Team has had additional opportunities to confer with the Parties about this and other related matters and is confident that such agreement exists.

---

[5] Although no Use of Force Report was submitted, FPD reported the incident to federal authorities. The arresting officer was indicted on federal civil rights charges and ultimately pled guilty to filing a false police report.

## V.    CONCLUSION

As was the case following completion of the audit's initial phase, the Monitoring Team previewed its findings for the Parties prior to filing this report with the Court. FPD shared the Monitoring Team and DOJ's concerns about the high number of instances of unreported force particularly in that the absence of reporting reflects inattention by FPD's patrol supervisors. Additionally, FPD is aware that some of the selected incidents in this phase involve officers whose conduct the Monitoring Team assessed and rated as Unsatisfactory in the audit's first phase. FPD recognizes the need to develop and implement an Early Intervention System (CD ¶259) so that such conduct is identified and remediated in a timely manner. However, such a system is only as good as the supervisors who oversee it. Based on its post-audit conference with the Parties, the Monitoring Team is confident that FPD is working diligently to improve its internal reporting and accountability systems.  It should be noted that all but two of the incidents of unreported force detailed here occurred before 2020. The Monitoring Team will evaluate data from later years (2021-2022) in the next Use of Force audit, set to begin later this year, and looks forward to assisting FPD in achieving substantial compliance in this crucial area.

# Exhibit 1

## **USE OF FORCE AUDIT CHECKLIST**

**Report Number**: _____          **NA = Not Applicable**

**Monitoring Team Member:** _____          **Y = Yes**

**Date:** _____          **N = No**

**Satisfactory/Unsatisfactory** ☐Y / ☐N          **U = Unknown**

| Documentation | |
|---|---|
| 1.  Was BWC video of this UOF available? | ☐Y / ☐N |
| 2.  Was In-Car video of this UOF available? | ☐Y / ☐N |
| 3.  Is there a 911 recording available? | ☐Y / ☐N |
| 4.  Is the UOF report accurate and complete? | ☐Y / ☐N |
| 5.  Was the UOF report  submitted within the required timeframe? | ☐Y / ☐N |
| 6.  Was "pattern language" used in the primary or supplemental reports? | ☐Y / ☐N |
| 7.  Were witnesses listed in the report? | ☐Y / ☐N |
| De-Escalation | |
| 8.  Did the officer(s) provide a verbal warning prior to using force, as feasible? | ☐NA / ☐Y / ☐N / ☐U |
| 9.  Did the officer(s) slow down or attempt to stabilize the incident? | ☐NA / ☐Y / ☐N / ☐U |
| 10. Did the officer(s) use verbal techniques to calm an agitated person? | ☐NA / ☐Y / ☐N / ☐U |
| 11. Did the officer(s) call in additional resources to assist? | ☐NA / ☐Y / ☐N / ☐U |
| 12. Did the officer(s) attempt a range of tactics (distance, cover, and/or concealment)? | ☐NA / ☐Y / ☐N / ☐U |
| 13. Did the officer(s) use de-escalation techniques to minimize the UOF? | ☐NA / ☐Y / ☐N / ☐U |
| 14. Did the officer take any action that escalated the situation? | ☐NA / ☐Y / ☐N / ☐U |
| Force Response | |
| 15. Was the UOF objectively reasonable? | ☐NA / ☐Y / ☐N / ☐U |
| 16. Was the level of force proportional to the level of resistance? | ☐NA / ☐Y / ☐N / ☐U |
| 17. Did the officer(s) use an age-appropriate response? | ☐NA / ☐Y / ☐N / ☐U |

| | |
|---|---|
| 18. Did the officer identify himself/herself as soon as possible? | ☐NA / ☐Y / ☐N / ☐U |
| 19. Did the officer(s) allow the person to submit to arrest before force was used? | ☐NA / ☐Y / ☐N / ☐U |
| 20. Was force used on a restrained individual? | ☐NA / ☐Y / ☐N / ☐U |
| 21. Was force used as a retaliatory measure? | ☐NA / ☐Y / ☐N / ☐U |
| 22. If applicable, did any officer(s) act upon the "duty to intervene" when observing unreasonable force? | ☐NA / ☐Y / ☐N / ☐U |
| 23. Did the officer(s) provide immediate necessary medical assistance or summon medical assistance appropriately? | ☐NA / ☐Y / ☐N / ☐U |
| **Force Reporting** | |
| 24. Were other officers on the scene? | ☐Y / ☐N / ☐U |
| 25. Were civilian witnesses identified? | ☐Y / ☐N / ☐U |
| 26. Did each required officer submit a UOF report? | ☐Y / ☐N / ☐U |
| 27. Did the officer notify his or her supervisor? | ☐NA / ☐Y / ☐N / ☐U |
| 28. Was suspected unreasonable force reported to a supervisor? | ☐Y / ☐N / ☐U |
| 29. Was each use of force identified and justified? | ☐NA / ☐Y / ☐N / ☐U |
| **Force Investigation** | |
| 30. Was the reporting officer interviewed by the investigating supervisor | ☐Y / ☐N / ☐U |
| 31. Was the UOF Report returned for corrections | ☐NA / ☐Y / ☐N / ☐U |
| 32. Did the investigating supervisor recommend re-training? | ☐NA / ☐Y / ☐N / ☐U |
| 33. Did the investigating supervisor recommend discipline | ☐NA / ☐Y / ☐N / ☐U |
| 34. Was the force used correctly judged to be within policy? | ☐NA / ☐Y / ☐N / ☐U |
| 35. Was the force used judged to be outside of policy? | ☐NA / ☐Y / ☐N / ☐U |
| 36. Were witnesses interviewed by the investigator? | ☐NA / ☐Y / ☐N / ☐U |
| 37. Was the reporting officer carrying approved weapons? | ☐NA / ☐Y / ☐N / ☐U |

Reviewer's notes/comments:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____